DOUGLAS J. FARMER, CA Bar No. 139646
douglas.farmer@ogletree.com
BRIAN D. BERRY, CA Bar No. 229893
brian.berry@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Steuart Tower, Suite 1300
One Market Plaza
San Francisco, CA 94105
Telephone:     415.442.4810
Facsimile:     415.442.4870

KRISTIN S. HIGGINS (*Pro Hac Vice*)
kristin.higgins@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Preston Commons West
8117 Preston Road, Suite 500
Dallas, TX 75225
Telephone:  (214) 987-3800
Facsimile:  (214) 987-3927

Attorneys for Defendant
SOUTHWEST AIRLINES CO.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAYSON HUNTSMAN, on behalf of himself and all others similarly situated, | Case No. 4:19-cv-00083-PJH |
| Plaintiff, | **DEFENDANT SOUTHWEST AIRLINES CO.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |
| v. | |
| SOUTHWEST AIRLINES CO., | Date:            January 27, 2021 |
| Defendant. | Time:           9:00 a.m. |
| | Location:      Oakland Courthouse Courtroom 3, Third Floor Hon. Phyllis J. Hamilton |

## [REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED.]

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ...........................................................................................................1

II.     FACTUAL BACKGROUND ........................................................................................2

III.    LEGAL STANDARD ....................................................................................................3

IV.     ARGUMENT ................................................................................................................3

        A.      Plaintiff Fails to Show Commonality .............................................................3

                1.      Plaintiff's definition of "short term" military leave is not common .............5

                2.      CBA-specific employee control over schedules and leaves defeats
                        commonality ..................................................................................................6

                3.      CBA-specific rules for sick leave accrual defeat commonality ...................9

                4.      Plaintiff's other questions do not satisfy commonality ...............................10

        B.      Southwest's Res Judicata Defense Defeats Typicality ...........................................11

        C.      Plaintiff Is Inadequate to Represent Non-Pilots ......................................................13

        D.      Plaintiff Fails to Show Predominance ......................................................................14

                1.      Southwest's laches defense requires individual trials ................................15

                2.      Individual inquiries into military service dates predominate ......................18

                3.      Plaintiff's failure to provide a damages model defeats
                        predominance ..............................................................................................20

V.      CONCLUSION ...........................................................................................................22

DEFENDANT SOUTHWEST'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
    731 F.3d 952 (9th Cir. 2013) ............................................................................3

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) .................................................................................13, 14

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ........................................................................................3

*Case v. Judd*,
    No. 8:19-CV-607-T-33TGW, 2020 WL 440069 (M.D. Fla. Jan. 28, 2020) ..............................13

*Clarkson v. Alaska Airlines, Inc.*,
    No. 2:19-CV-0005-TOR, 2019 WL 2503957 (E.D. Wash. June 17, 2019),
    *motion to certify appeal denied*, 2019 WL 3773756 (E.D. Wash. Aug. 8, 2019) ....................10

*Clarkson v. Alaska Airlines, Inc.*,
    No. 2:19-CV-0005-TOR, 2020 WL 5899398 (E.D. Wash. Oct. 5, 2020) ..........................15, 16

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ........................................................................................21

*Corbin v. Sw. Airlines, Inc.*,
    2018 WL 4901155 (S.D. Tex. Oct. 9, 2018) ...............................................................15

*Couveau v. Am. Airlines, Inc.*,
    218 F.3d 1078 (9th Cir. 2000) ............................................................................15

*Danjaq LLC v. Sony Corp.*,
    263 F.3d 942 (9th Cir. 2001) .............................................................................15

*Dorris v. TXD Servs., LP*,
    753 F.3d 740 (8th Cir. 2014) ...............................................................................4

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) .........................................................................3, 13

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) ......................................................................................11

*Gruca v. U.S. Steel Corp.*
    495 F. 2d 1252 (1974) ...................................................................................16

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) .........................................................................17, 20

DEFENDANT SOUTHWEST'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

*Hoefert v. Am. Airlines, Inc.*,
    438 F. Supp. 2d 724 (N.D. Tex. 2020) ...................................................................4

*Holmberg v. Armbrecht*,
    327 U.S. 392 (1946) .......................................................................................15

*Int'l Union of Operating Eng'rs-Emp'rs Constr. Indus. Pension*, Welfare &
    *Training Tr. Funds v. Karr*,
    994 F.2d 1426 (9th Cir. 1993) ........................................................................12

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) ...........................................................................21

*Lopes v. Fremont Freewheelers*,
    No. C 07-6213 PJH, 2008 WL 3303970 (N.D. Cal. Aug. 7, 2008), *aff'd*, 362 F.
    App'x 874 (9th Cir. 2010) ...............................................................11, 12, 13

*Maher v. City of Chicago*,
    406 F. Supp. 2d 1006 (N.D. Ill. 2006)) ..............................................................15

*McLain v. Apodaca*,
    793 F.2d 1031 (9th Cir. 1986) ........................................................................12

*McPhail v. First Command Fin. Planning, Inc.*,
    247 F.R.D. 598 (S.D. Cal. 2007) ......................................................................14

*Nat'l Ass'n of Gov't Employees v. City Public Serv. Bd. of San Antonio*,
    40 F.3d 698 (5th Cir. 1994) .............................................................................15

*Navellier v. Sletten*,
    262 F.3d 923 (9th Cir. 2001) ......................................................................17, 20

*Opperman v. Kong Techs., Inc.*,
    No. 13-CV-00453-JST, 2017 WL 3149295 (N.D. Cal. July 25, 2017)......................21

*Owens v. Kaiser Found. Health Plan, Inc.*,
    244 F.3d 708 (9th Cir. 2001) ...........................................................................12

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) .............................................................................4

*Pickman v. Am. Exp. Co.*,
    No. C 11-05326 WHA, 2012 WL 258842 (N.D. Cal. Jan. 27, 2012) .......................13

*Rangel v. PLS Check Cashers of Cal., Inc.*,
    No. CV 16-6119 DMG (SSx), 2016 WL 6821788 (C.D. Cal. Nov. 16, 2016) ...........13

*Rogers v. City of San Antonio*,
    392 F.3d 758 (5th Cir. 2004) .............................................................................4

*RSI Corp. v. Int'l Bus. Machines Corp.*,
  No. 5:08-CV-3414, 2012 WL 3277136 (N.D. Cal. Aug. 9, 2012)............................17

*Sandoval v. Cty. of Sonoma*,
  912 F.3d 509 (9th Cir. 2018) ........................................................................11, 20

*Seiler v. Hollidaysburg Am. Legion Ambulance Serv., Inc.*,
  2011 WL 4017965 (W.D. Pa. Sept. 8, 2011) ...............................................15

*In re SFPP Right-of-Way Claims*,
  No. CV 15-07492 JVS, 2017 WL 2378363 (C.D. Cal. May 23, 2017) .....................16

*Stotz v. Mophie Inc.*,
  No. CV 16-8898-GW (FFMx), 2017 WL 11571083 (C.D. Cal. Dec. 14, 2017) ................14

*Strauss v. Angie's List, Inc.*,
  No. 2:17-CV-02560-HLT-TJJ, 2018 WL 5722561 (D. Kan. Nov. 1, 2018).............................15

*Sumrall v. Ensco Offshore Co.*,
  No. 2:17-CV-48-KS-MTP, 2018 WL 2088761 (S.D. Miss. May 7, 2018)................................15

*Tully v. Dep't of Justice*,
  481 F.3d 1367 (Fed. Cir. 2007) ....................................................................4

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ...............................................................................14

*Valenzuela v. Union Pac. R.R. Co.*,
  No. CV-15-01092-PHX-DGC, 2017 WL 679095 (D. Ariz. Feb. 21, 2017) .............................16

*W. Radio Servs. Co. v. Glickman*,
  123 F.3d 1189 (9th Cir. 1997) ......................................................................12

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ........................................................................3, 10, 11

*Ward v. Apple Inc.*,
  784 F. App'x 539 (9th Cir. 2019)....................................................................21

*Whittaker Corp. v. Execuair Corp.*,
  736 F.2d 1341 (9th Cir. 1984) .......................................................................17

## STATUTES

Uniformed Services Employment and Reemployment Rights Act (USERRA) ...................... *passim*

38 U.S.C. § 4312(a)(2) ............................................................................5

38 U.S.C. § 4316(b)........................................................................1, 4, 10, 12

38 U.S.C. § 4316(b)(1)(B)...........................................................................4

Fair Labor Standards Act.................................................................................................................13

**OTHER AUTHORITIES**

20 C.F.R.

　§ 1002.103 ..............................................................................................................................5

　§ 1002.150(a) .........................................................................................................................4

　§ 1002.150(b) ..............................................................................................................4, 6, 20

Fed. R. Civ. P.

