[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED.]

Exhibit A

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3

4

5     JAYSON HUNTSMAN, on behalf  )

      of himself and all others   )

6     similarly situated,         )

                                  )

7              Plaintiff,         )

                                  )

8     vs.                         ) Case No. 4:19-cv-00081-PJH

                                  )

9     SOUTHWEST AIRLINES CO.,     )

                                  )

10             Defendants.        )

                                  )

11

12

13

14                      CONFIDENTIAL

15

16        REMOTE DEPOSITION OF JAYSON HUNTSMAN

17              Monday, November 16, 2020

18

19

20

21

22

23     Reported Remotely and Stenographically by:

24     JANIS JENNINGS, CSR No. 3942, CLR, CCRR

25     Job No. 4332564

                                          Page 1

CONFIDENTIAL

```
 1

 2

 3

 4

 5

 6

 7                 REMOTE DEPOSITION OF JAYSON HUNTSMAN, located

 8         in Las Vegas, Nevada, taken on behalf of the Defendants,

 9         beginning at 8:06 a.m., on Monday, November 16, 2020,

10         sworn in by Janis Jennings, Certified Shorthand Reporter

11         No. 3942, CLR, CCRR.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page  2

CONFIDENTIAL

1      REMOTE APPEARANCES:

2

3         ON BEHALF OF PLAINTIFF:

4              OUTTEN AND GOLDEN LLP

5              BY:  MICHAEL SCIMONE, ESQ.

6                   MICHAEL DANNA, ESQ.

7              685 3rd Avenue

8              25th Floor

9              New York, New York  10017

10             mscimone@outtengolden.com

11             mdanna@outtengolden.com

12

13             THOMAS G. JARRARD, ESQ.

14             1020 North Washington Street

15             Spokane, Washington  99201

16             425.239.7290

17             tjarrard@att.net

18

19

20

21

22

23

24

25

                                    Page 3

```
 1      APPEARANCES:

 2

 3          ON BEHALF OF DEFENDANT:

 4                 OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

 5                 BY:  BRIAN D. BERRY, ESQ.

 6                      KRISTIN S. HIGGINS, ESQ.

 7                 Steuart Tower, Suite 1300

 8                 One Market Plaza

 9                 San Francisco, California  94105

10                 415.442.4810

11                 brian.berry@ogletree.com

12                 kristin.higgins@ogletree.com

13

14          ALSO REMOTELY PRESENT:

15                 CHRIS MABERRY, ESQ., Southwest Airlines

16                 BROOK PATTERSON, Southwest Airlines

17                 GREGG EISMAN, Videographer

18

19

20

21

22

23

24

25

                                              Page  4
```

1     multiple people from management at the military

2     resolution boards and also the Employee Relations

3     complaints that I spoke directly to, including, I

4     believe, Captain Dave Retnam.  Captain Alan Kasher

5     was there.  Those were for the military resolution

6     boards.

7             There's been several other individuals, but

8     as my defined role as a Oakland representative, my

9     initial contact would be Captain Dave Eggers.

10            MR. BERRY:  Okay.  Can we take a five-minute

11    break?  I just want to fill up coffee, get some

12    water, let you stretch your -- stretch as well.

13    Again, Jayson -- Mr. Huntsman, do let us know if

14    your back is bothering you at anytime.

15            THE WITNESS:  I am feeling great right now.

16    Thank you for -- thank you for clarifying.

17            MR. BERRY:  Okay.  Let's take five minutes.

18    Thanks.

19            THE VIDEOGRAPHER:  Off the record at

20    9:11 a.m.

21            (Off the record.)

22            THE VIDEOGRAPHER:  Back on the record at

23    9:21 a.m. Pacific Time.

24    BY MR. BERRY:

25        Q.   Mr. Huntsman, I want to talk for a bit about

Veritext Legal Solutions
866 299-5127

1    scheduling.   How is a pilot's schedule set?

2             MR. SCIMONE:   Objection.

3    BY MR. BERRY:

4        Q.    And by "schedule," I mean work schedule.

5    How is your work schedule set at Southwest Airlines?

6        A.    I can -- I will try to give you a -- in

7    general.   I could literally speak hours about

8    scheduling.   In general, a bid is put out for early

9    in the month, so that closes -- the initial bid

10   closes initially, I believe, on the 9th of the

11   month, and that would be for the initial bid.

12            A secondary bid for what would be called "a

13   blank line is" held later in the month, and that

14   closes, I believe, on the 19th of the month.

15            In between both of those segments you have

16   what's called "trip trade giveaway."   That's another

17   way that pilots pick up or try to give away work.

18   That opens on different days, depending upon the

19   earlier lines that I've spoke of.   It also could be

20   affected if you have training that month.   You could

21   have a lock on your board which could change your

22   dates for trade.   And it can also be affected by

23   other things, such as your vacation lines,

24   et cetera.

25            But, in general, pilots will bid a line, and

Page 57

1   then they will use -- historically, they will wait

2   until the 25th of the month to do what's called

3   "enhance line improvement trip trade," which they

4   would normally set their final schedules.   And when

5   I say "final," I will caveat that with schedules

6   change day to day, depending upon different

7   techniques that pilots use.

8           They may be looking for a quality of life.

9   They may be looking for maximum pay.   Or something

10  in their personal life may change, and they want to

11  alter their schedule that way.   So I know that's a

12  lot, but that's -- I could dive down much deeper,

13  because there are many, many different ways to set

14  your schedule for flying.

15      Q.   Thanks for the overview, and I'll take you

16  up on the two-hour version of it another time.   We

17  won't have the opportunity to do that today, but I

18  would like to -- to discuss some of these elements.

19          So let's start with the initial bid.   So is

20  it right that you bid for flying in a month one

21  month in advance?

22      A.   That is correct.

23      Q.   Okay.   And you bid on -- is it called a --

24  is it called "a line"?   Is that one month's worth of

25  flights?

CONFIDENTIAL

1     A.   That is correct.

2     Q.   And a line consists of various pairings; is

3  that right?

4     A.   That is also correct.

5     Q.   And pairings consist of different

6  consecutive flights?

7     A.   Anywhere from one to four days.  Sometimes

8  there can be greater ones with overlap, but that's

9  really not applicable.

10     Q.   Okay.  And so when you're looking at lines a

11  month in advance -- so let's say we're -- we're now

12  in November, so you recently, I would think,

13  submitted your bid for December; is that right?

14     A.   That is -- today is the 16th?  Yes, I -- I

15  submitted my bid for December on the 9th of the

16  month, because I chose not to bid a blank line this

17  month.

18     Q.   And so when you bid that line, you can see

19  the days that you will be flying; is that right?

20     A.   Once the line is awarded, you can see your

21  initial bid.  I'll caveat that with the fact that

22  pilots -- a lot of pilots will bid certain pairings

23  not planning on flying those pairings.  But, yes,

24  you can see your initial bid.

25     Q.   And how does -- how does Southwest determine

Page 59

1   who gets what line that they bid for?

2       A.   The lines are awarded on a seniority basis

3   per domicile and crew -- and seat position.

4       Q.   Okay.  And how is seniority determined?

5       A.   Date of hire.

6       Q.   And so the longer you've been with the

7   company, the more likely you are to get the line

8   that you've requested?

9       A.   No.  That's not true.  It's kind of -- I'll

10  use -- the saying that would best explain it would

11  be "one person's trash is another person's

12  treasure."  To give you a brief example of that,

13  some pilots enjoy flying AMs pairings, which

14  predominantly our pairings are all either AMs or

15  PMs.  Some pilots prefer to fly at night.  Other

16  pilots want weekends.  Others want weekdays.  It can

17  have anything from a child custody agreement to

18  outside obligations.  And many of our pilots

19  actually have outside businesses or interests or

20  even attorneys, and they're bidding around their

21  particular work schedule.

22          So if you're asking if seniority helps you

23  secure the exact line you want, I would say that's

24  very true.  That said, you may be the senior person

25  in the domicile, and what others consider the least

Page 60

1  desirable line for that month may be your first

2  selection.

3      Q.   To the extent two pilots are interested in

4  the same line, the person with higher seniority gets

5  the line; is that right?

6      A.   That is correct.

7      Q.   And is that true for blank-line bidding as

8  well?

9      A.   That is also correct.  That's a separate --

10  that's a separate bid, and the seniority is based

11  off the individuals who bid a blank line.

12      Q.   For the trip trade giveaway, are there

13  limitations -- are there limits on -- I should say,

14  are there restrictions on how you can use that

15  program?

16      A.   Can you be more specific?

17      Q.   Yeah.  That was -- that was a bad question.

18  Are you able to contact any pilot who may be

19  interested in swapping a pairing with you, or can --

20  or is it limited to people -- to a certain range of

21  people?

22      A.   For -- okay.  So I'll try to explain it the

23  best I can for -- for non-pilots.  The trip trade

24  giveaway would be seat-specific, so, for example,

25  I'm a first officer.  I sit in the right seat.  That

Page 61

1    would be one limitation.

2            And for first officers, once that's awarded,

3    you can trade with any first officer in the entire

4    system.  So, for example, I trade -- I fly pairings

5    in multiple domiciles, so I will fly normally out of

6    Las Vegas, Los Angeles, Oakland, Denver.  Basically,

7    I'm one of the pilots that will travel for work.  So

8    I will look at trip trade giveaway in other

9    domiciles.

10           For your initial bid line, you're limited to

11   the pairings in the lines that are in your domicile.

12   So trip trade giveaway, that's when I alluded that

13   some pilots bid pairings that they're not planning

14   on flying.  For example, we have what's called a

15   Lance Captain Program.  Those individuals can fly in

16   both seats.

17           I am too junior to hold that position, but,

18   in general, they will bid pairings or they will bid

19   a line with their seniority, and they will give away

20   the entire line.  They are giving away their flying

21   because they are trying to pick up captain pairings

22   or they're trying to pick up pairings at a better

23   rate.  Maybe they have to operate the aircraft for

24   less hours for more pay, or maybe they're just doing

25   it for quality of life.  But with trip trade

Veritext Legal Solutions
866 299-5127

1    giveaway, that's -- kind of the function is it's an

2    open market system per seat position.

3          Does that answer the limitation aspect, or

4    are you trying to dive deeper?

5        Q.   I asked a -- an unclear question.  You gave

6    a great answer, so I appreciate the clarity.

7        A.   Yes, sir.

8        Q.   And so just to back up, I think the first

9    thing you mentioned makes good sense, that a -- a

10   first officer can't bid on a captain position.  So

11   there are limitations that you have to bid for the

12   seat for which you're qualified; right?

13       A.   That is correct.

14       Q.   Okay.  And then there -- for the early line

15   bidding, the initial line bidding, you are limited

16   to your domicile.  But then for trade trip giveaway,

17   it's opened up to -- to other domiciles so long as

18   you're interested in flying there, originating your

19   flights; is that right?

20       A.   That is correct.  And I'll also say that you

21   can give away --

22          DEPOSITION REPORTER:  Excuse me.  Excuse me.

23   Excuse me.  Excuse me.  I'm sorry, Mr. Berry.  Can

24   you get a little closer to your computer.  And I do

25   need that question again.  I apologize.  It was a

1   little hard to make out.

2          (Clarification requested by Reporter.)

3   BY MR. BERRY:

4      Q.   I think I'll ask it again.  It's coming

5   through here.  But I just wanted to confirm -- and I

6   think that, Mr. Huntsman, you've done so -- is

7   that -- I'll break it up.

8          So when you're doing trip trade giveaway,

9   you can only accept or trade for seats that you're

10  qualified to fly in that position; is that right?

11     A.   That is correct.

12     Q.   Okay.

13     A.   Some pilots are qualified in both seats,

14  though.  That's the -- that's the caveat.  And a lot

15  of these -- I'll speak in general, but there are

16  some nuances to these individual questions.

17     Q.   And the initial line bidding, you're limited

18  to your domicile, which, in your case, is Oakland;

19  is that right?

20     A.   That is correct.

21     Q.   And then when trip trade giveaway is

22  available, you can trade for people or trade with

23  people at other domiciles?

24     A.   You can, and you can also trade portions of

25  that pairing.  For example, I may have a three-day

Page 64

CONFIDENTIAL

1   trip for a pairing, and I could literally give away

2   one leg.  I could give away a leg from Las Vegas to

3   Oakland at the very end because I want to stay in

4   Las Vegas.  And another pilot may be commuting to

5   Oakland, and they pick up that individual leg.

6           So it's -- I only bring that example to show

7   that the trading system and the flexibility -- there

8   are a lot of different options depending upon

9   current conditions within the market, would be the

10  best way to put it.

11      Q.   So pilots have a fair amount of flexibility

12  in determining their schedule?

13      A.   Not always, but some.  Again, that's -- I

14  could speak for hours on that, but, in general, the

15  better your seniority, usually your better chances

16  of getting an initial line that you want.  You have

17  a better chance at other options, like your annual

18  vacation bidding.

19          But it really depends on how many pilots we

20  have and how much flying there is in the system.

21  Currently, I'm sure you've seen on the news through

22  public labor negotiations that many in the industry

23  have been furloughed, so that would be an example of

24  a current market condition to where previously most

25  pilots would do most of their trading on the 25th of

Veritext Legal Solutions
866 299-5127

1    the month for ELITT, and trip trade giveaway was

2    very sparse.  That has flipped 180 degrees now,

3    based purely on the market condition.

4            Does that -- is that adequate?  Was that --

5    do you understand?

6    Q.   I think so.  I do.  I think your -- your

7    explanation makes good sense.  In the spirit of

8    confirming, I believe what you're saying is that

9    pilots do have flexibility in setting their

10   schedules.  The more senior a pilot is, the more

11   flexibility they have, but flexibility depends upon

12   market conditions.

13           MR. SCIMONE:  Objection.

14           THE WITNESS:  Did somebody else -- I thought

15   I heard something else.

16           MR. SCIMONE:  I was just objecting.  Go

17   ahead.

18           THE WITNESS:  Okay.  Yes and no.  There is

19   flexibility, but that statement, depending upon each

20   individual pilot, would be very, very different.  So

21   flexibility for one pilot would be -- could be next

22   to -- if you were to do a zero to 100, one pilot may

23   have the flexibility of a 1, and one may have a

24   flexibility of 100, and that could be factors at

25   work and/or in other circumstances.

CONFIDENTIAL

1           So that's a tough statement in general for

2    me to agree with to apply to other issues.  But I

3    will say, yes, for an initial bid line it is true

4    that your seniority helps, and there is more

5    flexibility in our system than perhaps an airline

6    that has multiple types of aircraft, which would be

7    another limitation.

8    BY MR. BERRY:

9        Q.   And one of the things that a pilot may take

10   into account when bidding for a line is whether

11   they're -- whether the pilot may need to be on some

12   form of leave in the coming month; is that right?

13       A.   If I have -- if a pilot has vacation leave,

14   for example, that particular pilot will bid lines

15   that touch the vacation to maximize their pay.  So

16   that would be an example of pilots bidding a line

17   they're not planning on flying because they have a

18   vacation leave.

19           But as far as leaves in general, do you have

20   another example that -- that you were thinking of?

21       Q.   Sure.  Let's use military leave.  So I know

22   that you recently retired from the military.  We

23   will have an occasion later to talk about that.

24           But during the period of your service, let's

25   say it's -- you know, we're in November now.  Let's

Page 67

1   block of weeks and take that week -- Christmas is

2   usually the most sought-after week of leave -- and

3   take that week of leave and give it to the most

4   junior pilot in the system.  The same holds true

5   with trip trade giveaway, so there is absolutely no

6   seniority with that system.

7      Q.   The trip trade giveaway is a free-market

8   system.  If you -- you can contact someone.  If they

9   happen to be your friend, colleague, for whatever

10  reason, if they want to trade with you, then you're

11  able to trade?

12     A.   That is correct.

13     Q.   Okay.  I want to make sure that I got an

14  answer to my -- my question.  And that was helpful.

15  So if you tried to bid a day off when you knew you

16  were going to be on leave but you wound up getting

17  scheduled in your line, you would have the

18  opportunity if you wanted to, to try to trade that

19  trip away so you would not have a conflict; is that

20  right?

21     A.   All pilots do have access to trip trade

22  giveaway, barring some of the restrictions that I

23  covered earlier, yes.

24     Q.   Okay.  When you were -- during your -- your

25  service in the Reserves, did you have a practice one

1   way or the other of trying to avoid scheduling trips

2   during your military leaves or to, going the

3   other -- or, the other way around, to try to bid

4   lines that there was a conflict?

5      A.  I would say every -- every month of military

6   service while I was doing military leave would have

7   been different.  I performed many different things

8   early on.  I did longer missions.  And on my board

9   you could also see times to where trips were dropped

10   or trips were not dropped.

11         In general, my understanding and the

12   question that I asked to the company is if they

13   expected us to do military leave on our days off,

14   and the answer was no.  Does that answer your

15   question?  In general, me as a pilot, I fly nonstop.

16   So I'm one of the pilots that I'm looking to work as

17   many days as possible.  I don't have any children,

18   and I'm trying to maximize early on to try to retire

19   earlier.  So if -- that would be the way that I

20   approach work.  But that's different between

21   every -- every individual.

22      Q.  I think I'm asking a slightly different

23   question, which is:  When you're doing your bid one

24   month in advance, generally speaking, do you look at

25   what else is going on in your life in that month so

Page 72

1    you can try to optimize your flying schedule around
2    the other things that you plan to be doing in that
3    month?
4        A.   I think it would be safe to say that every
5    pilot does that, yes.
6        Q.   Okay.  And so when you were bidding one
7    month in advance, is one of the things that you took
8    into consideration military leaves that you expected
9    to be taken or, I should say, military service that
10   you expected to be performed?
11            Let me re-ask that question.
12            When you were looking one month in advance
13   while doing your bidding, was one of the
14   considerations that you took into account military
15   service that you expected to be performing?
16       A.   I would say for my particular job of
17   military service, probably 90 percent of my actual
18   days of military service, especially towards the
19   latter end, were unable to be forecast a month in
20   advance.
21            To clarify on that, there were only certain