　Rule 23.................................................................................................................................3, 13

　Rule 23(a) ........................................................................................................................11, 14

　Rule 23(a)(2) .................................................................................................................3, 10, 11

　Rule 23(a)(3) ........................................................................................................................16

　Rule 23(b)(3) ........................................................................................................................14

2 W. Rubenstein, Newberg on Class Actions § 4:50 (5th ed. 2012) ................................................14

Richard Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L.
　Rev. 97 (2009) .......................................................................................................................3

DEFENDANT SOUTHWEST'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

I.      **INTRODUCTION**

Plaintiff Jayson Huntsman asks this Court to certify a class of employees who took "short term" military leave from their employment with Defendant Southwest Airlines Co. ("Southwest") at any time since October 2004.  Plaintiff's theory is that Southwest should compensate for these military leaves of 14 days or fewer because Southwest compensates employees for sick leave, jury duty, and bereavement leave, which are allegedly "comparable" to "short term" military leave under the federal Uniformed Services Employment and Reemployment Rights Act (" USERRA"), 38 U.S.C. § 4316(b).

The Court should deny Plaintiff's request.  The term "short term" military leave is not defined, mentioned, or referenced in USERRA or the implementing regulations.  Nor is the definition of "short term" military leave uniform across workgroups or over time at Southwest.  Thus, the proposed class members are not similarly situated with respect to "short term" military leave, as Plaintiff has defined it.

In addition, the "comparability" question cannot be answered in a single stroke that fairly addresses employees who belong to 11 different unions that separately negotiated and renegotiated their members' employment conditions, including the terms governing their leaves of absence, over the last 16 years.  Putative class members are subject to CBA-specific rules governing their work schedules that affect whether and for how long they take leave in many instances, and these considerations materially affect the "comparability" analysis.  Further, Plaintiff's military service records diverge considerably from Southwest's military leave records for him, which demonstrates that individualized evidentiary issues affecting liability would predominate over any common questions at trial.  Plaintiff also fails to offer any plausible damages model in light of his attack on the reliability of Southwest's leave records and the military's service records.

Southwest's defenses undermine the value of Federal Rule of Civil Procedure ("Rule") 23's claim-aggregating device as well.  Southwest's laches defense will vary dramatically across the proposed class, depending on the amount of time that different proposed class members have slept on their rights and the time period for which Southwest has maintained leave records for each proposed class member, which varies across workgroups.  Also, Plaintiff is uniquely exposed to

1    Southwest's res judicata defense because he could have brought his claim in the previous class

2    action lawsuit that he filed, which alleged a claim under USERRA § 2316(b) that differs from the

3    current claim only in the "benefit" it seeks in relief.

4            Thus, the Court should deny Plaintiff's motion.

5    **II.        FACTUAL BACKGROUND**

6            Southwest is an airline that operates thousands of flights each day with service to over 100

7    domestic airports in 40 states and several international airports.  ECF 29-2 (Thorsen Decl. ¶ 4).

8    Southwest's commitment to its military employees is widely recognized.  The Pilots' union, the

9    Southwest Airlines Pilot Association ("SWAPA"), acknowledges Southwest's "long history of

10   strong support for pilots affiliated with the National Guard or reserve forces."  Declaration of Brian

11   D. Berry, Ex. E (Southard Dep. at 53:11–19, Ex. 5 (Military Handbook at p. 2)); *see also id.* at

12   83:5–85:17 (approximately 12 percent of Southwest Pilots are veterans).[1]  Given Southwest's track

13   record of support for military employees, it is "nominated year after year for being one of the best

14   companies to work for, for vets."  Ex. E (Southard Dep. at 83:5–85:17).

15           Although some Southwest employees are not subject to a union contract, the large majority

16   of Southwest's workforce is unionized.  Plaintiff's proposed class definition includes current and

17   former employees whose conditions of employment at Southwest were collectively bargained by

18   11 different labor unions.  ECF 78 (Mot. at 3–4).  Each of these labor unions and Southwest have

19   renegotiated their respective CBAs several times during the class period, which stretches back to

20   October 2004.  *E.g.*, Ex. I (Munguia Dep., Ex. 3 (summary of CBAs); Ex. E (Southard Dep. at

21   11:11–17, 22:9–24:9, Ex. 3 (three CBAs with Pilots' union)); Ex J (Ireland Dep. at 20:25–26:17,

22   Ex. 5 (three CBAs with Flight Instructors' union)); Ex. F (Rea Dep. at 21:11–23:3, Ex. 5 (three

23   CBAs with Flight Attendants' union)).

24           As Plaintiff observes, the CBAs do not include a right for employees to receive

25   compensation during periods of military leave, although employees can use accrued vacation, and

26   in some instances accrued sick leave pay, to receive compensation during periods of military leave.

27   _____

28   [1] All "Ex." cites with alphabetic exhibits herein (e.g., Ex. A, Ex. B, etc.) refer to the exhibits
     attached to the Declaration of Brian D. Berry, filed concurrently with this memorandum.

*See, e.g.*, Ex. E (Southard Dep. at 57:3–5); Ex. H (Jordan Dep. at 46:6–15); Ex. F (Rea Dep. at 79:12–25).  The CBAs allow employees to take paid sick leave to the extent that employees have accrued sick leave and experience a qualifying illness.  *See, e.g.*, Ex. E (Southard Dep. at 21:20–23:2, Ex. 2 (SWAPA CBA at pp. 12-1 to 12-5)); Ex. H (Jordan Dep. at 52:4–14, Ex. 9 (TWU 555 CBA at p. 40)).  The CBAs also allow employees to take paid jury duty leave and to take up to four days of paid bereavement leave in the event that an employee experiences the death of certain close family members.  *See, e.g.*, Ex. E (Southard Dep., Ex. 2 (SWAPA CBA at pp. 2-3, 12-1)); Ex. H (Jordan Dep., Ex. 9 (TWU 555 CBA at pp. 15, 53)).

As explained below, these superficial similarities provide insufficient support for Plaintiff's motion for class certification.

## III.    LEGAL STANDARD

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)).  To decide whether class treatment is appropriate, the Court conducts a "rigorous analysis" of the record to determine if Plaintiff has met his burden of establishing the elements of Rule 23.  *See Dukes*, 564 U.S. at 351.  In conducting its analysis, the Court evaluates the merits of Plaintiff's claims to the extent the merits "overlap" with the Rule 23 requirements.  *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011).

## IV.    ARGUMENT

### A.    Plaintiff Fails to Show Commonality

Rule 23 requires a showing that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  Merely reciting common questions and asserting violation of the same law are insufficient to show commonality "since any competently crafted class complaint literally raises common questions."  *Dukes*, 564 U.S. at 349 (quoting Richard Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131–32 (2009)) (internal quotation marks and alteration omitted).  Rather, commonality exists only where a plaintiff demonstrates the existence of at least one common answer to a "significant question" that is "apt to drive the

resolution of the litigation."  *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 963 (9th Cir. 2013).