22   weekends out of the year that would be a -- what's
23   called, like, a "hard UTA," where you absolutely had
24   to be there on the exact date.  So, in general, no,
25   I did not look at military service or try to bid in

Page 73

1    Q.    "Unit Training Assembly?

2    A.    To the best of my knowledge, yes.

3    Q.    I think that's right too, but obviously

4  you're the expert.

5    A.    I'm not an expert, but I think that's -- I

6  think that's a good guess.

7    Q.    So when there are hard dates that you expect

8  will not be moved, was that a consideration that you

9  took into account when bidding your line?

10   A.    I would say -- I would have to look at a

11  particular month.  It would depend on a lot of

12  factors.  What -- what are the goals for that month,

13  for example?  Are there holidays?  Are there other

14  days?

15         So I -- I'm not trying to not answer your

16  question, but I do want you to realize that every

17  single day changes with the pilot's scheduling,

18  depending upon an individual pilot's goals.  But to

19  answer your question if I bid my particular line

20  based on doing military service on my days off, the

21  answer is no.

22   Q.    Okay.  Was it a consideration?

23   A.    I guess I'm not really understanding your

24  question.  But I definitely looked at all events,

25  but I did not base a line bidding schedule on doing

Page 76

1  you wouldn't be working those days for Southwest?

2      A.   Well, I disagree, because if you were -- if

3  you bid around them, then you are volunteering --

4  you are volunteering to work two extra days in your

5  month.  You are giving up days off to do military

6  service.

7      Q.   But if someone wants to max- -- the only way

8  you get paid is if you're flying; right?

9      A.   That is correct.

10      Q.   Okay.  And so if you're not flying two days,

11  whether conflicts or not, your pay is based on how

12  many days you actually fly; right?

13      A.   The days you fly and the types of pairings;

14  that is correct.

15      Q.   There are also some advantages to

16  scheduling -- pay advantages that a pilot can avail

17  himself of by scheduling conflicts with leaves;

18  isn't that right?

19      A.   As far as advantages, yes, there's

20  advantages, like I gave you earlier with your

21  vacation, advantages, I would say, depending upon

22  your seniority, advantages depending upon what your

23  goal was for the month.  Your goal may be to have a

24  lot of days off for personal reasons.  Your goals

25  may be to work every day.

Veritext Legal Solutions
866 299-5127

1          Everything is really situationally

2    dependent, so for the word "advantage," it would

3    really depend upon a unique pilot's --

4        Q.    But I think you --

5        A.    -- circumstance.

6        Q.    I'm sorry.  I didn't mean to interrupt.

7        A.    Oh, I was complete.

8        Q.    Well, in your circumstance -- I think you

9    testified earlier that you're someone who likes to

10   maximize their flying and therefore their pay

11   generally.

12       A.    Most months.  Most months I would say that

13   was accurate.

14       Q.    Okay.  And for someone in your position,

15   isn't it right that having a conflict with -- having

16   a military leave conflict with -- with a pairing

17   that's on your schedule can allow you to bid for

18   certain premium flights, and also because when

19   you're on military, it resets your -- the

20   regulations for how -- how many hours you can fly in

21   a month; right?

22       A.    Well, some of it would be market-dependent.

23   For example, if you drop military -- if you drop a

24   trip for military in our current environment, there

25   is no inventory.  So there is no premium flying.

Page 81

CONFIDENTIAL

1    There is no additional flying.

2            There is some very minimal, but when there's

3    inventory in the system, you speak to the

4    protections or the reset.   There's what's called a

5    "cap limit" on each individual pilot, which is a

6    number that once reached -- once they go over that,

7    they lose their seniority.   And then there are other

8    options as well -- excuse me -- for picking up time.

9            But in general -- and this would go back to

10   factors, what I referenced earlier for picking up

11   premium time per se.   It's market-dependent.   So it

12   would all depend on what's available at the time.

13       Q.   Right.   And I don't want to fixate on the

14   current COVID situation.   You understand this

15   lawsuit, as you allege it, goes back to 2004; is

16   that right?

17       A.   I do.   But it also current -- but it also

18   covers present time as well.

19       Q.   Sure.   Sure.   You're right.   I just want to

20   make sure that we are not fixed on the scheduling

21   and, as you call it, the market environment and the

22   COVID era right now but we're speaking more

23   generally.

24           So let me ask a different question.   Have

25   you ever because you had a trip pulled because of

1   military leave been in a situation where you could

2   bid on and receive premium flights that you

3   otherwise wouldn't be entitled to fly?

4       A.   Through my military drops, I bid open time

5   present day.  Nothing has ever changed with my

6   bidding techniques as far as my open time bids go.

7   If I did have a military drop, if there is open time

8   available, I will always pick up at the highest rate

9   available.

10       That said, it is still seniority based on

11   premium, so if someone is senior to me, which as,

12   going back to the dates you referenced, I was not

13   senior, if there is a senior pilot available, they

14   get the pairing as published.  And that goes to

15   present day as well.  It is seniority-based for an

16   open time system.  So just because I dropped

17   military leave does not mean that I'm going to be

18   awarded the pairing.

19       Q.   But there are other circumstances where you

20   or other pilots have dropped trips due to military

21   leave, which has allowed them to pick up premium

22   flights which pay more than the flights that they

23   dropped due to military leave; is that right?

24       A.   If they dropped a flight, they lost their

25   pay.  So if the military leave caused an individual

1   to lose their flying or, as you said, drop a

2   pairing, that individual lost the pay for that

3   particular pairing.  So if that person after

4   performing military leave, which they could not pick

5   up on those particular days of military leave, if

6   they picked up in the open system afterwards, they

7   would be allowed to pick up at whatever rate their

8   seniority could hold.  If they picked up at premium

9   or attempted to and another pilot bid it at a

10  straight time or a lower rate, that pilot would be

11  awarded the pair.

12      Q.   And so there -- there is an advantage to

13  having a conflict with your schedule and military

14  leave, because then that allows you to bid --

15  assuming you get it, to bid on a premium flight?

16      A.   Again, I would disagree.  And I would say

17  that if a pilot has to drop military leave, then

18  they're performing work for military leave on those

19  days, and they also fully lost their compensation

20  from Southwest for those particular days.

21           On the days that they are off, if they are

22  available and legal for flying and they pick up and

23  they're legal and a senior person, then they will be

24  awarded the pairing.  But they're not awarded that

25  pairing if they're legal and available solely

Page 84

1    because they dropped military leave.

2        Q.   And whether a pilot bids on premium flights

3    as a result of dropped trips during military leave

4    is something that's just -- it's up to an individual

5    pilot to make those decisions?

6        A.   That is correct.  And that's also where I

7    have had conversations in the past with management

8    pilots, and it goes into expectations or basically

9    kind of made-up rules as far as what they expect

10   pilots to do.

11       Q.   What are the "made-up rules" that you're

12   referring to?

13       A.   Certain pilots or certain management pilots

14   have suggested that if a pilot drops military leave

15   that they should pick up a pairing at a

16   straight-time pay.

17       Q.   And you think that that's inappropriate?

18       A.   Yes, I do.

19       Q.   Why do you think that's inappropriate?

20       A.   A pilot -- a pilot has lost their pay when

21   they dropped the pairing.  Southwest does not

22   compensate an individual if they drop military

23   leave.  So that person has lost their compensation,

24   and they should be allowed to pick up a trip based

25   off their seniority and what's available, just like

Page 85

1    any other pilot in the system.  They should not be

2    treated differently than anyone else.

3        Q.   And that's true even if a pilot's practice

4    is to schedule conflicts so that they can pick up

5    premium flights?

6        A.   I can see, Mr. Berry -- I feel like you're

7    trying to lead me into saying that that's a practice

8    that I did as far as dropping to pick up premium

9    flights.

10            What I will say is that, again, Southwest

11   Airlines said that they do not expect an individual

12   pilot to work or perform military service on their

13   days off, so I will definitely say that anytime I

14   have an ability to pick up open time, I will pick it

15   up at the best rate available at the time.

16       Q.   Do you have knowledge about other pilots'

17   practices in this regard?

18       A.   Could you be more specific.

19       Q.   Yeah.  Do you -- do you have -- do you know

20   whether other pilots tried to schedule conflicts

21   with their military leave in order to pick up

22   premium flights?

23       A.   I do not -- I can tell you in general that

24   all pilots using all forms of bidding, as we covered

25   earlier, are going to do whatever works best for

Page 86

1   their individual goals as far as quality of life, as

2   far as scheduling.

3            Some pilots would rather work -- if I had

4   two days of military service and 12 days of

5   Southwest, some pilots would rather work 12 days

6   total in a month, so they would drop a pairing or

7   bid a pairing so that they only had to work 12 days

8   in the month.  Or they may want more pay for the

9   month, so they will bid around it, or they will bid

10  for 14 days.  Everything is very specific for an

11  individual pilot and their individual goals.

12       Q.   So we've been -- I want to shift focus a

13  little bit, and so what we've been talking about for

14  the last 10 or 15 minutes has been scheduling

15  practices at Southwest Airlines, so flying time;

16  right?

17            I want to focus for a minute on the schedule

18  related to military service, which we began talking

19  about earlier.  I want to pick up that thread.  So

20  what you mentioned is that, at least for the kind of

21  service that you performed in the military,

22  especially recently, a lot of the duties were

23  unpredictable in terms of when the dates would fall

24  for a variety of reasons; is that right?

25       A.   A certain percentage, but I couldn't -- it

Veritext Legal Solutions
866 299-5127

1   2014 was when that particular incident happened, but

2   the individual that I'm referencing apparently had

3   multiple incidents of the same behavior before that.

4       Q.   The allegations that you're making in

5   this -- this lawsuit, Huntsman 2, did you bring

6   those to the attention of Southwest Airlines before

7   filing the lawsuit?

8       A.   I would say the -- the best -- the one that

9   I can say factually that was brought up was that we

10  repeatedly asked -- I know that I personally

11  individually asked for the Department of Labor VETS

12  or an outside organization to come in and review all

13  aspects of USERRA law with all comparable forms of

14  leave for military employees at Southwest.

15          Did I speak specifically to the nature or

16  verbiage of this complaint?  I do not recall doing

17  that.  But I did ask for an outside agency to come

18  in and just review all the programs and give us a

19  "yes" or "no" so that we could have closure on both

20  sides and move forward.

21      Q.   And so when you say "the nature of this

22  complaint," you mean the allegation that short-term

23  military leave is comparable to other forms of leave

24  and therefore Southwest Airlines should compensate

25  for short-term military leave?

Page 119

1    A.  That's correct.  That would be one aspect of

2 it, yes, but --

3    Q.  You don't recall -- you don't recall whether

4 you brought that to Southwest's attention?

5    A.  I do not remember specifically bringing the

6 verbiage that you just said to Southwest's

7 attention.

8    Q.  Is there a reason -- is there a reason why

9 you didn't?

10    A.  Well, there was -- there were way more

11 aspects to what we were alleging.  There are way

12 more aspects to the military issues than would be

13 for this specific case, like I talked about with

14 reemployment, with harassment.

15        There are many issues, which is the reason

16 that I broadly asked, "Can we please just have an

17 outside agency come in?  We can both air our

18 grievances in relation to compliance and have a

19 third party, basically, settle it," for lack of

20 better terms.

21    Q.  Yeah.  So I want to ask about this specific

22 allegation that's made in this complaint.  Is there

23 a reason why you didn't bring these allegations to

24 Southwest's attention?

25        MR. SCIMONE:  And I will just state an

Page 120

1   objection here -- one second, Jayson -- similar to

2   my earlier one, that to the extent that this is

3   calling for discussions with counsel about the

4   timing of the lawsuit, reasons for filing it when we

5   did, et cetera, I would ask you not to divulge that

6   information on grounds of attorney work product.  If

7   you can give an answer without -- without touching

8   on that information, then -- then you can answer the

9   question.

10          THE WITNESS:  I believe the best answer to

11  the question would be that, like I alluded earlier

12  with Huntsman 1 versus 2, is simply the legal

13  process and everything else was purely discussions

14  with the -- my attorneys, and I would not feel

15  comfortable divulging that information.

16  BY MR. BERRY:

17      Q.   When did you engage attorneys for Huntsman 1

18  or Hunts- -- let's start with Huntsman 1.  When did

19  you first engage attorneys for Huntsman 1?

20      A.   I cannot give you an exact date.  I can tell

21  you progressively that it was after the completion

22  of the Military Resolution Board, to the best of my

23  knowledge, the reason being that discussions within

24  the union and -- were basically -- without divulging

25  attorney-client issues there either, was that the

Page 121

CONFIDENTIAL

1    call, and the only person I made before -- talked to

2    before filing that lawsuit was to inform my wife

3    that I was going to file legal action and to make

4    sure that she was okay with that.

5         Q.   So before -- so your first contact was with

6    Mr. Jarrard; is that right?

7         A.   To the best of my recollection, yes.

8         Q.   Okay.  So I want to take you to a time

9    before that.  Before you made a contact with your

10   lawyers in this case, why didn't you bring to

11   Southwest's attention your allegation that it should

12   compensate for short-term military leave because it

13   compensates for other forms of allegedly comparable

14   leave?

15        A.   Well, again, I didn't bring this specific

16   instance of this case before, and I can't answer as

17   far as my conversations with the attorneys, but we

18   did ask for every aspect and every program to be

19   reviewed by an outside source.

20        Q.   Okay.  But you did not bring this specific

21   issue to Southwest's attention; is that right?

22        A.   That is correct.  And it goes back to

23   conversations with my attorneys.

24        Q.   No.  I'm talking about before you engaged

25   your attorneys.  So you couldn't have talked to them

Page 123

1   until you talked to them.  So let's go to before you

2   had attorneys.

3          And my question is specifically with respect

4   to the allegations in this lawsuit.  Before you had

5   attorneys, why didn't you bring this to -- this --

6   these allegations to Southwest's attention?

7      A.   The answer that I have is that I believed

8   the harassment and intimidation issues were much

9   larger in scope than these issues.  These issues in

10  Huntsman 1 and Huntsman 2 were obviously something

11  that I wanted to address, but most important to me

12  was the fact that I was -- almost felt -- I felt

13  dirty performing military service, and I didn't feel

14  that there was any information or education as far

15  as the company goes to that aspect.  And I didn't

16  feel there was any action being taken in those

17  particular cases.  They basically were a higher

18  ranking of priority to me at the time, but now

19  obviously we're slowly working through all of them.

20         But to answer your question, that's the

21  best -- that's really my best answer, is I felt that

22  there were other priorities or other things that

23  were more important as far as a daily work life.

24     Q.   Okay.  So before you had engaged attorneys,

25  you had concluded that Southwest should be

Page 124

CONFIDENTIAL

1   compensating pilots for short-term military leave,

2   but there were issues that prevented you from

3   bringing them to Southwest's attention; is that

4   right?

5       A.   I would -- I would say in general I believed

6   in the nature of the complaint, based off my

7   understanding of other companies' actions.  I

8   understood at the time other companies' actions.  As

9   I spoke to earlier -- for example, the AT&T and MGM

10  examples that I gave you -- I knew other companies

11  were compensating.  But at the time it was kind --

12  as I alluded to earlier, what is the most important

13  issue right now, and then as I became more educated

14  on the law and how it applies to each one is how I

15  kind of progressed with dealing with each individual

16  issue.

17          MR. BERRY:  Mr. Huntsman, I'm introducing

18  what's called Exhibit 2, which should be the

19  military handbook.  Let me know when you can see

20  that.  Unfortunately, it's turned sideways, so we're

21  going to have to figure out how to adjust the view.

22          (Exhibit 2 marked for identification.)

23          THE WITNESS:  There's a "Rotate" bottom in

24  the toolbar -- a "Rotate" button in the toolbar.

25          MR. BERRY:  Thank you.  You beat me to it.

Page 125