"Courts determine commonality with reference to the nature of the underlying claims."  *Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014).

In this case, Plaintiff's USERRA claim turns on whether military leave is "comparable" to sick leave, jury duty leave, or bereavement leave as each type of leave was applied to each of the 11 different workgroups.  The implementing regulations for USERRA identify three non-exclusive factors that inform the comparison: (i) the duration of the leaves, (ii) the purpose of the leaves, and (iii) an employee's ability to choose when to take the leaves.  *See* 20 C.F.R. § 1002.150(b).  Whether two forms of leave are comparable depends generally on "the ***circumstances*** in which the benefits are provided" rather than any particular factor.  *Tully v. Dep't of Justice*, 481 F.3d 1367, 1369 (Fed. Cir. 2007) (emphasis added); 20 C.F.R. § 1002.150(b).  For instance, considering these comparative circumstances of leaves, the Northern District of Texas granted summary judgment in favor of American Airlines earlier this year, finding jury duty, vacation, and sick leave were not comparable to military leave.  *Hoefert v. Am. Airlines, Inc*., 438 F. Supp. 2d 724, 739–41 (N.D. Tex. 2020).

The fundamental "comparability" question is not amenable to a common answer because the proposed class members are not subject to any uniform policy governing their leaves of absence.  Rather, their leaves are governed by the terms of numerous CBAs that labor unions have negotiated and renegotiated with Southwest over the years.  *See supra* at § II.  The CBAs have materially different terms that prevent a common answer to the core question about whether military leave is "comparable" to sick leave, jury duty leave, or bereavement leave across CBAs and across work groups.  This is especially true because USERRA § 4316(b) specifically asks whether an employer "generally provides" a benefit to employees on non-military leaves who have a "***similar seniority, status, and pay***" as an employee on military leave.  38 U.S.C. § 4316(b)(1)(B) (emphasis added); 20 C.F.R. § 1002.150(a) (analysis conducted on "similarly situated" employees); *Rogers v. City of San Antonio*, 392 F.3d 758, 769 (5th Cir. 2004) (analysis conducted "in relation to peer employees"); *Dorris v. TXD Servs., LP*, 753 F.3d 740, 745 (8th Cir. 2014) (quoting *Rogers*).

DEFENDANT SOUTHWEST'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1

**1.      Plaintiff's definition of "short term" military leave is not common**

2

Plaintiff defines his class to include Southwest employees who took "short term" military

3

leaves, which Plaintiff artificially defines as a military leave that lasts "14 days or fewer."  Mot. at

4

2:14–19.  He does so in the hopes of satisfying the "duration" inquiry by ignoring one of the

5

fundamental attributes of military leave—that it often extends for months or even years—and

6

focusing instead only on those leaves that "fall somewhere between 1 and 14 days."  *See* Mot at

7

10:10–11.[2]

8

Setting aside the merits of Plaintiff's "comparability" contention, what matters here is that

9

no uniform definition of "short term" military leave exists across workgroups or throughout the

10

proposed class period.  In the Pilot CBA effective September 2012, SWAPA and Southwest agreed

11

to develop a "Joint SWA/SWAPA Flight Operations Military Handbook" ("Military Handbook")

12

that would provide "policy explanations and detailed instructions" for Pilots who serve in the

13

military.  Ex. E (Southard Dep., Ex. 2 (SWAPA CBA at p. 12-7)).  The Military Handbook was

14

published in November 2014.  Ex. E. (Souhthard Dep. at 53:7–54:7).  It explained that, at the time,

15

Southwest defined "short term" military leave as "service in the uniformed service for less than

16

***thirty-one (31) days***."  Ex. E (Southard Dep., Ex. 5 at p. 2 (Military Handbook § 2.b) (emphasis

17

added)).  The Military Handbook tied this definition to USERRA regulations related to the notice

18

requirement for reemployment after a period of more than 30 days of military leave, among other

19

things.  *Id.* at p. 9 (Military Handbook § 15.d (citing 20 C.F.R. § 1002.103)).

20

Southwest did not begin coding "short term" military leave as 14 days or fewer ***for Pilots***

21

until 2016.  Ex. E (Southard Dep. at 53:7–56:4).[3]  Thus, Plaintiff's definition of "short term"

22

23

---

24

[2] Plaintiff concedes that there is no difference between "short term" and "long term" military leave as a practical matter.  *See* Ex. A (Huntsman Dep. at 151:15–156:6).  Moreover, as USERRA

25

provides up to 5 years of cumulative military leave, there is no statutory basis to look at military leaves of only 14 days or fewer.  *See* 38 U.S.C. § 4312(a)(2).

26

[3] In November 2016, Southwest began using a separate code for pilots' military leaves of 14 days

27

or fewer in connection with a perfect attendance program, which is an administrative matter unrelated to the claim in this case.  Ex. E (Southard Dep. at 54:25–56:4).  For Flight Attendants, the

28

14-day demarcation is used to notify administrators that the employee can be removed from the bidding and scheduling process during the period.  Ex. F (Rea Dep. at 74:20–75:16).

1    military leave was not operative even for Pilots during the vast majority of the class period.  Nor is

2    Plaintiff's definition recognized across workgroups.  Some workgroups draw no distinction

3    between "short term" and "long term" military leave.  For instance, the leave of absence records for

4    Customer Sales & Support Representatives use a single code for military leaves of any duration,

5    and they make no distinction between short term and long term military leave.  Ex G (Taylor Dep.

6    at 29:21–30:22).  The same is true for Flight Instructors.  Ex. J (Ireland Dep 46:14–47:25).  By

7    contrast, the system for Dispatchers codes military leave over 30 days as extended military leave.

8    Ex. L (Hickl Dep. at 38:20–39:2).  At bottom, Plaintiff's definition of "short term military leave" is

9    not uniform across all proposed class members, which undermines the purported commonality of

10   their claims.

11                   **2.      CBA-specific employee control over schedules and leaves defeats**

12                   **commonality**

13           As noted above, USERRA's implementing regulations identify three non-exclusive factors to

14   consider for the "comparability" analysis, including an employee's ability to choose when to take the

15   leaves and the duration of the leaves.  *See* 20 C.F.R. § 1002.150(b).  An employee's ability to choose

16   when to take leaves and how many days of leave to take, however, varies between the 11 different

17   workgroups and their varied CBAs, and it even varies among members of the same workgroup.  This

18   further establishes the lack of commonality necessary to certify a class.

19           Southwest treats an employee's absence from work as a "leave" only if the absence

20   conflicts with the employee's work schedule.  *See, e.g.*, Ex. E (Southard Dep. at 103:6–18, 115:7–

21   18, 116:9–24).  As explained below, an employee's control over his work schedule translates into

22   control over whether to take certain leaves—for instance, by bidding or trading for a schedule that

23   does not conflict with the days he is unable to work.  It also translates into control over the duration

24   of certain leaves—for instance, by bidding or trading for a schedule that conflicts with only part of

25   the time that the employee is unable to work.  These core facts about the nature of a leave of absence

26   undermine any common resolution to the "comparability" question, because the level of control that

27   Southwest employees exercise over their work schedules varies substantially across work groups, and

28   it varies even among employees subject to the same CBA based on seniority and other factors.