```
 1    paramount.  So is this -- is this a time -- so at

 2    some point we are going to take a more extended

 3    break for folks to eat.  This may be the time to do

 4    that.

 5                DEPOSITION REPORTER:  Why don't we go off

 6    the record.

 7                MR. BERRY:  Yeah.  Sorry.  We can talk about

 8    folks' diets.

 9                THE VIDEOGRAPHER:  Off the record at

10    11:21 a.m.

11                (Off the record.)

12                THE VIDEOGRAPHER:  Back at 11:36 a.m.

13    BY MR. BERRY:

14        Q.   Mr. Huntsman, while we were on break, I

15    marked an exhibit, Exhibit 3, which is the complaint

16    in this case.  Do you have that?

17        A.   It's a new exhibit?

18                MR. BERRY:  Yes.

19                THE WITNESS:  Okay.

20                (Exhibit 3 marked for identification.)

21                THE WITNESS:  Okay.  I have the exhibit up.

22    Which page would you like me to go to?

23    BY MR. BERRY:

24        Q.   Well, first, do you recognize the exhibit?

25        A.   Let's see.  Let me make sure it's the
```

Page 151

1    correct one.

2             Yes, I do.

3        Q.    And what is Exhibit 3?

4        A.    It's a class-action complaint filed by me on

5    behalf of all members of the class versus Southwest

6    Airlines.

7        Q.    Okay.   And if I can direct you to

8    paragraph 11, which is page 4, under the heading

9    "Class Action Allegations."   Let me know when you're

10   there.

11       A.    I'm here.

12       Q.    And do you see the indented part that has

13   the class definition?

14       A.    I do.

15       Q.    Okay.   And do you see where the

16   definition -- the class definition is framed based

17   on, it says -- well, I'll just read it.

18             "The following Class:

19             "Current or former employees of

20             Southwest Airlines Co. who, during

21             their employment with Defendant, took

22             short-term military leave (which

23             Southwest defines as military leave

24             that lasted 14 days or fewer) from

25             their employment with Southwest Airlines

                                          Page 152

1              Co. and during such period of short-term

2              military leave did not receive their

3              regular wages or salary that they would

4              have earned," and then it goes on.

5              Do you see that?

6        A.    I do.

7        Q.    Okay.  Before we took a break, we were

8   talking about the cutoff at 15 days, so 14 days or

9   fewer or above.  Do you recall that discussion?

10       A.    I do.

11       Q.    Okay.  And I wanted to make sure -- you

12  referenced a few times that you didn't have the

13  complaint in front of you, so I wanted to put it in

14  front of you and see if it changes your testimony or

15  informs you in any -- in any way.  And so let me --

16  let me ask a question.

17             You say -- the complaint reads that

18  "short-term military leave is defined by Southwest

19  as leaves lasting 14 days or fewer."

20             Do you see that?

21       A.    I do see it.

22       Q.    Okay.  Where does Southwest Airlines define

23  military -- short-term military leave as 14 days or

24  fewer?

25       A.    Without any reference to other documents, my

                                        Page 153

1   guess is it's purely -- my opinion is it's kind of

2   poor verbiage for understanding.   The only thing I

3   could think of would be a carryover from the past

4   case.

5        Q.   Okay.   So you're talking about the

6   settlement -- the settlement of Huntsman 1?

7        A.   Yes.   And that is just an educated guess.

8        Q.   Okay.   Well, we saw the -- the military

9   handbook that defines short-term military leave

10  as -- in terms of 30 -- fewer than 31 days; right?

11       A.   Again, that was an outdated document.

12       Q.   Your proposed class goes back to

13  October 10, 2004; is that right?

14       A.   That's correct.

15       Q.   Okay.   So whether or not the military

16  handbook is outdated for a period of time covered

17  by your class, it was in effect; is that right?

18       A.   During a certain portion of time of the

19  complaint for pilots, only that particular document

20  is used as a reference item.   But, again, that did

21  not have to be complied with.   That was pretty

22  voluntary.

23       Q.   Okay.   There's a definition in there of

24  "short-term military leave" as 30 -- as less than

25  31 days; right?

Veritext Legal Solutions
866 299-5127

1      A.    For a certain amount of time, yes, there

2    was.

3      Q.    Okay.   But you're not adopting that

4    definition of "short-term military leave"; correct?

5      A.    That is correct.

6      Q.    Okay.   And I believe you testified earlier

7    that as a factual matter, there is no difference

8    between a 14-day military leave and a 16-day

9    military leave; is that right?

10     A.    I testified that there's no difference

11   other -- in -- as regards to duration, there's a 2

12   day difference.

13     Q.    And is there any other difference other than

14   the two days, which -- but I grant you by math the

15   difference between 14 and 16 is 2 days.   Is there

16   any other difference between military leave of

17   14 days and 16 days?

18              MR. SCIMONE:   Objection.

19              THE WITNESS:   I would say obviously there's

20   a difference in the basis of my allegation, but I

21   cannot factually reference another document for a

22   difference in duration outside of the allegation

23   which is in front of me.

24   BY MR. BERRY:

25     Q.    Okay.   Setting -- setting aside whether

CONFIDENTIAL

1   you can reference a document, in your -- in your

2   experience, is there a difference between a 14-day

3   and a 16-day military leave other than the 2 days'

4   difference?

5        A.   Outside of USERRA floors and other variables

6   that could come into play, not to my knowledge.

7        Q.   Do you have an understanding of what

8   Southwest's bereavement leave policy is for pilots?

9        A.   In general, yes.

10       Q.   What's your understanding?

11       A.   My understanding is that it is a -- you can

12   have a pairing pool with up to four days' pay for --

13   to take care of something -- there's a definition

14   I believe that's probably immediate family; like

15   father, mother, spouse, child.  I'm not sure of the

16   exact definition, but ultimately there's up to four

17   days of paid leave for bereavement.

18       Q.   Okay.  And in this lawsuit you contend that

19   bereavement leave is comparable to military leave;

20   is that right?

21       A.   In the forms of type and duration, yes.

22       Q.   Yeah.  So in what ways is -- are bereavement

23   leaves comparable to military leaves?

24            MR. SCIMONE:  Objection.

25            THE WITNESS:  Barring the objection from my

Page 156

1    is on P0009.



Page 208

1    they were not paid for it.

2        Q.   And, looking back, some of these records go

3    back to, it looks like, 2012.  Is that about the

4    time that you joined Southwest and transitioned from

5    active military to Reserves?

6        A.   Yes, it is.

7        Q.   Okay.  And so -- and now we're sitting here.

8    It's the end of 2020, so a little over eight years,

9    if I'm doing my math right.  Am I right that your

10   recollection of the days that you were on military

11   leave back in 2012 is foggy?

12       A.   I would say that's an accurate assessment.

13       Q.   Okay.  Do you have a better recollection of

14   the days that you served in the military last year?

15       A.   Somewhat.  But, again, going more than a

16   year ago, it would be very difficult to pin down a

17   specific date outside of the information I provided.

18            (Exhibit 6 marked for identification.)

19   BY MR. BERRY:

20       Q.   Mr. Huntsman, I just introduced Exhibit 6.

21   Can you let me know when you have that up.  It

22   should be an Excel spreadsheet.

23       A.   I do have it up.  It's in a pretty large

24   font, but I can read it.  I can read it.  I

25   recognize it as a document that I presented.  And

                                    Page  212

1   also I would like to stress again, per our prior

2   agreement, that a lot of this information is

3   protected by the Privacy Act, and I do not authorize

4   its viewing or release outside of our previous

5   agreement.

6            MR. SCIMONE:  We'll ask to mark testimony

7   about this exhibit confidential.

8            MR. BERRY:  I think we're going -- we're

9   going to spend probably the balance of the day

10  talking about this document in connection with other

11  documents, which, I think, are equally sensitive

12  from Mr. Huntsman's perspective.  So I would just

13  propose that we maintain it -- everything as

14  confidential until we de-designate some portion of

15  the transcript.

16           Does that work for everyone?

17           MR. SCIMONE:  Agreed.

18           MR. BERRY:  Okay.

19  BY MR. BERRY:

20     Q.   So, Mr. Huntsman, this is a document, I'll

21  represent for the record, that's Bates-numbered

22  P00031, which is an Excel spreadsheet that you

23  produced in this litigation.  Do you recognize this

24  document?

25     A.   Yes, I do.

                                        Page  213

1     Q.   Okay.  I'm going to take a shot at saying

2   what I think is here, and you can tell me if -- if

3   it's -- if I'm wrong.  So it looks like what you

4   have done is to take the military leave records from

5   Southwest that we -- that Southwest produced in this

6   litigation, and then you added some columns to those

7   records with some annotations.

8          We'll get into details, but does that

9   sound -- as a process matter, is that what we're

10   looking at?

11     A.   Yes.

12     Q.   Okay.  And so the first -- well, let's look

13   at column G.  It says, "LMS Count of Days."  And is

14   it your understanding that that --

15          (Clarification requested by Reporter.)

16          MR. BERRY:  Sorry.

17   BY MR. BERRY:

18     Q.   "LMS Count of Days."

19          And is your understanding that that is the

20   number of days that you had drop trip so you were on

21   military leave with Southwest on the dates that are

22   reflected in each row?

23     A.   To the best of my knowledge, that is.  I

24   will say that the LM and LMS codes and different

25   annotations that scheduling has utilized over the

Page  214

 1   years, I have not been privy to, so I cannot point

 2   you to a definition of that.

 3       Q.   Yeah.  I'm not -- I'm not asking you to

 4   define it.  I'm asking you process-wise what we are

 5   looking at.  So it -- it looks to me like you took

 6   the LMS records that we produced and you added

 7   column H, which says "PCARS Y/N."  Do I understand

 8   that, right, to be -- that's whether the PCARS

 9   record, either yes or no, reflects the -- the days

10   that are in Southwest's records?

11       A.   That's correct.

12       Q.   Okay.  And then you added a column I labeled

13   "Discrepancies and Errors in PCARS or SWA in the

14   Southwest Records"; right?

15       A.   Yes.

16       Q.   Okay.  And so in preparing this -- well, let

17   me back up.

18           Did you prepare this document?

19       A.   I prepared -- I did everything in the

20   discrepancies.  I did everything in th e-- the

21   yes/no column.  Basically anything that was added or

22   cross-checked, I did.  I was provided the

23   spreadsheet with the dates from my attorney.

24       Q.   And did you prepare this information -- you

25   prepared this information under oath; right?

Page 215

1      A.   I don't understand what -- what you're

2    asking me.

3      Q.   Well, we had -- we can pull up the

4    interrogatory responses, but we asked you to

5    identify the dates of your military service, and the

6    interrogatory responses that are signed under oath

7    say, "See my document production."   And this is the

8    document production, or one document.

9           So I'm wondering if these statements, in

10   your mind, were made under oath are not?

11     A.   I would say that this was a good-faith

12   estimate of the accuracy and cross-check of all

13   information that I had available to me under oath,

14   yes.

15     Q.   Okay.  So looking at columns H and I --

16   again, I'm just talking logistics here; we'll get

17   into the details -- it looks like what you've done

18   is when PCARS -- the PCARS record did not reflect a

19   military leave from Southwest records, you annotated

20   "No" in H and then provided a comment in column I;

21   is that right?

22     A.   Yes.  What I attempted to do was anything

23   that did not match perfectly, I attempted to access

24   either my leave notification from Southwest or any

25   other document that I could find in the search that

Page 216

1    you were serving and that -- that leave is also

2    reflected in Southwest's records?

3         A.   No, I did not, because the records matched.

4         Q.   Okay.  But if the PCARS record is inexact,

5    it could show days that you were -- it could -- it

6    could show days that you -- it could say that you

7    were on leave -- sorry.  I'm not saying that right.

8              In your view, there are instances when PCARS

9    does not state a date when you were performing

10   military service; correct?

11        A.   I would say an example of that would be if a

12   PCARS payment was made on a separate date for what I

13   referenced earlier, so...

14        Q.   I -- we need to do this step-wise.  I

15   believe what you said is that there are -- there are

16   instances where PCARS does not show a date of

17   military service when you were actually serving in

18   the military; is that right?

19        A.   That is correct.

20        Q.   Okay.  Are there instances when PCARS shows

21   a date of military service when you were not serving

22   in the military?

23        A.   I would say it probably does, yes.

24        Q.   Okay.  Did you undertake any investigation

25   in your records to check those discrepancies?

1      A.    Yes, I can.   That would be my best guess.

2  Often there may be additional duties.   I may be

3  doing a performance report.   Earlier in my service

4  in the squadron I had additional duties which

5  required additional time outside of my primary

6  duties.   Some of those were allowed to be -- you

7  could do some of them on the road.

8           For example, when I was a flight commander,

9  I'd be responsible for multiple performance reports

10  for multiple people.   That would be something I

11  could work on on my laptop and not be on base to do.

12  Oftentimes while doing that -- and I notice that

13  the years 2018, and that time previously were

14  extremely busy while I was doing union duties as

15  well.

16          So oftentimes I may have performed

17  performance reports or other types of military duty

18  and simply did not fill out the paperwork or follow

19  up on the paperwork to make sure that I was paid for

20  that status.

21      Q.    So your -- when you say "Remote

22  work/travel/telecommute," have you confirmed that

23  that's what you were doing on that day or that's

24  just a guess about what -- what you may have been

25  doing?

1      A.   I don't have -- I don't have that
2    information in front of me.  Obviously I put
3    "Remote work/travel/telecommute."  I don't know
4    exactly what I was doing that day, but it may have
5    been something to where I saw that I was not here
6    or -- when I say "here," like maybe I was not on
7    base or I don't have anything factual.  But that
8    would be my best guess.  Anything that I cannot find
9    factual information, I tried to put my best guess
10   for an explanation.
11      Q.   Okay.  So you had some -- you can see in the
12   surrounding columns around the same time period you
13   have some photos.  But you looked for photos on this
14   date and could not find a photo?
15      A.   I -- if I did find a photo for that
16   particular date, if there was any type of photo,
17   there was nothing like my other photos that shows,
18   you know, maybe I'm physically on base.  But there's
19   no PCARS, et cetera.
20      Q.   Okay.  And you don't have any independent
21   recollection today about whether you served on
22   May 18th, 2018?
23      A.   I do not.
24      Q.   If I can take you down to row 112.  This is
25   a military leave on March 19th, 2019.

Page 231

1   instance when we scroll through, when there's a

2   letter followed by some text, that the black text

3   are notes and comments that you prepared that are

4   explanatory, and you prepared them in order to

5   respond to the discovery requests?

6        A.   That is correct.  I -- I typed the black

7   test -- text.  Those are my notes.  And each one is

8   my best good faith estimate as to why there would be

9   a discrepancy.

10       Q.   Okay.  And so on the April 13th, 2013 -- so

11  this is back to A.  You note that your squadron was

12  out of money and pay statuses were not available and

13  were filed later.  And so this -- this is similar to

14  your note earlier about the continuing resolution;

15  is that right?

16       A.   Yes.  And that -- again, that's my best

17  guessing.  When I have a comment about a medical

18  requirement that is due -- I don't remember if I had

19  a back injury at that point, but if -- unless it was

20  something in regard to that and my medical status

21  with the military, it probably would have been a

22  flight physical.  So that's why I placed -- that's

23  why I said that was my best guess.

24       Q.   Okay.  And just to confirm, I believe --

25  I believe it's -- it's true from the context, but

Page 236

1    it is a best guess.  You're not certain sitting here

2    today or based on your review of records whether you

3    performed military service on April 13th, 2013?

4        A.   That's correct.  Every -- each one of

5    my answers is my best guess as to what -- why

6    there's a discrepancy, but I cannot factually state

7    on any of these whether or not I performed duty on

8    that particular day.

9        Q.   In doing your -- let me back up for a second

10   and ask a bigger picture question.

11            In doing your investigation, did you ever

12   discover a date of military leave in Southwest's

13   records when you did not serve in the military?

14       A.   Do you -- as regard as days that are on my

15   PCARS where I was working for Southwest or are you

16   asking if there is a military leave annotated with

17   Southwest that I did not perform military leave?

18       Q.   Well, the -- the Southwest records show

19   that you were on leave on -- on certain dates;

20   right?

21            And my question is:  Have you ever -- well,

22   in doing your investigation, did you ever find one

23   or more instances where you concluded, oh, you know,

24   what?  Actually this says that I was on leave but I

25   actually wasn't performing military duty?

Page  237

1      A.    Yes, I have.

2      Q.    Okay.  And did you -- did you annotate those

3  here?

4      A.    It was not in the scope of this

5  investigation.  It was annotated with the company

6  multiple times over the years, including my last

7  Employee Relations complaint.

8      Q.    Okay.  How many -- how many such instances

9  did you find?

10     A.    So I could not -- I could not do that with

11  this document search because I did not have access

12  prior to, I believe, six months of my schedule.  So

13  it's impossible for me to see when Southwest has me

14  on military leave.

15          So, for example, it's currently November,

16  I would be able to see my military leaves on the

17  screen that I have access to back approximately six

18  months, but for the scope of this request, I cannot

19  see any dates.  It would be impossible for me to do

20  that because I don't know what they had annotated on

21  my screen.

22          To answer your question further, over the

23  years I have identified multiple times when military

24  leave was incorrectly placed or there were changes

25  and the company never changed the status.  Those

Page  238