For example, the Pilot CBA articulates an intricate scheduling process unique to Pilots.  Ex. E (Southard Dep., Ex. 2 (SWAPA CBA at pp. 5-1 to 9-4)); Ex. A (Huntsman Dep. at 56:25–58:14 ("I could literally speak hours about scheduling.")).  Each month, a Pilot bids on the schedule that he wants to fly in the following month.  *Id.*  Southwest awards a Pilot's bid according to a seniority-based system tied to the Pilot's hire date.  Ex. A (Huntsman Dep. at 59:25–60:5).  After a Pilot receives his monthly schedule, he can participate in a "free market" system of trading flights with other Pilots subject to various restrictions.  *Id.* at 61:17–63:4, 71:7–11.  As a result of these CBA-specific terms, Pilots have "a lot of different options" to exercise "flexibility" with their schedules.  *Id.* at 64:8–67:11.  Plaintiff concedes that the amount of control is "very, very different" for "each individual pilot."  *Id.*; *see also id.* at 66:22–25 ("if you were to do a zero to 100, one pilot may have the flexibility of a 1, and one may have a flexibility of 100"); *id.* at 76:7–21 ("Every single day changes with the pilot's scheduling, depending upon an individual pilot's goals."); *id.* at 63:8–67:7; 72:22–73:5; 86:16–87:11.  A Pilot can exercise control over whether to take certain leaves of absence and over the duration of those leaves, depending on various scheduling factors and the Pilot's goals.  For instance, a Pilot who has an upcoming two-day military service (or other known absence) can elect to bid or trade for a schedule that does or does not conflict, in whole or in part, with the military service.  *Id. at* 86:19–87:11.

Non-Pilot members of the proposed class who are subject to different CBAs have different—and often lower—levels of control over their schedules.  Unlike Pilots, who bid their schedules monthly, Dispatchers bid their schedules annually, and the Dispatchers' CBA dictates a repeating pattern of six days on, three days off, six days on, three days off, then six days off.  Ex. L (Hickl Dep. at 21:16–22:25, Ex. 3 (TWU 550 CBA at pp. 4-1 to 4-2, 4-6 to 4-12)).  Mechanics also bid on their schedules once per year, pursuant to the terms of two separate CBAs.  Ex. I (Munguia Dep. at 27:6–23, Ex. 4 (AMFA CBA at p. 20)).  Material Specialists bid their schedules semi-annually under yet another CBA.  Ex. I (Munguia Dep. at 32:25–33:16, Ex. 8 (IBT CBA at p.10)).[4]

---

[4] The CBAs covering these workgroups have specific provisions for handling shifts that are temporarily available because an employee is on a leave of absence.  Specifically, under the AMFA contracts, if an employee knows he will be on leave for more than 30 days, the employee's shift is put up for bid by other employees to work during the "vacancy."  Ex. I (Munguia Dep., Ex.

1    By comparison to Pilots, who bid their schedules monthly, these workgroups have limited

2    opportunity to bid for work schedules that do or do not conflict with upcoming absences from work

3    because their schedules are set much further in advance and are subject to other CBA-specific

4    scheduling rules.[5]

5           Even within the same CBA and the same workgroup there are significant differences when

6    it comes to how much flexibility employees have over their schedules.  For instance, a Pilot's

7    control over his schedule is highly dependent on his seniority.  Ex. A (Huntsman Dep. at 58:23–

8    60:5, 61:3–6, 65:11–66:5); Ex. E (Southard Dep, Ex. 2 (SWAPA CBA at pp. 3-1, 5-1 to 5-2)).

9    And other workgroups also use a seniority-based system for determining schedules.  *See, e.g.*, Ex. I

10   (Munguia Dep., Ex. 4 (AMFA CBA at p. 20)).  Thus, an employee's seniority within his

11   workgroup has a material effect on the employee's control over his schedule, including whether to

12   take certain leaves of absence and for how many days.  *See, e.g.*, Ex. E (Southard Dep. at 103:6–

13   18, 115:7–18, 116:9–24).

14          The "comparability" analysis is affected in other CBA-specific ways.  For instance, the

15   three CBAs governing Flight Attendants during the proposed class period required Flight

16   Attendants to "make every attempt to bid off, trade or give away pairings or training that conflict

17   with military service."  Ex. F (Rea Dep., Ex. 2 (2002 TWU 556 CBA at p. 63); *see also id.*, Ex. 3

18   (2008 TWU 556 CBA at p. 87), Ex. 4 (2013 TWU 556 CBA at p. 15-121)).  CBAs for other

19   workgroups do not include this requirement.  *See, e.g.*, Ex. E (Southard Dep., Ex. 2 (SWAPA CBA

20   at pp. 12-7 to 12-8)); Ex. H (Jordan Dep. at 27:4–20, Ex. 3 (IAM CBA at p.24)).  The Flight

21

22   _____

23   4 (AMFA CBA at p. 42). The IBT group bids the vacancy only if the leave is expected to last more
     than 60 days.  *Id.*, Ex. 8 (IBT CBA at pp. 24–25).

24   5 Customer Service & Support Representatives and Ground Operations Customer Service Agents
     are represented by the same union and share the same contract requiring bidding "at least five (5)
25   times per year."  Ex. H (Jordan Dep, Ex. 3 (IAM CBA at p. 8)).  Yet, their processes differ between
     and amongst these groups. Specifically, CS&S Representatives have an automated bidding process
26   every two months and Ground Operations Customer Service Agents bid on paper with some
     stations bidding schedules monthly and others bidding every two months.  Declaration of Michelle
27   Jordan ¶ 2.  For Ramp Agents, Operations Agents, Provisioning Agents, and Freight Agents, who
     are all subject to the same CBA, the frequency and specifics of their shift bids could vary by bid
28   location and station due to flight schedule changes.  *Id.* ¶ 3.

Attendants' contractual obligation to attempt to reduce or eliminate conflicts between their work schedules and any military service plainly informs the duration inquiry for Flight Attendants in a way that is specific and exclusive to that workgroup.

Given that employees have different levels of control over the frequency and duration of their leaves of absence, the "comparability" analysis cannot be conducted across workgroups or even within the same workgroup.

### 3. CBA-specific rules for sick leave accrual defeat commonality

Sick leave is one of form of leave alleged by Plaintiff to be comparable to military leave. However, there can be no common answer to the question of whether sick leave is comparable to military leave for all class members. Paid sick leave is an accrual-based benefit. An employee is entitled to take paid sick leave only to the extent the employee has accrued sick leave time during the employee's tenure with Southwest and meets the requirements for using the accrued sick leave. *E.g.*, Ex. E (Southard Dep., Ex. 2 (SWAPA CBA at pp. 12-1 to 12-2)); Ex. H (Jordan Dep., Ex. 3 (IAM CBA at p. 26)). Different CBAs have different accrual rates for paid sick leave and different caps on the amount of paid sick leave that an employee can accrue.

Pilots are paid on a "Trips for Pay" ("TFP") basis. Ex. E (Southard Dep. at 26:16–27:5). Each flight has a specific number of TFPs assigned to it, and a Pilot's seniority determines how much they get paid for each TFP. *Id.* For Pilots, sick leave accrues at a rate of 1 TFP for every 10 TFPs flown (i.e., a 10% accrual rate), and it is capped at 1,600 hours. Ex. E (Southard Dep. at 48:19–49:14; Ex. 2 (SWAPA CBA at p. 12-1)). Like Pilots, Flight Attendants are paid on a TFP basis and accrue sick leave at a 10% rate. Ex. F (Rea Dep. at 49:23–51:14, Ex. 4 (TWU 556 CBA at p. 16-123)). But their sick leave accrual is capped at 2,400 TFPs. *Id.*

By contrast, Flight Instructors, who are paid on an hourly basis, accrue sick leave at a rate of eight hours per calendar month of work. Ex. J (Ireland Dep. at 27:10 –28:3, Ex. 4 (TWU 557 CBA at p. 47)). The same accrual rate applies to several other workgroups. Ex. H (Jordan Dep., Ex. 4 (IAM CBA at p. 52), Ex. 9 (TWU 555 CBA at p. 40)). But the cap on sick leave accrual varies across these workgroups. For instance, the cap for Flight Instructors is 206 days (or roughly 1,650 hours at a regular 8-hour day rate). Ex. J (Ireland Dep., Ex. 4 (TWU 557 CBA at p. 47)).