```
 1   clarification.
 2           MR. SCIMONE:  Yeah.  I mean, and I'm fine
 3   with him answering the question to the extent that
 4   you are not trying to pin him down to a legal
 5   position, but I feel like that's what you're trying
 6   to do.  And you're not telling me that you aren't
 7   trying to do that, so I'm having a hard time
 8   understanding what you're driving at.
 9           MR. BERRY:  Well, yeah.  It's his testimony,
10   and so --
11           MR. SCIMONE:  Yes, it is.
12           MR. BERRY:  Let's -- let's proceed.  If you
13   want to instruct him not to answer, you can.
14   BY MR. BERRY:
15      Q.   So, Mr. Huntsman, I believe what you said is
16   that there are instances when Southwest's records
17   will not show that you were on military leave, but
18   you performed military duty; is that right?
19      A.   I am saying that I performed military days
20   that -- I performed military duty on days off
21   showing on my CWA records that are not annotated
22   accordingly, yes.
23      Q.   And so in that regard Southwest's records
24   are inaccurate?
25      A.   I would say yes.
```

1    those days?

2              MR. SCIMONE:  Objection.

3              Answer to the best of your ability.

4              THE WITNESS:  Okay.

5    BY MR. BERRY:

6         Q.   It's a yes-or-no question.

7         A.   It's not a yes-or-no, in my opinion, sir.

8              Ultimately, if Southwest had a notification

9    system or had changed it, then this would not be an

10   issue.  So my answer is that an individual

11   performing military leave should be treated

12   comparable to other forms of leave.  So if they were

13   proceeding on that date a military service or doing

14   military service and the notification system

15   prevented them from accurately representing that,

16   then, yes, they should be compensated just as if

17   they were in the system.

18        Q.   Okay.  So that's -- that's a rationale.  As

19   I understand it, you are providing some reasons why

20   Southwest's records may be inaccurate, because, in

21   your view, the notification system is flawed; right?

22        A.   That is correct.

23        Q.   Okay.  So for whatever the reason -- and

24   there could be other reasons why on any given -- on

25   any given day the leave record may be inaccurate.

                                        Page  259

 1    location, which is something that's sort of --

 2    that's pilot-specific.  I take it that a lot of

 3    their reservists do their drilling locally, and so

 4    the -- you know, a travel day or prep day would be

 5    different than if you were, say, flying to the

 6    Netherlands, as you have done in instances, or to

 7    the Pacific theater; is that right?

 8         A.   I would say that would be fair.  But I would

 9    say most reservists, they also have exercises and

10    deployments that they do on a regularly basis,

11    sometimes yearly or semiannual, where they do

12    travel.  So just because they aren't operating an

13    aircraft, I would say that -- that most reservists

14    and guardsmen do have to travel to locations on a

15    regular basis.

16         Q.   Okay.  If you scroll down to the next entry.

17    This is "H" as in "Herb."  This entry relates to a

18    military leave on August 6th, 2016, a one-day leave

19    that doesn't appear in PCARS.  And you note that

20    there is a photo that supports that you were on base

21    on that day; is that right?

22         A.   That's correct.  The photo on the screen --

23    thankfully, I took it to show -- that's a screen of

24    a type of orders or a duty certification process.

25    And I was having some type of -- there was some type

Page  267

CONFIDENTIAL

1    of issue with it, or I -- I needed to take those

2    dates to either fix our pay status or have something

3    with the orderly room to fix it, so I took that.

4    That's --

5              (Clarification requested by Reporter.)

6              THE WITNESS:  There was some issue with the

7    orders system that made me take this picture, and

8    that picture is a government computer in my squadron

9    physically at Travis Air Fore Base.

10   BY MR. BERRY:

11       Q.   That was my next question.  It looks like

12   you are accessing a system called AROWS?

13       A.   That's correct.

14       Q.   Okay.  And you can tell from this photo that

15   this is not your personal computer.  This is a

16   computer that's on base?

17       A.   Yes, it is.

18            DEPOSITION REPORTER:  Can you spell the

19   "AROWS," please.

20            THE WITNESS:  Yes, ma'am.  It's Alpha,

21   Romeo, Oscar, Whiskey, Sierra.

22   BY MR. BERRY:

23       Q.   Do you remember taking this picture?

24       A.   No, I do not.

25       Q.   And -- but your best guess is that you took

Page  268

1  it in order to send it to someone for technical

2  help; is that right?

3     A.   I -- I took it for -- I don't know the

4  reason at the time.  I'm guessing it was some kind

5  of problem with the information that is shown on the

6  screen, so either a certification date was wrong, a

7  date needed to be changed.  They move through the

8  system.

9          There's different -- there's different

10  levels of certification, so sometimes they would be

11  stuck in certain areas, and so we would need help

12  from an outside agency to move the order through to

13  a completed status.  There's probably five or six

14  more reasons I could list why I would have taken a

15  picture of that particular system.

16     Q.   So you don't -- you don't recall why you

17  took the picture, but you know that this was a

18  computer that was on base at the time?

19     A.   That's correct.  Yes.  That's -- I'm leaning

20  up to look at the picture individually.  Yes.

21     Q.   At the top -- this looks like it's an iPhone

22  interface or smartphone interface; is that right?

23     A.   Yes.  That was probably taken with my phone

24  at the time.

25     Q.   Okay.  And the "August 6th, 2016 at

Page 269

 1   same as the last one.  It says, "Photo supported on

 2   base."

 3        A.   That is correct.  And referencing the -- the

 4   photo, this would be a common photo.  And that 349

 5   Air Mobility Wing in the photo, the UTA schedule --

 6             (Clarification requested by Reporter.)

 7             THE WITNESS:  I apologize.

 8             The photo that's listed under letter "I" for

 9   November the 22nd, this would be a photo that I

10   would normally take at least once a year, and it

11   shows the UTA schedule for the fiscal year.

12             The reason that I would take this would be

13   for planning purposes, because some of the UTA

14   weekends were mandatory, and some of them were not.

15   But it also would show -- if you notice under Flight

16   A and Flight B, it would show me other opportunities

17   to where if I needed to see a reserve doctor for an

18   injury or a return to fly status, it may give me a

19   separate opportunity to see them on that particular

20   date.  That's definitely why I would take that

21   picture.

22   BY MR. BERRY:

23        Q.   Okay.  And do you recall taking this

24   picture?

25        A.   I recall taking pictures of the UTA schedule

                                        Page  272

1    many times.  I don't remember this specific date,

2    though.

3        Q.   Have you ever had someone else who serves

4    alongside you at Travis Air Force base send you a

5    picture of a schedule?

6        A.   Yes, I have.

7        Q.   And do you know if this is an instance where

8    someone sent you a picture of a schedule?

9        A.   I do not know that answer to that.

10       Q.   It's possible?

11       A.   It is a possibility, but the way this was on

12   my phone, I think I took the picture.  But it is

13   most certainly a possibility.

14       Q.   Can I ask you to scroll up to the last

15   photo, which was H.  It's a August 6, 2016 photo.

16       A.   Okay.

17       Q.   And you see there's -- there's no text above

18   "August 6, 2016"?  I'm asking you to observe an

19   absence, which may be odd, but it will make sense

20   when you look at the next one, where above the date

21   and timestamp, "November 22, 2016," it says "Travis

22   AFB."

23       A.   I'm looking.  Stand by.

24            On H -- I'm looking at H.  That says, "Below

25   shows I was at Travis Air Force base on August the

Page  273

```
 1   all four for both days.  That would be a scheduler

 2   pulling up a pay system who had access to a pay

 3   system, and they would input for each individual.

 4   That's why I said it's most probable that I simply

 5   did not sign the sheet of paper, but it is also a

 6   possibility that there was an entry error when that

 7   individual went through to click on specific days

 8   for UTAs.

 9       Q.   Okay.  Looking down at L now, L relates to a

10   one-day military leave on July 5th, 2017.  And you

11   note that there's a security clearance photo that

12   supports that you were performing military duty.

13       A.   That's correct.

14       Q.   Can you explain how this supports that you

15   were performing military duty.

16       A.   Yes.  This was -- this is the best that I

17   could find, and this was a text conversation between

18   the unit security manager for the security

19   clearance.  So my security clearance, as I gave an

20   example earlier -- I was using myself.  I used to

21   have a higher level.  That went down to a lower

22   level.  So many years lapsed between my last

23   investigation for a security clearance and the

24   current one that I was attempting to get.