1    The cap for Flight Simulator Technicians is now 2,000 hours, but a previous CBA in effect during

2    the proposed class period imposed a cap of 1,650 hours. Ex. K (Wheatley Dep. at 23:8–25, 26:3–

3    19, Ex. 2 (IBT CBA at p. 47), Ex. 5 (IBT CBA at p. 44)).  The cap for Ramp Agents, Provisioning

4    Agents, and Freight Agents is now 2,400 hours, but it was 1,650 hours under a CBA that was in

5    effect for several years of the proposed class period.  Ex. H (Jordan Dep., Ex. 8 (TWU 555 CBA at

6    p. 31), Ex. 9 (TWU 555 CBA at p. 40)).  The differing sick leave and accrual cap rules prevent a

7    common answer to the question of whether paid sick leave is comparable to military leave, because

8    CBA-specific rules affect the amount of time that any given employee can go out on sick leave.

### 4.    Plaintiff's other questions do not satisfy commonality

10   Apart from the "comparability" question, Plaintiff contends that four other questions satisfy

11   the commonalty requirement.  He is wrong about each.

12   According to Plaintiff, whether paid leave is one of the "rights and benefits" protected by

13   USERRA § 4316(b) is a "common" question.  Mot. at 9:7–12.  This question has no bearing on the

14   commonality analysis under Rule 23(a)(2).  It is a pure question of law that affects all employers

15   equally, and, as Plaintiff notes, the Court has already answered it by concluding that Plaintiff's

16   claim is cognizable under USERRA.[6]

17   Plaintiff says common questions exist about whether "Southwest has violated USERRA"

18   by (i) failing to provide proposed class members with the same right and benefits as employees

19   who take certain forms of paid leave, and by (ii) treating proposed class members less favorably

20   than other employees who take comparable leaves. Mot. at 9:2–5, 10:12–14.  These questions

21   simply parrot the statute; they do not establish commonality.  *See Dukes*, 564 U.S. at 349 ("Is that

22   an unlawful employment practice?  What remedies should we get?  Reciting these questions is not

23   sufficient to obtain class certification.")  Also, these two questions are derivative of the

24

25   _____

26   [6] Plaintiff observes that the District Court for the Eastern District of Washington has joined this
     Court in concluding that a paid-leave claim is cognizable under USERRA.  *See Clarkson v. Alaska
     Airlines, Inc.*, No. 2:19-CV-0005-TOR, 2019 WL 2503957 (E.D. Wash. June 17, 2019), *motion to*
27   *certify appeal denied*, 2019 WL 3773756 (E.D. Wash. Aug. 8, 2019).  Although Southwest is
     aware of no appeal of this issue to the Ninth Circuit, this issue is currently on appeal to the Third
28   Circuit and the Seventh Circuit.  *See* Exs. N, O.

1    "comparability" question and assume that this predicate question has a common answer.  But

2    because the "comparability" question cannot be answered on a common basis, there is no further

3    question to ask about whether Southwest deprived military employees of relevant rights and

4    benefits or treated them less favorably than employees on comparable forms of leave.

5        Finally, Plaintiff contends that Southwest's "good faith" defense satisfies commonality.

6    Mot. at 10:15–11:1.  This argument misapprehends the commonality requirement.  As the Supreme

7    Court has explained, "Commonality requires the plaintiff to demonstrate that the class members

8    "have suffered the same injury.'"  *Dukes*, 564 U.S. at 349–50 (quoting *Gen. Tel. Co. of Sw. v.*

9    *Falcon*, 457 U.S. 147, 157 (1982)).  Although Southwest disagrees with Plaintiff's presumption

10   that its good faith defense involves the same facts and evidence across workgroups,[7] what matters

11   here is that Plaintiff has failed to demonstrate that the core "comparability" question satisfies

12   commonality.  As such, he cannot make an end-run around Rule 23(a)(2) by invoking one of

13   Southwest's affirmative defenses without meeting his own burden.

14       **B.    Southwest's Res Judicata Defense Defeats Typicality**

15       The typicality inquiry under Rule 23(a) asks "whether other members have the same or

16   similar injury, whether the action is based on conduct which is not unique to the named plaintiffs,

17   and whether other class members have been injured by the same course of conduct."  *Sandoval v.*

18   *Cty. of Sonoma*, 912 F.3d 509, 518 (9th Cir. 2018).

19       Plaintiff is atypical of other proposed class members because he is uniquely exposed to

20   Southwest's res judicata defense.  *See* Ex. P (SWA Responses to Plaintiff's Second Set of

21   Interrogatories at pp. 5–7 (Interrogatory No. 5)).  As this Court explained in *Lopes v. Fremont*

22   *Freewheelers*, No. C 07-6213 PJH, 2008 WL 3303970, at *5 (N.D. Cal. Aug. 7, 2008) (Hamilton,

23

24   ───────────────────
     [7] For instance, Southwest's "good faith" defense for Pilots' claims turns on different facts and
25   evidence than its defense related to non-Pilots' claims.  Unlike other unions and workgroups,
     SWAPA and Pilots are subject to a unique, collectively bargained obligation to assist Southwest in
26   complying with USERRA.  Ex. E (Southard Dep., Ex. 2 (SWAPA CBA at p. 12-7 ("[Southwest] and
     [SWAPA] are jointly committed in the support of those who participate as members of the uniformed
27   services and recognize that it is the responsibility of all parties involved, including the pilots who
     serve in the military, to ensure compliance with applicable federal law.")))  Yet neither SWAPA nor
28   a single individual Pilot ever raised Plaintiff's paid-leave claim with Southwest or the Military
     Resolution Board at any point during the 16-year class period.  Ex. E (Southard Dep. 83:5-85:17).

1    J.), *aff'd*, 362 F. App'x 874 (9th Cir. 2010):

2          The doctrine of res judicata, or claim preclusion, "bars all grounds for recovery
           which could have been asserted, whether they were or not, in a prior suit between
3          the same parties . . . on the same cause of action." *McLain v. Apodaca*, 793 F.2d
           1031, 1033 (9th Cir. 1986). The doctrine is applicable whenever there is "(1) an
4          identity of claims, (2) a final judgment on the merits, and (3) identity or privity
           between the parties." *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th
5          Cir. 1997).

6    In assessing the first element, "the central criterion in determining whether there is an identity of

7    claims . . . is whether the two suits arise out of the same transactional nucleus of facts."  *Lopes*,

8    2008 WL 3303970, at *5 (quoting *Owens v. Kaiser Found. Health Plan, Inc*., 244 F.3d 708, 714

9    (9th Cir. 2001)); *see also Int'l Union of Operating Eng'rs-Emp'rs Constr. Indus. Pension*, *Welfare*

10   *& Training Tr. Funds v. Karr*, 994 F.2d 1426, 1429 (9th Cir. 1993) ("Whether two events arise

11   from the same transaction or series depends on whether they are related to the same set of facts and

12   whether they could conveniently be tried together.").

13          Plaintiff was the named representative in a class action against Southwest that he filed in

14   July 2017 ("*Huntsman I*").  As in this case ("*Huntsman II*"), the complaint in *Huntsman I* alleged

15   that short term military leave is "comparable" to other forms of leave under USERRA § 4316(b).

16   Ex. Q (*Huntsman I* Complaint ¶ 71).  The only difference between the section 4316(b) claim in

17   *Huntsman I* and the section 4316(b) claim in *Huntsman II* is the particular benefit sought in relief.

18   Indeed, the complaint in *Huntsman I* alleged, "Southwest has violated USERRA § 4316(b) by

19   ***failing to provide*** its Pilots who take short term military leave with any ***accrued paid sick leave***

20   while simultaneously providing accrued paid sick leave to Pilots who engage in . . . other

21   comparable types of leave."  Ex. Q (*Huntsman I* Complaint ¶ 71 (emphasis added)).  The complaint

22   in *Huntsman II* alleges, "Southwest has maintained a policy or practice of ***failing to pay employees***

23   their regular wages or salaries when they take short term military leave, while continuing to pay

24   employees their wages or salaries when they take other comparable forms of non-military leave

25   [such as accrued paid sick leave]."  ECF 1 (Complaint ¶ 49 (emphasis added)).