25            The technological issues for this were an
```

Page 290

1   absolute nightmare.  You were supposed to be able to
2   log into the system, which I have later on in the
3   exhibits.  I received multiple passwords.  I would
4   do something in the system.  It would lock me out.
5   And the worst part is that my complete form was
6   reset twice over multiple months.  This is something
7   that flows through the squadron, and then it goes up
8   to a high-level security branch.  Once it gets there
9   and if they send it back, the form reset.  It was
10  extremely frustrating.  I worked on it for multiple
11  days.
12          And, quite frankly, it was another factor in
13  me starting to lean to leave the squadron.  If you
14  notice, that date was 2018, and that was the time to
15  where I decided that I had too much on my plate, and
16  I was thinking of separating to a unit to where
17  there was less involvement required.
18      Q.   Okay.  And the -- there's a stamp -- maybe a
19  location stamp that says "312 CAL" on the photo.  Do
20  you see that?
21      A.   I do.  That's simply -- that's identifying
22  the person -- it's a sergeant in the 312 Airlift
23  Squadron, of which I was a member of.
24      Q.   So this is a text message that two and a
25  half years later, whatever the case may be, you

Page  291

1    scroll down, but if I can take you to row No. 92.

2    Let me know when you're there.

3         A.    I'm there.

4         Q.    Okay.  Do you see that -- that this leave

5    entry is for July 5th, 2017?

6         A.    I do.

7         Q.    Okay.  And so am I right that the

8    explanation that you have for July 5, 2018 is an

9    error?

10        A.    That is -- that is probably an error, yes.

11        Q.    Okay.  Is there any reason to believe that

12   this explanation screenshot that you provided

13   related to July 5, 2018 provides support for you

14   being -- for you performing military duty on

15   July 25th, 2017, one year previously?

16        A.    I do not know that.  That was an honest

17   error as far as the date.  I would have to go back

18   and look at the PCARS and search that particular

19   date again.  But, no, that's -- I must have missed a

20   date by a year as far as the calendar year.

21        Q.    Okay.  And so am I right that you have not

22   looked at your -- your various records -- or to the

23   extent you looked at them, you were looking at the

24   wrong year.  You have not yet investigated whether

25   you have any support for the -- for whether you were

Page 293

1        And, yes, there -- there are a variety of

2    reasons the pay statuses may show differently than

3    the dates in the notification system.

4        Q.   So sitting here today, if PCARS shows

5    that -- does not show that you were not performing

6    duty on February 9th, that you were on military

7    leave, and your best or your -- one plausible

8    explanation, you believe, is that PCARS is just off

9    by a day and that you were serving in the military

10   on February 9th?

11       A.   That is a fair -- that would be a fair

12   assessment.  And PCARS shows that I was not paid on

13   the 9th.  It does not show that I was not performing

14   military service on that day.

15       Q.   Well, it doesn't show anything one way or

16   the other.

17       A.   I'm sorry?

18       Q.   It doesn't have an entry for February 9th at

19   all, so it just shows that -- the absence of the

20   date on PCARS means that you weren't compensated;

21   right?

22       A.   That's correct.  And I was compensated on

23   the 12th, so that was just my best guess as to why

24   it was shifted.

25       Q.   So going down to N, this is a one-day leave

                                          Page 298

1    on May 4th, 2018 that appears in South- --

2    Southwest's records but does not appear in your

3    PCARS record.  And you note that there is -- a photo

4    supported remote work on the 4th of May in prep for

5    the 5th of May.  Do you see that?

6        A.    I do.

7        Q.    And there are two photos on this sheet.  Can

8    you explain to me what's going on in these photos?

9        A.    I can.  The photos -- my best explanation

10   that I can give is the 15.pdf looks like a

11   performance report file.  Again, that would be

12   something that I would work on remotely.  They

13   changed the format, and I think that was about the

14   timeframe where they changed the versions of the --

15   the DOD form for officer performance reports.

16           I could not open it for whatever reason it

17   was, and I took the picture to take into base the

18   next day to present it to ask them what I need to

19   update or how I could open the new format of the OPR

20   so that I did not have to -- so that I could access

21   it from my personal computer, or there was some type

22   of application on base to where it simply was not

23   opening the file.

24           The next day shows a picture of me in the

25   squadron, and that is either a -- I'm scrolling in

Page 299

1      Q.    But you don't have the same absolute
2   certainty about why you took the photo or what
3   the -- what was going on?
4      A.    You know, unless I'm 100 percent, I always
5   caveat, so I would say I'm 99 percent that that
6   was -- the file labeled 15.pdf was a performance
7   report, probably a shell of a performance report in
8   a PDF format, and it would no longer work on my
9   computer.
10           I took the picture.  I probably -- I either
11  maybe texted someone else at the time, or I took it
12  the next day, because usually someone else has
13  encountered the problem or they have a workaround or
14  there will be someone on base that knows how to fix
15  it.
16     Q.    Okay.  And so --
17     A.    It was --
18     Q.    Go ahead, Mr. Huntsman.
19     A.    I'm saying it would probably be a product
20  that I wanted to have completed for that next day,
21  is -- based off -- there's no other reason that I
22  would be working on it that late in the evening.
23     Q.    Okay.  And so both of these photos, again,
24  looked like that they are rendered from a iPhone.
25  They have the similar format with the picture of an

                                    Page 301

CONFIDENTIAL

1    airplane in the upper right and the battery,

2    et cetera; is that right?  So is your -- is your --

3    is it your recollection that you took these photos

4    with your iPhone?

5        A.    That's the -- that would be my best guess.

6        Q.    And then the photo of May 4th, 2018, you

7    took that about -- on or about 9:18 at night in

8    order to take it in the next day to discuss the

9    technical issue?

10       A.    That's a best guess.  And, again, if I'm

11   working on that product that late at night, then

12   there was frustration involved with the technical

13   issue, and so I was taking it to -- to basically

14   show what the issue was.

Page 302



Page 303

1    A.    That's correct.

2    Q.    You haven't changed any of the dates or

3    times on any of these -- the time and date

4    signatures on any of these photos?

5    A.    I have not changed any item on any photo.

6    Q.    Moving down to O, this involves a 2 day

7    military leave from Southwest Airlines on May 22nd

8    and May 23rd that does not appear in your PCARS

9    report.  You have a note that says, "Photo supported

10   at base."

11         Do you see that?

12   A.    I do.

13   Q.    Okay.  And then the photo that you provided

14   has a timestamp of 12:38 p.m. on May 23, 2018.  Do

15   you see that?

16   A.    I do.

17   Q.    Okay.  Can you tell me about this photo.

18   A.    My best guess is I thought the sign they had

19   up was funny, probably not politically correct.

20         But I know with absolute certainty that

21   that's the entrance to the SARM office, which would

22   be the people that -- if you see the yoga ball in

23   the background, that's the desk for the individual

24   who I was dealing with for my security clearance

25   issues.  I may have been there to see her.  Or the

Page 304

CONFIDENTIAL

1          I, JANIS JENNINGS, CSR No. 3942, Certified

2     Shorthand Reporter, certify:

3          That the foregoing proceedings were taken

4     before me at the time and place therein set forth, at

5     which time the witness was duly sworn by me;

6          That the testimony of the witness, the

7     questions propounded, and all objections and statements

8     made at the time of the examination were recorded

9     stenographically by me and were thereafter transcribed;

10         That the foregoing pages contain a full, true

11    and accurate record of all proceedings and testimony.

12         Pursuant to F.R.C.P. 30(e)(2) before

13    completion of the proceedings, review of the transcript

14    [  ] was [X] was not requested.

15         I further certify that I am not a relative or

16    employee of any attorney of the parties, nor financially

17    interested in the action.

18         I declare under penalty of perjury under the

19    laws of California that the foregoing is true and

20    correct.

21    Dated this 18th day of November 2020.

22

23    _____

24    JANIS JENNINGS, CSR NO. 3942

25    CLR, CCRR

                                        Page  323

# The Joint SWA/SWAPA Flight Operations Military Handbook

  

  

**As set forth in the
Collective Bargaining Agreement
dated November 1, 2009**

**Between
Southwest Airlines Co.
and the
Southwest Airlines Pilots' Association**

**Effective Date: Nov 1, 2014
Required Review Date: Oct 30, 2015**

EXHIBIT

0002

# Table of Contents

SECTION 1: Purpose ........................................................... 2

SECTION 2: Definitions ...................................................... 2

SECTION 3: General .......................................................... 2

SECTION 4: MILOA Notification ............................................ 3

SECTION 5: Notification Timeline ......................................... 3

SECTION 6: MILOA Notification Form Completion ............................ 4

SECTION 7: MILOA Trip Pulls .............................................. 6

SECTION 8: Changes or Cancellations Of Military Leave .................... 7

SECTION 9: Health And Welfare Benefits ................................... 7

SECTION 10: Monthly Bidding .............................................. 8

SECTION 11: Pass Privileges .............................................. 8

SECTION 12: Jumpseat Privileges .......................................... 8

SECTION 13: Known Crewmember (KCM) ....................................... 8

SECTION 14: Vacation ..................................................... 8

SECTION 15: Reemployment After MILOA ..................................... 9

SECTION 16: Training Following MILOA ..................................... 11

SECTION 17: 401K Plan .................................................... 12

SECTION 18: Profitsharing ................................................ 12

SECTION 19: Stock Options ................................................ 12

SECTION 20: Benefits Booklet And Checklist ............................... 12

SECTION 21: Military Appreciation Program (MAP) .......................... 12

ATTACHMENT 1: Chief Pilot Checklist ...................................... 14

SWA-HuntsII 009098

1. Purpose:

   Southwest Airlines Co. (the "Company") and the Southwest Airlines Pilots'
   Association (the "Association") have a long history of strong support for pilots
   affiliated with the National Guard or reserve forces. The Company and the
   Association have jointly and separately demonstrated the acknowledgment of
   and appreciation for the significant sacrifices required of those who
   simultaneously serve the Nation and the Company. This Joint SWA/SWAPA Flight Operations Military Handbook satisfies Section 12.F.1.c. of the
   Collective Bargaining Agreement (hereinafter referred to as the "Agreement")
   between the Company and the Association. The purpose of this Handbook is
   to provide policy and procedures for Association members participating in the
   uniformed services under Title 38 USC 4301-4334, Uniformed Services
   Employment and Reemployment Rights Act of 1994, as amended (hereinafter
   referred to as "USERRA"). The USERRA Law is implemented by the rules
   and regulations contained in 20 CFR Part 1002, USERRA Final Rules. While
   USERRA establishes a floor, not a ceiling, for the employment and
   reemployment rights and benefits for those it protects, Southwest Airlines
   may provide greater rights and benefits than USERRA requires.

2. Definitions:

   a. Military Leave of Absence (MILOA): Absence from work for purposes of
      serving in the uniformed services.
   b. Short Term MILOA: Service in the uniformed services for fewer than
      thirty-one (31) days.
   c. Long Term MILOA: Service in the uniformed services for thirty-one (31) or
      more days.
   d. For applicable definitions contained in USERRA, refer to 20 CFR Part
      1002.5, USERRA Final Rules.

3. General:

   a. Nothing in this Handbook, the Agreement, SWA Policy or SWAPA Policy
      will diminish the rights, benefits and protections prescribed in USERRA.
   b. For subjects not addressed in USERRA, applicable provision in the
      Agreement will apply. In the event an issue is not addressed by USERRA
      or the Agreement, applicable Southwest Airlines policies and/or
      procedures will apply.
   c. The SWA Flight Operations Military Liaison is the primary agent available
      to assist with and resolve issues arising from military duty requirements
      and SWA employment. If the Military Liaison is not available, a Domicile
      Chief Pilot should be contacted. After duty hours and time-critical issues
      should be referred to the Chief Pilot on call.
   d. Pilots are encouraged to maintain contact with their Chief Pilots during a
      long-term MILOA.

SWA-HuntsII 009099

e. Pilots are encouraged to periodically review material distributed through SWALife, Company e-mail, and the SWAPA website while on MILOA. Pilots will retain access to SWALife, CWA and the SWAPA website while on a MILOA.

f. Pilots are required to log in to SWALife once every 90 days to keep their SWALife log-in and CASS account active. If the pilot is locked out of CASS or denied SWALife access while on MILOA contact the SWA Flight Operations Military Liaison for assistance.

g. A Military Resolution Board (MRB) as provided for in the Agreement is available to resolve policy issues regarding military leave.

h. Seniority is retained and longevity will accrue while on MILOA.

i. Probation: For Long Term MILOAs, probation will be extended day-for-day for every MILOA day over thirty (30) consecutive days.

j. The Company will share MILOA data with the Association as requested.