26          As Southwest will further demonstrate if this case proceeds to the summary judgment stage,

27   *Huntsman I* and *Huntsman II* arise from the same transactional nucleus of facts.[8]  Plaintiff

28

---

[8] The second and third elements of res judicata are clearly established as well.  Judge Donato

obviously could have sued for compensation for short term military leaves in *Huntsman I* while he was suing for sick-leave accrual, because the claims arise from the same leaves of absence and are predicated on the same "comparability" argument under USERRA § 2316(b).  He elected not to do so, instead filing this lawsuit the next business day after the notice of settlement issued to class members in *Huntsman I*.  Ex. A (Huntsman Dep. at 123:8–125:16); Berry Decl. ¶ 2 (class notice in *Huntsman I* issued on January 4, 2019); ECF 1 (*Huntsman II* complaint filed on January 7, 2019).  Thus, he faces a res judicata defense that renders him atypical of the class he wants to represent.  *See, e.g.*, *Lopes*, 2008 WL 3303970, at *5–6 (finding res judicata where first and second actions involved the same bicycle collision and subsequent prosecution for battery such that the claims in the second action were "either brought, or could have been brought, in the first [] action."); *Rangel v. PLS Check Cashers of Cal., Inc.*, No. CV 16-6119 DMG (SSx), 2016 WL 6821788, at *6 (C.D. Cal. Nov. 16, 2016) (holding res judicata barred plaintiff's claims for unpaid overtime and minimum wage under the Fair Labor Standards Act because she was a class member in earlier case asserting California Labor Code violations that was settled and dismissed); *Pickman v. Am. Exp. Co.*, No. C 11-05326 WHA, 2012 WL 258842, at *4 (N.D. Cal. Jan. 27, 2012) (holding res judicata barred Plaintiff's claims where she had twice sued based on identical facts: "All of plaintiff's claims arose from the same nucleus of facts—the practice of transferring customer service telephone calls to overseas call centers.")[9]

### C.   Plaintiff Is Inadequate to Represent Non-Pilots

The adequacy inquiry under Rule 23 asks whether the named plaintiffs will "fairly and adequately protect the interest" of the class." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625

---

entered final approval of the class settlement in *Huntsman I* in October 2019, and Southwest subsequently executed on the settlement by funding the sick leave banks of class members pursuant to the terms of the settlement.  Ex. R (Final Approval Order).  Also, the parties in *Huntsman I* and *Huntsman II* are the same.  In both actions, Plaintiff is Jayson Huntsman and Defendant is Southwest Airlines. Co.  *Compare* ECF 1, *with* Ex. Q.

[9] *See also Case v. Judd*, No. 8:19-CV-607-T-33TGW, 2020 WL 440069, at *7 (M.D. Fla. Jan. 28, 2020) (denying certification of USERRA class on typicality and other grounds, explaining "when a plaintiff seeks to represent a class of employees, the plaintiff fails to satisfy the typicality prong if his personal situation or choices give rise to defenses not available as an explanation for alleged discrimination of other class members.").

(1997).  Courts assess the "sharing of interest between representatives and absentees" and any conflicts of interest that exist with the named plaintiffs or counsel.  *Ellis*, 657 F.3d at 985.  Courts also consider unethical behavior in determining whether a party is adequate.  *Stotz v. Mophie Inc.*, No. CV 16-8898-GW (FFMx), 2017 WL 11571083, at *14–15 (C.D. Cal. Dec. 14, 2017).

Here, Plaintiff is not an adequate representative of the class he wants to represent.  He lacks any meaningful knowledge of the terms of the CBAs of non-Pilot workgroups or how their scheduling works.  He admits that he has no knowledge about how work schedules at Southwest are set for class members who worked as Flight Simulator Technicians, Customer Service Agents, Ramp Agents, Provisioning Agents, Freight Agents, Appearance Technicians, Material Specialists, or Dispatchers, and that his knowledge of how schedules are set for Flight Attendants, Flight Instructors, and Mechanics is limited.  Ex. A (Huntsman Dep. at 102:7–102:10).  He also admits that he is not familiar with terms of the various CBAs that govern the scheduling and leave provisions of non-Pilots, whether non-Pilot workgroups distinguish between "short term" and "long term" military leave, and whether other workgroups have a handbook similar to the Military Handbook for Pilots related to military leaves.  *Id.* at 105:23–106:7, 141:24–142:13.  Without a working knowledge of the facts that inform the claims of absent class members, Plaintiff is inadequate to represent their interests.  *See, e.g.*, *McPhail v. First Command Fin. Planning, Inc*., 247 F.R.D. 598, 612 (S.D. Cal. 2007) (finding class representative inadequate because representative had little knowledge of the underlying facts of the lawsuit, among other reasons).

### D.      Plaintiff Fails to Show Predominance

Predominance under Rule 23(b)(3) imposes a "far more demanding" standard than does commonality under Rule 23(a).  *Amchem*, 21 U.S. at 624.  When assessing predominance, a court must "give careful scrutiny to the relation between common and individual questions in a case."  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).  "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"  *Id.* (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, 196–97 (5th ed. 2012)).

### 1.    Southwest's laches defense requires individual trials

The doctrine of laches bars plaintiffs from sleeping on their rights, running up damages, and prejudicing a defendant.  In contrast to a statute of limitations, laches is not limited to the passage of time but rather is "a question of the inequity of permitting the claim to be enforced."  *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946).  To demonstrate laches, a defendant must prove "unreasonable delay by the plaintiff and prejudice to itself."  *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000) (citation omitted); *Nat'l Ass'n of Gov't Employees v. City Public Serv. Bd. of San Antonio*, 40 F.3d 698 (5th Cir. 1994) (affirming district court's determination that a defendant was prejudiced by a 12-year delay in filing suit because of the lack of accurate records and loss of witnesses testimony).

Courts recognize two types of prejudice caused by laches: evidentiary and economic.  *Danjaq LLC v. Sony Corp*., 263 F.3d 942, 955 (9th Cir. 2001); *Strauss v. Angie's List, Inc*., No. 2:17-CV-02560-HLT-TJJ, 2018 WL 5722561, at *10 (D. Kan. Nov. 1, 2018), *aff'd*, 951 F.3d 1263 (10th Cir. 2020) ("Evidentiary prejudice may be found in the case of lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died . . . .  Economic prejudice may arise where a defendant . . . will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." (internal quotation marks and citations omitted)).  "The doctrine [of laches] is applied on a sliding scale: the longer the delay, the less the prejudice that must be shown."  *Maher v. City of Chicago*, 406 F. Supp. 2d 1006, 1031 (N.D. Ill. 2006), *aff'd*, 547 F.3d 817 (7th Cir. 2008).

It is well settled that laches is an affirmative defense to USERRA claims.  *Clarkson v. Alaska Airlines, Inc.*, No. 2:19-CV-0005-TOR, 2020 WL 5899398, at *3–4 (E.D. Wash. Oct. 5, 2020) (collecting cases); *Corbin v. Sw. Airlines, Inc*., 2018 WL 4901155, at *10 (S.D. Tex. Oct. 9, 2018) (laches defense applied to bar claims where plaintiff delayed bring suit for ten years).[10]

---

[10] *See also Seiler v. Hollidaysburg Am. Legion Ambulance Serv., Inc*., 2011 WL 4017965, at *8 (W.D. Pa. Sept. 8, 2011) (finding that laches is the only method for a defendant to challenge stale USERRA claims); *Sumrall v. Ensco Offshore Co.*, No. 2:17-CV-48-KS-MTP, 2018 WL 2088761, at *8 (S.D. Miss. May 7, 2018) ("[C]ourts have permitted the affirmative defense of laches to prevent injustice.").