k. If the Company has reason to contact a pilot's military unit commander or supervisor, reasonable efforts will be made to notify the pilot beforehand.

4. Notification

a. Pilots (or "an appropriate officer" as defined in CFR 1002.85) are required to give advance notice of pending service whenever circumstances reasonably allow. Under USERRA, the Company does not have authority to deny or question military duty. MILOA notification is simply notification, not a request.

b. Notification can be either verbal or written and may be informal, following any format. The preferred method is to submit a MILOA notification form through SWALife>Flight Ops>Forms/Reports>Military Forms>launch "Military Leave Notice". In the event the on-line notification form is not used, all of the information contained in the form should be provided via whatever media the pilot elected to use to notify the Company of the MILOA.

c. When possible, a pilot should submit routine MILOA notifications by the 11th day of the month prior (21st for Blank Line awards).

d. In the event that advanced notification is prevented by military necessity, or otherwise impossible or unreasonable the pilot will notify his/her Chief Pilot or the Flight Operations Military Liaison as soon as conditions permit.

5. Notification Timeline

a. The MILOA Notification form is electronically transmitted to the Chief Pilot's office. On normal workdays, the Chief Pilot's office will complete its review within twenty-four (24) hours following submission by the pilot and electronically transmit the notification to Crew Planning and/or Crew Scheduling using the "Pullsheets" program. A pilot submitting a MILOA notification outside normal work hours or on non-normal work days should be aware that his/her notification will not be processed until the

SWA-HuntsII 009100

next normal work day. If outside normal work hours or on non-normal work days the chief pilot on call (CPOC) can be reached in the NOC to facilitate a MILOA Notification 469-603-0405.

b. The table below reflects the timeline for completing the tasks associated with MILOA Notification. Processing of MILOA Notifications submitted on non-normal workdays or during non-duty hours may exceed these timelines.

### Table 1: MILOA Notification/Processing Timeline

| TASKS | DATE/TIME |
|---|---|
| Pilot submits routine MILOA Notification | By the 11th @ 1200 CST |
| MILOA and trip pull (if required) posted | By the 15th @1200 CST |
| Pilot submits routine MILOA Notification for Blank Line Award | By the 21st @1200 CST |
| MILOA and trip pull (if required) posted for Blank Line Award | By the 22nd @ 1200 CST |
| Short-notice MILOA Notification (If possible, submit 120 hours prior to "Depart Domicile Time") | MILOA and trip adjustment (if required) posted on pilot's schedule within approximately 48 hours of notification |

6. MILOA Notification Form Completion Procedures: The following completion instructions apply if the on-line MILOA Notification form is used.

   a. My Information: Should be pre-populated with all information.
   b. Additional Contact Information
      i. Email Address: email address where a copy of the submission will be sent.
      ii. Base: Assigned domicile for the month in which the MILOA occurs.
      iii. Seat: Captain or First Officer (pull down – select)
      iv. Your Phone number: The number to be called if there are questions regarding your MILOA.
      v. Unit Name: Military Unit Designation
      vi. Unit Location: Military unit location or base
      vii. Unit Phone Number: Self-explanatory
      viii. Commander's name: Optional (enter "decline" if pilot does not elect to provide).
      ix. Commander's Phone: Optional (enter "123-456-7890" if pilot does not elect to provide).
      x. Commander's Email: Optional (enter "decline@decline.com" if pilot does not elect to provide).

SWA-HuntsII 009101

      xi. Select either Yes or No as appropriate to highlight if a PC/PT training is due in the month the MILOA occurs. NOTE: One of the two options must be selected to submit the Notification.

c. Military Duty Details:

      i. New Request: click on this radio button if this is the first notification submitted for this MILOA.

      ii. Revision:

          a) Click on this radio button if revising information for a previously submitted MILOA notice.

          b) If a scheduled MILOA changes or is cancelled, the pilot will call Scheduling directly as soon as practical to have the leave removed/updated on the pilot's schedule. The pilot may submit an amended MILOA Notification form in lieu of calling Scheduling.

      iii. Depart Domicile Date/Time:

          a) Enter the date and time required to be back in the assigned Crew Base with enough time to travel safely to the uniformed service site and arrive fit to perform the service. This date/time should include time for travel from the pilot's crew base to place of residence, and then to the military duty location, plus required rest prior to performance of military duty. Normally the date/time should be twenty-four (24) hours or less from the "Start Military Duty" date/time listed in the next block. If more than twenty-four (24) hours is required (e.g. long term MILOA or other special circumstances) explain in the Comments/Description of MILOA text block at the bottom of the form. A single period of military duty covering multiple trips should be entered as a continuous military leave.

          b) Scheduling will make every effort to ensure a pilot is returned to the domicile at or before the "Depart Domicile Date/Time". In the event that delays beyond the control of scheduling occur, all available options will be used to return the pilot to his/her domicile in time. MILOA times will not be changed without specific concurrence of the pilot.

      iv. Start Military Duty Date/Time: Self-explanatory

      v. End Military Duty Date/Time: The date/time released from military duty. If unknown, enter the best estimate (can be adjusted through revision later).

      vi. Return to Domicile Date/Time: Enter the date/time available to Southwest Airlines Flight Ops or Training Scheduling to perform SWA duty. It should be the time the pilot is available to report to domicile rested and ready to depart for a SWA trip. This date/time should include travel time from the duty location to residence (as appropriate) then to the Crew Base and any required rest. Normally this will be within twenty-four (24) hours of the End Military Duty

SWA-HuntsII 009102

Date/Time, but if special circumstances (USERRA-authorized leave, etc.) extend that period explain in the Comments/Description of MILOA text block.

    vii. Trip Pull Requested: Three options are available on this drop down menu.

        a) "No pairing(s) currently conflict with the MILOA, post MILOA immediately. If conflicting parings are posted they will be pulled immediately" – There are no conflicts on the pilot's CWA schedule/board, but if any should be posted between MILOA Notification and posting on the pilot schedule, they will be pulled immediately. (Note: When military duty does not conflict with SWA duty, the MILOA will be included on the pilot's schedule to prevent conflicts between JA and MILOA)

        b) "Assigned parings currently conflict with this MILOA. Pull conflicting pairings AS SOON AS THIS NOTIFICATION IS RECEIVED in Crew Scheduling/Planning" – Scheduling will pull conflicting pairings immediately per para 7b.

        c) "Assigned pairings currently conflict with this MILOA. Pull conflicting pairings five (5) days prior to the pairing start" - Scheduling will leave trips on your board until five (5) days prior to the pairing so as to allow the pilot to use them in ELITT or TT/GA transaction.

        d) Comments/Description of MILOA: Free text box for any additional information

    viii. Add another Military Duty Detail – allows pilot to submit an additional MILOA notice. Up to three total MILOA notices may be submitted.

    ix. The MILOA will be posted on the pilot's board as a continuous MILOA regardless of whether or not it conflicts with scheduled activities.

7. Resolving conflicts between Military Duty and SWA Duty (MILOA Trip Pulls). When MILOA dates conflict with scheduled SWA activities, the conflict will be resolved as follows:

    a. The pilot may attempt to resolve the scheduling conflict through ELITT and/or Trip Trade Give Away (TTGA).

    b. Scheduling will resolve the conflict using the following guidelines:

        i. Crew Scheduling will determine the most cost effective point at which to move to pull a pilot to comply with MILOA requirements.

        ii. If a pairing is split, the pilot will be pulled from and/or rejoined to the pairing within 1.6 TFP as determined by the contractual split points in Section 6.B.13.d.i.(d).i of the Agreement. The pilot can request alternate split points on the comments section of the electronic MILOA Notification Form.

SWA-HuntsII 009103

       iii.  Pairings modified by the Company and returned to the pilot will have the pay prorated as per Section 4.I.9.

       iv.  For MILOA conflicts that involve a Reserve pairing, only reserve days that actually conflict will be pulled.

  c.  The pilot will be provided "must ride" status in order to join or rejoin pairings split due to MILOA conflicts. Deadheading provisions set forth in Section 5.S. of the Agreement will apply.

  d.  Crew Scheduling will be required to ensure that the pilot returns to the domicile at or before the "Depart Domicile Time" in order to meet military commitments. If delays begin to impact the pilot's ability to meet this time, crew scheduling will confer with the pilot. All options will be considered to return the pilot to domicile in time. MILOA times will not be changed without concurrence of the pilot.

8.  Changes or cancellations of military leave. If the scheduled MILOA changes or is cancelled, the pilot will call scheduling directly as soon as practical to have the leave removed/updated on the pilot's schedule. To ensure proper coordination the pilot should also contact his/her Base Coordinator at the earliest opportunity to advise them of the change. The pilot may submit an amended MILOA Notification form in lieu of calling scheduling or the Base Coordinator. If there was a trip pull associated with the MILOA, the pilot may be assigned the pairing in accordance with Section 6.B.7.b. of the Agreement.

9.  Health and Welfare Benefits

  a.  For a period of service fewer than thirty-one (31) days, a pilot will be considered to be in active employment status for purposes of Health and Welfare Benefits. The pilot will continue the coverage in effect as of the last day worked before military leave began for the entire MILOA, with premiums/contributions at active employee rates.

  b.  For a period of service thirty-one (31) days or greater, the pilot will be considered to be on a leave of absence for purposes of Health and Welfare Benefits. In such a case, Health and Welfare Benefits will be as described in the Southwest Airlines Co. Employee Benefit Plan Book (SPD). The SPD contains additional provisions and is the governing document for Health and Welfare Benefits while on MILOA. The SPD is available on SWALife >About Me >My Health >Health & Welfare Information >Benefits Information >Summary Plan Descriptions >Employee Benefits Plan Book (SPD), or by calling Health & Welfare Benefits at (800) 551-1211 or emailing askbenefits@wnco.com. In general:

       i.  Health Care Benefits and contributions will continue unaffected for a period of one hundred twenty (120) days, plus an additional period determined by a formula based on TFP in the pilot's sick bank and OJI bank as well as remaining vacation. This period starts on the pilot's last day actively at work. Note: Accrued sick trips and accrued OJI trips will be used for the purpose of computing the

SWA-HuntsII 009104

       extension period only.  A pilot on MILOA shall retain his/her Sick
       and OJI banks.

ii. The Benefits Department will notify the pilot before this extension
period expires.  At that point, the pilot has the option of continuing
health benefits through COBRA at COBRA rates.

iii. The pilot will have the choice to discontinue Health and Welfare
Benefits.  To do so, the pilot must contact the Benefits Department
at (800) 551-1211 or askbenefits@wnco.com to coordinate.

10. Monthly Bidding: If the pilot will be on a MILOA for an entire bid period, a
monthly bid is not required.  The pilot may elect to submit a bid for vacation
(a "paper bid" for pay purposes) or a vacancy bid.  Vacation bidding will be in
accordance with Section 11 of the Agreement.  Vacancy bidding will be in
accordance with Section 9 of the Agreement while on MILOA. The pilot's
vacancy bid will be used to determine their reemployment position.  As a
general rule, the pilot is entitled to reemployment in the position that he or
she would have attained with reasonable certainty if not for the absence due
to uniformed service (Ref 20 CFR Part 1002.191-199). If the reemployment
position requires the pilot to complete Captain Upgrade Training refer to
Section 16e of this document.

11. Pass Privileges: This includes on-line and off-line pass privileges.

a. Pass benefits are unchanged for the first thirty (30) days of a continuous
MILOA.

b. For MILOAs of greater than thirty (30) days:
   i. On-line travel:  SWA pass privileges continue unchanged for pilots
   and their eligible travelers.
   ii. Off-line travel: Pilot and dependent/companion off-line pass
   privileges are discontinued beginning on the 31st day of any MILOA.
   Privileges will be restored upon completion of the MILOA.

12. Jumpseat Privileges:  Off-line and on-line flightdeck jumpseat privileges
remain unchanged while on MILOA.

13. Known Crewmember (KCM): This program is intended for use by pilots
performing SWA Duty.  Pilots on long term MILOA will be inactive in the
KCM database for the duration of the MILOA.

14. Vacation

a. A pilot is authorized to use vacation time for MILOA.

b. A pilot who has been awarded/scheduled vacation but is unable to take the
vacation due to MILOA will be paid for the vacation in accordance with the
Agreement.  The pilot may choose to be temporarily returned to "Active
Employee" status to be placed on vacation.  The pilot may elect to submit a
bid to determine vacation pay. Any earned vacation that is unused due to

SWA-HuntsII 009105

MILOA will be paid in that year.  Vacation does not carry over to the next year.