Courts have held that lengthy delays between discovering a right and filing suit under USERRA are unreasonable. *Maher*, 547 F.3d at 822–23 (11-year delay under USERA predecessor was unreasonable); *Gruca v. U.S. Steel Corp.* 495 F. 2d 1252, 1259–60 (1974) (8-year delay unreasonable).

A notice-based defense like laches creates individualized inquiries by its very nature. *Valenzuela v. Union Pac. R.R. Co.*, No. CV-15-01092-PHX-DGC, 2017 WL 679095, at *14 (D. Ariz. Feb. 21, 2017), *vacated in part* (Mar. 3, 2017), *opinion reinstated*, 2017 WL 1398593 (D. Ariz. Apr. 19, 2017). In the class action context, courts repeatedly have held that laches requires a fact-specific inquiry that entails individualized examinations into when a plaintiff or putative class member had notice that his or her rights were purportedly violated. *Valenzuela*, 2017 WL 679095, at *14; *In re SFPP Right-of-Way Claims*, No. CV 15-07492 JVS (DFMx), 2017 WL 2378363, at *17–18 (C.D. Cal. May 23, 2017) (denying class certification and finding that "the existence of numerous individual defenses [including laches] overwhelm Plaintiffs' theories."); *see also Clarkson,* 2020 WL 5899398, at *3–4 (denying pilots' summary judgment motion on defense of laches and noting that "the application of laches is fact-specific"). Here, highly individualized issues related to notice exist, including when each class member learned of Southwest's leave policies, when each class member learned of his or her putative right to receive paid military leave based on Southwest's treatment of allegedly comparable leaves, and how long each class member slept on his or her rights. *See Valenzuela*, 2017 WL 679095, at *14; *SFPP Right-of-Way*, 2017 WL 2378363, at *17–18; *cf. Clarkson,* 2020 WL 5899398, at *3–4.

The evidentiary prejudice to Southwest will vary across workgroups and time periods, primarily due to the numerous and varied systems of record that have been used company-wide to record leaves of absence. For different workgroups, this includes a variety of database programs like Kronos, SAP, Crew Scheduling System, and Aspect Workforce Management, along with manual spreadsheets. Ex. M (Nelson Dep. at 52:15–55:23); Ex. G (Taylor Dep. at 23:13–25:3, 26:11–28:19); Ex. J (Ireland Dep. at 41:11–42:14); Ex. E (Southard Dep. at 94:16–95:22). For instance, Southwest's leave records for Pilots date back to December 2007, while the leave records for Dispatchers date back to only 2012. Ex. E (Southard Dep. at 94:16–100:23); Ex. L (Hickl Dep

at 33:21–36:12).[11]  Without available records, Southwest will suffer evidentiary prejudice defending against claims that employees took military leaves during one of the periods for which records no longer exist.  These periods differ among proposed class members, further demonstrating that common questions do not predominate.  *Id.*  Also, as Plaintiff's deposition demonstrates, each proposed class member would need to rummage through his or her old text messages, photos, emails, and calendars to demonstrate liability as to any particular date of military leave, even where Southwest's records are intact.  *See infra* at § IV.D.2.  This is not only prejudicial to Southwest but is also precisely the opposite of the common proof required to try a class case.

Southwest would also suffer economic prejudice to varying degrees depending on how long the proposed class members slept on their rights.  Indeed, Plaintiff's proposed class seeks compensation for military leaves dating back over 16 years, plus liquidated damages and pre-judgment interest.  ECF 1 (Complaint pp. 13–14). The amount of economic prejudice would vary substantially across proposed class members because, for instance, a Pilot who first took military leave in October 2004 is not similarly situated to a Pilot who first took military leave last year.  *See Whittaker Corp. v. Execuair Corp.*, 736 F.2d 1341, 1347 (9th Cir. 1984) ("[Defendant] was prejudiced because it continued engaging in its existing practices, incurring additional potential liability by reason of [Plaintiff]'s failure to take prompt action."); *RSI Corp. v. Int'l Bus. Machines Corp.*, No. 5:08-CV-3414, 2012 WL 3277136, at *15 (N.D. Cal. Aug. 9, 2012) ("[T]hat a defendant continues to engage in its existing practices, thus incurring additional potential liability as a result of the plaintiff's delay, may also demonstrate prejudice.")

Finally, Southwest's laches defense to Plaintiff's individual claim is unique.  Plaintiff's delay in bringing his claim is especially unreasonable because he intentionally slept on his rights during the pendency of his prior lawsuit *Huntsman I*.  *See* Ex. A (Huntsman Dep. at 119:4–121:15, 125:5–23); *see also supra* at § IV.B. Thus, in addition to creating intractable individual issues among class members, Southwest's laches defense also renders Plaintiff an atypical member of his

---

[11] Also, given Southwest's laches defense, Plaintiff is atypical of Pilots and non-Pilots whose leave records no longer exist.  *See* Fed. R. Civ. P 23(a)(3).

proposed class.  *See Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001) (affirming denial of class certification on typicality grounds where plaintiff was "subject to unique defenses"); *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992) (same where "[Plaintiff]'s unique background and factual situation require him to prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class.")

### 2.    Individual inquiries into military service dates predominate

Plaintiff routinely took military leave from Southwest on dates that are not reflected in the military's records.  *See* Ex. A (Huntsman Dep. at 212:6–214:11, 215:18–216:14, Ex. 6).  In 2017 and 2018 alone, Plaintiff took nine separate military leaves from Southwest, totaling 14 days of leave, that do not appear in his military service records.[12]  Yet, Plaintiff claims that he was injured by Southwest's practice of failing to compensate him for those days because he was performing military service, and he seeks payment for those days despite the military having no records to verify his service on those days.  ECF 1 (Complaint ¶¶ 5, 42-43, 51-52, Prayer at ¶ E); Ex. C at Rows 83–106).

In his written discovery responses and at his deposition, Plaintiff tried to prove that he actually performed military service on the days included in Southwest's leave records but that were not reflected in the Air Force's service records for him.[13]  According to Plaintiff, Southwest's leave records ***and the Air Force's service records*** are unreliable.  Specifically, he testified that his

---

[12] Plaintiff took military leave from Southwest on the following 14 days that do not appear in either his military "PCARS" (Point Credit Summary Inquiry) record of dates of service or the military records from Travis Air Force Base where he served: 1/6/17–1/8/17 (3 days), 6/2/17 (1 day), 6/12/17 (1 day), 7/5/17 (1 day), 5/18/18 (1 day), 5/22/18–5/23/18 (2 days), 7/11/18–7/13/18 (3 days) , 8/24/18 (1 day), and 8/31/18 (1 day).  *See* Ex. A (Huntsman Dep. at 208:3–19, 212:6–214:11, 215:18–216:14); Ex. B at P00009–15; Ex. C); Declaration of John Freed ("Freed Decl.") ¶¶ 2-3, Exs. 1, 2; Declaration of Nikki Southard ("Southard Decl.") ¶ 3.

[13] Plaintiff is apparently attempting to preemptively rebut an inference that he took military leaves from Southwest when he was not performing military service in order to take advantage of the scheduling rules of pilots.  When a pilot has a leave that conflicts with his schedule, those flights are removed or "dropped" from his schedule and he becomes eligible to bid on other flights, including flights at premium pay that he could not fly previously.  Ex. A (Huntsman Dep. 80:15-87:11).  Thus, there is a financial incentive for a Pilot to claim he is on military leave when he might not actually be performing military service.