c.  Vacation accrual: Upon return from a long term MILOA, vacation accrual will be accomplished by a look-back for twelve (12) calendar months beginning with the return date. All vacation eligibility which would have been accrued if the pilot had not been on MILOA will be restored. The months that fall in the current year will be accrued toward the next year's vacation. (For example: a third-year First Officer returning to SWA on 1 Sep 2009 from a 24-month MILOA.  From that date, look back 12 months to begin calculating vacation accrual.  That gives the pilot Sept 2008 through Dec 2008 for vacation accrual, earning five days of vacation to take in 2009. In this example, the pilot also gets vacation accrual for Jan 2009 through Aug 2009 for nine days of vacation in 2010). An extension of a pilot's MILOA and the consequent change in the 12-month look back period could result in the loss of vacation days awarded based on the pilot's original return date. If these vacation days are the in future, they will be removed by Crew Planning.  If they are in the past and have been paid, Pilot Payroll will work with the pilot to establish a payment schedule to repay the Company upon the pilot's return.

d.  Vacation bidding.  A pilot on MILOA will be eligible to bid vacation during the normal bidding cycle. Unless a pilot knows that he/she will not return to SWA for the entire year, the pilot should participate in the vacation bidding process.  If the pilot has vacation days accrued but does not bid, he/she will be assigned from the remaining pool of vacation weeks. If the pilot is given vacation accrual due to the 12-month look back after the vacation bid process has been completed, the pilot must contact Crew Planning to be assigned vacation from the pool of available weeks.

15. Reemployment after MILOA

a.  In general, if a Southwest Airlines pilot has been absent from Southwest Airlines due to uniformed service, he or she will be eligible for reemployment under USERRA by meeting the following criteria:

   i.  The pilot provided advance notice of the employee's service. (See Section 4 and 5);

   ii.  The pilot has five years or less of cumulative service in the uniformed services. (See Section 15d);

   iii.  The pilot timely returns to work or applies for reemployment, if required (See Section 15b); and,

   iv.  The employee has not been separated from service with a disqualifying discharge or under other than honorable conditions.

b.  Generally, Southwest Airlines does not require an application for re-employment following MILOA as discussed in USERRA. It is assumed that the pilot will return to work within the USERRA specified timeframes unless the pilot informs the Chief Pilot or SWA Flight Operations Military Liaison otherwise. The USERRA timeline for returning to work is as follows:

SWA-HuntsII 009106

    i.  Period of service less than thirty-one (31) days, the pilot will report back to work at the beginning of the next scheduled work period.

    ii.  Period of service more than thirty (30) days but less than one hundred eighty-one (181) days. The pilot will contact the Chief Pilot (written or verbal) not later than fourteen (14) days after completing service.

    iii.  Period of service more than one hundred eighty (180) days. The pilot will contact the Chief Pilot (written or verbal) not later than ninety (90) days after completing service.

c.  Upon completing service in the uniformed services, the pilot will notify their Chief Pilot of the expected return date. Coordination with the Chief Pilot prior to completion of military service may expedite requalification training scheduling, but is not required. The pilot may notify the Chief Pilot verbally or in writing (e-mail is acceptable). The Chief Pilot will then notify Crew Planning, Benefits, Training scheduling and Payroll of the effective date of return. (See Returning from MILOA checklist in Attachment 1).

d.  Pursuant to USERRA, an employee may perform service in the uniformed services for a cumulative period of up to five (5) years and retain reemployment rights with the employer. The exceptions to this rule are described in 20 CFR 1002.103. Pilots that want to confirm that the Company has accurate exemption status of their uniformed service may do so by contacting the SWA Flight Operations Military Liaison to coordinate. For periods of service that exceed 30 days, Pilots must, upon the request of the employer provide documentation connected with that service as described in 20 CFR Part 1002.121. Documents that satisfy the requirement to establish eligibility for reemployment after a period of service of more than 30 days are defined in 20 CFR 1002.123 and will only be requested by the Company at the completion of the MILOA, the Pilot may provide these sooner if desired.

e.  The Company will promptly reemploy the pilot when he or she returns from a period of service. "Prompt reemployment" means as soon as practicable under the circumstances of each case. Absent unusual circumstances, reemployment must occur within two (2) weeks of the date the pilot provides the Company. (See Returning from MILOA checklist in Attachment 1).

    i.  The Company generally defines 5 calendar days as prompt reemployment when returning from long term MILOA.

    ii.  In cases where a pilot returning from a long term MILOA requires training the following actions should be completed:

        a)  A "Pullsheets" entry will be made by the Pilots Crew Base Chief Pilot to return the Employee to active status effective the date they indicate they are available to work.

        b)  Unless training is available sooner beginning on the sixth (6th) calendar day following the established "available to work" date and continuing until the Pilot enters requalification training, the Pilot will be paid a daily pro rata

SWA-HuntsII 009107

TFP based upon schedule line guarantee TFP for the month not to exceed the Training Pay Guarantee Chart from Section 4.K.6 while in training.

   c) The pay rate will be establishing pursuant to USERRA provisions and will be based on the Pilots pay rate at his/her date of return to work.

f. A pilot must have a current FAA Medical Certificate prior to beginning training or SWA flying. Pilots may bid their schedule in accordance with Section 5 of the Agreement once a return to work date has been established. If the pilots medical certificate has lapsed while on MILOA the pilot may bid provided the Chief Pilot has concurred that it is reasonable to expect that the individual will have a current FAA medical certificate before reporting for any training or flying assignment.

g. Flight Operations Payroll is the point of contact for payroll issues resulting from MILOA (FlightOpsPayroll@wnco.com, (469) 603-1093)

h. Health Care Premiums: Premiums are automatically deducted from monthly pay. This will continue while on MILOA for the time specified in paragraph 9. Once there are insufficient funds in the pilot's payroll account, the pilot will be billed for the applicable benefits. Main Payroll will attempt to recover the debt in a very short amount of time. Upon return from MILOA, there will be a debit for these benefits on the account. The pilot may contact Main Payroll to determine payment schedule if required and/or desired.

i. Health plan coverage will be reinstated upon actual reemployment or the established return to work date.

16. Training Following MILOA: Training required upon return from a MILOA will be as directed in the Flight Operations Training Manual (FOTM).

a. A pilot should contact his/her Chief Pilot in advance of his/her anticipated return from MILOA to initiate the requalification process. This is essential because requalification cannot begin until the pilot is returned to Active Employee status and that is accomplished through the Chief Pilot's office.

b. The Chief Pilot will coordinate with the Flight Operations Training Scheduling Department for required requalification training.

c. The level of requalification training required is based upon the number of days that have elapsed since the date of the first flight of the last three (3) consecutive flights flown by the pilot in a SWA B737 aircraft and the date of the requalification training. The break points for the levels of requalification training are determined by reference to the Flight Operations Training Manual found on SWALife. NOTE: Each level of requalification contains differing requirements for past due recurrent events.

d. A pilot may request an additional training period, if desired. See the Agreement, Section 23.F.

e. For First Officer's requiring Captain Upgrade training upon reemployment, Section 23.M.4 of the Agreement will apply. However, in

SWA-HuntsII 009108

those cases where the pilot is restricted from attending upgrade pursuant to Section 23.M.4 of the Agreement, the pilot will be paid Captain Pay Rate retroactively to the date calculated under Section 15.e.ii.a upon successful completion of Captain Upgrade Training. Retroactive Pay will be computed based on the actual TFP flown as an FO pursuant to Section 23.M.4 of the Agreement.

17. 401K Plan: After a pilot returns from MILOA, he or she will be allowed to make up his or her missed contributions or elective deferrals including Company match. Generally, these makeup contributions or elective deferrals must be made during a time period starting with the date of reemployment and continuing for up to three times the length of the employee's immediate past period of uniformed service, with the repayment period not to exceed five years. For questions about the 401k make-up contributions, contact Retirement Benefits at (800) 551-1211 or SWAPA at (800) 969-7972. The calculation is available for every pilot who has taken MILOA and will be provided upon request.

18. Profitsharing: After the pilot returns from MILOA, he or she will receive a profitsharing "make-up" contribution for the period of time the pilot was on MILOA. The credit will be based on an estimate of the compensation the pilot would have earned had he or she remained active with the Company during the MILOA period and the profitsharing percentage factor for the year for which the make-up contribution pertains. For questions about the profitsharing make-up contribution, contact Retirement Benefits at (800) 551-1211. The calculation is available for every pilot who has taken MILOA and will be provided upon request.

19. Stock Options: While on MILOA a pilot may exercise stock options under his or her respective stock option plan.

20. Benefits Booklet and Checklist. The Company has published a guide "You're Protecting Our Freedoms--We're Protecting Your Benefits" to help service members understand how their benefits will be affected by their military service. The guide includes checklists of items that each service member should consider when entering into and when returning from military service and addresses the areas of Health & Welfare benefits, 401(k), ProfitSharing and other retirement benefits, Stock Options, and Pass Privileges. The guide is available on SWALife >About Me >My Life Events >Military Leave.

21. Military Appreciation Program (MAP) and Registration: The Military Appreciation Program is a means for Southwest Airlines to express gratitude and admiration for Southwest Airlines Employees who currently serve in America's military services through affiliation with the National Guard or Reserve Forces. Participation in the Military Appreciation Program is voluntary and requires registration. Eligible Employees who elect to participate will be awarded SWAG Points as determined by the program in

SWA-HuntsII 009109

effect at the time the Employee served after opting into the MAP. The employee is required to opt out when no longer eligible (i.e., no longer serving in the uniformed services).  For Program Rules, Eligibility and Registration refer to SWALife>Flight Ops>Our Business>MILOA.

SWA-HuntsII 009110

## Attachment 1: CHIEF PILOT'S CHECKLIST FOR
## PILOTS RETURNING FROM MILOA REQUIRING RETRAINING

_____ If the Pilot might have been on MILOA for more than 1825 cumulative days (5 years), you should contact John Freed, HQ Flight Ops, John.freed@wnco.com office 469-603-0733 to verify eligibility for re-employment. Once reemployment eligibility has been verified, proceed as follows.
NOTE: The Pilot should have already been in communication with HQ Flight Ops regarding reemployment eligibility.

_____ Determine, from the Pilot, the availability date for reemployment ("Return to Work" date).
- Advise the Pilot that this date will be used to return them to "Active Employee" status
- Beginning this date, they are considered available to SWA for scheduling training or other duties. If they will be unavailable to be scheduled with reasonable notice (i.e. 24 hours), they should revise their "return to work date".
- Advise that they will return to "paid" status within 6 days
  - o If training is available within 6 days, pay will begin when they begin training
  - o If training is not immediately available, pay will begin on day 6 at a training rate, e.g. pro rata TFP based upon schedule line contract guarantee TFP.
    - ▪ This rate will continue until training is begun
    - ▪ Pay rate will be based on their seniority per USERRA.
- If they accept duty assignments (i.e. office duty) other than training prior to the 6th day, their pay will begin on the first day worked.
- Advise Pilot that they will be contacted regarding required training scheduling
- Confirm contact information for the Pilot. Inform Pilot of the following requirements:
  - o Current Passport
  - o Current plastic FAA Pilot's License including "English Proficient"
  - o For First Officer's and Check Airmen: current FCC Radiotelephone Operator's Permit

_____ Ensure a PullSheet entry is made returning the Employee to active status effective the "date of return" provided by the Pilot.

_____ Contact Training Scheduling
- Provide Training Scheduling with the Pilot's return date and request a training date for requalification.
- **DIRECT PILOT NOT TO CONTACT TRAINING SCHEDULING UNTIL ADVISED TO DO SO**

_____ Once Training Scheduling determines a start-training date for requalification, contact the Pilot, advise them of the date and direct them to communicate with Training Scheduling.

_____ **Pay Coordination**
- If training will begin within 5 days of the return to work date provided by the Pilot, no further action regarding pay is required.
- If training will **not** begin within 5 days of the return to work date provided by the Pilot, notify Flight Ops Payroll (469-603-1093) to begin USERRA pay rate beginning on the 6th calendar day following the "return to work" date provided by the Pilot.
  - o Confirm this telecom with an email to: FlightOpsPayroll@wnco.com ; colleen.ireland@wnco.com; John.freed@wnco.com. SUBJ: MILOA Return to Work Pay. "Flight Ops Employee John Doe, EE 12345, will return to work effective [date1]. Requalification training will begin on [date2]. Please initiate payroll action to begin pay based upon pro rata of schedule line guarantee rate TFP beginning [date1 + 5 calendar days] and continuing until Pilot enters requalification training."

_____ Retain this checklist and a copy of the email sent in the Pilot's folder in the Crew Base

SWA-HuntsII 009111

This handbook accepted to satisfy the Agreement, Paragraph 12.F.1.c. on this __30TH__ day of __October__, 2014.

_(signature)_ _____

Captain Craig J. Drew
Vice President
Flight Operations
Southwest Airlines Co.

_(signature)_ _____

Captain Mark Richardson
President
Southwest Airlines Pilots' Assoc.

SWA-HuntsII 009112