"PCARS" military service record is both over-inclusive (*i.e.*, it includes dates when he did not perform military service) and under-inclusive (*i.e.*, it excludes dates when he did perform military service). Ex. A (Huntsman Dep. at 218:14–23). He also testified repeatedly that Southwest's military leave records are "flawed" and "inaccurate." *Id.* at 237:21–238:1, 257:15–25, 259:18–22; Ex. C (Column I).

In the absence of reliable records of his military service dates, Plaintiff claims a handful of emails, texts, and iPhone photos that he produced might support an inference that he performed military service on the days missing from his military records. *See* Ex. B at P00018–30, Ex. C (Column I); Ex. A (Huntsman Dep. at 236:24–237:8 ("[E]ach one of my answers is my best guess as to what – why there's a discrepancy, but I cannot factually state on any of these whether or not I performed duty on that particular day."); *id.* at 212:6–214:11, 215:18–216:14, 230:21–231:10, Ex. 6); Ex. D (Huntsman Verified Responses to Interrogatories at pp. 6–8 (Response Nos. 4, 5)).

Plaintiff's effort to explain away the discrepancies between Southwest's data and the Air Force's data is counter-productive but telling. It demonstrates that individualized inquiries are needed to assess the reliability of various documents, and to evaluate credibility, on issues that lie at the heart of each class member's case. For instance, Plaintiff's verified discovery responses state that a photo of a hard-copy schedule posted on a wall at Travis Air Force Base shows that he was physically present at Travis Air Force Base performing military service on November 22, 2016. Ex. C at Row 82; Ex. B at P000022 ("photo supported on base"). But at his deposition he admitted that colleagues at Travis Air Force Base have sent him photos of schedules posted at the base on previous occasions, and it is "most certainly a possibility" that a colleague, not Plaintiff, took the November 22 photo. Ex. A (Huntsman Dep at 272:8–273:13). Similarly, he stated in his verified discovery responses that an image of a text message shows that he performed military duty on July 5, 2017. Ex. C at Row 92 ("Security Clearance Photo supported."); Ex. D at pp. 6-7 (Response to Interrogatory No. 4); Ex. S at pp. 7-9 (Response to Request No. 3). But he conceded at his deposition that the image was taken on July 5, 20*18*, one year later. Ex. A (Huntsman Dep.

at 290:9–293:20, Ex. 5 at P000024).

Similarly, the reliability of the time and date stamps on the photos is dubious.  For instance, Plaintiff relies on a "Travis Afb" location stamp on one photo to prove his location on November 22, 2016, but that location stamp is missing from a photo he took with the same phone a few months earlier at Travis Air Force Base.  *Compare* Ex. A (Huntsman Dep., Ex. 5 at P000022 ("Travis Afb" location stamp), *with* Ex. B at P000021 (no location stamp), Ex. A (Huntsman Dep. at 267:17–269:20).  ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████

These kinds of evidentiary issues would predominate at trial because they inform the "comparability" question, which goes to the heart of whether Southwest is liable to class members. Indeed, the evidence strongly suggests Plaintiff has taken a substantial number of military leaves without actually performing service in the military.  *See* Ex. A (Huntsman Dep. 208:3–19, 212:6– 214:11, 215:18–216:14, Ex. 5 at P00009–15, Ex. 6); Freed Decl. ¶¶ 2-3, Exs. 1, 2; Southard Decl. ¶ 3.  This materially affects the ability to resolve, on a representative basis, the question of the duration of military leaves, and the question of whether the employee has control over when to take military leaves.  *See* 20 C.F.R. § 1002.150(b).  Thus, Plaintiff is incorrect that "the same facts would likely be used to resolve the comparability analysis" for proposed class members other than Plaintiff.  *See* Mot. at 14:27–15:2.  And, to the extent Plaintiff argues that the dispute over his military service dates would not predominate because these facts are unique to him, the Court should conclude that he is atypical of the class and deny certification for that reason as well.  *See Sandoval*, 912 F.3d at 518 (typicality asks "whether the action is based on conduct which is not unique to the named plaintiffs"); *Navellier*, 262 F.3d at 941; *Hanon*, 976 F.2d at 508.

### 3. Plaintiff's failure to provide a damages model defeats predominance

Plaintiff asserts in conclusory fashion that the damages for the proposed class could be

1  calculated on a classwide basis "by examining data reflecting each Class Member's periods of

2  short term military leave during the Class period and determining what wages they would have

3  received had they continued working during such leave." Mot. at 15:8–10. But Plaintiff cannot

4  have it both ways. He cannot testify repeatedly that military leave records provided by Southwest

5  and the military's service records are "inaccurate" and "flawed" when he wants to avoid an

6  inference that is damaging to him, and then assert that the same records are reliable for purposes of

7  calculating damages. *See* Ex. A (Huntsman Dep. at 237:21–238:1, 257:15–25, 259:18–22; *see also*

8  *id.* at Ex. 5 at P00031 (Column I)). Given his testimony that there are no accurate records of his

9  military service, Plaintiff has not identified any way to "examin[e] data" for each class member's

10  military leave that would allow damages to be reliably tied to Southwest's conduct.

11        Contrary to Plaintiff's assertion, this case is unlike *Leyva v. Medline Indus. Inc.*, 716 F.3d

12  510 (9th Cir. 2013). *See* Mot. at 15:4–10. In *Leyva*, a wage-and-hour case, the Court concluded

13  that the employer's "computerized payroll and time-keeping database would enable the court to

14  accurately calculate damages and related penalties for each claim." *Id.* at 514. Those facts are absent

15  here. In 2017 and 2018 alone, Southwest's records show 14 days of military leave that Plaintiff

16  apparently was not actually performing military service. *See supra* at § V.D.II, fn. 12. Plainly, he

17  should not recover any damages for those days even if he were to prevail at the liability stage.

18        This case is akin to *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) and its progeny, in

19  which courts have denied certification not because damages are individualized, but because the

20  plaintiffs failed to show that "damages stemmed from the defendant's actions that created the legal

21  liability." *Leyva*, 716 F.3d at 514 (citing *Comcast*, 569 U.S. at 38). Plaintiff makes no meaningful

22  effort to explain how he might compute damages on a classwide basis consistent with *Comcast*.

23  Instead, he promises that damages "will largely be determined by Southwest's data productions in

24  this case." Mot. at 15:12–13. That is not enough, especially when he attacks the reliability of

25  those very records. *See Ward v. Apple Inc.*, 784 F. App'x 539, 540–41 (9th Cir. 2019) ("The

26  plaintiffs here have done even less than the *Comcast* plaintiffs: Instead of providing an imperfect

27  model, they have provided only a promise of a model to come."); *Opperman v. Kong Techs., Inc.*,

28  No. 13-CV-00453-JST, 2017 WL 3149295, at *10–12 (N.D. Cal. July 25, 2017) (finding expert's

1  "assurance that he c[ould] build a model to calculate damages" inadequate).  For this reason, too,

2  the Court should deny Plaintiff's motion to certify a class.

3  **V.      CONCLUSION**

4          The Court should not certify a class.  The "comparability" analysis will not only vary across

5  CBAs and workgroups based on CBA-specific levels of control that employees exercise over the

6  frequency and length of their leaves of absences, but it will also vary among class members in the

7  same workgroup.  Plaintiff also faces unique defenses that render his individual case atypical of the

8  class.  Finally, any common questions would be overwhelmed by individual questions related to

9  each employee's military leave records, when they were on notice of their claims, and the amount

10  of time that they slept on their rights.  Thus, the Court should deny Plaintiff's motion to certify a

11  class.

12  DATED: December 2, 2020                    OGLETREE, DEAKINS, NASH, SMOAK &
                                               STEWART, P.C.
13

14

15                                             By: */s/ Brian D. Berry*
                                                   DOUGLAS J. FARMER
16                                                 BRIAN D. BERRY

17                                                 Attorneys for Defendant
                                                   SOUTHWEST AIRLINES CO.
18

19                                                                               45163478.1

20

21

22

23

24

25

26

27

28