DOUGLAS J. FARMER, CA Bar No. 139646
douglas.farmer@ogletree.com
BRIAN D. BERRY, CA Bar No. 229893
brian.berry@ogletree.com
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
One Embarcadero Center, Suite 900
San Francisco, CA 94111
Telephone:  415.442.4810
Facsimile:  415.442.4870

KRISTIN S. HIGGINS *(Pro Hac Vice)*
kristin.higgins@ogletree.com
OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.
Preston Commons West
8117 Preston Road, Suite 500
Dallas, TX 75225
Telephone:  (214) 987-3800
Facsimile:  (214) 987-3927

Attorneys for Defendant
SOUTHWEST AIRLINES CO.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAYSON HUNTSMAN, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SOUTHWEST AIRLINES CO.,<br><br>Defendant. | Case No. 4:19-cv-00083-PJH<br><br>**NOTICE OF FILING OF DOCUMENTS WITH REVISED REDACTIONS PURSUANT TO LOCAL RULE 79-5(F)**<br><br>**(RE: DKT. NOS. 105, 107)** |

1    Pursuant to Local Rule 79-5(f), Defendant Southwest Airlines Co. hereby gives notice of

2 filing documents with revised redactions that comply with the Court's Order re Administrative

3 Motion to Seal (Re: ECF No. 99) and its Order re clarification (Re: Dkt. No. 106).  *See* Dkt. Nos.

4 105, 107.

5    The following documents are attached hereto with redactions that comply with the Court's

6 orders:

7
8    Ex. 1:    Defendant Southwest Airlines Co.'s Opposition to Plaintiff's Motion for Class
             Certification [redacted];

9    Ex. 2:    Exhibit A to the Declaration of Brian D. Berry in Support of Defendant
             Southwest Airlines Co.'s Opposition to Plaintiff's Motion for Class
10            Certification [redacted];

11   Ex. 3:    Exhibit B to the Declaration of Brian D. Berry in Support of Defendant
             Southwest Airlines Co.'s Opposition to Plaintiff's Motion for Class
12            Certification [redacted];

13
14   Ex. 4:    Exhibit 1 to the Declaration of John Freed in Support of Defendant Southwest
             Airlines Co.'s Opposition to Plaintiff's Motion for Class Certification [no
15            redactions]; and

16   Ex. 5:    Exhibit 2 to the Declaration of John Freed in Support of Defendant Southwest
             Airlines Co.'s Opposition to Plaintiff's Motion for Class Certification [no
17            redactions].

18

19
20 DATED: March 3, 2021                         OGLETREE, DEAKINS, NASH,
                                              SMOAK & STEWART, P.C.

21

22                                            By: */s/ Brian D. Berry*
                                                 DOUGLAS J. FARMER
23                                               BRIAN D. BERRY
                                                 KRISTIN S. HIGGINS
24
                                                 Attorneys for Defendant
25                                               SOUTHWEST AIRLINES CO.

26

27                                                                          46248870.1
28

EXHIBIT 1

DOUGLAS J. FARMER, CA Bar No. 139646
douglas.farmer@ogletree.com
BRIAN D. BERRY, CA Bar No. 229893
brian.berry@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Steuart Tower, Suite 1300
One Market Plaza
San Francisco, CA 94105
Telephone:     415.442.4810
Facsimile:     415.442.4870

KRISTIN S. HIGGINS (*Pro Hac Vice*)
kristin.higgins@ogletree.com
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
Preston Commons West
8117 Preston Road, Suite 500
Dallas, TX 75225
Telephone:  (214) 987-3800
Facsimile:  (214) 987-3927

Attorneys for Defendant
SOUTHWEST AIRLINES CO.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAYSON HUNTSMAN, on behalf of himself and all others similarly situated,<br><br>            Plaintiff,<br><br>     v.<br><br>SOUTHWEST AIRLINES CO.,<br><br>            Defendant. | Case No. 4:19-cv-00083-PJH<br><br>**DEFENDANT SOUTHWEST AIRLINES CO.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:          January 27, 2021<br><br>Time:          9:00 a.m.<br><br>Location:     Oakland Courthouse<br>                    Courtroom 3, Third Floor<br>                    Hon. Phyllis J. Hamilton |

1

2

# **TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................... 1

II.     FACTUAL BACKGROUND .................................................................. 2

III.    LEGAL STANDARD .............................................................................. 3

IV.     ARGUMENT ........................................................................................... 3

        A.      Plaintiff Fails to Show Commonality ........................................... 3

                1.      Plaintiff's definition of "short term" military leave is not common ............. 5

                2.      CBA-specific employee control over schedules and leaves defeats
                        commonality ........................................................................... 6

                3.      CBA-specific rules for sick leave accrual defeat commonality ................... 9

                4.      Plaintiff's other questions do not satisfy commonality ............................... 10

        B.      Southwest's Res Judicata Defense Defeats Typicality ............................. 11

        C.      Plaintiff Is Inadequate to Represent Non-Pilots ...................................... 13

        D.      Plaintiff Fails to Show Predominance ..................................................... 14

                1.      Southwest's laches defense requires individual trials ................................. 15

                2.      Individual inquiries into military service dates predominate ...................... 18

                3.      Plaintiff's failure to provide a damages model defeats
                        predominance .......................................................................... 20

V.      CONCLUSION ..................................................................................... 22

DEFENDANT SOUTHWEST'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
   731 F.3d 952 (9th Cir. 2013) .................................................................................................3

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ....................................................................................................13, 14

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) .............................................................................................................3

*Case v. Judd*,
   No. 8:19-CV-607-T-33TGW, 2020 WL 440069 (M.D. Fla. Jan. 28, 2020) .............................13

*Clarkson v. Alaska Airlines, Inc.*,
   No. 2:19-CV-0005-TOR, 2019 WL 2503957 (E.D. Wash. June 17, 2019),
   *motion to certify appeal denied*, 2019 WL 3773756 (E.D. Wash. Aug. 8, 2019) .....................10

*Clarkson v. Alaska Airlines, Inc.*,
   No. 2:19-CV-0005-TOR, 2020 WL 5899398 (E.D. Wash. Oct. 5, 2020) ...........................15, 16

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) .............................................................................................................21

*Corbin v. Sw. Airlines, Inc.*,
   2018 WL 4901155 (S.D. Tex. Oct. 9, 2018) ..........................................................................15

*Couveau v. Am. Airlines, Inc.*,
   218 F.3d 1078 (9th Cir. 2000) .............................................................................................15

*Danjaq LLC v. Sony Corp.*,
   263 F.3d 942 (9th Cir. 2001) ...............................................................................................15

*Dorris v. TXD Servs., LP*,
   753 F.3d 740 (8th Cir. 2014) .................................................................................................4

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ...........................................................................................3, 13

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) ...........................................................................................................11

*Gruca v. U.S. Steel Corp.*
   495 F. 2d 1252 (1974) .........................................................................................................16

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ..........................................................................................17, 20

DEFENDANT SOUTHWEST'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

*Hoefert v. Am. Airlines, Inc.*,
    438 F. Supp. 2d 724 (N.D. Tex. 2020) ................................................................4

*Holmberg v. Armbrecht*,
    327 U.S. 392 (1946) .........................................................................................15

*Int'l Union of Operating Eng'rs-Emp'rs Constr. Indus. Pension, Welfare &
    Training Tr. Funds v. Karr*,
    994 F.2d 1426 (9th Cir. 1993) ..........................................................................12

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013) .............................................................................21

*Lopes v. Fremont Freewheelers*,
    No. C 07-6213 PJH, 2008 WL 3303970 (N.D. Cal. Aug. 7, 2008), *aff'd*, 362 F.
    App'x 874 (9th Cir. 2010) ..................................................................11, 12, 13

*Maher v. City of Chicago*,
    406 F. Supp. 2d 1006 (N.D. Ill. 2006)) .............................................................15

*McLain v. Apodaca*,
    793 F.2d 1031 (9th Cir. 1986) ..........................................................................12

*McPhail v. First Command Fin. Planning, Inc.*,
    247 F.R.D. 598 (S.D. Cal. 2007) ......................................................................14

*Nat'l Ass'n of Gov't Employees v. City Public Serv. Bd. of San Antonio*,
    40 F.3d 698 (5th Cir. 1994) ..............................................................................15

*Navellier v. Sletten*,
    262 F.3d 923 (9th Cir. 2001) .......................................................................17, 20

*Opperman v. Kong Techs., Inc.*,
    No. 13-CV-00453-JST, 2017 WL 3149295 (N.D. Cal. July 25, 2017)....................21

*Owens v. Kaiser Found. Health Plan, Inc.*,
    244 F.3d 708 (9th Cir. 2001) ............................................................................12

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ..............................................................................4

*Pickman v. Am. Exp. Co.*,
    No. C 11-05326 WHA, 2012 WL 258842 (N.D. Cal. Jan. 27, 2012) ....................13

*Rangel v. PLS Check Cashers of Cal., Inc.*,
    No. CV 16-6119 DMG (SSx), 2016 WL 6821788 (C.D. Cal. Nov. 16, 2016) ...........13

*Rogers v. City of San Antonio*,
    392 F.3d 758 (5th Cir. 2004) ..............................................................................4

*RSI Corp. v. Int'l Bus. Machines Corp.*,
   No. 5:08-CV-3414, 2012 WL 3277136 (N.D. Cal. Aug. 9, 2012)............................17

*Sandoval v. Cty. of Sonoma*,
   912 F.3d 509 (9th Cir. 2018) .............................................................................11, 20

*Seiler v. Hollidaysburg Am. Legion Ambulance Serv., Inc.*,
   2011 WL 4017965 (W.D. Pa. Sept. 8, 2011) ............................................................15

*In re SFPP Right-of-Way Claims*,
   No. CV 15-07492 JVS, 2017 WL 2378363 (C.D. Cal. May 23, 2017) ......................16

*Stotz v. Mophie Inc.*,
   No. CV 16-8898-GW (FFMx), 2017 WL 11571083 (C.D. Cal. Dec. 14, 2017) .........14

*Strauss v. Angie's List, Inc.*,
   No. 2:17-CV-02560-HLT-TJJ, 2018 WL 5722561 (D. Kan. Nov. 1, 2018)...............15

*Sumrall v. Ensco Offshore Co.*,
   No. 2:17-CV-48-KS-MTP, 2018 WL 2088761 (S.D. Miss. May 7, 2018)..................15

*Tully v. Dep't of Justice*,
   481 F.3d 1367 (Fed. Cir. 2007) .................................................................................4

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) .............................................................................................14

*Valenzuela v. Union Pac. R.R. Co.*,
   No. CV-15-01092-PHX-DGC, 2017 WL 679095 (D. Ariz. Feb. 21, 2017) ..............16

*W. Radio Servs. Co. v. Glickman*,
   123 F.3d 1189 (9th Cir. 1997) ..................................................................................12

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ......................................................................................3, 10, 11

*Ward v. Apple Inc.*,
   784 F. App'x 539 (9th Cir. 2019).............................................................................21

*Whittaker Corp. v. Execuair Corp.*,
   736 F.2d 1341 (9th Cir. 1984) ..................................................................................17

**STATUTES**

Uniformed Services Employment and Reemployment Rights Act (USERRA) ...................... *passim*

38 U.S.C. § 4312(a)(2) ......................................................................................................5

38 U.S.C. § 4316(b)........................................................................................1, 4, 10, 12

38 U.S.C. § 4316(b)(1)(B)................................................................................................4

Fair Labor Standards Act..................................................................................................13

**OTHER AUTHORITIES**

20 C.F.R.

    § 1002.103 ...........................................................................................................5

    § 1002.150(a)........................................................................................................4

    § 1002.150(b) ...............................................................................................4, 6, 20

Fed. R. Civ. P.

    Rule 23.............................................................................................................3, 13

    Rule 23(a) .......................................................................................................11, 14

    Rule 23(a)(2) ...............................................................................................3, 10, 11

    Rule 23(a)(3) .....................................................................................................16

    Rule 23(b)(3) ....................................................................................................14

2 W. Rubenstein, Newberg on Class Actions § 4:50 (5th ed. 2012) ..................................14

Richard Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L.
    Rev. 97 (2009) ....................................................................................................3

I.      INTRODUCTION

Plaintiff Jayson Huntsman asks this Court to certify a class of employees who took "short term" military leave from their employment with Defendant Southwest Airlines Co. ("Southwest") at any time since October 2004.  Plaintiff's theory is that Southwest should compensate for these military leaves of 14 days or fewer because Southwest compensates employees for sick leave, jury duty, and bereavement leave, which are allegedly "comparable" to "short term" military leave under the federal Uniformed Services Employment and Reemployment Rights Act (" USERRA"), 38 U.S.C. § 4316(b).

The Court should deny Plaintiff's request.  The term "short term" military leave is not defined, mentioned, or referenced in USERRA or the implementing regulations.  Nor is the definition of "short term" military leave uniform across workgroups or over time at Southwest.  Thus, the proposed class members are not similarly situated with respect to "short term" military leave, as Plaintiff has defined it.

In addition, the "comparability" question cannot be answered in a single stroke that fairly addresses employees who belong to 11 different unions that separately negotiated and renegotiated their members' employment conditions, including the terms governing their leaves of absence, over the last 16 years.  Putative class members are subject to CBA-specific rules governing their work schedules that affect whether and for how long they take leave in many instances, and these considerations materially affect the "comparability" analysis.  Further, Plaintiff's military service records diverge considerably from Southwest's military leave records for him, which demonstrates that individualized evidentiary issues affecting liability would predominate over any common questions at trial.  Plaintiff also fails to offer any plausible damages model in light of his attack on the reliability of Southwest's leave records and the military's service records.

Southwest's defenses undermine the value of Federal Rule of Civil Procedure ("Rule") 23's claim-aggregating device as well.  Southwest's laches defense will vary dramatically across the proposed class, depending on the amount of time that different proposed class members have slept on their rights and the time period for which Southwest has maintained leave records for each proposed class member, which varies across workgroups.  Also, Plaintiff is uniquely exposed to

DEFENDANT SOUTHWEST'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

1  Southwest's res judicata defense because he could have brought his claim in the previous class

2  action lawsuit that he filed, which alleged a claim under USERRA § 2316(b) that differs from the

3  current claim only in the "benefit" it seeks in relief.

4      Thus, the Court should deny Plaintiff's motion.

5  **II.    FACTUAL BACKGROUND**

6      Southwest is an airline that operates thousands of flights each day with service to over 100

7  domestic airports in 40 states and several international airports.  ECF 29-2 (Thorsen Decl. ¶ 4).

8  Southwest's commitment to its military employees is widely recognized.  The Pilots' union, the

9  Southwest Airlines Pilot Association ("SWAPA"), acknowledges Southwest's "long history of

10 strong support for pilots affiliated with the National Guard or reserve forces."  Declaration of Brian

11 D. Berry, Ex. E (Southard Dep. at 53:11–19, Ex. 5 (Military Handbook at p. 2)); *see also id.* at

12 83:5–85:17 (approximately 12 percent of Southwest Pilots are veterans).[1]  Given Southwest's track

13 record of support for military employees, it is "nominated year after year for being one of the best

14 companies to work for, for vets."  Ex. E (Southard Dep. at 83:5–85:17).

15     Although some Southwest employees are not subject to a union contract, the large majority

16 of Southwest's workforce is unionized.  Plaintiff's proposed class definition includes current and

17 former employees whose conditions of employment at Southwest were collectively bargained by

18 11 different labor unions.  ECF 78 (Mot. at 3–4).  Each of these labor unions and Southwest have

19 renegotiated their respective CBAs several times during the class period, which stretches back to

20 October 2004.  *E.g.*, Ex. I (Munguia Dep., Ex. 3 (summary of CBAs); Ex. E (Southard Dep. at

21 11:11–17, 22:9–24:9, Ex. 3 (three CBAs with Pilots' union)); Ex J (Ireland Dep. at 20:25–26:17,

22 Ex. 5 (three CBAs with Flight Instructors' union)); Ex. F (Rea Dep. at 21:11–23:3, Ex. 5 (three

23 CBAs with Flight Attendants' union)).

24     As Plaintiff observes, the CBAs do not include a right for employees to receive

25 compensation during periods of military leave, although employees can use accrued vacation, and

26 in some instances accrued sick leave pay, to receive compensation during periods of military leave.

27

28 _____

[1] All "Ex." cites with alphabetic exhibits herein (e.g., Ex. A, Ex. B, etc.) refer to the exhibits attached to the Declaration of Brian D. Berry, filed concurrently with this memorandum.

*See, e.g.*, Ex. E (Southard Dep. at 57:3–5); Ex. H (Jordan Dep. at 46:6–15); Ex. F (Rea Dep. at 79:12–25).  The CBAs allow employees to take paid sick leave to the extent that employees have accrued sick leave and experience a qualifying illness.  *See, e.g.*, Ex. E (Southard Dep. at 21:20–23:2, Ex. 2 (SWAPA CBA at pp. 12-1 to 12-5)); Ex. H (Jordan Dep. at 52:4–14, Ex. 9 (TWU 555 CBA at p. 40)).  The CBAs also allow employees to take paid jury duty leave and to take up to four days of paid bereavement leave in the event that an employee experiences the death of certain close family members.  *See, e.g.*, Ex. E (Southard Dep., Ex. 2 (SWAPA CBA at pp. 2-3, 12-1)); Ex. H (Jordan Dep., Ex. 9 (TWU 555 CBA at pp. 15, 53)).

As explained below, these superficial similarities provide insufficient support for Plaintiff's motion for class certification.

## III.    LEGAL STANDARD

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)).  To decide whether class treatment is appropriate, the Court conducts a "rigorous analysis" of the record to determine if Plaintiff has met his burden of establishing the elements of Rule 23.  *See Dukes*, 564 U.S. at 351.  In conducting its analysis, the Court evaluates the merits of Plaintiff's claims to the extent the merits "overlap" with the Rule 23 requirements.  *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011).

## IV.    ARGUMENT

### A.    Plaintiff Fails to Show Commonality

Rule 23 requires a showing that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  Merely reciting common questions and asserting violation of the same law are insufficient to show commonality "since any competently crafted class complaint literally raises common questions."  *Dukes*, 564 U.S. at 349 (quoting Richard Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131–32 (2009)) (internal quotation marks and alteration omitted).  Rather, commonality exists only where a plaintiff demonstrates the existence of at least one common answer to a "significant question" that is "apt to drive the

1    resolution of the litigation." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 963 (9th Cir. 2013).

2    "Courts determine commonality with reference to the nature of the underlying claims." *Parsons v.*

3    *Ryan*, 754 F.3d 657, 676 (9th Cir. 2014).

4            In this case, Plaintiff's USERRA claim turns on whether military leave is "comparable" to

5    sick leave, jury duty leave, or bereavement leave as each type of leave was applied to each of the

6    11 different workgroups.  The implementing regulations for USERRA identify three non-exclusive

7    factors that inform the comparison: (i) the duration of the leaves, (ii) the purpose of the leaves, and

8    (iii) an employee's ability to choose when to take the leaves.  *See* 20 C.F.R. § 1002.150(b).

9    Whether two forms of leave are comparable depends generally on "the ***circumstances*** in which the

10   benefits are provided" rather than any particular factor.  *Tully v. Dep't of Justice*, 481 F.3d 1367,

11   1369 (Fed. Cir. 2007) (emphasis added); 20 C.F.R. § 1002.150(b).  For instance, considering these

12   comparative circumstances of leaves, the Northern District of Texas granted summary judgment in

13   favor of American Airlines earlier this year, finding jury duty, vacation, and sick leave were not

14   comparable to military leave.  *Hoefert v. Am. Airlines, Inc*., 438 F. Supp. 2d 724, 739–41 (N.D.

15   Tex. 2020).

16           The fundamental "comparability" question is not amenable to a common answer because

17   the proposed class members are not subject to any uniform policy governing their leaves of

18   absence.  Rather, their leaves are governed by the terms of numerous CBAs that labor unions have

19   negotiated and renegotiated with Southwest over the years.  *See supra* at § II.  The CBAs have

20   materially different terms that prevent a common answer to the core question about whether

21   military leave is "comparable" to sick leave, jury duty leave, or bereavement leave across CBAs

22   and across work groups.  This is especially true because USERRA § 4316(b) specifically asks

23   whether an employer "generally provides" a benefit to employees on non-military leaves who have

24   a "***similar seniority, status, and pay***" as an employee on military leave.  38 U.S.C. § 4316(b)(1)(B)

25   (emphasis added); 20 C.F.R. § 1002.150(a) (analysis conducted on "similarly situated"

26   employees); *Rogers v. City of San Antonio*, 392 F.3d 758, 769 (5th Cir. 2004) (analysis conducted

27   "in relation to peer employees"); *Dorris v. TXD Servs., LP*, 753 F.3d 740, 745 (8th Cir. 2014)

28   (quoting *Rogers*).

1

**1.       Plaintiff's definition of "short term" military leave is not common**

2       Plaintiff defines his class to include Southwest employees who took "short term" military

3   leaves, which Plaintiff artificially defines as a military leave that lasts "14 days or fewer."  Mot. at

4   2:14–19.  He does so in the hopes of satisfying the "duration" inquiry by ignoring one of the

5   fundamental attributes of military leave—that it often extends for months or even years—and

6   focusing instead only on those leaves that "fall somewhere between 1 and 14 days."  *See* Mot at

7   10:10–11.[2]

8       Setting aside the merits of Plaintiff's "comparability" contention, what matters here is that

9   no uniform definition of "short term" military leave exists across workgroups or throughout the

10   proposed class period.  In the Pilot CBA effective September 2012, SWAPA and Southwest agreed

11   to develop a "Joint SWA/SWAPA Flight Operations Military Handbook" ("Military Handbook")

12   that would provide "policy explanations and detailed instructions" for Pilots who serve in the

13   military.  Ex. E (Southard Dep., Ex. 2 (SWAPA CBA at p. 12-7)).  The Military Handbook was

14   published in November 2014.  Ex. E. (Souhthard Dep. at 53:7–54:7).  It explained that, at the time,

15   Southwest defined "short term" military leave as "service in the uniformed service for less than

16   ***thirty-one (31) days***."  Ex. E (Southard Dep., Ex. 5 at p. 2 (Military Handbook § 2.b) (emphasis

17   added)).  The Military Handbook tied this definition to USERRA regulations related to the notice

18   requirement for reemployment after a period of more than 30 days of military leave, among other

19   things.  *Id.* at p. 9 (Military Handbook § 15.d (citing 20 C.F.R. § 1002.103)).

20       Southwest did not begin coding "short term" military leave as 14 days or fewer ***for Pilots***

21   until 2016.  Ex. E (Southard Dep. at 53:7–56:4).[3]  Thus, Plaintiff's definition of "short term"

22

23   ─────────────────────

24   [2] Plaintiff concedes that there is no difference between "short term" and "long term" military leave
     as a practical matter.  *See* Ex. A (Huntsman Dep. at 151:15–156:6).  Moreover, as USERRA
25   provides up to 5 years of cumulative military leave, there is no statutory basis to look at military
     leaves of only 14 days or fewer.  *See* 38 U.S.C. § 4312(a)(2).

26   [3] In November 2016, Southwest began using a separate code for pilots' military leaves of 14 days
     or fewer in connection with a perfect attendance program, which is an administrative matter
27   unrelated to the claim in this case.  Ex. E (Southard Dep. at 54:25–56:4).  For Flight Attendants, the
     14-day demarcation is used to notify administrators that the employee can be removed from the
28   bidding and scheduling process during the period.  Ex. F (Rea Dep. at 74:20–75:16).

military leave was not operative even for Pilots during the vast majority of the class period.  Nor is Plaintiff's definition recognized across workgroups.  Some workgroups draw no distinction between "short term" and "long term" military leave.  For instance, the leave of absence records for Customer Sales & Support Representatives use a single code for military leaves of any duration, and they make no distinction between short term and long term military leave.  Ex G (Taylor Dep. at 29:21–30:22).  The same is true for Flight Instructors.  Ex. J (Ireland Dep 46:14–47:25).  By contrast, the system for Dispatchers codes military leave over 30 days as extended military leave.  Ex. L (Hickl Dep. at 38:20–39:2).  At bottom, Plaintiff's definition of "short term military leave" is not uniform across all proposed class members, which undermines the purported commonality of their claims.

### 2. CBA-specific employee control over schedules and leaves defeats commonality

As noted above, USERRA's implementing regulations identify three non-exclusive factors to consider for the "comparability" analysis, including an employee's ability to choose when to take the leaves and the duration of the leaves.  *See* 20 C.F.R. § 1002.150(b).  An employee's ability to choose when to take leaves and how many days of leave to take, however, varies between the 11 different workgroups and their varied CBAs, and it even varies among members of the same workgroup.  This further establishes the lack of commonality necessary to certify a class.

Southwest treats an employee's absence from work as a "leave" only if the absence conflicts with the employee's work schedule.  *See, e.g.*, Ex. E (Southard Dep. at 103:6–18, 115:7–18, 116:9–24).  As explained below, an employee's control over his work schedule translates into control over whether to take certain leaves—for instance, by bidding or trading for a schedule that does not conflict with the days he is unable to work.  It also translates into control over the duration of certain leaves—for instance, by bidding or trading for a schedule that conflicts with only part of the time that the employee is unable to work.  These core facts about the nature of a leave of absence undermine any common resolution to the "comparability" question, because the level of control that Southwest employees exercise over their work schedules varies substantially across work groups, and it varies even among employees subject to the same CBA based on seniority and other factors.

For example, the Pilot CBA articulates an intricate scheduling process unique to Pilots.  Ex. E (Southard Dep., Ex. 2 (SWAPA CBA at pp. 5-1 to 9-4)); Ex. A (Huntsman Dep. at 56:25–58:14 ("I could literally speak hours about scheduling.")).  Each month, a Pilot bids on the schedule that he wants to fly in the following month.  *Id.*  Southwest awards a Pilot's bid according to a seniority-based system tied to the Pilot's hire date.  Ex. A (Huntsman Dep. at 59:25–60:5).  After a Pilot receives his monthly schedule, he can participate in a "free market" system of trading flights with other Pilots subject to various restrictions.  *Id.* at 61:17–63:4, 71:7–11.  As a result of these CBA-specific terms, Pilots have "a lot of different options" to exercise "flexibility" with their schedules.  *Id.* at 64:8–67:11.  Plaintiff concedes that the amount of control is "very, very different" for "each individual pilot."  *Id.*; *see also id.* at 66:22–25 ("if you were to do a zero to 100, one pilot may have the flexibility of a 1, and one may have a flexibility of 100"); *id.* at 76:7–21 ("Every single day changes with the pilot's scheduling, depending upon an individual pilot's goals."); *id.* at 63:8–67:7; 72:22–73:5; 86:16–87:11.  A Pilot can exercise control over whether to take certain leaves of absence and over the duration of those leaves, depending on various scheduling factors and the Pilot's goals.  For instance, a Pilot who has an upcoming two-day military service (or other known absence) can elect to bid or trade for a schedule that does or does not conflict, in whole or in part, with the military service.  *Id. at* 86:19–87:11.

Non-Pilot members of the proposed class who are subject to different CBAs have different—and often lower—levels of control over their schedules.  Unlike Pilots, who bid their schedules monthly, Dispatchers bid their schedules annually, and the Dispatchers' CBA dictates a repeating pattern of six days on, three days off, six days on, three days off, then six days off.  Ex. L (Hickl Dep. at 21:16–22:25, Ex. 3 (TWU 550 CBA at pp. 4-1 to 4-2, 4-6 to 4-12)).  Mechanics also bid on their schedules once per year, pursuant to the terms of two separate CBAs.  Ex. I (Munguia Dep. at 27:6–23, Ex. 4 (AMFA CBA at p. 20)).  Material Specialists bid their schedules semi-annually under yet another CBA.  Ex. I (Munguia Dep. at 32:25–33:16, Ex. 8 (IBT CBA at p.10)).[4]

---

[4] The CBAs covering these workgroups have specific provisions for handling shifts that are temporarily available because an employee is on a leave of absence.  Specifically, under the AMFA contracts, if an employee knows he will be on leave for more than 30 days, the employee's shift is put up for bid by other employees to work during the "vacancy."  Ex. I (Munguia Dep., Ex.

1    By comparison to Pilots, who bid their schedules monthly, these workgroups have limited

2    opportunity to bid for work schedules that do or do not conflict with upcoming absences from work

3    because their schedules are set much further in advance and are subject to other CBA-specific

4    scheduling rules.[5]

5    　　　Even within the same CBA and the same workgroup there are significant differences when

6    it comes to how much flexibility employees have over their schedules.  For instance, a Pilot's

7    control over his schedule is highly dependent on his seniority.  Ex. A (Huntsman Dep. at 58:23–

8    60:5, 61:3–6, 65:11–66:5); Ex. E (Southard Dep, Ex. 2 (SWAPA CBA at pp. 3-1, 5-1 to 5-2)).

9    And other workgroups also use a seniority-based system for determining schedules.  *See, e.g.*, Ex. I

10   (Munguia Dep., Ex. 4 (AMFA CBA at p. 20)).  Thus, an employee's seniority within his

11   workgroup has a material effect on the employee's control over his schedule, including whether to

12   take certain leaves of absence and for how many days.  *See, e.g.*, Ex. E (Southard Dep. at 103:6–

13   18, 115:7–18, 116:9–24).

14   　　　The "comparability" analysis is affected in other CBA-specific ways.  For instance, the

15   three CBAs governing Flight Attendants during the proposed class period required Flight

16   Attendants to "make every attempt to bid off, trade or give away pairings or training that conflict

17   with military service."  Ex. F (Rea Dep., Ex. 2 (2002 TWU 556 CBA at p. 63); *see also id.*, Ex. 3

18   (2008 TWU 556 CBA at p. 87), Ex. 4 (2013 TWU 556 CBA at p. 15-121)).  CBAs for other

19   workgroups do not include this requirement.  *See, e.g.*, Ex. E (Southard Dep., Ex. 2 (SWAPA CBA

20   at pp. 12-7 to 12-8)); Ex. H (Jordan Dep. at 27:4–20, Ex. 3 (IAM CBA at p.24)).  The Flight

21

22   ─────────────────────

23   4 (AMFA CBA at p. 42). The IBT group bids the vacancy only if the leave is expected to last more
     than 60 days.  *Id.*, Ex. 8 (IBT CBA at pp. 24–25).

24   5 Customer Service & Support Representatives and Ground Operations Customer Service Agents
     are represented by the same union and share the same contract requiring bidding "at least five (5)
25   times per year."  Ex. H (Jordan Dep, Ex. 3 (IAM CBA at p. 8)).  Yet, their processes differ between
     and amongst these groups. Specifically, CS&S Representatives have an automated bidding process
26   every two months and Ground Operations Customer Service Agents bid on paper with some
     stations bidding schedules monthly and others bidding every two months.  Declaration of Michelle
27   Jordan ¶ 2.  For Ramp Agents, Operations Agents, Provisioning Agents, and Freight Agents, who
     are all subject to the same CBA, the frequency and specifics of their shift bids could vary by bid
28   location and station due to flight schedule changes.  *Id.* ¶ 3.

Attendants' contractual obligation to attempt to reduce or eliminate conflicts between their work schedules and any military service plainly informs the duration inquiry for Flight Attendants in a way that is specific and exclusive to that workgroup.

Given that employees have different levels of control over the frequency and duration of their leaves of absence, the "comparability" analysis cannot be conducted across workgroups or even within the same workgroup.

### 3.      CBA-specific rules for sick leave accrual defeat commonality

Sick leave is one of form of leave alleged by Plaintiff to be comparable to military leave. However, there can be no common answer to the question of whether sick leave is comparable to military leave for all class members.  Paid sick leave is an accrual-based benefit.  An employee is entitled to take paid sick leave only to the extent the employee has accrued sick leave time during the employee's tenure with Southwest and meets the requirements for using the accrued sick leave. *E.g.*, Ex. E (Southard Dep., Ex. 2 (SWAPA CBA at pp. 12-1 to 12-2)); Ex. H (Jordan Dep., Ex. 3 (IAM CBA at p. 26)).  Different CBAs have different accrual rates for paid sick leave and different caps on the amount of paid sick leave that an employee can accrue.

Pilots are paid on a "Trips for Pay" ("TFP") basis.  Ex. E (Southard Dep. at 26:16–27:5). Each flight has a specific number of TFPs assigned to it, and a Pilot's seniority determines how much they get paid for each TFP.  *Id.*  For Pilots, sick leave accrues at a rate of 1 TFP for every 10 TFPs flown (i.e., a 10% accrual rate), and it is capped at 1,600 hours.  Ex. E (Southard Dep. at 48:19–49:14; Ex. 2 (SWAPA CBA at p. 12-1)).  Like Pilots, Flight Attendants are paid on a TFP basis and accrue sick leave at a 10% rate.  Ex. F (Rea Dep. at 49:23–51:14, Ex. 4 (TWU 556 CBA at p. 16-123)).  But their sick leave accrual is capped at 2,400 TFPs.  *Id.*

By contrast, Flight Instructors, who are paid on an hourly basis, accrue sick leave at a rate of eight hours per calendar month of work.  Ex. J (Ireland Dep. at 27:10 –28:3, Ex. 4 (TWU 557 CBA at p. 47)).  The same accrual rate applies to several other workgroups.  Ex. H (Jordan Dep., Ex. 4 (IAM CBA at p. 52), Ex. 9 (TWU 555 CBA at p. 40)).  But the cap on sick leave accrual varies across these workgroups.  For instance, the cap for Flight Instructors is 206 days (or roughly 1,650 hours at a regular 8-hour day rate).  Ex. J (Ireland Dep., Ex. 4 (TWU 557 CBA at p. 47)).

The cap for Flight Simulator Technicians is now 2,000 hours, but a previous CBA in effect during the proposed class period imposed a cap of 1,650 hours. Ex. K (Wheatley Dep. at 23:8–25, 26:3–19, Ex. 2 (IBT CBA at p. 47), Ex. 5 (IBT CBA at p. 44)).  The cap for Ramp Agents, Provisioning Agents, and Freight Agents is now 2,400 hours, but it was 1,650 hours under a CBA that was in effect for several years of the proposed class period.  Ex. H (Jordan Dep., Ex. 8 (TWU 555 CBA at p. 31), Ex. 9 (TWU 555 CBA at p. 40)).  The differing sick leave and accrual cap rules prevent a common answer to the question of whether paid sick leave is comparable to military leave, because CBA-specific rules affect the amount of time that any given employee can go out on sick leave.

### 4.    Plaintiff's other questions do not satisfy commonality

Apart from the "comparability" question, Plaintiff contends that four other questions satisfy the commonalty requirement.  He is wrong about each.

According to Plaintiff, whether paid leave is one of the "rights and benefits" protected by USERRA § 4316(b) is a "common" question.  Mot. at 9:7–12.  This question has no bearing on the commonality analysis under Rule 23(a)(2).  It is a pure question of law that affects all employers equally, and, as Plaintiff notes, the Court has already answered it by concluding that Plaintiff's claim is cognizable under USERRA.[6]

Plaintiff says common questions exist about whether "Southwest has violated USERRA" by (i) failing to provide proposed class members with the same right and benefits as employees who take certain forms of paid leave, and by (ii) treating proposed class members less favorably than other employees who take comparable leaves.  Mot. at 9:2–5, 10:12–14.  These questions simply parrot the statute; they do not establish commonality.  *See Dukes*, 564 U.S. at 349 ("Is that an unlawful employment practice?  What remedies should we get?  Reciting these questions is not sufficient to obtain class certification.")  Also, these two questions are derivative of the

---

[6] Plaintiff observes that the District Court for the Eastern District of Washington has joined this Court in concluding that a paid-leave claim is cognizable under USERRA.  *See Clarkson v. Alaska Airlines, Inc.*, No. 2:19-CV-0005-TOR, 2019 WL 2503957 (E.D. Wash. June 17, 2019), *motion to certify appeal denied*, 2019 WL 3773756 (E.D. Wash. Aug. 8, 2019).  Although Southwest is aware of no appeal of this issue to the Ninth Circuit, this issue is currently on appeal to the Third Circuit and the Seventh Circuit.  *See* Exs. N, O.

1    "comparability" question and assume that this predicate question has a common answer.  But

2    because the "comparability" question cannot be answered on a common basis, there is no further

3    question to ask about whether Southwest deprived military employees of relevant rights and

4    benefits or treated them less favorably than employees on comparable forms of leave.

5         Finally, Plaintiff contends that Southwest's "good faith" defense satisfies commonality.

6    Mot. at 10:15–11:1.  This argument misapprehends the commonality requirement.  As the Supreme

7    Court has explained, "Commonality requires the plaintiff to demonstrate that the class members

8    "have suffered the same injury.'"  *Dukes*, 564 U.S. at 349–50 (quoting *Gen. Tel. Co. of Sw. v.*

9    *Falcon*, 457 U.S. 147, 157 (1982)).  Although Southwest disagrees with Plaintiff's presumption

10   that its good faith defense involves the same facts and evidence across workgroups,[7] what matters

11   here is that Plaintiff has failed to demonstrate that the core "comparability" question satisfies

12   commonality.  As such, he cannot make an end-run around Rule 23(a)(2) by invoking one of

13   Southwest's affirmative defenses without meeting his own burden.

14        **B.    Southwest's Res Judicata Defense Defeats Typicality**

15        The typicality inquiry under Rule 23(a) asks "whether other members have the same or

16   similar injury, whether the action is based on conduct which is not unique to the named plaintiffs,

17   and whether other class members have been injured by the same course of conduct."  *Sandoval v.*

18   *Cty. of Sonoma*, 912 F.3d 509, 518 (9th Cir. 2018).

19        Plaintiff is atypical of other proposed class members because he is uniquely exposed to

20   Southwest's res judicata defense.  *See* Ex. P (SWA Responses to Plaintiff's Second Set of

21   Interrogatories at pp. 5–7 (Interrogatory No. 5)).  As this Court explained in *Lopes v. Fremont*

22   *Freewheelers*, No. C 07-6213 PJH, 2008 WL 3303970, at *5 (N.D. Cal. Aug. 7, 2008) (Hamilton,

23

---

24   [7] For instance, Southwest's "good faith" defense for Pilots' claims turns on different facts and
     evidence than its defense related to non-Pilots' claims.  Unlike other unions and workgroups,

25   SWAPA and Pilots are subject to a unique, collectively bargained obligation to assist Southwest in
     complying with USERRA.  Ex. E (Southard Dep., Ex. 2 (SWAPA CBA at p. 12-7 ("[Southwest] and

26   [SWAPA] are jointly committed in the support of those who participate as members of the uniformed
     services and recognize that it is the responsibility of all parties involved, including the pilots who

27   serve in the military, to ensure compliance with applicable federal law.")))  Yet neither SWAPA nor
     a single individual Pilot ever raised Plaintiff's paid-leave claim with Southwest or the Military

28   Resolution Board at any point during the 16-year class period.  Ex. E (Southard Dep. 83:5-85:17).

1   J.), *aff'd*, 362 F. App'x 874 (9th Cir. 2010):

2   > The doctrine of res judicata, or claim preclusion, "bars all grounds for recovery
    > which could have been asserted, whether they were or not, in a prior suit between
3   > the same parties . . . on the same cause of action." *McLain v. Apodaca*, 793 F.2d
    > 1031, 1033 (9th Cir. 1986). The doctrine is applicable whenever there is "(1) an
4   > identity of claims, (2) a final judgment on the merits, and (3) identity or privity
    > between the parties." *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th
5   > Cir. 1997).

6   In assessing the first element, "the central criterion in determining whether there is an identity of

7   claims . . . is whether the two suits arise out of the same transactional nucleus of facts."  *Lopes*,

8   2008 WL 3303970, at *5 (quoting *Owens v. Kaiser Found. Health Plan, Inc*., 244 F.3d 708, 714

9   (9th Cir. 2001)); *see also Int'l Union of Operating Eng'rs-Emp'rs Constr. Indus. Pension*, *Welfare*

10  *& Training Tr. Funds v. Karr*, 994 F.2d 1426, 1429 (9th Cir. 1993) ("Whether two events arise

11  from the same transaction or series depends on whether they are related to the same set of facts and

12  whether they could conveniently be tried together.").

13       Plaintiff was the named representative in a class action against Southwest that he filed in

14  July 2017 ("*Huntsman I*").  As in this case ("*Huntsman II*"), the complaint in *Huntsman I* alleged

15  that short term military leave is "comparable" to other forms of leave under USERRA § 4316(b).

16  Ex. Q (*Huntsman I* Complaint ¶ 71.  The only difference between the section 4316(b) claim in

17  *Huntsman I* and the section 4316(b) claim in *Huntsman II* is the particular benefit sought in relief.

18  Indeed, the complaint in *Huntsman I* alleged, "Southwest has violated USERRA § 4316(b) by

19  ***failing to provide*** its Pilots who take short term military leave with any ***accrued paid sick leave***

20  while simultaneously providing accrued paid sick leave to Pilots who engage in . . . other

21  comparable types of leave."  Ex. Q (*Huntsman I* Complaint ¶ 71 (emphasis added)).  The complaint

22  in *Huntsman II* alleges, "Southwest has maintained a policy or practice of ***failing to pay employees***

23  their regular wages or salaries when they take short term military leave, while continuing to pay

24  employees their wages or salaries when they take other comparable forms of non-military leave

25  [such as accrued paid sick leave]."  ECF 1 (Complaint ¶ 49 (emphasis added)).

26       As Southwest will further demonstrate if this case proceeds to the summary judgment stage,

27  *Huntsman I* and *Huntsman II* arise from the same transactional nucleus of facts.[8]  Plaintiff

28  _____

[8] The second and third elements of res judicata are clearly established as well.  Judge Donato

obviously could have sued for compensation for short term military leaves in *Huntsman I* while he was suing for sick-leave accrual, because the claims arise from the same leaves of absence and are predicated on the same "comparability" argument under USERRA § 2316(b).  He elected not to do so, instead filing this lawsuit the next business day after the notice of settlement issued to class members in *Huntsman I*.  Ex. A (Huntsman Dep. at 123:8–125:16); Berry Decl. ¶ 2 (class notice in *Huntsman I* issued on January 4, 2019); ECF 1 (*Huntsman II* complaint filed on January 7, 2019).  Thus, he faces a res judicata defense that renders him atypical of the class he wants to represent. *See, e.g.*, *Lopes*, 2008 WL 3303970, at *5–6 (finding res judicata where first and second actions involved the same bicycle collision and subsequent prosecution for battery such that the claims in the second action were "either brought, or could have been brought, in the first [] action."); *Rangel v. PLS Check Cashers of Cal., Inc.*, No. CV 16-6119 DMG (SSx), 2016 WL 6821788, at *6 (C.D. Cal. Nov. 16, 2016) (holding res judicata barred plaintiff's claims for unpaid overtime and minimum wage under the Fair Labor Standards Act because she was a class member in earlier case asserting California Labor Code violations that was settled and dismissed); *Pickman v. Am. Exp. Co.*, No. C 11-05326 WHA, 2012 WL 258842, at *4 (N.D. Cal. Jan. 27, 2012) (holding res judicata barred Plaintiff's claims where she had twice sued based on identical facts: "All of plaintiff's claims arose from the same nucleus of facts—the practice of transferring customer service telephone calls to overseas call centers.")[9]

## C.   Plaintiff Is Inadequate to Represent Non-Pilots

The adequacy inquiry under Rule 23 asks whether the named plaintiffs will "fairly and adequately protect the interest" of the class." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625

---

entered final approval of the class settlement in *Huntsman I* in October 2019, and Southwest subsequently executed on the settlement by funding the sick leave banks of class members pursuant to the terms of the settlement.  Ex. R (Final Approval Order).  Also, the parties in *Huntsman I* and *Huntsman II* are the same.  In both actions, Plaintiff is Jayson Huntsman and Defendant is Southwest Airlines. Co.  *Compare* ECF 1, *with* Ex. Q.

[9] *See also Case v. Judd*, No. 8:19-CV-607-T-33TGW, 2020 WL 440069, at *7 (M.D. Fla. Jan. 28, 2020) (denying certification of USERRA class on typicality and other grounds, explaining "when a plaintiff seeks to represent a class of employees, the plaintiff fails to satisfy the typicality prong if his personal situation or choices give rise to defenses not available as an explanation for alleged discrimination of other class members.").

(1997).  Courts assess the "sharing of interest between representatives and absentees" and any conflicts of interest that exist with the named plaintiffs or counsel.  *Ellis*, 657 F.3d at 985.  Courts also consider unethical behavior in determining whether a party is adequate.  *Stotz v. Mophie Inc.*, No. CV 16-8898-GW (FFMx), 2017 WL 11571083, at *14–15 (C.D. Cal. Dec. 14, 2017).

Here, Plaintiff is not an adequate representative of the class he wants to represent.  He lacks any meaningful knowledge of the terms of the CBAs of non-Pilot workgroups or how their scheduling works.  He admits that he has no knowledge about how work schedules at Southwest are set for class members who worked as Flight Simulator Technicians, Customer Service Agents, Ramp Agents, Provisioning Agents, Freight Agents, Appearance Technicians, Material Specialists, or Dispatchers, and that his knowledge of how schedules are set for Flight Attendants, Flight Instructors, and Mechanics is limited.  Ex. A (Huntsman Dep. at 102:7–102:10).  He also admits that he is not familiar with terms of the various CBAs that govern the scheduling and leave provisions of non-Pilots, whether non-Pilot workgroups distinguish between "short term" and "long term" military leave, and whether other workgroups have a handbook similar to the Military Handbook for Pilots related to military leaves.  *Id.* at 105:23–106:7, 141:24–142:13.  Without a working knowledge of the facts that inform the claims of absent class members, Plaintiff is inadequate to represent their interests.  *See, e.g.*, *McPhail v. First Command Fin. Planning, Inc*., 247 F.R.D. 598, 612 (S.D. Cal. 2007) (finding class representative inadequate because representative had little knowledge of the underlying facts of the lawsuit, among other reasons).

### D.      Plaintiff Fails to Show Predominance

Predominance under Rule 23(b)(3) imposes a "far more demanding" standard than does commonality under Rule 23(a).  *Amchem*, 21 U.S. at 624.  When assessing predominance, a court must "give careful scrutiny to the relation between common and individual questions in a case."  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).  "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"  *Id.* (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, 196–97 (5th ed. 2012)).

### 1.   Southwest's laches defense requires individual trials

The doctrine of laches bars plaintiffs from sleeping on their rights, running up damages, and prejudicing a defendant.  In contrast to a statute of limitations, laches is not limited to the passage of time but rather is "a question of the inequity of permitting the claim to be enforced."  *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946).  To demonstrate laches, a defendant must prove "unreasonable delay by the plaintiff and prejudice to itself."  *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000) (citation omitted); *Nat'l Ass'n of Gov't Employees v. City Public Serv. Bd. of San Antonio*, 40 F.3d 698 (5th Cir. 1994) (affirming district court's determination that a defendant was prejudiced by a 12-year delay in filing suit because of the lack of accurate records and loss of witnesses testimony).

Courts recognize two types of prejudice caused by laches: evidentiary and economic.  *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955 (9th Cir. 2001); *Strauss v. Angie's List, Inc.*, No. 2:17-CV-02560-HLT-TJJ, 2018 WL 5722561, at *10 (D. Kan. Nov. 1, 2018), *aff'd*, 951 F.3d 1263 (10th Cir. 2020) ("Evidentiary prejudice may be found in the case of lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died . . . .  Economic prejudice may arise where a defendant . . . will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." (internal quotation marks and citations omitted)).  "The doctrine [of laches] is applied on a sliding scale: the longer the delay, the less the prejudice that must be shown."  *Maher v. City of Chicago*, 406 F. Supp. 2d 1006, 1031 (N.D. Ill. 2006), *aff'd*, 547 F.3d 817 (7th Cir. 2008).

It is well settled that laches is an affirmative defense to USERRA claims.  *Clarkson v. Alaska Airlines, Inc.*, No. 2:19-CV-0005-TOR, 2020 WL 5899398, at *3–4 (E.D. Wash. Oct. 5, 2020) (collecting cases); *Corbin v. Sw. Airlines, Inc.*, 2018 WL 4901155, at *10 (S.D. Tex. Oct. 9, 2018) (laches defense applied to bar claims where plaintiff delayed bring suit for ten years).[10]

---

[10] *See also Seiler v. Hollidaysburg Am. Legion Ambulance Serv., Inc.*, 2011 WL 4017965, at *8 (W.D. Pa. Sept. 8, 2011) (finding that laches is the only method for a defendant to challenge stale USERRA claims); *Sumrall v. Ensco Offshore Co.*, No. 2:17-CV-48-KS-MTP, 2018 WL 2088761, at *8 (S.D. Miss. May 7, 2018) ("[C]ourts have permitted the affirmative defense of laches to prevent injustice.").

1    Courts have held that lengthy delays between discovering a right and filing suit under USERRA

2    are unreasonable.  *Maher*, 547 F.3d at 822–23 (11-year delay under USERA predecessor was

3    unreasonable); *Gruca v. U.S. Steel Corp.* 495 F. 2d 1252, 1259–60 (1974) (8-year delay

4    unreasonable).

5        A notice-based defense like laches creates individualized inquiries by its very nature.

6    *Valenzuela v. Union Pac. R.R. Co*., No. CV-15-01092-PHX-DGC, 2017 WL 679095, at *14 (D.

7    Ariz. Feb. 21, 2017), *vacated in part* (Mar. 3, 2017), *opinion reinstated*, 2017 WL 1398593 (D.

8    Ariz. Apr. 19, 2017).  In the class action context, courts repeatedly have held that laches requires a

9    fact-specific inquiry that entails individualized examinations into when a plaintiff or putative class

10   member had notice that his or her rights were purportedly violated.  *Valenzuela*, 2017 WL 679095,

11   at *14; *In re SFPP Right-of-Way Claims*, No. CV 15-07492 JVS (DFMx), 2017 WL 2378363, at

12   *17–18 (C.D. Cal. May 23, 2017) (denying class certification and finding that "the existence of

13   numerous individual defenses [including laches] overwhelm Plaintiffs' theories."); *see also*

14   *Clarkson,* 2020 WL 5899398, at *3–4 (denying pilots' summary judgment motion on defense of

15   laches and noting that "the application of laches is fact-specific").  Here, highly individualized

16   issues related to notice exist, including when each class member learned of Southwest's leave

17   policies, when each class member learned of his or her putative right to receive paid military leave

18   based on Southwest's treatment of allegedly comparable leaves, and how long each class member

19   slept on his or her rights.  *See Valenzuela*, 2017 WL 679095, at *14; *SFPP Right-of-Way*, 2017 WL

20   2378363, at *17–18; *cf. Clarkson,* 2020 WL 5899398, at *3–4.

21       The evidentiary prejudice to Southwest will vary across workgroups and time periods,

22   primarily due to the numerous and varied systems of record that have been used company-wide to

23   record leaves of absence.  For different workgroups, this includes a variety of database programs

24   like Kronos, SAP, Crew Scheduling System, and Aspect Workforce Management, along with

25   manual spreadsheets.  Ex. M (Nelson Dep. at 52:15–55:23); Ex. G (Taylor Dep. at 23:13–25:3,

26   26:11–28:19); Ex. J (Ireland Dep. at 41:11–42:14); Ex. E (Southard Dep. at 94:16–95:22).  For

27   instance, Southwest's leave records for Pilots date back to December 2007, while the leave records

28   for Dispatchers date back to only 2012.  Ex. E (Southard Dep. at 94:16–100:23); Ex. L (Hickl Dep

at 33:21–36:12).[11]  Without available records, Southwest will suffer evidentiary prejudice defending against claims that employees took military leaves during one of the periods for which records no longer exist.  These periods differ among proposed class members, further demonstrating that common questions do not predominate.  *Id.*  Also, as Plaintiff's deposition demonstrates, each proposed class member would need to rummage through his or her old text messages, photos, emails, and calendars to demonstrate liability as to any particular date of military leave, even where Southwest's records are intact.  *See infra* at § IV.D.2.  This is not only prejudicial to Southwest but is also precisely the opposite of the common proof required to try a class case.

Southwest would also suffer economic prejudice to varying degrees depending on how long the proposed class members slept on their rights.  Indeed, Plaintiff's proposed class seeks compensation for military leaves dating back over 16 years, plus liquidated damages and pre-judgment interest.  ECF 1 (Complaint pp. 13–14). The amount of economic prejudice would vary substantially across proposed class members because, for instance, a Pilot who first took military leave in October 2004 is not similarly situated to a Pilot who first took military leave last year.  *See Whittaker Corp. v. Execuair Corp.*, 736 F.2d 1341, 1347 (9th Cir. 1984) ("[Defendant] was prejudiced because it continued engaging in its existing practices, incurring additional potential liability by reason of [Plaintiff]'s failure to take prompt action."); *RSI Corp. v. Int'l Bus. Machines Corp.*, No. 5:08-CV-3414, 2012 WL 3277136, at *15 (N.D. Cal. Aug. 9, 2012) ("[T]hat a defendant continues to engage in its existing practices, thus incurring additional potential liability as a result of the plaintiff's delay, may also demonstrate prejudice.")

Finally, Southwest's laches defense to Plaintiff's individual claim is unique.  Plaintiff's delay in bringing his claim is especially unreasonable because he intentionally slept on his rights during the pendency of his prior lawsuit *Huntsman I*.  *See* Ex. A (Huntsman Dep. at 119:4–121:15, 125:5–23); *see also supra* at § IV.B. Thus, in addition to creating intractable individual issues among class members, Southwest's laches defense also renders Plaintiff an atypical member of his

---

[11] Also, given Southwest's laches defense, Plaintiff is atypical of Pilots and non-Pilots whose leave records no longer exist.  *See* Fed. R. Civ. P 23(a)(3).

1   proposed class.  *See Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001) (affirming denial of

2   class certification on typicality grounds where plaintiff was "subject to unique defenses"); *Hanon*

3   *v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (same where "[Plaintiff]'s unique

4   background and factual situation require him to prepare to meet defenses that are not typical of the

5   defenses which may be raised against other members of the proposed class.")

<div align="center">

**2.      Individual inquiries into military service dates predominate**

</div>

7           Plaintiff routinely took military leave from Southwest on dates that are not reflected in the

8   military's records.  *See* Ex. A (Huntsman Dep. at 212:6–214:11, 215:18–216:14, Ex. 6).  In 2017

9   and 2018 alone, Plaintiff took nine separate military leaves from Southwest, totaling 14 days of

10   leave, that do not appear in his military service records.[12]  Yet, Plaintiff claims that he was injured

11   by Southwest's practice of failing to compensate him for those days because he was performing

12   military service, and he seeks payment for those days despite the military having no records to

13   verify his service on those days.  ECF 1 (Complaint ¶¶ 5, 42-43, 51-52, Prayer at ¶ E); Ex. C at

14   Rows 83–106).

15

16           In his written discovery responses and at his deposition, Plaintiff tried to prove that he

17   actually performed military service on the days included in Southwest's leave records but that were

18   not reflected in the Air Force's service records for him.[13]  According to Plaintiff, Southwest's leave

19   records ***and the Air Force's service records*** are unreliable.  Specifically, he testified that his

---

[12] Plaintiff took military leave from Southwest on the following 14 days that do not appear in either his military "PCARS" (Point Credit Summary Inquiry) record of dates of service or the military records from Travis Air Force Base where he served: 1/6/17–1/8/17 (3 days), 6/2/17 (1 day), 6/12/17 (1 day), 7/5/17 (1 day), 5/18/18 (1 day), 5/22/18–5/23/18 (2 days), 7/11/18–7/13/18 (3 days) , 8/24/18 (1 day), and 8/31/18 (1 day).  *See* Ex. A (Huntsman Dep. at 208:3–19, 212:6–214:11, 215:18–216:14); Ex. B at P00009–15; Ex. C); Declaration of John Freed ("Freed Decl.") ¶¶ 2-3, Exs. 1, 2; Declaration of Nikki Southard ("Southard Decl.") ¶ 3.

[13] Plaintiff is apparently attempting to preemptively rebut an inference that he took military leaves from Southwest when he was not performing military service in order to take advantage of the scheduling rules of pilots.  When a pilot has a leave that conflicts with his schedule, those flights are removed or "dropped" from his schedule and he becomes eligible to bid on other flights, including flights at premium pay that he could not fly previously.  Ex. A (Huntsman Dep. 80:15-87:11).  Thus, there is a financial incentive for a Pilot to claim he is on military leave when he might not actually be performing military service.

1  "PCARS" military service record is both over-inclusive (*i.e.*, it includes dates when he did not

2  perform military service) and under-inclusive (*i.e.*, it excludes dates when he did perform military

3  service).  Ex. A (Huntsman Dep. at 218:14–23).  He also testified repeatedly that Southwest's

4  military leave records are "flawed" and "inaccurate."  *Id.* at 237:21–238:1, 257:15–25, 259:18–22;

5  Ex. C (Column I).

6       In the absence of reliable records of his military service dates, Plaintiff claims a handful of

7  emails, texts, and iPhone photos that he produced might support an inference that he performed

8  military service on the days missing from his military records.  *See* Ex. B at P00018–30, Ex. C

9  (Column I); Ex. A (Huntsman Dep. at 236:24–237:8 ("[E]ach one of my answers is my best guess

10  as to what – why there's a discrepancy, but I cannot factually state on any of these whether or not I

11  performed duty on that particular day."); *id.* at 212:6–214:11, 215:18–216:14, 230:21–231:10, Ex.

12  6); Ex. D (Huntsman Verified Responses to Interrogatories at pp. 6–8 (Response Nos. 4, 5)).

13

14       Plaintiff's effort to explain away the discrepancies between Southwest's data and the Air

15  Force's data is counter-productive but telling.  It demonstrates that individualized inquiries are

16  needed to assess the reliability of various documents, and to evaluate credibility, on issues that lie

17  at the heart of each class member's case.  For instance, Plaintiff's verified discovery responses

18  state that a photo of a hard-copy schedule posted on a wall at Travis Air Force Base shows that he

19  was physically present at Travis Air Force Base performing military service on November 22,

20  2016.  Ex. C at Row 82; Ex. B at P000022 ("photo supported on base").  But at his deposition he

21  admitted that colleagues at Travis Air Force Base have sent him photos of schedules posted at the

22  base on previous occasions, and it is "most certainly a possibility" that a colleague, not Plaintiff,

23  took the November 22 photo.  Ex. A (Huntsman Dep at 272:8–273:13).  Similarly, he stated in his

24  verified discovery responses that an image of a text message shows that he performed military duty

25  on July 5, 2017.  Ex. C at Row 92 ("Security Clearance Photo supported."); Ex. D at pp. 6-7

26  (Response to Interrogatory No. 4); Ex. S at pp. 7-9 (Response to Request No. 3).  But he conceded

27  at his deposition that the image was taken on July 5, 20*18*, one year later.  Ex. A (Huntsman Dep.

28

1    at 290:9–293:20, Ex. 5 at P000024).

2         Similarly, the reliability of the time and date stamps on the photos is dubious.  For instance,

3    Plaintiff relies on a "Travis Afb" location stamp on one photo to prove his location on

4    November 22, 2016, but that location stamp is missing from a photo he took with the same phone a

5    few months earlier at Travis Air Force Base.  *Compare* Ex. A (Huntsman Dep., Ex. 5 at P000022

6    ("Travis Afb" location stamp), *with* Ex. B at P000021 (no location stamp), Ex. A (Huntsman Dep.

7    at 267:17–269:20). ████████████████████████████████████████

8    ████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ███████████████████████████

12        These kinds of evidentiary issues would predominate at trial because they inform the

13   "comparability" question, which goes to the heart of whether Southwest is liable to class members.

14   Indeed, the evidence strongly suggests Plaintiff has taken a substantial number of military leaves

15   without actually performing service in the military.  *See* Ex. A (Huntsman Dep. 208:3–19, 212:6–

16   214:11, 215:18–216:14, Ex. 5 at P00009–15, Ex. 6); Freed Decl. ¶¶ 2-3, Exs. 1, 2; Southard Decl. ¶

17   3.  This materially affects the ability to resolve, on a representative basis, the question of the

18   duration of military leaves, and the question of whether the employee has control over when to take

19   military leaves.  *See* 20 C.F.R. § 1002.150(b).  Thus, Plaintiff is incorrect that "the same facts

20   would likely be used to resolve the comparability analysis" for proposed class members other than

21   Plaintiff.  *See* Mot. at 14:27–15:2.  And, to the extent Plaintiff argues that the dispute over his

22   military service dates would not predominate because these facts are unique to him, the Court

23   should conclude that he is atypical of the class and deny certification for that reason as well.  *See*

24   *Sandoval*, 912 F.3d at 518 (typicality asks "whether the action is based on conduct which is not

25   unique to the named plaintiffs"); *Navellier*, 262 F.3d at 941; *Hanon*, 976 F.2d at 508.

26

27        **3.    Plaintiff's failure to provide a damages model defeats predominance**

28   Plaintiff asserts in conclusory fashion that the damages for the proposed class could be

calculated on a classwide basis "by examining data reflecting each Class Member's periods of short term military leave during the Class period and determining what wages they would have received had they continued working during such leave." Mot. at 15:8–10. But Plaintiff cannot have it both ways. He cannot testify repeatedly that military leave records provided by Southwest and the military's service records are "inaccurate" and "flawed" when he wants to avoid an inference that is damaging to him, and then assert that the same records are reliable for purposes of calculating damages. *See* Ex. A (Huntsman Dep. at 237:21–238:1, 257:15–25, 259:18–22; *see also id.* at Ex. 5 at P00031 (Column I)). Given his testimony that there are no accurate records of his military service, Plaintiff has not identified any way to "examin[e] data" for each class member's military leave that would allow damages to be reliably tied to Southwest's conduct.

Contrary to Plaintiff's assertion, this case is unlike *Leyva v. Medline Indus. Inc*., 716 F.3d 510 (9th Cir. 2013). *See* Mot. at 15:4–10. In *Leyva*, a wage-and-hour case, the Court concluded that the employer's "computerized payroll and time-keeping database would enable the court to accurately calculate damages and related penalties for each claim." *Id.* at 514. Those facts are absent here. In 2017 and 2018 alone, Southwest's records show 14 days of military leave that Plaintiff apparently was not actually performing military service. *See supra* at § V.D.II, fn. 12. Plainly, he should not recover any damages for those days even if he were to prevail at the liability stage.

This case is akin to *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) and its progeny, in which courts have denied certification not because damages are individualized, but because the plaintiffs failed to show that "damages stemmed from the defendant's actions that created the legal liability." *Leyva*, 716 F.3d at 514 (citing *Comcast*, 569 U.S. at 38). Plaintiff makes no meaningful effort to explain how he might compute damages on a classwide basis consistent with *Comcast*. Instead, he promises that damages "will largely be determined by Southwest's data productions in this case." Mot. at 15:12–13. That is not enough, especially when he attacks the reliability of those very records. *See Ward v. Apple Inc.*, 784 F. App'x 539, 540–41 (9th Cir. 2019) ("The plaintiffs here have done even less than the *Comcast* plaintiffs: Instead of providing an imperfect model, they have provided only a promise of a model to come."); *Opperman v. Kong Techs., Inc.*, No. 13-CV-00453-JST, 2017 WL 3149295, at *10–12 (N.D. Cal. July 25, 2017) (finding expert's

"assurance that he c[ould] build a model to calculate damages" inadequate).  For this reason, too, the Court should deny Plaintiff's motion to certify a class.

## V.    CONCLUSION

The Court should not certify a class.  The "comparability" analysis will not only vary across CBAs and workgroups based on CBA-specific levels of control that employees exercise over the frequency and length of their leaves of absences, but it will also vary among class members in the same workgroup.  Plaintiff also faces unique defenses that render his individual case atypical of the class.  Finally, any common questions would be overwhelmed by individual questions related to each employee's military leave records, when they were on notice of their claims, and the amount of time that they slept on their rights.  Thus, the Court should deny Plaintiff's motion to certify a class.

DATED: December 2, 2020

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By: */s/ Brian D. Berry*
        DOUGLAS J. FARMER
        BRIAN D. BERRY

        Attorneys for Defendant
        SOUTHWEST AIRLINES CO.

45163478.1

EXHIBIT 2

Exhibit A

CONFIDENTIAL

```
 1                 UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF CALIFORNIA
 3
 4
 5      JAYSON HUNTSMAN, on behalf  )
        of himself and all others  )
 6      similarly situated,         )
                                    )
 7                Plaintiff,        )
                                    )
 8      vs.                         ) Case No. 4:19-cv-00081-PJH
                                    )
 9      SOUTHWEST AIRLINES CO.,     )
                                    )
10                Defendants.       )
                                    )
11
12
13
14                      CONFIDENTIAL
15
16          REMOTE DEPOSITION OF JAYSON HUNTSMAN
17               Monday, November 16, 2020
18
19
20
21
22
23      Reported Remotely and Stenographically by:
24      JANIS JENNINGS, CSR No. 3942, CLR, CCRR
25      Job No. 4332564
```

Page 1

CONFIDENTIAL

```
1

2

3

4

5

6

7                    REMOTE DEPOSITION OF JAYSON HUNTSMAN, located

8        in Las Vegas, Nevada, taken on behalf of the Defendants,

9        beginning at 8:06 a.m., on Monday, November 16, 2020,

10       sworn in by Janis Jennings, Certified Shorthand Reporter

11       No. 3942, CLR, CCRR.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page  2

CONFIDENTIAL

```
 1        REMOTE  APPEARANCES:

 2

 3           ON  BEHALF  OF  PLAINTIFF:

 4                OUTTEN  AND  GOLDEN  LLP

 5                BY:   MICHAEL  SCIMONE,  ESQ.

 6                     MICHAEL  DANNA,  ESQ.

 7                685  3rd  Avenue

 8                25th  Floor

 9                New  York,  New  York   10017

10                mscimone@outtengolden.com

11                mdanna@outtengolden.com

12

13                THOMAS  G.  JARRARD,  ESQ.

14                1020  North  Washington  Street

15                Spokane,  Washington   99201

16                425.239.7290

17                tjarrard@att.net

18

19

20

21

22

23

24

25

                                        Page  3
```

CONFIDENTIAL

```
 1      APPEARANCES:

 2

 3         ON BEHALF OF DEFENDANT:

 4              OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

 5              BY:  BRIAN D. BERRY, ESQ.

 6                   KRISTIN S. HIGGINS, ESQ.

 7              Steuart Tower, Suite 1300

 8              One Market Plaza

 9              San Francisco, California  94105

10              415.442.4810

11              brian.berry@ogletree.com

12              kristin.higgins@ogletree.com

13

14         ALSO REMOTELY PRESENT:

15              CHRIS MABERRY, ESQ., Southwest Airlines

16              BROOK PATTERSON, Southwest Airlines

17              GREGG EISMAN, Videographer

18

19

20

21

22

23

24

25
```

Page  4

1    multiple people from management at the military

2    resolution boards and also the Employee Relations

3    complaints that I spoke directly to, including, I

4    believe, Captain Dave Retnam.  Captain Alan Kasher

5    was there.  Those were for the military resolution

6    boards.

7            There's been several other individuals, but

8    as my defined role as a Oakland representative, my

9    initial contact would be Captain Dave Eggers.

10           MR. BERRY:  Okay.  Can we take a five-minute

11   break?  I just want to fill up coffee, get some

12   water, let you stretch your -- stretch as well.

13   Again, Jayson -- Mr. Huntsman, do let us know if

14   your back is bothering you at anytime.

15           THE WITNESS:  I am feeling great right now.

16   Thank you for -- thank you for clarifying.

17           MR. BERRY:  Okay.  Let's take five minutes.

18   Thanks.

19           THE VIDEOGRAPHER:  Off the record at

20   9:11 a.m.

21           (Off the record.)

22           THE VIDEOGRAPHER:  Back on the record at

23   9:21 a.m. Pacific Time.

24   BY MR. BERRY:

25       Q.   Mr. Huntsman, I want to talk for a bit about

Page 56

1   scheduling.  How is a pilot's schedule set?

2        MR. SCIMONE:  Objection.

3   BY MR. BERRY:

4        Q.   And by "schedule," I mean work schedule.

5   How is your work schedule set at Southwest Airlines?

6        A.   I can -- I will try to give you a -- in

7   general.  I could literally speak hours about

8   scheduling.  In general, a bid is put out for early

9   in the month, so that closes -- the initial bid

10  closes initially, I believe, on the 9th of the

11  month, and that would be for the initial bid.

12       A secondary bid for what would be called "a

13  blank line is" held later in the month, and that

14  closes, I believe, on the 19th of the month.

15       In between both of those segments you have

16  what's called "trip trade giveaway."  That's another

17  way that pilots pick up or try to give away work.

18  That opens on different days, depending upon the

19  earlier lines that I've spoke of.  It also could be

20  affected if you have training that month.  You could

21  have a lock on your board which could change your

22  dates for trade.  And it can also be affected by

23  other things, such as your vacation lines,

24  et cetera.

25       But, in general, pilots will bid a line, and

Page 57

1    then they will use -- historically, they will wait

2    until the 25th of the month to do what's called

3    "enhance line improvement trip trade," which they

4    would normally set their final schedules.   And when

5    I say "final," I will caveat that with schedules

6    change day to day, depending upon different

7    techniques that pilots use.

8           They may be looking for a quality of life.

9    They may be looking for maximum pay.   Or something

10   in their personal life may change, and they want to

11   alter their schedule that way.   So I know that's a

12   lot, but that's -- I could dive down much deeper,

13   because there are many, many different ways to set

14   your schedule for flying.

15        Q.   Thanks for the overview, and I'll take you

16   up on the two-hour version of it another time.   We

17   won't have the opportunity to do that today, but I

18   would like to -- to discuss some of these elements.

19           So let's start with the initial bid.   So is

20   it right that you bid for flying in a month one

21   month in advance?

22        A.   That is correct.

23        Q.   Okay.   And you bid on -- is it called a --

24   is it called "a line"?   Is that one month's worth of

25   flights?

1     A.    That is correct.

2     Q.    And a line consists of various pairings; is

3     that right?

4     A.    That is also correct.

5     Q.    And pairings consist of different

6     consecutive flights?

7     A.    Anywhere from one to four days.  Sometimes

8     there can be greater ones with overlap, but that's

9     really not applicable.

10    Q.    Okay.  And so when you're looking at lines a

11    month in advance -- so let's say we're -- we're now

12    in November, so you recently, I would think,

13    submitted your bid for December; is that right?

14    A.    That is -- today is the 16th?  Yes, I -- I

15    submitted my bid for December on the 9th of the

16    month, because I chose not to bid a blank line this

17    month.

18    Q.    And so when you bid that line, you can see

19    the days that you will be flying; is that right?

20    A.    Once the line is awarded, you can see your

21    initial bid.  I'll caveat that with the fact that

22    pilots -- a lot of pilots will bid certain pairings

23    not planning on flying those pairings.  But, yes,

24    you can see your initial bid.

25    Q.    And how does -- how does Southwest determine

Page 59

1    who gets what line that they bid for?

2        A.    The lines are awarded on a seniority basis

3    per domicile and crew -- and seat position.

4        Q.    Okay.   And how is seniority determined?

5        A.    Date of hire.

6        Q.    And so the longer you've been with the

7    company, the more likely you are to get the line

8    that you've requested?

9        A.    No.   That's not true.   It's kind of -- I'll

10   use -- the saying that would best explain it would

11   be "one person's trash is another person's

12   treasure."   To give you a brief example of that,

13   some pilots enjoy flying AMs pairings, which

14   predominantly our pairings are all either AMs or

15   PMs.   Some pilots prefer to fly at night.   Other

16   pilots want weekends.   Others want weekdays.   It can

17   have anything from a child custody agreement to

18   outside obligations.   And many of our pilots

19   actually have outside businesses or interests or

20   even attorneys, and they're bidding around their

21   particular work schedule.

22            So if you're asking if seniority helps you

23   secure the exact line you want, I would say that's

24   very true.   That said, you may be the senior person

25   in the domicile, and what others consider the least

Veritext Legal Solutions
866 299-5127

1 desirable line for that month may be your first

2 selection.

3     Q.    To the extent two pilots are interested in

4 the same line, the person with higher seniority gets

5 the line; is that right?

6     A.    That is correct.

7     Q.    And is that true for blank-line bidding as

8 well?

9     A.    That is also correct.  That's a separate --

10 that's a separate bid, and the seniority is based

11 off the individuals who bid a blank line.

12     Q.    For the trip trade giveaway, are there

13 limitations -- are there limits on -- I should say,

14 are there restrictions on how you can use that

15 program?

16     A.    Can you be more specific?

17     Q.    Yeah.  That was -- that was a bad question.

18 Are you able to contact any pilot who may be

19 interested in swapping a pairing with you, or can --

20 or is it limited to people -- to a certain range of

21 people?

22     A.    For -- okay.  So I'll try to explain it the

23 best I can for -- for non-pilots.  The trip trade

24 giveaway would be seat-specific, so, for example,

25 I'm a first officer.  I sit in the right seat.  That

Page 61

1    would be one limitation.

2          And for first officers, once that's awarded,

3    you can trade with any first officer in the entire

4    system.  So, for example, I trade -- I fly pairings

5    in multiple domiciles, so I will fly normally out of

6    Las Vegas, Los Angeles, Oakland, Denver.  Basically,

7    I'm one of the pilots that will travel for work.  So

8    I will look at trip trade giveaway in other

9    domiciles.

10          For your initial bid line, you're limited to

11    the pairings in the lines that are in your domicile.

12    So trip trade giveaway, that's when I alluded that

13    some pilots bid pairings that they're not planning

14    on flying.  For example, we have what's called a

15    Lance Captain Program.  Those individuals can fly in

16    both seats.

17          I am too junior to hold that position, but,

18    in general, they will bid pairings or they will bid

19    a line with their seniority, and they will give away

20    the entire line.  They are giving away their flying

21    because they are trying to pick up captain pairings

22    or they're trying to pick up pairings at a better

23    rate.  Maybe they have to operate the aircraft for

24    less hours for more pay, or maybe they're just doing

25    it for quality of life.  But with trip trade

Veritext Legal Solutions
866 299-5127

1    giveaway, that's -- kind of the function is it's an

2    open market system per seat position.

3          Does that answer the limitation aspect, or

4    are you trying to dive deeper?

5    Q.   I asked a -- an unclear question.  You gave

6    a great answer, so I appreciate the clarity.

7    A.   Yes, sir.

8    Q.   And so just to back up, I think the first

9    thing you mentioned makes good sense, that a -- a

10    first officer can't bid on a captain position.  So

11    there are limitations that you have to bid for the

12    seat for which you're qualified; right?

13    A.   That is correct.

14    Q.   Okay.  And then there -- for the early line

15    bidding, the initial line bidding, you are limited

16    to your domicile.  But then for trade trip giveaway,

17    it's opened up to -- to other domiciles so long as

18    you're interested in flying there, originating your

19    flights; is that right?

20    A.   That is correct.  And I'll also say that you

21    can give away --

22          DEPOSITION REPORTER:  Excuse me.  Excuse me.

23    Excuse me.  Excuse me.  I'm sorry, Mr. Berry.  Can

24    you get a little closer to your computer.  And I do

25    need that question again.  I apologize.  It was a

Veritext Legal Solutions
866 299-5127

1    little hard to make out.

2              (Clarification requested by Reporter.)

3    BY MR. BERRY:

4        Q.    I think I'll ask it again.  It's coming

5    through here.  But I just wanted to confirm -- and I

6    think that, Mr. Huntsman, you've done so -- is

7    that -- I'll break it up.

8              So when you're doing trip trade giveaway,

9    you can only accept or trade for seats that you're

10   qualified to fly in that position; is that right?

11       A.    That is correct.

12       Q.    Okay.

13       A.    Some pilots are qualified in both seats,

14   though.  That's the -- that's the caveat.  And a lot

15   of these -- I'll speak in general, but there are

16   some nuances to these individual questions.

17       Q.    And the initial line bidding, you're limited

18   to your domicile, which, in your case, is Oakland;

19   is that right?

20       A.    That is correct.

21       Q.    And then when trip trade giveaway is

22   available, you can trade for people or trade with

23   people at other domiciles?

24       A.    You can, and you can also trade portions of

25   that pairing.  For example, I may have a three-day

Page 64

CONFIDENTIAL

1    trip for a pairing, and I could literally give away

2    one leg.  I could give away a leg from Las Vegas to

3    Oakland at the very end because I want to stay in

4    Las Vegas.  And another pilot may be commuting to

5    Oakland, and they pick up that individual leg.

6           So it's -- I only bring that example to show

7    that the trading system and the flexibility -- there

8    are a lot of different options depending upon

9    current conditions within the market, would be the

10   best way to put it.

11   Q.   So pilots have a fair amount of flexibility

12   in determining their schedule?

13   A.   Not always, but some.  Again, that's -- I

14   could speak for hours on that, but, in general, the

15   better your seniority, usually your better chances

16   of getting an initial line that you want.  You have

17   a better chance at other options, like your annual

18   vacation bidding.

19          But it really depends on how many pilots we

20   have and how much flying there is in the system.

21   Currently, I'm sure you've seen on the news through

22   public labor negotiations that many in the industry

23   have been furloughed, so that would be an example of

24   a current market condition to where previously most

25   pilots would do most of their trading on the 25th of

Page 65

1    the month for ELITT, and trip trade giveaway was

2    very sparse.  That has flipped 180 degrees now,

3    based purely on the market condition.

4            Does that -- is that adequate?  Was that --

5    do you understand?

6      Q.   I think so.  I do.  I think your -- your

7    explanation makes good sense.  In the spirit of

8    confirming, I believe what you're saying is that

9    pilots do have flexibility in setting their

10   schedules.  The more senior a pilot is, the more

11   flexibility they have, but flexibility depends upon

12   market conditions.

13           MR. SCIMONE:  Objection.

14           THE WITNESS:  Did somebody else -- I thought

15   I heard something else.

16           MR. SCIMONE:  I was just objecting.  Go

17   ahead.

18           THE WITNESS:  Okay.  Yes and no.  There is

19   flexibility, but that statement, depending upon each

20   individual pilot, would be very, very different.  So

21   flexibility for one pilot would be -- could be next

22   to -- if you were to do a zero to 100, one pilot may

23   have the flexibility of a 1, and one may have a

24   flexibility of 100, and that could be factors at

25   work and/or in other circumstances.

Veritext Legal Solutions
866 299-5127

1           So that's a tough statement in general for
2    me to agree with to apply to other issues.  But I
3    will say, yes, for an initial bid line it is true
4    that your seniority helps, and there is more
5    flexibility in our system than perhaps an airline
6    that has multiple types of aircraft, which would be
7    another limitation.
8    BY MR. BERRY:
9        Q.   And one of the things that a pilot may take
10   into account when bidding for a line is whether
11   they're -- whether the pilot may need to be on some
12   form of leave in the coming month; is that right?
13       A.   If I have -- if a pilot has vacation leave,
14   for example, that particular pilot will bid lines
15   that touch the vacation to maximize their pay.  So
16   that would be an example of pilots bidding a line
17   they're not planning on flying because they have a
18   vacation leave.
19           But as far as leaves in general, do you have
20   another example that -- that you were thinking of?
21       Q.   Sure.  Let's use military leave.  So I know
22   that you recently retired from the military.  We
23   will have an occasion later to talk about that.
24           But during the period of your service, let's
25   say it's -- you know, we're in November now.  Let's

Page 67

1   block of weeks and take that week -- Christmas is

2   usually the most sought-after week of leave -- and

3   take that week of leave and give it to the most

4   junior pilot in the system.  The same holds true

5   with trip trade giveaway, so there is absolutely no

6   seniority with that system.

7       Q.   The trip trade giveaway is a free-market

8   system.  If you -- you can contact someone.  If they

9   happen to be your friend, colleague, for whatever

10  reason, if they want to trade with you, then you're

11  able to trade?

12      A.   That is correct.

13      Q.   Okay.  I want to make sure that I got an

14  answer to my -- my question.  And that was helpful.

15  So if you tried to bid a day off when you knew you

16  were going to be on leave but you wound up getting

17  scheduled in your line, you would have the

18  opportunity if you wanted to, to try to trade that

19  trip away so you would not have a conflict; is that

20  right?

21      A.   All pilots do have access to trip trade

22  giveaway, barring some of the restrictions that I

23  covered earlier, yes.

24      Q.   Okay.  When you were -- during your -- your

25  service in the Reserves, did you have a practice one

Page 71

1    way or the other of trying to avoid scheduling trips

2    during your military leaves or to, going the

3    other -- or, the other way around, to try to bid

4    lines that there was a conflict?

5        A.   I would say every -- every month of military

6    service while I was doing military leave would have

7    been different.  I performed many different things

8    early on.  I did longer missions.  And on my board

9    you could also see times to where trips were dropped

10   or trips were not dropped.

11            In general, my understanding and the

12   question that I asked to the company is if they

13   expected us to do military leave on our days off,

14   and the answer was no.  Does that answer your

15   question?  In general, me as a pilot, I fly nonstop.

16   So I'm one of the pilots that I'm looking to work as

17   many days as possible.  I don't have any children,

18   and I'm trying to maximize early on to try to retire

19   earlier.  So if -- that would be the way that I

20   approach work.  But that's different between

21   every -- every individual.

22       Q.   I think I'm asking a slightly different

23   question, which is:  When you're doing your bid one

24   month in advance, generally speaking, do you look at

25   what else is going on in your life in that month so

Page 72

1    you can try to optimize your flying schedule around

2    the other things that you plan to be doing in that

3    month?

4        A.   I think it would be safe to say that every

5    pilot does that, yes.

6        Q.   Okay.  And so when you were bidding one

7    month in advance, is one of the things that you took

8    into consideration military leaves that you expected

9    to be taken or, I should say, military service that

10   you expected to be performed?

11           Let me re-ask that question.

12           When you were looking one month in advance

13   while doing your bidding, was one of the

14   considerations that you took into account military

15   service that you expected to be performing?

16       A.   I would say for my particular job of

17   military service, probably 90 percent of my actual

18   days of military service, especially towards the

19   latter end, were unable to be forecast a month in

20   advance.

21           To clarify on that, there were only certain

22   weekends out of the year that would be a -- what's

23   called, like, a "hard UTA," where you absolutely had

24   to be there on the exact date.  So, in general, no,

25   I did not look at military service or try to bid in

Page 73

1     Q.    "Unit Training Assembly?

2     A.    To the best of my knowledge, yes.

3     Q.    I think that's right too, but obviously

4   you're the expert.

5     A.    I'm not an expert, but I think that's -- I

6   think that's a good guess.

7     Q.    So when there are hard dates that you expect

8   will not be moved, was that a consideration that you

9   took into account when bidding your line?

10     A.    I would say -- I would have to look at a

11   particular month.  It would depend on a lot of

12   factors.  What -- what are the goals for that month,

13   for example?  Are there holidays?  Are there other

14   days?

15          So I -- I'm not trying to not answer your

16   question, but I do want you to realize that every

17   single day changes with the pilot's scheduling,

18   depending upon an individual pilot's goals.  But to

19   answer your question if I bid my particular line

20   based on doing military service on my days off, the

21   answer is no.

22     Q.    Okay.  Was it a consideration?

23     A.    I guess I'm not really understanding your

24   question.  But I definitely looked at all events,

25   but I did not base a line bidding schedule on doing

Page 76

1    you wouldn't be working those days for Southwest?

2        A.   Well, I disagree, because if you were -- if

3    you bid around them, then you are volunteering --

4    you are volunteering to work two extra days in your

5    month.  You are giving up days off to do military

6    service.

7        Q.   But if someone wants to max- -- the only way

8    you get paid is if you're flying; right?

9        A.   That is correct.

10       Q.   Okay.  And so if you're not flying two days,

11   whether conflicts or not, your pay is based on how

12   many days you actually fly; right?

13       A.   The days you fly and the types of pairings;

14   that is correct.

15       Q.   There are also some advantages to

16   scheduling -- pay advantages that a pilot can avail

17   himself of by scheduling conflicts with leaves;

18   isn't that right?

19       A.   As far as advantages, yes, there's

20   advantages, like I gave you earlier with your

21   vacation, advantages, I would say, depending upon

22   your seniority, advantages depending upon what your

23   goal was for the month.  Your goal may be to have a

24   lot of days off for personal reasons.  Your goals

25   may be to work every day.

Page 80

1          Everything is really situationally

2     dependent, so for the word "advantage," it would

3     really depend upon a unique pilot's --

4          Q.   But I think you --

5          A.   -- circumstance.

6          Q.   I'm sorry.  I didn't mean to interrupt.

7          A.   Oh, I was complete.

8          Q.   Well, in your circumstance -- I think you

9     testified earlier that you're someone who likes to

10    maximize their flying and therefore their pay

11    generally.

12         A.   Most months.  Most months I would say that

13    was accurate.

14         Q.   Okay.  And for someone in your position,

15    isn't it right that having a conflict with -- having

16    a military leave conflict with -- with a pairing

17    that's on your schedule can allow you to bid for

18    certain premium flights, and also because when

19    you're on military, it resets your -- the

20    regulations for how -- how many hours you can fly in

21    a month; right?

22         A.   Well, some of it would be market-dependent.

23    For example, if you drop military -- if you drop a

24    trip for military in our current environment, there

25    is no inventory.  So there is no premium flying.

Page 81

CONFIDENTIAL

1   There is no additional flying.

2         There is some very minimal, but when there's

3   inventory in the system, you speak to the

4   protections or the reset.  There's what's called a

5   "cap limit" on each individual pilot, which is a

6   number that once reached -- once they go over that,

7   they lose their seniority.  And then there are other

8   options as well -- excuse me -- for picking up time.

9         But in general -- and this would go back to

10  factors, what I referenced earlier for picking up

11  premium time per se.  It's market-dependent.  So it

12  would all depend on what's available at the time.

13     Q.   Right.  And I don't want to fixate on the

14  current COVID situation.  You understand this

15  lawsuit, as you allege it, goes back to 2004; is

16  that right?

17     A.   I do.  But it also current -- but it also

18  covers present time as well.

19     Q.   Sure.  Sure.  You're right.  I just want to

20  make sure that we are not fixed on the scheduling

21  and, as you call it, the market environment and the

22  COVID era right now but we're speaking more

23  generally.

24        So let me ask a different question.  Have

25  you ever because you had a trip pulled because of

Page 82

1   military leave been in a situation where you could

2   bid on and receive premium flights that you

3   otherwise wouldn't be entitled to fly?

4       A.   Through my military drops, I bid open time

5   present day.  Nothing has ever changed with my

6   bidding techniques as far as my open time bids go.

7   If I did have a military drop, if there is open time

8   available, I will always pick up at the highest rate

9   available.

10       That said, it is still seniority based on

11   premium, so if someone is senior to me, which as,

12   going back to the dates you referenced, I was not

13   senior, if there is a senior pilot available, they

14   get the pairing as published.  And that goes to

15   present day as well.  It is seniority-based for an

16   open time system.  So just because I dropped

17   military leave does not mean that I'm going to be

18   awarded the pairing.

19       Q.   But there are other circumstances where you

20   or other pilots have dropped trips due to military

21   leave, which has allowed them to pick up premium

22   flights which pay more than the flights that they

23   dropped due to military leave; is that right?

24       A.   If they dropped a flight, they lost their

25   pay.  So if the military leave caused an individual

Page 83

CONFIDENTIAL

1    to lose their flying or, as you said, drop a

2    pairing, that individual lost the pay for that

3    particular pairing.  So if that person after

4    performing military leave, which they could not pick

5    up on those particular days of military leave, if

6    they picked up in the open system afterwards, they

7    would be allowed to pick up at whatever rate their

8    seniority could hold.  If they picked up at premium

9    or attempted to and another pilot bid it at a

10   straight time or a lower rate, that pilot would be

11   awarded the pair.

12       Q.   And so there -- there is an advantage to

13   having a conflict with your schedule and military

14   leave, because then that allows you to bid --

15   assuming you get it, to bid on a premium flight?

16       A.   Again, I would disagree.  And I would say

17   that if a pilot has to drop military leave, then

18   they're performing work for military leave on those

19   days, and they also fully lost their compensation

20   from Southwest for those particular days.

21            On the days that they are off, if they are

22   available and legal for flying and they pick up and

23   they're legal and a senior person, then they will be

24   awarded the pairing.  But they're not awarded that

25   pairing if they're legal and available solely

Page 84

1    because they dropped military leave.

2        Q.    And whether a pilot bids on premium flights

3    as a result of dropped trips during military leave

4    is something that's just -- it's up to an individual

5    pilot to make those decisions?

6        A.    That is correct.  And that's also where I

7    have had conversations in the past with management

8    pilots, and it goes into expectations or basically

9    kind of made-up rules as far as what they expect

10   pilots to do.

11       Q.    What are the "made-up rules" that you're

12   referring to?

13       A.    Certain pilots or certain management pilots

14   have suggested that if a pilot drops military leave

15   that they should pick up a pairing at a

16   straight-time pay.

17       Q.    And you think that that's inappropriate?

18       A.    Yes, I do.

19       Q.    Why do you think that's inappropriate?

20       A.    A pilot -- a pilot has lost their pay when

21   they dropped the pairing.  Southwest does not

22   compensate an individual if they drop military

23   leave.  So that person has lost their compensation,

24   and they should be allowed to pick up a trip based

25   off their seniority and what's available, just like

Page 85

CONFIDENTIAL

1   any other pilot in the system.  They should not be

2   treated differently than anyone else.

3       Q.   And that's true even if a pilot's practice

4   is to schedule conflicts so that they can pick up

5   premium flights?

6       A.   I can see, Mr. Berry -- I feel like you're

7   trying to lead me into saying that that's a practice

8   that I did as far as dropping to pick up premium

9   flights.

10          What I will say is that, again, Southwest

11  Airlines said that they do not expect an individual

12  pilot to work or perform military service on their

13  days off, so I will definitely say that anytime I

14  have an ability to pick up open time, I will pick it

15  up at the best rate available at the time.

16      Q.   Do you have knowledge about other pilots'

17  practices in this regard?

18      A.   Could you be more specific.

19      Q.   Yeah.  Do you -- do you have -- do you know

20  whether other pilots tried to schedule conflicts

21  with their military leave in order to pick up

22  premium flights?

23      A.   I do not -- I can tell you in general that

24  all pilots using all forms of bidding, as we covered

25  earlier, are going to do whatever works best for

Veritext Legal Solutions
866 299-5127

1    their individual goals as far as quality of life, as

2    far as scheduling.

3         Some pilots would rather work -- if I had

4    two days of military service and 12 days of

5    Southwest, some pilots would rather work 12 days

6    total in a month, so they would drop a pairing or

7    bid a pairing so that they only had to work 12 days

8    in the month.  Or they may want more pay for the

9    month, so they will bid around it, or they will bid

10   for 14 days.  Everything is very specific for an

11   individual pilot and their individual goals.

12       Q.   So we've been -- I want to shift focus a

13   little bit, and so what we've been talking about for

14   the last 10 or 15 minutes has been scheduling

15   practices at Southwest Airlines, so flying time;

16   right?

17            I want to focus for a minute on the schedule

18   related to military service, which we began talking

19   about earlier.  I want to pick up that thread.  So

20   what you mentioned is that, at least for the kind of

21   service that you performed in the military,

22   especially recently, a lot of the duties were

23   unpredictable in terms of when the dates would fall

24   for a variety of reasons; is that right?

25       A.   A certain percentage, but I couldn't -- it

Page 87

1  2014 was when that particular incident happened, but

2  the individual that I'm referencing apparently had

3  multiple incidents of the same behavior before that.

4      Q.   The allegations that you're making in

5  this -- this lawsuit, Huntsman 2, did you bring

6  those to the attention of Southwest Airlines before

7  filing the lawsuit?

8      A.   I would say the -- the best -- the one that

9  I can say factually that was brought up was that we

10  repeatedly asked -- I know that I personally

11  individually asked for the Department of Labor VETS

12  or an outside organization to come in and review all

13  aspects of USERRA law with all comparable forms of

14  leave for military employees at Southwest.

15          Did I speak specifically to the nature or

16  verbiage of this complaint?  I do not recall doing

17  that.  But I did ask for an outside agency to come

18  in and just review all the programs and give us a

19  "yes" or "no" so that we could have closure on both

20  sides and move forward.

21      Q.   And so when you say "the nature of this

22  complaint," you mean the allegation that short-term

23  military leave is comparable to other forms of leave

24  and therefore Southwest Airlines should compensate

25  for short-term military leave?

Page 119

1     A.  That's correct.  That would be one aspect of

2  it, yes, but --

3     Q.  You don't recall -- you don't recall whether

4  you brought that to Southwest's attention?

5     A.  I do not remember specifically bringing the

6  verbiage that you just said to Southwest's

7  attention.

8     Q.  Is there a reason -- is there a reason why

9  you didn't?

10     A.  Well, there was -- there were way more

11  aspects to what we were alleging.  There are way

12  more aspects to the military issues than would be

13  for this specific case, like I talked about with

14  reemployment, with harassment.

15          There are many issues, which is the reason

16  that I broadly asked, "Can we please just have an

17  outside agency come in?  We can both air our

18  grievances in relation to compliance and have a

19  third party, basically, settle it," for lack of

20  better terms.

21     Q.  Yeah.  So I want to ask about this specific

22  allegation that's made in this complaint.  Is there

23  a reason why you didn't bring these allegations to

24  Southwest's attention?

25          MR. SCIMONE:  And I will just state an

1    objection here -- one second, Jayson -- similar to

2    my earlier one, that to the extent that this is

3    calling for discussions with counsel about the

4    timing of the lawsuit, reasons for filing it when we

5    did, et cetera, I would ask you not to divulge that

6    information on grounds of attorney work product.  If

7    you can give an answer without -- without touching

8    on that information, then -- then you can answer the

9    question.

10          THE WITNESS:  I believe the best answer to

11    the question would be that, like I alluded earlier

12    with Huntsman 1 versus 2, is simply the legal

13    process and everything else was purely discussions

14    with the -- my attorneys, and I would not feel

15    comfortable divulging that information.

16    BY MR. BERRY:

17       Q.   When did you engage attorneys for Huntsman 1

18    or Hunts- -- let's start with Huntsman 1.  When did

19    you first engage attorneys for Huntsman 1?

20       A.   I cannot give you an exact date.  I can tell

21    you progressively that it was after the completion

22    of the Military Resolution Board, to the best of my

23    knowledge, the reason being that discussions within

24    the union and -- were basically -- without divulging

25    attorney-client issues there either, was that the

Page 121

1    call, and the only person I made before -- talked to

2    before filing that lawsuit was to inform my wife

3    that I was going to file legal action and to make

4    sure that she was okay with that.

5         Q.   So before -- so your first contact was with

6    Mr. Jarrard; is that right?

7         A.   To the best of my recollection, yes.

8         Q.   Okay.  So I want to take you to a time

9    before that.  Before you made a contact with your

10   lawyers in this case, why didn't you bring to

11   Southwest's attention your allegation that it should

12   compensate for short-term military leave because it

13   compensates for other forms of allegedly comparable

14   leave?

15        A.   Well, again, I didn't bring this specific

16   instance of this case before, and I can't answer as

17   far as my conversations with the attorneys, but we

18   did ask for every aspect and every program to be

19   reviewed by an outside source.

20        Q.   Okay.  But you did not bring this specific

21   issue to Southwest's attention; is that right?

22        A.   That is correct.  And it goes back to

23   conversations with my attorneys.

24        Q.   No.  I'm talking about before you engaged

25   your attorneys.  So you couldn't have talked to them

Page 123

1   until you talked to them.   So let's go to before you

2   had attorneys.

3            And my question is specifically with respect

4   to the allegations in this lawsuit.   Before you had

5   attorneys, why didn't you bring this to -- this --

6   these allegations to Southwest's attention?

7        A.   The answer that I have is that I believed

8   the harassment and intimidation issues were much

9   larger in scope than these issues.   These issues in

10  Huntsman 1 and Huntsman 2 were obviously something

11  that I wanted to address, but most important to me

12  was the fact that I was -- almost felt -- I felt

13  dirty performing military service, and I didn't feel

14  that there was any information or education as far

15  as the company goes to that aspect.   And I didn't

16  feel there was any action being taken in those

17  particular cases.   They basically were a higher

18  ranking of priority to me at the time, but now

19  obviously we're slowly working through all of them.

20            But to answer your question, that's the

21  best -- that's really my best answer, is I felt that

22  there were other priorities or other things that

23  were more important as far as a daily work life.

24       Q.   Okay.   So before you had engaged attorneys,

25  you had concluded that Southwest should be

CONFIDENTIAL

1    compensating pilots for short-term military leave,

2    but there were issues that prevented you from

3    bringing them to Southwest's attention; is that

4    right?

5        A.    I would -- I would say in general I believed

6    in the nature of the complaint, based off my

7    understanding of other companies' actions.  I

8    understood at the time other companies' actions.  As

9    I spoke to earlier -- for example, the AT&T and MGM

10   examples that I gave you -- I knew other companies

11   were compensating.  But at the time it was kind --

12   as I alluded to earlier, what is the most important

13   issue right now, and then as I became more educated

14   on the law and how it applies to each one is how I

15   kind of progressed with dealing with each individual

16   issue.

17        MR. BERRY:  Mr. Huntsman, I'm introducing

18   what's called Exhibit 2, which should be the

19   military handbook.  Let me know when you can see

20   that.  Unfortunately, it's turned sideways, so we're

21   going to have to figure out how to adjust the view.

22        (Exhibit 2 marked for identification.)

23        THE WITNESS:  There's a "Rotate" bottom in

24   the toolbar -- a "Rotate" button in the toolbar.

25        MR. BERRY:  Thank you.  You beat me to it.

Page 125

1   paramount.  So is this -- is this a time -- so at

2   some point we are going to take a more extended

3   break for folks to eat.  This may be the time to do

4   that.

5              DEPOSITION REPORTER:  Why don't we go off

6   the record.

7              MR. BERRY:  Yeah.  Sorry.  We can talk about

8   folks' diets.

9              THE VIDEOGRAPHER:  Off the record at

10  11:21 a.m.

11             (Off the record.)

12             THE VIDEOGRAPHER:  Back at 11:36 a.m.

13  BY MR. BERRY:

14       Q.   Mr. Huntsman, while we were on break, I

15  marked an exhibit, Exhibit 3, which is the complaint

16  in this case.  Do you have that?

17       A.   It's a new exhibit?

18             MR. BERRY:  Yes.

19             THE WITNESS:  Okay.

20             (Exhibit 3 marked for identification.)

21             THE WITNESS:  Okay.  I have the exhibit up.

22  Which page would you like me to go to?

23  BY MR. BERRY:

24       Q.   Well, first, do you recognize the exhibit?

25       A.   Let's see.  Let me make sure it's the

                                        Page 151

1    correct one.

2              Yes, I do.

3        Q.    And what is Exhibit 3?

4        A.    It's a class-action complaint filed by me on

5    behalf of all members of the class versus Southwest

6    Airlines.

7        Q.    Okay.  And if I can direct you to

8    paragraph 11, which is page 4, under the heading

9    "Class Action Allegations."  Let me know when you're

10   there.

11       A.    I'm here.

12       Q.    And do you see the indented part that has

13   the class definition?

14       A.    I do.

15       Q.    Okay.  And do you see where the

16   definition -- the class definition is framed based

17   on, it says -- well, I'll just read it.

18             "The following Class:

19             "Current or former employees of

20             Southwest Airlines Co. who, during

21             their employment with Defendant, took

22             short-term military leave (which

23             Southwest defines as military leave

24             that lasted 14 days or fewer) from

25             their employment with Southwest Airlines

                                        Page 152

CONFIDENTIAL

1          Co. and during such period of short-term

2          military leave did not receive their

3          regular wages or salary that they would

4          have earned," and then it goes on.

5          Do you see that?

6     A.   I do.

7     Q.   Okay.  Before we took a break, we were

8  talking about the cutoff at 15 days, so 14 days or

9  fewer or above.  Do you recall that discussion?

10    A.   I do.

11    Q.   Okay.  And I wanted to make sure -- you

12 referenced a few times that you didn't have the

13 complaint in front of you, so I wanted to put it in

14 front of you and see if it changes your testimony or

15 informs you in any -- in any way.  And so let me --

16 let me ask a question.

17         You say -- the complaint reads that

18 "short-term military leave is defined by Southwest

19 as leaves lasting 14 days or fewer."

20         Do you see that?

21    A.   I do see it.

22    Q.   Okay.  Where does Southwest Airlines define

23 military -- short-term military leave as 14 days or

24 fewer?

25    A.   Without any reference to other documents, my

Page 153

1   guess is it's purely -- my opinion is it's kind of

2   poor verbiage for understanding.   The only thing I

3   could think of would be a carryover from the past

4   case.

5       Q.   Okay.   So you're talking about the

6   settlement -- the settlement of Huntsman 1?

7       A.   Yes.   And that is just an educated guess.

8       Q.   Okay.   Well, we saw the -- the military

9   handbook that defines short-term military leave

10   as -- in terms of 30 -- fewer than 31 days; right?

11      A.   Again, that was an outdated document.

12      Q.   Your proposed class goes back to

13  October 10, 2004; is that right?

14      A.   That's correct.

15      Q.   Okay.   So whether or not the military

16  handbook is outdated for a period of time covered

17  by your class, it was in effect; is that right?

18      A.   During a certain portion of time of the

19  complaint for pilots, only that particular document

20  is used as a reference item.   But, again, that did

21  not have to be complied with.   That was pretty

22  voluntary.

23      Q.   Okay.   There's a definition in there of

24  "short-term military leave" as 30 -- as less than

25  31 days; right?

Page 154

1      A.   For a certain amount of time, yes, there

2  was.

3      Q.   Okay.  But you're not adopting that

4  definition of "short-term military leave"; correct?

5      A.   That is correct.

6      Q.   Okay.  And I believe you testified earlier

7  that as a factual matter, there is no difference

8  between a 14-day military leave and a 16-day

9  military leave; is that right?

10     A.   I testified that there's no difference

11  other -- in -- as regards to duration, there's a 2

12  day difference.

13     Q.   And is there any other difference other than

14  the two days, which -- but I grant you by math the

15  difference between 14 and 16 is 2 days.  Is there

16  any other difference between military leave of

17  14 days and 16 days?

18          MR. SCIMONE:   Objection.

19          THE WITNESS:   I would say obviously there's

20  a difference in the basis of my allegation, but I

21  cannot factually reference another document for a

22  difference in duration outside of the allegation

23  which is in front of me.

24  BY MR. BERRY:

25     Q.   Okay.  Setting -- setting aside whether

                                              Page 155

1    you can reference a document, in your -- in your

2    experience, is there a difference between a 14-day

3    and a 16-day military leave other than the 2 days'

4    difference?

5        A.    Outside of USERRA floors and other variables

6    that could come into play, not to my knowledge.

7        Q.    Do you have an understanding of what

8    Southwest's bereavement leave policy is for pilots?

9        A.    In general, yes.

10       Q.    What's your understanding?

11       A.    My understanding is that it is a -- you can

12   have a pairing pool with up to four days' pay for --

13   to take care of something -- there's a definition

14   I believe that's probably immediate family; like

15   father, mother, spouse, child.  I'm not sure of the

16   exact definition, but ultimately there's up to four

17   days of paid leave for bereavement.

18       Q.    Okay.  And in this lawsuit you contend that

19   bereavement leave is comparable to military leave;

20   is that right?

21       A.    In the forms of type and duration, yes.

22       Q.    Yeah.  So in what ways is -- are bereavement

23   leaves comparable to military leaves?

24            MR. SCIMONE:  Objection.

25            THE WITNESS:  Barring the objection from my

                                        Page 156

1    is on P0009.

2         A.    I'm there.  I'm at the top of the page.

3         Q.    Okay.  This is a document at the top that

4    says it's a point credit summary inquiry, and then

5    it's PCARS.

6              MR. BERRY:  Ms. Jennings, P-C-A-R-S, PCARS.

7    BY MR. BERRY:

8         Q.    Is "PCARS" how you refer to it in the

9    military?  Is that the shorthand?

10        A.    It's not a document we commonly reference or

11   utilize.  In all of the years, I probably have

12   referenced the document, you know, two to three

13   times.  Getting close to retirement is about the

14   only time you would look at -- at this document.

15        Q.    Is -- is this the PCARS record for you?

16        A.    To the best of my knowledge, yes.

17        Q.    And I see it's dated January 3rd, 2020.  Do

18   you see that in the upper right-hand corner?

19        A.    That's correct.

20        Q.    Did you request a PCARS report on or about

21   January 3, 2020?

22        A.    I do not recall exactly, but listing as is

23   this is the date, and I think this is what I

24   produced.  I found this in my documents if it's the

25   one I'm looking at, so the answer would be yes,

                                              Page 208

1    they were not paid for it.

2        Q.   And, looking back, some of these records go

3    back to, it looks like, 2012.  Is that about the

4    time that you joined Southwest and transitioned from

5    active military to Reserves?

6        A.   Yes, it is.

7        Q.   Okay.  And so -- and now we're sitting here.

8    It's the end of 2020, so a little over eight years,

9    if I'm doing my math right.  Am I right that your

10   recollection of the days that you were on military

11   leave back in 2012 is foggy?

12       A.   I would say that's an accurate assessment.

13       Q.   Okay.  Do you have a better recollection of

14   the days that you served in the military last year?

15       A.   Somewhat.  But, again, going more than a

16   year ago, it would be very difficult to pin down a

17   specific date outside of the information I provided.

18           (Exhibit 6 marked for identification.)

19   BY MR. BERRY:

20       Q.   Mr. Huntsman, I just introduced Exhibit 6.

21   Can you let me know when you have that up.  It

22   should be an Excel spreadsheet.

23       A.   I do have it up.  It's in a pretty large

24   font, but I can read it.  I can read it.  I

25   recognize it as a document that I presented.  And

Page  212

CONFIDENTIAL

1    also I would like to stress again, per our prior

2    agreement, that a lot of this information is

3    protected by the Privacy Act, and I do not authorize

4    its viewing or release outside of our previous

5    agreement.

6            MR. SCIMONE:   We'll ask to mark testimony

7    about this exhibit confidential.

8            MR. BERRY:   I think we're going -- we're

9    going to spend probably the balance of the day

10   talking about this document in connection with other

11   documents, which, I think, are equally sensitive

12   from Mr. Huntsman's perspective.   So I would just

13   propose that we maintain it -- everything as

14   confidential until we de-designate some portion of

15   the transcript.

16           Does that work for everyone?

17           MR. SCIMONE:   Agreed.

18           MR. BERRY:   Okay.

19   BY MR. BERRY:

20     Q.   So, Mr. Huntsman, this is a document, I'll

21   represent for the record, that's Bates-numbered

22   P00031, which is an Excel spreadsheet that you

23   produced in this litigation.   Do you recognize this

24   document?

25     A.   Yes, I do.

                                            Page 213

1      Q.   Okay.  I'm going to take a shot at saying

2   what I think is here, and you can tell me if -- if

3   it's -- if I'm wrong.  So it looks like what you

4   have done is to take the military leave records from

5   Southwest that we -- that Southwest produced in this

6   litigation, and then you added some columns to those

7   records with some annotations.

8           We'll get into details, but does that

9   sound -- as a process matter, is that what we're

10  looking at?

11      A.   Yes.

12      Q.   Okay.  And so the first -- well, let's look

13  at column G.  It says, "LMS Count of Days."  And is

14  it your understanding that that --

15          (Clarification requested by Reporter.)

16          MR. BERRY:  Sorry.

17  BY MR. BERRY:

18      Q.   "LMS Count of Days."

19          And is your understanding that that is the

20  number of days that you had drop trip so you were on

21  military leave with Southwest on the dates that are

22  reflected in each row?

23      A.   To the best of my knowledge, that is.  I

24  will say that the LM and LMS codes and different

25  annotations that scheduling has utilized over the

                                        Page  214

1    years, I have not been privy to, so I cannot point

2    you to a definition of that.

3        Q.   Yeah.  I'm not -- I'm not asking you to

4    define it.  I'm asking you process-wise what we are

5    looking at.  So it -- it looks to me like you took

6    the LMS records that we produced and you added

7    column H, which says "PCARS Y/N."  Do I understand

8    that, right, to be -- that's whether the PCARS

9    record, either yes or no, reflects the -- the days

10   that are in Southwest's records?

11       A.   That's correct.

12       Q.   Okay.  And then you added a column I labeled

13   "Discrepancies and Errors in PCARS or SWA in the

14   Southwest Records"; right?

15       A.   Yes.

16       Q.   Okay.  And so in preparing this -- well, let

17   me back up.

18           Did you prepare this document?

19       A.   I prepared -- I did everything in the

20   discrepancies.  I did everything in th e-- the

21   yes/no column.  Basically anything that was added or

22   cross-checked, I did.  I was provided the

23   spreadsheet with the dates from my attorney.

24       Q.   And did you prepare this information -- you

25   prepared this information under oath; right?

Page  215

1    A.   I don't understand what -- what you're

2    asking me.

3    Q.   Well, we had -- we can pull up the

4    interrogatory responses, but we asked you to

5    identify the dates of your military service, and the

6    interrogatory responses that are signed under oath

7    say, "See my document production."  And this is the

8    document production, or one document.

9        So I'm wondering if these statements, in

10   your mind, were made under oath are not?

11   A.   I would say that this was a good-faith

12   estimate of the accuracy and cross-check of all

13   information that I had available to me under oath,

14   yes.

15   Q.   Okay.  So looking at columns H and I --

16   again, I'm just talking logistics here; we'll get

17   into the details -- it looks like what you've done

18   is when PCARS -- the PCARS record did not reflect a

19   military leave from Southwest records, you annotated

20   "No" in H and then provided a comment in column I;

21   is that right?

22   A.   Yes.  What I attempted to do was anything

23   that did not match perfectly, I attempted to access

24   either my leave notification from Southwest or any

25   other document that I could find in the search that

Page 216

1   you were serving and that -- that leave is also

2   reflected in Southwest's records?

3       A.   No, I did not, because the records matched.

4       Q.   Okay.  But if the PCARS record is inexact,

5   it could show days that you were -- it could -- it

6   could show days that you -- it could say that you

7   were on leave -- sorry.  I'm not saying that right.

8           In your view, there are instances when PCARS

9   does not state a date when you were performing

10  military service; correct?

11      A.   I would say an example of that would be if a

12  PCARS payment was made on a separate date for what I

13  referenced earlier, so...

14      Q.   I -- we need to do this step-wise.  I

15  believe what you said is that there are -- there are

16  instances where PCARS does not show a date of

17  military service when you were actually serving in

18  the military; is that right?

19      A.   That is correct.

20      Q.   Okay.  Are there instances when PCARS shows

21  a date of military service when you were not serving

22  in the military?

23      A.   I would say it probably does, yes.

24      Q.   Okay.  Did you undertake any investigation

25  in your records to check those discrepancies?

Page 218

1        A.    Yes, I can.    That would be my best guess.
2   Often there may be additional duties.  I may be
3   doing a performance report.  Earlier in my service
4   in the squadron I had additional duties which
5   required additional time outside of my primary
6   duties.  Some of those were allowed to be -- you
7   could do some of them on the road.
8            For example, when I was a flight commander,
9   I'd be responsible for multiple performance reports
10  for multiple people.  That would be something I
11  could work on on my laptop and not be on base to do.
12  Oftentimes while doing that -- and I notice that
13  the years 2018, and that time previously were
14  extremely busy while I was doing union duties as
15  well.
16           So oftentimes I may have performed
17  performance reports or other types of military duty
18  and simply did not fill out the paperwork or follow
19  up on the paperwork to make sure that I was paid for
20  that status.
21       Q.    So your -- when you say "Remote
22  work/travel/telecommute," have you confirmed that
23  that's what you were doing on that day or that's
24  just a guess about what -- what you may have been
25  doing?

1   A.   I don't have -- I don't have that

2   information in front of me.  Obviously I put

3   "Remote work/travel/telecommute."  I don't know

4   exactly what I was doing that day, but it may have

5   been something to where I saw that I was not here

6   or -- when I say "here," like maybe I was not on

7   base or I don't have anything factual.  But that

8   would be my best guess.  Anything that I cannot find

9   factual information, I tried to put my best guess

10  for an explanation.

11   Q.   Okay.  So you had some -- you can see in the

12  surrounding columns around the same time period you

13  have some photos.  But you looked for photos on this

14  date and could not find a photo?

15   A.   I -- if I did find a photo for that

16  particular date, if there was any type of photo,

17  there was nothing like my other photos that shows,

18  you know, maybe I'm physically on base.  But there's

19  no PCARS, et cetera.

20   Q.   Okay.  And you don't have any independent

21  recollection today about whether you served on

22  May 18th, 2018?

23   A.   I do not.

24   Q.   If I can take you down to row 112.  This is

25  a military leave on March 19th, 2019.

Page 231

1    instance when we scroll through, when there's a

2    letter followed by some text, that the black text

3    are notes and comments that you prepared that are

4    explanatory, and you prepared them in order to

5    respond to the discovery requests?

6        A.   That is correct.  I -- I typed the black

7    test -- text.  Those are my notes.  And each one is

8    my best good faith estimate as to why there would be

9    a discrepancy.

10       Q.   Okay.  And so on the April 13th, 2013 -- so

11   this is back to A.  You note that your squadron was

12   out of money and pay statuses were not available and

13   were filed later.  And so this -- this is similar to

14   your note earlier about the continuing resolution;

15   is that right?

16       A.   Yes.  And that -- again, that's my best

17   guessing.  When I have a comment about a medical

18   requirement that is due -- I don't remember if I had

19   a back injury at that point, but if -- unless it was

20   something in regard to that and my medical status

21   with the military, it probably would have been a

22   flight physical.  So that's why I placed -- that's

23   why I said that was my best guess.

24       Q.   Okay.  And just to confirm, I believe --

25   I believe it's -- it's true from the context, but

Page 236

1    it is a best guess.  You're not certain sitting here

2    today or based on your review of records whether you

3    performed military service on April 13th, 2013?

4         A.   That's correct.  Every -- each one of

5    my answers is my best guess as to what -- why

6    there's a discrepancy, but I cannot factually state

7    on any of these whether or not I performed duty on

8    that particular day.

9         Q.   In doing your -- let me back up for a second

10   and ask a bigger picture question.

11            In doing your investigation, did you ever

12   discover a date of military leave in Southwest's

13   records when you did not serve in the military?

14        A.   Do you -- as regard as days that are on my

15   PCARS where I was working for Southwest or are you

16   asking if there is a military leave annotated with

17   Southwest that I did not perform military leave?

18        Q.   Well, the -- the Southwest records show

19   that you were on leave on -- on certain dates;

20   right?

21            And my question is:  Have you ever -- well,

22   in doing your investigation, did you ever find one

23   or more instances where you concluded, oh, you know,

24   what?  Actually this says that I was on leave but I

25   actually wasn't performing military duty?

1     A.   Yes, I have.

2     Q.   Okay.  And did you -- did you annotate those

3   here?

4     A.   It was not in the scope of this

5   investigation.  It was annotated with the company

6   multiple times over the years, including my last

7   Employee Relations complaint.

8     Q.   Okay.  How many -- how many such instances

9   did you find?

10    A.   So I could not -- I could not do that with

11  this document search because I did not have access

12  prior to, I believe, six months of my schedule.  So

13  it's impossible for me to see when Southwest has me

14  on military leave.

15         So, for example, it's currently November,

16  I would be able to see my military leaves on the

17  screen that I have access to back approximately six

18  months, but for the scope of this request, I cannot

19  see any dates.  It would be impossible for me to do

20  that because I don't know what they had annotated on

21  my screen.

22         To answer your question further, over the

23  years I have identified multiple times when military

24  leave was incorrectly placed or there were changes

25  and the company never changed the status.  Those

Page 238

```
 1   clarification.
 2            MR. SCIMONE:  Yeah.  I mean, and I'm fine
 3   with him answering the question to the extent that
 4   you are not trying to pin him down to a legal
 5   position, but I feel like that's what you're trying
 6   to do.  And you're not telling me that you aren't
 7   trying to do that, so I'm having a hard time
 8   understanding what you're driving at.
 9            MR. BERRY:  Well, yeah.  It's his testimony,
10   and so --
11            MR. SCIMONE:  Yes, it is.
12            MR. BERRY:  Let's -- let's proceed.  If you
13   want to instruct him not to answer, you can.
14   BY MR. BERRY:
15      Q.   So, Mr. Huntsman, I believe what you said is
16   that there are instances when Southwest's records
17   will not show that you were on military leave, but
18   you performed military duty; is that right?
19      A.   I am saying that I performed military days
20   that -- I performed military duty on days off
21   showing on my CWA records that are not annotated
22   accordingly, yes.
23      Q.   And so in that regard Southwest's records
24   are inaccurate?
25      A.   I would say yes.
```

Page 257

CONFIDENTIAL

```
 1   those days?

 2           MR. SCIMONE:  Objection.

 3           Answer to the best of your ability.

 4           THE WITNESS:  Okay.

 5   BY MR. BERRY:

 6       Q.   It's a yes-or-no question.

 7       A.   It's not a yes-or-no, in my opinion, sir.

 8           Ultimately, if Southwest had a notification

 9   system or had changed it, then this would not be an

10   issue.  So my answer is that an individual

11   performing military leave should be treated

12   comparable to other forms of leave.  So if they were

13   proceeding on that date a military service or doing

14   military service and the notification system

15   prevented them from accurately representing that,

16   then, yes, they should be compensated just as if

17   they were in the system.

18       Q.   Okay.  So that's -- that's a rationale.  As

19   I understand it, you are providing some reasons why

20   Southwest's records may be inaccurate, because, in

21   your view, the notification system is flawed; right?

22       A.   That is correct.

23       Q.   Okay.  So for whatever the reason -- and

24   there could be other reasons why on any given -- on

25   any given day the leave record may be inaccurate.
```

Page 259

```
 1    location, which is something that's sort of --
 2    that's pilot-specific.  I take it that a lot of
 3    their reservists do their drilling locally, and so
 4    the -- you know, a travel day or prep day would be
 5    different than if you were, say, flying to the
 6    Netherlands, as you have done in instances, or to
 7    the Pacific theater; is that right?
 8         A.   I would say that would be fair.  But I would
 9    say most reservists, they also have exercises and
10    deployments that they do on a regularly basis,
11    sometimes yearly or semiannual, where they do
12    travel.  So just because they aren't operating an
13    aircraft, I would say that -- that most reservists
14    and guardsmen do have to travel to locations on a
15    regular basis.
16         Q.   Okay.  If you scroll down to the next entry.
17    This is "H" as in "Herb."  This entry relates to a
18    military leave on August 6th, 2016, a one-day leave
19    that doesn't appear in PCARS.  And you note that
20    there is a photo that supports that you were on base
21    on that day; is that right?
22         A.   That's correct.  The photo on the screen --
23    thankfully, I took it to show -- that's a screen of
24    a type of orders or a duty certification process.
25    And I was having some type of -- there was some type
```

Page 267

1  of issue with it, or I -- I needed to take those

2  dates to either fix our pay status or have something

3  with the orderly room to fix it, so I took that.

4  That's --

5          (Clarification requested by Reporter.)

6          THE WITNESS:  There was some issue with the

7  orders system that made me take this picture, and

8  that picture is a government computer in my squadron

9  physically at Travis Air Fore Base.

10 BY MR. BERRY:

11    Q.   That was my next question.  It looks like

12 you are accessing a system called AROWS?

13    A.   That's correct.

14    Q.   Okay.  And you can tell from this photo that

15 this is not your personal computer.  This is a

16 computer that's on base?

17    A.   Yes, it is.

18         DEPOSITION REPORTER:  Can you spell the

19 "AROWS," please.

20         THE WITNESS:  Yes, ma'am.  It's Alpha,

21 Romeo, Oscar, Whiskey, Sierra.

22 BY MR. BERRY:

23    Q.   Do you remember taking this picture?

24    A.   No, I do not.

25    Q.   And -- but your best guess is that you took

                                          Page  268

CONFIDENTIAL

1    it in order to send it to someone for technical

2    help; is that right?

3        A.    I -- I took it for -- I don't know the

4    reason at the time.  I'm guessing it was some kind

5    of problem with the information that is shown on the

6    screen, so either a certification date was wrong, a

7    date needed to be changed.  They move through the

8    system.

9            There's different -- there's different

10   levels of certification, so sometimes they would be

11   stuck in certain areas, and so we would need help

12   from an outside agency to move the order through to

13   a completed status.  There's probably five or six

14   more reasons I could list why I would have taken a

15   picture of that particular system.

16       Q.    So you don't -- you don't recall why you

17   took the picture, but you know that this was a

18   computer that was on base at the time?

19       A.    That's correct.  Yes.  That's -- I'm leaning

20   up to look at the picture individually.  Yes.

21       Q.    At the top -- this looks like it's an iPhone

22   interface or smartphone interface; is that right?

23       A.    Yes.  That was probably taken with my phone

24   at the time.

25       Q.    Okay.  And the "August 6th, 2016 at

                                              Page 269

1   same as the last one.  It says, "Photo supported on

2   base."

3        A.   That is correct.  And referencing the -- the

4   photo, this would be a common photo.  And that 349

5   Air Mobility Wing in the photo, the UTA schedule --

6             (Clarification requested by Reporter.)

7             THE WITNESS:  I apologize.

8             The photo that's listed under letter "I" for

9   November the 22nd, this would be a photo that I

10  would normally take at least once a year, and it

11  shows the UTA schedule for the fiscal year.

12            The reason that I would take this would be

13  for planning purposes, because some of the UTA

14  weekends were mandatory, and some of them were not.

15  But it also would show -- if you notice under Flight

16  A and Flight B, it would show me other opportunities

17  to where if I needed to see a reserve doctor for an

18  injury or a return to fly status, it may give me a

19  separate opportunity to see them on that particular

20  date.  That's definitely why I would take that

21  picture.

22  BY MR. BERRY:

23       Q.   Okay.  And do you recall taking this

24  picture?

25       A.   I recall taking pictures of the UTA schedule

                                          Page  272

1    many times.  I don't remember this specific date,

2    though.

3        Q.   Have you ever had someone else who serves

4    alongside you at Travis Air Force base send you a

5    picture of a schedule?

6        A.   Yes, I have.

7        Q.   And do you know if this is an instance where

8    someone sent you a picture of a schedule?

9        A.   I do not know that answer to that.

10       Q.   It's possible?

11       A.   It is a possibility, but the way this was on

12   my phone, I think I took the picture.  But it is

13   most certainly a possibility.

14       Q.   Can I ask you to scroll up to the last

15   photo, which was H.  It's a August 6, 2016 photo.

16       A.   Okay.

17       Q.   And you see there's -- there's no text above

18   "August 6, 2016"?  I'm asking you to observe an

19   absence, which may be odd, but it will make sense

20   when you look at the next one, where above the date

21   and timestamp, "November 22, 2016," it says "Travis

22   AFB."

23       A.   I'm looking.  Stand by.

24            On H -- I'm looking at H.  That says, "Below

25   shows I was at Travis Air Force base on August the

Veritext Legal Solutions
866 299-5127

1    all four for both days.  That would be a scheduler

2    pulling up a pay system who had access to a pay

3    system, and they would input for each individual.

4    That's why I said it's most probable that I simply

5    did not sign the sheet of paper, but it is also a

6    possibility that there was an entry error when that

7    individual went through to click on specific days

8    for UTAs.

9        Q.   Okay.  Looking down at L now, L relates to a

10   one-day military leave on July 5th, 2017.  And you

11   note that there's a security clearance photo that

12   supports that you were performing military duty.

13       A.   That's correct.

14       Q.   Can you explain how this supports that you

15   were performing military duty.

16       A.   Yes.  This was -- this is the best that I

17   could find, and this was a text conversation between

18   the unit security manager for the security

19   clearance.  So my security clearance, as I gave an

20   example earlier -- I was using myself.  I used to

21   have a higher level.  That went down to a lower

22   level.  So many years lapsed between my last

23   investigation for a security clearance and the

24   current one that I was attempting to get.

25            The technological issues for this were an

                                        Page  290

1    absolute nightmare.  You were supposed to be able to

2    log into the system, which I have later on in the

3    exhibits.  I received multiple passwords.  I would

4    do something in the system.  It would lock me out.

5    And the worst part is that my complete form was

6    reset twice over multiple months.  This is something

7    that flows through the squadron, and then it goes up

8    to a high-level security branch.  Once it gets there

9    and if they send it back, the form reset.  It was

10   extremely frustrating.  I worked on it for multiple

11   days.

12          And, quite frankly, it was another factor in

13   me starting to lean to leave the squadron.  If you

14   notice, that date was 2018, and that was the time to

15   where I decided that I had too much on my plate, and

16   I was thinking of separating to a unit to where

17   there was less involvement required.

18      Q.   Okay.  And the -- there's a stamp -- maybe a

19   location stamp that says "312 CAL" on the photo.  Do

20   you see that?

21      A.   I do.  That's simply -- that's identifying

22   the person -- it's a sergeant in the 312 Airlift

23   Squadron, of which I was a member of.

24      Q.   So this is a text message that two and a

25   half years later, whatever the case may be, you

Page 291

1   scroll down, but if I can take you to row No. 92.

2   Let me know when you're there.

3        A.    I'm there.

4        Q.    Okay.  Do you see that -- that this leave

5   entry is for July 5th, 2017?

6        A.    I do.

7        Q.    Okay.  And so am I right that the

8   explanation that you have for July 5, 2018 is an

9   error?

10        A.    That is -- that is probably an error, yes.

11        Q.    Okay.  Is there any reason to believe that

12   this explanation screenshot that you provided

13   related to July 5, 2018 provides support for you

14   being -- for you performing military duty on

15   July 25th, 2017, one year previously?

16        A.    I do not know that.  That was an honest

17   error as far as the date.  I would have to go back

18   and look at the PCARS and search that particular

19   date again.  But, no, that's -- I must have missed a

20   date by a year as far as the calendar year.

21        Q.    Okay.  And so am I right that you have not

22   looked at your -- your various records -- or to the

23   extent you looked at them, you were looking at the

24   wrong year.  You have not yet investigated whether

25   you have any support for the -- for whether you were

Page 293

1           And, yes, there -- there are a variety of

2    reasons the pay statuses may show differently than

3    the dates in the notification system.

4        Q.   So sitting here today, if PCARS shows

5    that -- does not show that you were not performing

6    duty on February 9th, that you were on military

7    leave, and your best or your -- one plausible

8    explanation, you believe, is that PCARS is just off

9    by a day and that you were serving in the military

10   on February 9th?

11       A.   That is a fair -- that would be a fair

12   assessment.  And PCARS shows that I was not paid on

13   the 9th.  It does not show that I was not performing

14   military service on that day.

15       Q.   Well, it doesn't show anything one way or

16   the other.

17       A.   I'm sorry?

18       Q.   It doesn't have an entry for February 9th at

19   all, so it just shows that -- the absence of the

20   date on PCARS means that you weren't compensated;

21   right?

22       A.   That's correct.  And I was compensated on

23   the 12th, so that was just my best guess as to why

24   it was shifted.

25       Q.   So going down to N, this is a one-day leave

Page 298

1    on May 4th, 2018 that appears in South- --

2    Southwest's records but does not appear in your

3    PCARS record.  And you note that there is -- a photo

4    supported remote work on the 4th of May in prep for

5    the 5th of May.  Do you see that?

6        A.    I do.

7        Q.    And there are two photos on this sheet.  Can

8    you explain to me what's going on in these photos?

9        A.    I can.  The photos -- my best explanation

10   that I can give is the 15.pdf looks like a

11   performance report file.  Again, that would be

12   something that I would work on remotely.  They

13   changed the format, and I think that was about the

14   timeframe where they changed the versions of the --

15   the DOD form for officer performance reports.

16           I could not open it for whatever reason it

17   was, and I took the picture to take into base the

18   next day to present it to ask them what I need to

19   update or how I could open the new format of the OPR

20   so that I did not have to -- so that I could access

21   it from my personal computer, or there was some type

22   of application on base to where it simply was not

23   opening the file.

24           The next day shows a picture of me in the

25   squadron, and that is either a -- I'm scrolling in

Page 299

1      Q.   But you don't have the same absolute

2   certainty about why you took the photo or what

3   the -- what was going on?

4      A.   You know, unless I'm 100 percent, I always

5   caveat, so I would say I'm 99 percent that that

6   was -- the file labeled 15.pdf was a performance

7   report, probably a shell of a performance report in

8   a PDF format, and it would no longer work on my

9   computer.

10          I took the picture.  I probably -- I either

11   maybe texted someone else at the time, or I took it

12   the next day, because usually someone else has

13   encountered the problem or they have a workaround or

14   there will be someone on base that knows how to fix

15   it.

16      Q.   Okay.  And so --

17      A.   It was --

18      Q.   Go ahead, Mr. Huntsman.

19      A.   I'm saying it would probably be a product

20   that I wanted to have completed for that next day,

21   is -- based off -- there's no other reason that I

22   would be working on it that late in the evening.

23      Q.   Okay.  And so both of these photos, again,

24   looked like that they are rendered from a iPhone.

25   They have the similar format with the picture of an

Page 301

CONFIDENTIAL

1    airplane in the upper right and the battery,

2    et cetera; is that right?  So is your -- is your --

3    is it your recollection that you took these photos

4    with your iPhone?

5         A.    That's the -- that would be my best guess.

6         Q.    And then the photo of May 4th, 2018, you

7    took that about -- on or about 9:18 at night in

8    order to take it in the next day to discuss the

9    technical issue?

10        A.    That's a best guess.  And, again, if I'm

11   working on that product that late at night, then

12   there was frustration involved with the technical

13   issue, and so I was taking it to -- to basically

14   show what the issue was.

Page 302



Page 303

1      A.    That's correct.

2      Q.    You haven't changed any of the dates or

3  times on any of these -- the time and date

4  signatures on any of these photos?

5      A.    I have not changed any item on any photo.

6      Q.    Moving down to O, this involves a 2 day

7  military leave from Southwest Airlines on May 22nd

8  and May 23rd that does not appear in your PCARS

9  report.  You have a note that says, "Photo supported

10  at base."

11           Do you see that?

12      A.    I do.

13      Q.    Okay.  And then the photo that you provided

14  has a timestamp of 12:38 p.m. on May 23, 2018.  Do

15  you see that?

16      A.    I do.

17      Q.    Okay.  Can you tell me about this photo.

18      A.    My best guess is I thought the sign they had

19  up was funny, probably not politically correct.

20           But I know with absolute certainty that

21  that's the entrance to the SARM office, which would

22  be the people that -- if you see the yoga ball in

23  the background, that's the desk for the individual

24  who I was dealing with for my security clearance

25  issues.  I may have been there to see her.  Or the

Page 304

CONFIDENTIAL

```
 1              I, JANIS JENNINGS, CSR No. 3942, Certified

 2     Shorthand Reporter, certify:

 3              That the foregoing proceedings were taken

 4     before me at the time and place therein set forth, at

 5     which time the witness was duly sworn by me;

 6              That the testimony of the witness, the

 7     questions propounded, and all objections and statements

 8     made at the time of the examination were recorded

 9     stenographically by me and were thereafter transcribed;

10              That the foregoing pages contain a full, true

11     and accurate record of all proceedings and testimony.

12              Pursuant to F.R.C.P. 30(e)(2) before

13     completion of the proceedings, review of the transcript

14     [  ] was [X] was not requested.

15              I further certify that I am not a relative or

16     employee of any attorney of the parties, nor financially

17     interested in the action.

18              I declare under penalty of perjury under the

19     laws of California that the foregoing is true and

20     correct.

21          Dated this 18th day of November 2020.

22

23          _____

24          JANIS JENNINGS, CSR NO. 3942

25          CLR, CCRR
```

Page 323

# The Joint SWA/SWAPA Flight Operations Military Handbook

  

  

**As set forth in the
Collective Bargaining Agreement
dated November 1, 2009**

**Between
Southwest Airlines Co.
and the
Southwest Airlines Pilots' Association**

**Effective Date: Nov 1, 2014
Required Review Date: Oct 30, 2015**

EXHIBIT

0002

# Table of Contents

SECTION 1: Purpose ........................................................... 2

SECTION 2: Definitions ..................................................... 2

SECTION 3: General .......................................................... 2

SECTION 4: MILOA Notification ........................................ 3

SECTION 5: Notification Timeline ................................... 3

SECTION 6: MILOA Notification Form Completion ............................. 4

SECTION 7: MILOA Trip Pulls ........................................ 6

SECTION 8: Changes or Cancellations Of Military Leave ..................... 7

SECTION 9: Health And Welfare Benefits ............................ 7

SECTION 10: Monthly Bidding .......................................... 8

SECTION 11: Pass Privileges .......................................... 8

SECTION 12: Jumpseat Privileges ................................... 8

SECTION 13: Known Crewmember (KCM) ............................. 8

SECTION 14: Vacation ................................................. 8

SECTION 15: Reemployment After MILOA ............................ 9

SECTION 16: Training Following MILOA ............................. 11

SECTION 17: 401K Plan ................................................ 12

SECTION 18: Profitsharing ............................................ 12

SECTION 19: Stock Options ........................................... 12

SECTION 20: Benefits Booklet And Checklist ..................... 12

SECTION 21: Military Appreciation Program (MAP) ..................... 12

ATTACHMENT 1: Chief Pilot Checklist ............................. 14

SWA-HuntsII 009098

1. Purpose:

Southwest Airlines Co. (the "Company") and the Southwest Airlines Pilots' Association (the "Association") have a long history of strong support for pilots affiliated with the National Guard or reserve forces. The Company and the Association have jointly and separately demonstrated the acknowledgment of and appreciation for the significant sacrifices required of those who simultaneously serve the Nation and the Company. This Joint SWA/SWAPA Flight Operations Military Handbook satisfies Section 12.F.1.c. of the Collective Bargaining Agreement (hereinafter referred to as the "Agreement") between the Company and the Association. The purpose of this Handbook is to provide policy and procedures for Association members participating in the uniformed services under Title 38 USC 4301-4334, Uniformed Services Employment and Reemployment Rights Act of 1994, as amended (hereinafter referred to as "USERRA"). The USERRA Law is implemented by the rules and regulations contained in 20 CFR Part 1002, USERRA Final Rules. While USERRA establishes a floor, not a ceiling, for the employment and reemployment rights and benefits for those it protects, Southwest Airlines may provide greater rights and benefits than USERRA requires.

2. Definitions:

a. Military Leave of Absence (MILOA): Absence from work for purposes of serving in the uniformed services.
b. Short Term MILOA: Service in the uniformed services for fewer than thirty-one (31) days.
c. Long Term MILOA: Service in the uniformed services for thirty-one (31) or more days.
d. For applicable definitions contained in USERRA, refer to 20 CFR Part 1002.5, USERRA Final Rules.

3. General:

a. Nothing in this Handbook, the Agreement, SWA Policy or SWAPA Policy will diminish the rights, benefits and protections prescribed in USERRA.
b. For subjects not addressed in USERRA, applicable provision in the Agreement will apply. In the event an issue is not addressed by USERRA or the Agreement, applicable Southwest Airlines policies and/or procedures will apply.
c. The SWA Flight Operations Military Liaison is the primary agent available to assist with and resolve issues arising from military duty requirements and SWA employment. If the Military Liaison is not available, a Domicile Chief Pilot should be contacted. After duty hours and time-critical issues should be referred to the Chief Pilot on call.
d. Pilots are encouraged to maintain contact with their Chief Pilots during a long-term MILOA.

SWA-HuntsII 009099

e. Pilots are encouraged to periodically review material distributed through SWALife, Company e-mail, and the SWAPA website while on MILOA. Pilots will retain access to SWALife, CWA and the SWAPA website while on a MILOA.

f. Pilots are required to log in to SWALife once every 90 days to keep their SWALife log-in and CASS account active. If the pilot is locked out of CASS or denied SWALife access while on MILOA contact the SWA Flight Operations Military Liaison for assistance.

g. A Military Resolution Board (MRB) as provided for in the Agreement is available to resolve policy issues regarding military leave.

h. Seniority is retained and longevity will accrue while on MILOA.

i. Probation: For Long Term MILOAs, probation will be extended day-for-day for every MILOA day over thirty (30) consecutive days.

j. The Company will share MILOA data with the Association as requested.

k. If the Company has reason to contact a pilot's military unit commander or supervisor, reasonable efforts will be made to notify the pilot beforehand.

4. Notification

a. Pilots (or "an appropriate officer" as defined in CFR 1002.85) are required to give advance notice of pending service whenever circumstances reasonably allow. Under USERRA, the Company does not have authority to deny or question military duty. MILOA notification is simply notification, not a request.

b. Notification can be either verbal or written and may be informal, following any format. The preferred method is to submit a MILOA notification form through SWALife>Flight Ops>Forms/Reports>Military Forms>launch "Military Leave Notice". In the event the on-line notification form is not used, all of the information contained in the form should be provided via whatever media the pilot elected to use to notify the Company of the MILOA.

c. When possible, a pilot should submit routine MILOA notifications by the 11th day of the month prior (21st for Blank Line awards).

d. In the event that advanced notification is prevented by military necessity, or otherwise impossible or unreasonable the pilot will notify his/her Chief Pilot or the Flight Operations Military Liaison as soon as conditions permit.

5. Notification Timeline

a. The MILOA Notification form is electronically transmitted to the Chief Pilot's office. On normal workdays, the Chief Pilot's office will complete its review within twenty-four (24) hours following submission by the pilot and electronically transmit the notification to Crew Planning and/or Crew Scheduling using the "Pullsheets" program. A pilot submitting a MILOA notification outside normal work hours or on non-normal work days should be aware that his/her notification will not be processed until the

SWA-HuntsII 009100

next normal work day. If outside normal work hours or on non-normal work days the chief pilot on call (CPOC) can be reached in the NOC to facilitate a MILOA Notification 469-603-0405.

b. The table below reflects the timeline for completing the tasks associated with MILOA Notification. Processing of MILOA Notifications submitted on non-normal workdays or during non-duty hours may exceed these timelines.

### Table 1: MILOA Notification/Processing Timeline

| TASKS | DATE/TIME |
|---|---|
| Pilot submits routine MILOA Notification | By the 11th @ 1200 CST |
| MILOA and trip pull (if required) posted | By the 15th @1200 CST |
| Pilot submits routine MILOA Notification for Blank Line Award | By the 21st @1200 CST |
| MILOA and trip pull (if required) posted for Blank Line Award | By the 22nd @ 1200 CST |
| Short-notice MILOA Notification (If possible, submit 120 hours prior to "Depart Domicile Time") | MILOA and trip adjustment (if required) posted on pilot's schedule within approximately 48 hours of notification |

6. MILOA Notification Form Completion Procedures: The following completion instructions apply if the on-line MILOA Notification form is used.

   a. My Information: Should be pre-populated with all information.
   b. Additional Contact Information
      i. Email Address: email address where a copy of the submission will be sent.
      ii. Base: Assigned domicile for the month in which the MILOA occurs.
      iii. Seat: Captain or First Officer (pull down – select)
      iv. Your Phone number: The number to be called if there are questions regarding your MILOA.
      v. Unit Name: Military Unit Designation
      vi. Unit Location: Military unit location or base
      vii. Unit Phone Number: Self-explanatory
      viii. Commander's name: Optional (enter "decline" if pilot does not elect to provide).
      ix. Commander's Phone: Optional (enter "123-456-7890" if pilot does not elect to provide).
      x. Commander's Email: Optional (enter "decline@decline.com" if pilot does not elect to provide).

SWA-HuntsII 009101

    xi. Select either Yes or No as appropriate to highlight if a PC/PT training is due in the month the MILOA occurs. NOTE: One of the two options must be selected to submit the Notification.

c. Military Duty Details:

    i. New Request: click on this radio button if this is the first notification submitted for this MILOA.

    ii. Revision:

        a) Click on this radio button if revising information for a previously submitted MILOA notice.

        b) If a scheduled MILOA changes or is cancelled, the pilot will call Scheduling directly as soon as practical to have the leave removed/updated on the pilot's schedule. The pilot may submit an amended MILOA Notification form in lieu of calling Scheduling.

    iii. Depart Domicile Date/Time:

        a) Enter the date and time required to be back in the assigned Crew Base with enough time to travel safely to the uniformed service site and arrive fit to perform the service. This date/time should include time for travel from the pilot's crew base to place of residence, and then to the military duty location, plus required rest prior to performance of military duty. Normally the date/time should be twenty-four (24) hours or less from the "Start Military Duty" date/time listed in the next block. If more than twenty-four (24) hours is required (e.g. long term MILOA or other special circumstances) explain in the Comments/Description of MILOA text block at the bottom of the form. A single period of military duty covering multiple trips should be entered as a continuous military leave.

        b) Scheduling will make every effort to ensure a pilot is returned to the domicile at or before the "Depart Domicile Date/Time". In the event that delays beyond the control of scheduling occur, all available options will be used to return the pilot to his/her domicile in time. MILOA times will not be changed without specific concurrence of the pilot.

    iv. Start Military Duty Date/Time: Self-explanatory

    v. End Military Duty Date/Time: The date/time released from military duty. If unknown, enter the best estimate (can be adjusted through revision later).

    vi. Return to Domicile Date/Time: Enter the date/time available to Southwest Airlines Flight Ops or Training Scheduling to perform SWA duty. It should be the time the pilot is available to report to domicile rested and ready to depart for a SWA trip. This date/time should include travel time from the duty location to residence (as appropriate) then to the Crew Base and any required rest. Normally this will be within twenty-four (24) hours of the End Military Duty

SWA-HuntsII 009102

Date/Time, but if special circumstances (USERRA-authorized leave, etc.) extend that period explain in the Comments/Description of MILOA text block.

    vii. Trip Pull Requested: Three options are available on this drop down menu.

        a) "No pairing(s) currently conflict with the MILOA, post MILOA immediately.  If conflicting parings are posted they will be pulled immediately" – There are no conflicts on the pilot's CWA schedule/board, but if any should be posted between MILOA Notification and posting on the pilot schedule, they will be pulled immediately. (Note: When military duty does not conflict with SWA duty, the MILOA will be included on the pilot's schedule to prevent conflicts between JA and MILOA)

        b) "Assigned parings currently conflict with this MILOA. Pull conflicting pairings AS SOON AS THIS NOTIFICATION IS RECEIVED in Crew Scheduling/Planning" – Scheduling will pull conflicting pairings immediately per para 7b.

        c) "Assigned pairings currently conflict with this MILOA. Pull conflicting pairings five (5) days prior to the pairing start" - Scheduling will leave trips on your board until five (5) days prior to the pairing so as to allow the pilot to use them in ELITT or TT/GA transaction.

        d) Comments/Description of MILOA: Free text box for any additional information

    viii. Add another Military Duty Detail – allows pilot to submit an additional MILOA notice. Up to three total MILOA notices may be submitted.

    ix. The MILOA will be posted on the pilot's board as a continuous MILOA regardless of whether or not it conflicts with scheduled activities.

7. Resolving conflicts between Military Duty and SWA Duty (MILOA Trip Pulls). When MILOA dates conflict with scheduled SWA activities, the conflict will be resolved as follows:

    a. The pilot may attempt to resolve the scheduling conflict through ELITT and/or Trip Trade Give Away (TTGA).

    b. Scheduling will resolve the conflict using the following guidelines:

        i. Crew Scheduling will determine the most cost effective point at which to move to pull a pilot to comply with MILOA requirements.

        ii. If a pairing is split, the pilot will be pulled from and/or rejoined to the pairing within 1.6 TFP as determined by the contractual split points in Section 6.B.13.d.i.(d).i of the Agreement.  The pilot can request alternate split points on the comments section of the electronic MILOA Notification Form.

SWA-HuntsII 009103

        iii. Pairings modified by the Company and returned to the pilot will have the pay prorated as per Section 4.I.9.

        iv. For MILOA conflicts that involve a Reserve pairing, only reserve days that actually conflict will be pulled.

  c. The pilot will be provided "must ride" status in order to join or rejoin pairings split due to MILOA conflicts. Deadheading provisions set forth in Section 5.S. of the Agreement will apply.

  d. Crew Scheduling will be required to ensure that the pilot returns to the domicile at or before the "Depart Domicile Time" in order to meet military commitments. If delays begin to impact the pilot's ability to meet this time, crew scheduling will confer with the pilot. All options will be considered to return the pilot to domicile in time. MILOA times will not be changed without concurrence of the pilot.

8. Changes or cancellations of military leave. If the scheduled MILOA changes or is cancelled, the pilot will call scheduling directly as soon as practical to have the leave removed/updated on the pilot's schedule. To ensure proper coordination the pilot should also contact his/her Base Coordinator at the earliest opportunity to advise them of the change. The pilot may submit an amended MILOA Notification form in lieu of calling scheduling or the Base Coordinator. If there was a trip pull associated with the MILOA, the pilot may be assigned the pairing in accordance with Section 6.B.7.b. of the Agreement.

9. Health and Welfare Benefits

  a. For a period of service fewer than thirty-one (31) days, a pilot will be considered to be in active employment status for purposes of Health and Welfare Benefits. The pilot will continue the coverage in effect as of the last day worked before military leave began for the entire MILOA, with premiums/contributions at active employee rates.

  b. For a period of service thirty-one (31) days or greater, the pilot will be considered to be on a leave of absence for purposes of Health and Welfare Benefits. In such a case, Health and Welfare Benefits will be as described in the Southwest Airlines Co. Employee Benefit Plan Book (SPD). The SPD contains additional provisions and is the governing document for Health and Welfare Benefits while on MILOA. The SPD is available on SWALife >About Me >My Health >Health & Welfare Information >Benefits Information >Summary Plan Descriptions >Employee Benefits Plan Book (SPD), or by calling Health & Welfare Benefits at (800) 551-1211 or emailing askbenefits@wnco.com. In general:

        i. Health Care Benefits and contributions will continue unaffected for a period of one hundred twenty (120) days, plus an additional period determined by a formula based on TFP in the pilot's sick bank and OJI bank as well as remaining vacation. This period starts on the pilot's last day actively at work. Note: Accrued sick trips and accrued OJI trips will be used for the purpose of computing the

SWA-HuntsII 009104

                extension period only.  A pilot on MILOA shall retain his/her Sick
                and OJI banks.

ii. The Benefits Department will notify the pilot before this extension
period expires.  At that point, the pilot has the option of continuing
health benefits through COBRA at COBRA rates.

iii. The pilot will have the choice to discontinue Health and Welfare
Benefits.  To do so, the pilot must contact the Benefits Department
at (800) 551-1211 or askbenefits@wnco.com to coordinate.

10. Monthly Bidding: If the pilot will be on a MILOA for an entire bid period, a
monthly bid is not required.  The pilot may elect to submit a bid for vacation
(a "paper bid" for pay purposes) or a vacancy bid.  Vacation bidding will be in
accordance with Section 11 of the Agreement.  Vacancy bidding will be in
accordance with Section 9 of the Agreement while on MILOA. The pilot's
vacancy bid will be used to determine their reemployment position.  As a
general rule, the pilot is entitled to reemployment in the position that he or
she would have attained with reasonable certainty if not for the absence due
to uniformed service (Ref 20 CFR Part 1002.191-199). If the reemployment
position requires the pilot to complete Captain Upgrade Training refer to
Section 16e of this document.

11. Pass Privileges: This includes on-line and off-line pass privileges.

a. Pass benefits are unchanged for the first thirty (30) days of a continuous
MILOA.

b. For MILOAs of greater than thirty (30) days:

i. On-line travel:  SWA pass privileges continue unchanged for pilots
and their eligible travelers.

ii. Off-line travel: Pilot and dependent/companion off-line pass
privileges are discontinued beginning on the 31st day of any MILOA.
Privileges will be restored upon completion of the MILOA.

12. Jumpseat Privileges:  Off-line and on-line flightdeck jumpseat privileges
remain unchanged while on MILOA.

13. Known Crewmember (KCM): This program is intended for use by pilots
performing SWA Duty.  Pilots on long term MILOA will be inactive in the
KCM database for the duration of the MILOA.

14. Vacation

a. A pilot is authorized to use vacation time for MILOA.

b. A pilot who has been awarded/scheduled vacation but is unable to take the
vacation due to MILOA will be paid for the vacation in accordance with the
Agreement.  The pilot may choose to be temporarily returned to "Active
Employee" status to be placed on vacation.  The pilot may elect to submit a
bid to determine vacation pay. Any earned vacation that is unused due to

SWA-HuntsII 009105

MILOA will be paid in that year.  Vacation does not carry over to the next year.

c.  Vacation accrual: Upon return from a long term MILOA, vacation accrual will be accomplished by a look-back for twelve (12) calendar months beginning with the return date. All vacation eligibility which would have been accrued if the pilot had not been on MILOA will be restored. The months that fall in the current year will be accrued toward the next year's vacation. (For example: a third-year First Officer returning to SWA on 1 Sep 2009 from a 24-month MILOA.  From that date, look back 12 months to begin calculating vacation accrual.  That gives the pilot Sept 2008 through Dec 2008 for vacation accrual, earning five days of vacation to take in 2009. In this example, the pilot also gets vacation accrual for Jan 2009 through Aug 2009 for nine days of vacation in 2010). An extension of a pilot's MILOA and the consequent change in the 12-month look back period could result in the loss of vacation days awarded based on the pilot's original return date. If these vacation days are the in future, they will be removed by Crew Planning.  If they are in the past and have been paid, Pilot Payroll will work with the pilot to establish a payment schedule to repay the Company upon the pilot's return.

d.  Vacation bidding.  A pilot on MILOA will be eligible to bid vacation during the normal bidding cycle. Unless a pilot knows that he/she will not return to SWA for the entire year, the pilot should participate in the vacation bidding process.  If the pilot has vacation days accrued but does not bid, he/she will be assigned from the remaining pool of vacation weeks. If the pilot is given vacation accrual due to the 12-month look back after the vacation bid process has been completed, the pilot must contact Crew Planning to be assigned vacation from the pool of available weeks.

15. Reemployment after MILOA

a.  In general, if a Southwest Airlines pilot has been absent from Southwest Airlines due to uniformed service, he or she will be eligible for reemployment under USERRA by meeting the following criteria:

i.  The pilot provided advance notice of the employee' s service. (See Section 4 and 5);

ii.  The pilot has five years or less of cumulative service in the uniformed services. (See Section 15d);

iii.  The pilot timely returns to work or applies for reemployment, if required (See Section 15b); and,

iv.  The employee has not been separated from service with a disqualifying discharge or under other than honorable conditions.

b.  Generally, Southwest Airlines does not require an application for re-employment following MILOA as discussed in USERRA. It is assumed that the pilot will return to work within the USERRA specified timeframes unless the pilot informs the Chief Pilot or SWA Flight Operations Military Liaison otherwise. The USERRA timeline for returning to work is as follows:

SWA-HuntsII 009106

    i. Period of service less than thirty-one (31) days, the pilot will report back to work at the beginning of the next scheduled work period.

    ii. Period of service more than thirty (30) days but less than one hundred eighty-one (181) days. The pilot will contact the Chief Pilot (written or verbal) not later than fourteen (14) days after completing service.

    iii. Period of service more than one hundred eighty (180) days. The pilot will contact the Chief Pilot (written or verbal) not later than ninety (90) days after completing service.

c. Upon completing service in the uniformed services, the pilot will notify their Chief Pilot of the expected return date. Coordination with the Chief Pilot prior to completion of military service may expedite requalification training scheduling, but is not required. The pilot may notify the Chief Pilot verbally or in writing (e-mail is acceptable). The Chief Pilot will then notify Crew Planning, Benefits, Training scheduling and Payroll of the effective date of return. (See Returning from MILOA checklist in Attachment 1).

d. Pursuant to USERRA, an employee may perform service in the uniformed services for a cumulative period of up to five (5) years and retain reemployment rights with the employer. The exceptions to this rule are described in 20 CFR 1002.103. Pilots that want to confirm that the Company has accurate exemption status of their uniformed service may do so by contacting the SWA Flight Operations Military Liaison to coordinate. For periods of service that exceed 30 days, Pilots must, upon the request of the employer provide documentation connected with that service as described in 20 CFR Part 1002.121. Documents that satisfy the requirement to establish eligibility for reemployment after a period of service of more than 30 days are defined in 20 CFR 1002.123 and will only be requested by the Company at the completion of the MILOA, the Pilot may provide these sooner if desired.

e. The Company will promptly reemploy the pilot when he or she returns from a period of service. "Prompt reemployment" means as soon as practicable under the circumstances of each case. Absent unusual circumstances, reemployment must occur within two (2) weeks of the date the pilot provides the Company. (See Returning from MILOA checklist in Attachment 1).

    i. The Company generally defines 5 calendar days as prompt reemployment when returning from long term MILOA.

    ii. In cases where a pilot returning from a long term MILOA requires training the following actions should be completed:

        a) A "Pullsheets" entry will be made by the Pilots Crew Base Chief Pilot to return the Employee to active status effective the date they indicate they are available to work.

        b) Unless training is available sooner beginning on the sixth (6th) calendar day following the established "available to work" date and continuing until the Pilot enters requalification training, the Pilot will be paid a daily pro rata

SWA-HuntsII 009107

TFP based upon schedule line guarantee TFP for the month not to exceed the Training Pay Guarantee Chart from Section 4.K.6 while in training.

c) The pay rate will be establishing pursuant to USERRA provisions and will be based on the Pilots pay rate at his/her date of return to work.

f. A pilot must have a current FAA Medical Certificate prior to beginning training or SWA flying. Pilots may bid their schedule in accordance with Section 5 of the Agreement once a return to work date has been established. If the pilots medical certificate has lapsed while on MILOA the pilot may bid provided the Chief Pilot has concurred that it is reasonable to expect that the individual will have a current FAA medical certificate before reporting for any training or flying assignment.

g. Flight Operations Payroll is the point of contact for payroll issues resulting from MILOA (FlightOpsPayroll@wnco.com, (469) 603-1093)

h. Health Care Premiums: Premiums are automatically deducted from monthly pay. This will continue while on MILOA for the time specified in paragraph 9. Once there are insufficient funds in the pilot's payroll account, the pilot will be billed for the applicable benefits. Main Payroll will attempt to recover the debt in a very short amount of time. Upon return from MILOA, there will be a debit for these benefits on the account. The pilot may contact Main Payroll to determine payment schedule if required and/or desired.

i. Health plan coverage will be reinstated upon actual reemployment or the established return to work date.

16. Training Following MILOA: Training required upon return from a MILOA will be as directed in the Flight Operations Training Manual (FOTM).

a. A pilot should contact his/her Chief Pilot in advance of his/her anticipated return from MILOA to initiate the requalification process. This is essential because requalification cannot begin until the pilot is returned to Active Employee status and that is accomplished through the Chief Pilot's office.

b. The Chief Pilot will coordinate with the Flight Operations Training Scheduling Department for required requalification training.

c. The level of requalification training required is based upon the number of days that have elapsed since the date of the first flight of the last three (3) consecutive flights flown by the pilot in a SWA B737 aircraft and the date of the requalification training. The break points for the levels of requalification training are determined by reference to the Flight Operations Training Manual found on SWALife. NOTE: Each level of requalification contains differing requirements for past due recurrent events.

d. A pilot may request an additional training period, if desired. See the Agreement, Section 23.F.

e. For First Officer's requiring Captain Upgrade training upon reemployment, Section 23.M.4 of the Agreement will apply. However, in

SWA-HuntsII 009108

those cases where the pilot is restricted from attending upgrade pursuant to Section 23.M.4 of the Agreement, the pilot will be paid Captain Pay Rate retroactively to the date calculated under Section 15.e.ii.a upon successful completion of Captain Upgrade Training.  Retroactive Pay will be computed based on the actual TFP flown as an FO pursuant to Section 23.M.4 of the Agreement.

17. 401K Plan:  After a pilot returns from MILOA, he or she will be allowed to make up his or her missed contributions or elective deferrals including Company match. Generally, these makeup contributions or elective deferrals must be made during a time period starting with the date of reemployment and continuing for up to three times the length of the employee's immediate past period of uniformed service, with the repayment period not to exceed five years. For questions about the 401k make-up contributions, contact Retirement Benefits at (800) 551-1211 or SWAPA at (800) 969-7972. The calculation is available for every pilot who has taken MILOA and will be provided upon request.

18. Profitsharing:  After the pilot returns from MILOA, he or she will receive a profitsharing "make-up" contribution for the period of time the pilot was on MILOA.  The credit will be based on an estimate of the compensation the pilot would have earned had he or she remained active with the Company during the MILOA period and the profitsharing percentage factor for the year for which the make-up contribution pertains.  For questions about the profitsharing make-up contribution, contact Retirement Benefits at (800) 551-1211. The calculation is available for every pilot who has taken MILOA and will be provided upon request.

19. Stock Options: While on MILOA a pilot may exercise stock options under his or her respective stock option plan.

20. Benefits Booklet and Checklist.  The Company has published a guide "You're Protecting Our Freedoms--We're Protecting Your Benefits" to help service members understand how their benefits will be affected by their military service.  The guide includes checklists of items that each service member should consider when entering into and when returning from military service and addresses the areas of Health & Welfare benefits, 401(k), ProfitSharing and other retirement benefits, Stock Options, and Pass Privileges.  The guide is available on SWALife >About Me >My Life Events >Military Leave.

21. Military Appreciation Program (MAP) and Registration: The Military Appreciation Program is a means for Southwest Airlines to express gratitude and admiration for Southwest Airlines Employees who currently serve in America's military services through affiliation with the National Guard or Reserve Forces. Participation in the Military Appreciation Program is voluntary and requires registration. Eligible Employees who elect to participate will be awarded SWAG Points as determined by the program in

SWA-HuntsII 009109

effect at the time the Employee served after opting into the MAP. The employee is required to opt out when no longer eligible (i.e., no longer serving in the uniformed services).  For Program Rules, Eligibility and Registration refer to SWALife>Flight Ops>Our Business>MILOA.

SWA-HuntsII 009110

## Attachment 1: CHIEF PILOT'S CHECKLIST FOR
## PILOTS RETURNING FROM MILOA REQUIRING RETRAINING

_____ If the Pilot might have been on MILOA for more than 1825 cumulative days (5 years), you should contact John Freed, HQ Flight Ops, John.freed@wnco.com office 469-603-0733 to verify eligibility for re-employment. Once reemployment eligibility has been verified, proceed as follows.
NOTE: The Pilot should have already been in communication with HQ Flight Ops regarding reemployment eligibility.

_____ Determine, from the Pilot, the availability date for reemployment ("Return to Work" date).
- Advise the Pilot that this date will be used to return them to "Active Employee" status
- Beginning this date, they are considered available to SWA for scheduling training or other duties. If they will be unavailable to be scheduled with reasonable notice (i.e. 24 hours), they should revise their "return to work date".
- Advise that they will return to "paid" status within 6 days
  - o If training is available within 6 days, pay will begin when they begin training
  - o If training is not immediately available, pay will begin on day 6 at a training rate, e.g. pro rata TFP based upon schedule line contract guarantee TFP.
    - ▪ This rate will continue until training is begun
    - ▪ Pay rate will be based on their seniority per USERRA.
- If they accept duty assignments (i.e. office duty) other than training prior to the 6th day, their pay will begin on the first day worked.
- Advise Pilot that they will be contacted regarding required training scheduling
- Confirm contact information for the Pilot. Inform Pilot of the following requirements:
  - o Current Passport
  - o Current plastic FAA Pilot's License including "English Proficient"
  - o For First Officer's and Check Airmen: current FCC Radiotelephone Operator's Permit

_____ Ensure a PullSheet entry is made returning the Employee to active status effective the "date of return" provided by the Pilot.

_____ Contact Training Scheduling
- Provide Training Scheduling with the Pilot's return date and request a training date for requalification.
- **DIRECT PILOT NOT TO CONTACT TRAINING SCHEDULING UNTIL ADVISED TO DO SO**

_____ Once Training Scheduling determines a start-training date for requalification, contact the Pilot, advise them of the date and direct them to communicate with Training Scheduling.

_____ **Pay Coordination**
- If training will begin within 5 days of the return to work date provided by the Pilot, no further action regarding pay is required.
- If training will **not** begin within 5 days of the return to work date provided by the Pilot, notify Flight Ops Payroll (469-603-1093) to begin USERRA pay rate beginning on the 6th calendar day following the "return to work" date provided by the Pilot.
  - o Confirm this telecom with an email to: FlightOpsPayroll@wnco.com ; colleen.ireland@wnco.com; John.freed@wnco.com. SUBJ: MILOA Return to Work Pay. "Flight Ops Employee John Doe, EE 12345, will return to work effective [date1]. Requalification training will begin on [date2]. Please initiate payroll action to begin pay based upon pro rata of schedule line guarantee rate TFP beginning [date1 + 5 calendar days] and continuing until Pilot enters requalification training."

_____ Retain this checklist and a copy of the email sent in the Pilot's folder in the Crew Base

SWA-HuntsII 009111

This handbook accepted to satisfy the Agreement, Paragraph 12.F.1.c. on this _30TH_ day of _October_ , 2014.

Captain Craig J. Drew
Vice President
Flight Operations
Southwest Airlines Co.

Captain Mark Richardson
President
Southwest Airlines Pilots' Assoc.

SWA-HuntsII 009112

EXHIBIT 3

Exhibit B

03 JAN 2020

# ANG/USAFR Point Credit Summary Inquiry (PCARS)

## Point Credit Summary

**Summary Information**

| | |
|---|---|
| **Date Prepared:** | 03 JAN 2020 |
| **Duty Location:** | TRAVIS AFB CA 945350000 |
| **Name:** | MAJ JAYSON K HUNTSMAN |
| **Address:** | |
| **PAS Code:** | T80MFLPG |
| **SSAN:** | |
| **Retention/Retirement Date:** | 12 MAY |
| **Closeout Date:** | 11 MAY 2019 |
| **Career Satisfactory Service:** | 181119 |
| **Statement Reason:** | ANNUAL |

**Last R/R Year Points Earned**

| | |
|---|---|
| **From Date:** | 12 MAY 2018 |
| **Thru Date:** | 11 MAY 2019 |
| **Active Duty Training:** | 0025 |
| **Inactive Duty Training:** | 0062 |
| **ECI:** | 0000 |
| **Membership:** | 015 |
| **Total Points:** | 00102 |
| **Total Points for Retirements:** | 00102 |
| **Satisfactory Service Years, Months, and Days:** | 010000 |

## All Points Earned

### Type Duty (TD) Codes

| | | | | | |
|---|---|---|---|---|---|
| **1:** | Active Duty Other | **6:** | AFTP | **B:** | Continuation Pay |
| **2:** | Special Tour | **7:** | Paid Inactive Duty | **D:** | Paid IDT—RMP |
| **3:** | School Tour | **8:** | Nonpaid Inactive Duty | **E:** | Active Duty—FHP |
| **4:** | Annual Tour | **9:** | ECI | **F:** | Inactive Duty Status—FHP |
| **5:** | Extended Active Duty | **A:** | Nonpaid Active Duty | | |

| From Date | Thru Date | TD | Pts | From Date | Thru Date | TD | Pts | From Date | Thru Date | TD | Pts |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 02 JUN 2012 | 02 JUN 2012 | 7 | 002 | 10 JUN 2014 | 10 JUN 2014 | 7 | 001 | 28 SEP 2016 | 28 SEP 2016 | 6 | 002 |
| 03 JUN 2012 | 03 JUN 2012 | 7 | 002 | 10 JUN 2014 | 10 JUN 2014 | 6 | 001 | 29 SEP 2016 | 29 SEP 2016 | 7 | 002 |
| 07 JUN 2012 | 07 JUN 2012 | 7 | 001 | 13 JUN 2014 | 13 JUN 2014 | 6 | 001 | 30 SEP 2016 | 30 SEP 2016 | 7 | 002 |
| 07 JUN 2012 | 07 JUN 2012 | 6 | 001 | 13 JUN 2014 | 13 JUN 2014 | 7 | 001 | 01 OCT 2016 | 01 OCT 2016 | 7 | 002 |
| 08 JUN 2012 | 08 JUN 2012 | 7 | 001 | 15 JUN 2014 | 17 JUN 2014 | 2 | 003 | 02 OCT 2016 | 02 OCT 2016 | 7 | 002 |
| 08 JUN 2012 | 08 JUN 2012 | 6 | 001 | 18 JUN 2014 | 18 JUN 2014 | 7 | 001 | 05 DEC 2016 | 05 DEC 2016 | 7 | 002 |
| 19 JUN 2012 | 19 JUN 2012 | 6 | 001 | 21 JUN 2014 | 23 JUN 2014 | 2 | 003 | 06 DEC 2016 | 06 DEC 2016 | 7 | 002 |
| 19 JUN 2012 | 19 JUN 2012 | 7 | 001 | 24 JUN 2014 | 24 JUN 2014 | 7 | 001 | 07 DEC 2016 | 07 DEC 2016 | 7 | 002 |

| From Date | Thru Date | TD | Pts | From Date | Thru Date | TD | Pts | From Date | Thru Date | TD | Pts |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 26 JUN 2012 | 26 JUN 2012 | 7 | 001 | 26 JUN 2014 | 26 JUN 2014 | 7 | 001 | 08 DEC 2016 | 08 DEC 2016 | 7 | 002 |
| 26 JUN 2012 | 26 JUN 2012 | 6 | 001 | 30 JUN 2014 | 30 JUN 2014 | 6 | 001 | 10 FEB 2017 | 10 FEB 2017 | 7 | 002 |
| 10 JUL 2012 | 10 JUL 2012 | 6 | 001 | 01 JUL 2014 | 01 JUL 2014 | 6 | 002 | 11 FEB 2017 | 11 FEB 2017 | 7 | 002 |
| 11 JUL 2012 | 11 JUL 2012 | 6 | 001 | 02 JUL 2014 | 02 JUL 2014 | 6 | 002 | 12 FEB 2017 | 12 FEB 2017 | 7 | 002 |
| 16 JUL 2012 | 16 JUL 2012 | 7 | 001 | 11 JUL 2014 | 14 JUL 2014 | 4 | 004 | 03 MAR 2017 | 03 MAR 2017 | 7 | 002 |
| 16 JUL 2012 | 16 JUL 2012 | 6 | 001 | 16 JUL 2014 | 16 JUL 2014 | 7 | 001 | 04 MAR 2017 | 04 MAR 2017 | 7 | 002 |
| 17 JUL 2012 | 17 JUL 2012 | 7 | 001 | 19 JUL 2014 | 21 JUL 2014 | 4 | 003 | 09 MAR 2017 | 09 MAR 2017 | 6 | 001 |
| 17 JUL 2012 | 17 JUL 2012 | 6 | 001 | 24 JUL 2014 | 25 JUL 2014 | 2 | 002 | 09 MAR 2017 | 09 MAR 2017 | 7 | 001 |
| 18 JUL 2012 | 18 JUL 2012 | 7 | 001 | 07 AUG 2014 | 08 AUG 2014 | 4 | 002 | 16 MAR 2017 | 16 MAR 2017 | 7 | 001 |
| 18 JUL 2012 | 18 JUL 2012 | 6 | 001 | 19 AUG 2014 | 19 AUG 2014 | 7 | 002 | 16 MAR 2017 | 16 MAR 2017 | 6 | 001 |
| 01 AUG 2012 | 02 AUG 2012 | 4 | 002 | 20 AUG 2014 | 20 AUG 2014 | 7 | 001 | 02 APR 2017 | 02 APR 2017 | 7 | 002 |
| 03 AUG 2012 | 03 AUG 2012 | 7 | 001 | 21 AUG 2014 | 21 AUG 2014 | 7 | 001 | 19 APR 2017 | 19 APR 2017 | 7 | 001 |
| 04 AUG 2012 | 04 AUG 2012 | 6 | 002 | 22 AUG 2014 | 24 AUG 2014 | 4 | 003 | 19 APR 2017 | 19 APR 2017 | 6 | 001 |
| 05 AUG 2012 | 06 AUG 2012 | 4 | 002 | 05 SEP 2014 | 05 SEP 2014 | 4 | 001 | 24 APR 2017 | 24 APR 2017 | 7 | 001 |
| 09 AUG 2012 | 09 AUG 2012 | 6 | 002 | 07 SEP 2014 | 07 SEP 2014 | 2 | 002 | 25 APR 2017 | 25 APR 2017 | 6 | 001 |
| 10 AUG 2012 | 13 AUG 2012 | 4 | 004 | 08 SEP 2014 | 08 SEP 2014 | 2 | 001 | 25 APR 2017 | 25 APR 2017 | 7 | 001 |
| 17 AUG 2012 | 17 AUG 2012 | 7 | 001 | 15 SEP 2014 | 21 SEP 2014 | 2 | 007 | 12 MAY 2017 | 12 MAY 2017 | 6 | 001 |
| 18 AUG 2012 | 18 AUG 2012 | 4 | 001 | 30 SEP 2014 | 30 SEP 2014 | 7 | 002 | 12 MAY 2017 | 12 MAY 2017 | 7 | 001 |
| 20 AUG 2012 | 20 AUG 2012 | 7 | 002 | 01 OCT 2014 | 01 OCT 2014 | 6 | 001 | 13 MAY 2017 | 13 MAY 2017 | 7 | 002 |
| 23 AUG 2012 | 23 AUG 2012 | 6 | 002 | 01 OCT 2014 | 01 OCT 2014 | 7 | 001 | 14 MAY 2017 | 14 MAY 2017 | 7 | 002 |
| 24 AUG 2012 | 24 AUG 2012 | 6 | 002 | 02 OCT 2014 | 02 OCT 2014 | 7 | 001 | 15 MAY 2017 | 15 MAY 2017 | 6 | 001 |
| 25 AUG 2012 | 25 AUG 2012 | 6 | 002 | 02 OCT 2014 | 02 OCT 2014 | 6 | 001 | 15 MAY 2017 | 15 MAY 2017 | 7 | 001 |
| 26 AUG 2012 | 26 AUG 2012 | 6 | 001 | 07 OCT 2014 | 07 OCT 2014 | 6 | 001 | 22 MAY 2017 | 22 MAY 2017 | 6 | 002 |
| 26 AUG 2012 | 26 AUG 2012 | 7 | 001 | 07 OCT 2014 | 07 OCT 2014 | 7 | 001 | 23 MAY 2017 | 23 MAY 2017 | 6 | 002 |
| 27 AUG 2012 | 30 AUG 2012 | 4 | 004 | 21 OCT 2014 | 21 OCT 2014 | 6 | 001 | 12 JUN 2017 | 12 JUN 2017 | 4 | 001 |
| 13 SEP 2012 | 14 SEP 2012 | 4 | 002 | 21 OCT 2014 | 21 OCT 2014 | 7 | 001 | 13 JUN 2017 | 13 JUN 2017 | 6 | 002 |
| 02 OCT 2012 | 02 OCT 2012 | 7 | 001 | 23 OCT 2014 | 23 OCT 2014 | 7 | 001 | 27 JUN 2017 | 27 JUN 2017 | 6 | 001 |
| 02 OCT 2012 | 02 OCT 2012 | 6 | 001 | 23 OCT 2014 | 23 OCT 2014 | 6 | 001 | 10 JUL 2017 | 10 JUL 2017 | 4 | 001 |
| 07 NOV 2012 | 07 NOV 2012 | 6 | 001 | 24 OCT 2014 | 24 OCT 2014 | 6 | 001 | 11 JUL 2017 | 11 JUL 2017 | 4 | 001 |
| 17 NOV 2012 | 17 NOV 2012 | 7 | 002 | 24 OCT 2014 | 24 OCT 2014 | 7 | 001 | 12 JUL 2017 | 12 JUL 2017 | 6 | 002 |
| 18 NOV 2012 | 18 NOV 2012 | 7 | 002 | 28 OCT 2014 | 28 OCT 2014 | 7 | 001 | 13 JUL 2017 | 13 JUL 2017 | 6 | 002 |
| 19 NOV 2012 | 19 NOV 2012 | 6 | 001 | 29 OCT 2014 | 29 OCT 2014 | 6 | 002 | 14 JUL 2017 | 14 JUL 2017 | 4 | 001 |
| 20 NOV 2012 | 20 NOV 2012 | 6 | 001 | 30 OCT 2014 | 30 OCT 2014 | 6 | 002 | 20 JUL 2017 | 20 JUL 2017 | 4 | 001 |
| 21 NOV 2012 | 21 NOV 2012 | 4 | 001 | 03 DEC 2014 | 03 DEC 2014 | 7 | 001 | 21 JUL 2017 | 21 JUL 2017 | 4 | 001 |
| 27 NOV 2012 | 27 NOV 2012 | 4 | 001 | 04 DEC 2014 | 04 DEC 2014 | 7 | 002 | 24 JUL 2017 | 24 JUL 2017 | 4 | 001 |
| 28 NOV 2012 | 28 NOV 2012 | 7 | 001 | 20 DEC 2014 | 20 DEC 2014 | 7 | 002 | 25 JUL 2017 | 25 JUL 2017 | 4 | 001 |
| 29 NOV 2012 | 29 NOV 2012 | 7 | 002 | 22 DEC 2014 | 22 DEC 2014 | 7 | 002 | 26 JUL 2017 | 31 JUL 2017 | 1 | 006 |
| 30 NOV 2012 | 30 NOV 2012 | 7 | 002 | 08 JAN 2015 | 08 JAN 2015 | 7 | 002 | 07 AUG 2017 | 07 AUG 2017 | 4 | 001 |

| From Date | Thru Date | TD | Pts | From Date | Thru Date | TD | Pts | From Date | Thru Date | TD | Pts |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04 DEC 2012 | 04 DEC 2012 | 7 | 001 | 14 JAN 2015 | 14 JAN 2015 | 7 | 001 | 08 AUG 2017 | 08 AUG 2017 | 4 | 001 |
| 04 DEC 2012 | 04 DEC 2012 | 6 | 001 | 15 JAN 2015 | 15 JAN 2015 | 7 | 001 | 09 AUG 2017 | 09 AUG 2017 | 4 | 001 |
| 05 DEC 2012 | 05 DEC 2012 | 6 | 002 | 15 JAN 2015 | 15 JAN 2015 | 6 | 001 | 10 AUG 2017 | 10 AUG 2017 | 4 | 001 |
| 06 DEC 2012 | 06 DEC 2012 | 6 | 002 | 16 JAN 2015 | 16 JAN 2015 | 6 | 001 | 11 AUG 2017 | 11 AUG 2017 | 4 | 001 |
| 07 DEC 2012 | 07 DEC 2012 | 7 | 001 | 23 JAN 2015 | 23 JAN 2015 | 7 | 001 | 12 AUG 2017 | 12 AUG 2017 | 7 | 002 |
| 07 DEC 2012 | 07 DEC 2012 | 6 | 001 | 24 JAN 2015 | 24 JAN 2015 | 7 | 001 | 14 AUG 2017 | 14 AUG 2017 | 7 | 001 |
| 10 DEC 2012 | 10 DEC 2012 | 6 | 001 | 25 JAN 2015 | 25 JAN 2015 | 6 | 001 | 15 AUG 2017 | 15 AUG 2017 | 7 | 001 |
| 17 DEC 2012 | 17 DEC 2012 | 6 | 002 | 25 JAN 2015 | 25 JAN 2015 | 7 | 001 | 16 AUG 2017 | 16 AUG 2017 | 7 | 001 |
| 18 DEC 2012 | 18 DEC 2012 | 6 | 001 | 27 JAN 2015 | 27 JAN 2015 | 7 | 001 | 17 AUG 2017 | 17 AUG 2017 | 7 | 001 |
| 19 DEC 2012 | 19 DEC 2012 | 6 | 001 | 10 FEB 2015 | 10 FEB 2015 | 6 | 001 | 18 AUG 2017 | 16 SEP 2017 | 1 | 030 |
| 19 DEC 2012 | 19 DEC 2012 | 7 | 001 | 10 FEB 2015 | 10 FEB 2015 | 7 | 001 | 11 OCT 2017 | 11 OCT 2017 | 7 | 001 |
| 21 DEC 2012 | 21 DEC 2012 | 6 | 001 | 11 FEB 2015 | 11 FEB 2015 | 7 | 001 | 11 OCT 2017 | 11 OCT 2017 | 6 | 001 |
| 03 JAN 2013 | 03 JAN 2013 | 6 | 002 | 11 FEB 2015 | 11 FEB 2015 | 6 | 001 | 12 OCT 2017 | 12 OCT 2017 | 7 | 001 |
| 08 JAN 2013 | 08 JAN 2013 | 7 | 001 | 12 FEB 2015 | 12 FEB 2015 | 6 | 001 | 12 OCT 2017 | 12 OCT 2017 | 6 | 001 |
| 08 JAN 2013 | 08 JAN 2013 | 6 | 001 | 12 FEB 2015 | 12 FEB 2015 | 7 | 001 | 18 OCT 2017 | 18 OCT 2017 | 6 | 001 |
| 10 JAN 2013 | 10 JAN 2013 | 6 | 002 | 26 FEB 2015 | 26 FEB 2015 | 7 | 001 | 18 OCT 2017 | 18 OCT 2017 | 7 | 001 |
| 11 JAN 2013 | 11 JAN 2013 | 6 | 001 | 26 FEB 2015 | 26 FEB 2015 | 6 | 001 | 19 OCT 2017 | 19 OCT 2017 | 7 | 001 |
| 11 JAN 2013 | 11 JAN 2013 | 7 | 001 | 03 MAR 2015 | 06 MAR 2015 | 4 | 004 | 19 OCT 2017 | 19 OCT 2017 | 6 | 001 |
| 14 JAN 2013 | 14 JAN 2013 | 6 | 002 | 17 MAR 2015 | 07 APR 2015 | 2 | 022 | 27 OCT 2017 | 27 OCT 2017 | 7 | 001 |
| 15 JAN 2013 | 15 JAN 2013 | 6 | 002 | 08 APR 2015 | 08 APR 2015 | 6 | 001 | 27 OCT 2017 | 27 OCT 2017 | 6 | 001 |
| 17 JAN 2013 | 17 JAN 2013 | 7 | 001 | 09 APR 2015 | 09 APR 2015 | 6 | 002 | 30 OCT 2017 | 30 OCT 2017 | 6 | 001 |
| 17 JAN 2013 | 17 JAN 2013 | 6 | 001 | 11 APR 2015 | 11 APR 2015 | 7 | 001 | 30 OCT 2017 | 30 OCT 2017 | 7 | 001 |
| 18 JAN 2013 | 18 JAN 2013 | 6 | 001 | 11 APR 2015 | 11 APR 2015 | 6 | 001 | 31 OCT 2017 | 31 OCT 2017 | 6 | 001 |
| 18 JAN 2013 | 18 JAN 2013 | 7 | 001 | 12 APR 2015 | 12 APR 2015 | 6 | 001 | 31 OCT 2017 | 31 OCT 2017 | 7 | 001 |
| 20 JAN 2013 | 31 JAN 2013 | 1 | 012 | 12 APR 2015 | 12 APR 2015 | 7 | 001 | 01 NOV 2017 | 01 NOV 2017 | 7 | 001 |
| 01 FEB 2013 | 15 FEB 2013 | 1 | 015 | 13 APR 2015 | 20 APR 2015 | 2 | 008 | 01 NOV 2017 | 01 NOV 2017 | 6 | 001 |
| 16 FEB 2013 | 22 FEB 2013 | 1 | 007 | 21 APR 2015 | 21 APR 2015 | 2 | 001 | 08 NOV 2017 | 08 NOV 2017 | 6 | 002 |
| 25 FEB 2013 | 25 FEB 2013 | 7 | 001 | 23 APR 2015 | 23 APR 2015 | 7 | 001 | 09 NOV 2017 | 09 NOV 2017 | 6 | 002 |
| 25 FEB 2013 | 25 FEB 2013 | 6 | 001 | 23 APR 2015 | 23 APR 2015 | 6 | 001 | 10 NOV 2017 | 10 NOV 2017 | 4 | 001 |
| 27 FEB 2013 | 27 FEB 2013 | 6 | 001 | 28 APR 2015 | 28 APR 2015 | 4 | 001 | 17 NOV 2017 | 17 NOV 2017 | 4 | 001 |
| 28 FEB 2013 | 28 FEB 2013 | 6 | 001 | 30 APR 2015 | 30 APR 2015 | 4 | 001 | 20 NOV 2017 | 20 NOV 2017 | 4 | 001 |
| 28 FEB 2013 | 28 FEB 2013 | 7 | 001 | 01 MAY 2015 | 06 MAY 2015 | 1 | 006 | 14 DEC 2017 | 14 DEC 2017 | 7 | 001 |
| 05 MAR 2013 | 05 MAR 2013 | 7 | 001 | 07 MAY 2015 | 07 MAY 2015 | 7 | 001 | 15 DEC 2017 | 15 DEC 2017 | 7 | 001 |
| 02 APR 2013 | 02 APR 2013 | 7 | 001 | 07 MAY 2015 | 07 MAY 2015 | 6 | 001 | 21 DEC 2017 | 21 DEC 2017 | 7 | 001 |
| 02 APR 2013 | 02 APR 2013 | 6 | 001 | 08 MAY 2015 | 08 MAY 2015 | 6 | 001 | 22 DEC 2017 | 22 DEC 2017 | 7 | 001 |
| 03 APR 2013 | 03 APR 2013 | 7 | 001 | 08 MAY 2015 | 08 MAY 2015 | 7 | 001 | 04 JAN 2018 | 04 JAN 2018 | 6 | 001 |
| 03 APR 2013 | 03 APR 2013 | 6 | 001 | 13 MAY 2015 | 13 MAY 2015 | 7 | 001 | 04 JAN 2018 | 04 JAN 2018 | 7 | 001 |
| 04 APR 2013 | 04 APR 2013 | 7 | 001 | 14 MAY 2015 | 14 MAY 2015 | 7 | 001 | 08 JAN 2018 | 08 JAN 2018 | 6 | 001 |

| From Date | Thru Date | TD | Pts | From Date | Thru Date | TD | Pts | From Date | Thru Date | TD | Pts |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 05 APR 2013 | 05 APR 2013 | 7 | 001 | 14 MAY 2015 | 14 MAY 2015 | 6 | 001 | 08 JAN 2018 | 08 JAN 2018 | 7 | 001 |
| 06 APR 2013 | 06 APR 2013 | 7 | 002 | 18 MAY 2015 | 18 MAY 2015 | 6 | 002 | 09 JAN 2018 | 09 JAN 2018 | 7 | 001 |
| 12 APR 2013 | 12 APR 2013 | 7 | 001 | 19 MAY 2015 | 19 MAY 2015 | 6 | 002 | 16 JAN 2018 | 16 JAN 2018 | 7 | 001 |
| 20 APR 2013 | 20 APR 2013 | 6 | 002 | 27 MAY 2015 | 27 MAY 2015 | 7 | 001 | 30 JAN 2018 | 30 JAN 2018 | 6 | 001 |
| 21 APR 2013 | 21 APR 2013 | 6 | 002 | 28 MAY 2015 | 28 MAY 2015 | 7 | 001 | 31 JAN 2018 | 31 JAN 2018 | 6 | 001 |
| 07 MAY 2013 | 07 MAY 2013 | 7 | 002 | 02 JUN 2015 | 02 JUN 2015 | 7 | 002 | 10 FEB 2018 | 10 FEB 2018 | 7 | 002 |
| 08 MAY 2013 | 08 MAY 2013 | 7 | 002 | 03 JUN 2015 | 03 JUN 2015 | 6 | 002 | 11 FEB 2018 | 11 FEB 2018 | 7 | 002 |
| 22 MAY 2013 | 22 MAY 2013 | 7 | 002 | 10 JUN 2015 | 10 JUN 2015 | 7 | 001 | 12 FEB 2018 | 12 FEB 2018 | 6 | 001 |
| 23 MAY 2013 | 23 MAY 2013 | 7 | 002 | 10 JUN 2015 | 10 JUN 2015 | 6 | 001 | 03 MAR 2018 | 03 MAR 2018 | 7 | 002 |
| 18 JUN 2013 | 18 JUN 2013 | 7 | 001 | 11 JUN 2015 | 11 JUN 2015 | 7 | 002 | 30 MAR 2018 | 30 MAR 2018 | 7 | 002 |
| 18 JUN 2013 | 18 JUN 2013 | 6 | 001 | 13 JUN 2015 | 20 JUN 2015 | 1 | 008 | 13 APR 2018 | 13 APR 2018 | 7 | 001 |
| 19 JUN 2013 | 19 JUN 2013 | 7 | 001 | 16 JUL 2015 | 16 JUL 2015 | 7 | 002 | 14 APR 2018 | 14 APR 2018 | 6 | 001 |
| 19 JUN 2013 | 19 JUN 2013 | 6 | 001 | 17 JUL 2015 | 17 JUL 2015 | 7 | 002 | 14 APR 2018 | 14 APR 2018 | 7 | 001 |
| 20 JUN 2013 | 20 JUN 2013 | 7 | 001 | 18 JUL 2015 | 01 AUG 2015 | 1 | 015 | 15 APR 2018 | 15 APR 2018 | 6 | 001 |
| 20 JUN 2013 | 20 JUN 2013 | 6 | 001 | 09 AUG 2015 | 09 AUG 2015 | 7 | 002 | 15 APR 2018 | 15 APR 2018 | 7 | 001 |
| 24 JUN 2013 | 24 JUN 2013 | 2 | 001 | 10 AUG 2015 | 10 AUG 2015 | 7 | 002 | 16 APR 2018 | 16 APR 2018 | 6 | 001 |
| 25 JUN 2013 | 25 JUN 2013 | 7 | 001 | 11 AUG 2015 | 12 AUG 2015 | 4 | 002 | 16 APR 2018 | 16 APR 2018 | 7 | 001 |
| 25 JUN 2013 | 25 JUN 2013 | 6 | 001 | 13 AUG 2015 | 14 AUG 2015 | 4 | 002 | 05 MAY 2018 | 05 MAY 2018 | 7 | 002 |
| 26 JUN 2013 | 26 JUN 2013 | 6 | 002 | 17 AUG 2015 | 19 AUG 2015 | 4 | 003 | 04 JUN 2018 | 04 JUN 2018 | 4 | 001 |
| 27 JUN 2013 | 27 JUN 2013 | 6 | 002 | 20 AUG 2015 | 21 AUG 2015 | 4 | 002 | 05 JUN 2018 | 05 JUN 2018 | 4 | 001 |
| 28 JUN 2013 | 29 JUN 2013 | 2 | 002 | 28 AUG 2015 | 28 AUG 2015 | 6 | 001 | 06 JUN 2018 | 06 JUN 2018 | 4 | 001 |
| 01 JUL 2013 | 01 JUL 2013 | 6 | 001 | 29 AUG 2015 | 29 AUG 2015 | 6 | 001 | 07 JUN 2018 | 07 JUN 2018 | 4 | 001 |
| 01 JUL 2013 | 01 JUL 2013 | 7 | 001 | 31 AUG 2015 | 31 AUG 2015 | 6 | 002 | 08 JUN 2018 | 08 JUN 2018 | 4 | 001 |
| 02 JUL 2013 | 02 JUL 2013 | 7 | 001 | 02 SEP 2015 | 02 SEP 2015 | 7 | 001 | 11 JUN 2018 | 11 JUN 2018 | 7 | 002 |
| 10 JUL 2013 | 12 JUL 2013 | 4 | 003 | 01 OCT 2015 | 01 OCT 2015 | 7 | 001 | 12 JUN 2018 | 12 JUN 2018 | 7 | 002 |
| 14 JUL 2013 | 24 JUL 2013 | 1 | 011 | 01 OCT 2015 | 01 OCT 2015 | 6 | 001 | 02 JUL 2018 | 02 JUL 2018 | 4 | 001 |
| 25 JUL 2013 | 25 JUL 2013 | 7 | 001 | 02 OCT 2015 | 02 OCT 2015 | 4 | 001 | 03 JUL 2018 | 03 JUL 2018 | 4 | 001 |
| 30 JUL 2013 | 31 JUL 2013 | 2 | 002 | 05 OCT 2015 | 05 OCT 2015 | 7 | 001 | 05 JUL 2018 | 05 JUL 2018 | 4 | 001 |
| 05 AUG 2013 | 05 AUG 2013 | 6 | 001 | 05 OCT 2015 | 05 OCT 2015 | 6 | 001 | 06 JUL 2018 | 06 JUL 2018 | 4 | 001 |
| 05 AUG 2013 | 05 AUG 2013 | 7 | 001 | 06 OCT 2015 | 06 OCT 2015 | 7 | 001 | 07 JUL 2018 | 07 JUL 2018 | 7 | 001 |
| 06 AUG 2013 | 08 AUG 2013 | 4 | 003 | 06 OCT 2015 | 06 OCT 2015 | 6 | 001 | 08 JUL 2018 | 08 JUL 2018 | 7 | 001 |
| 12 AUG 2013 | 12 AUG 2013 | 6 | 001 | 07 OCT 2015 | 07 OCT 2015 | 7 | 001 | 09 JUL 2018 | 09 JUL 2018 | 7 | 001 |
| 12 AUG 2013 | 12 AUG 2013 | 7 | 001 | 07 OCT 2015 | 07 OCT 2015 | 6 | 001 | 02 AUG 2018 | 02 AUG 2018 | 4 | 001 |
| 15 AUG 2013 | 15 AUG 2013 | 6 | 001 | 08 OCT 2015 | 08 OCT 2015 | 7 | 001 | 03 AUG 2018 | 03 AUG 2018 | 4 | 001 |
| 16 AUG 2013 | 16 AUG 2013 | 6 | 001 | 08 OCT 2015 | 08 OCT 2015 | 6 | 001 | 06 AUG 2018 | 06 AUG 2018 | 4 | 001 |
| 20 AUG 2013 | 21 AUG 2013 | 2 | 002 | 19 OCT 2015 | 19 OCT 2015 | 6 | 001 | 07 AUG 2018 | 07 AUG 2018 | 4 | 001 |
| 25 AUG 2013 | 27 AUG 2013 | 4 | 003 | 19 OCT 2015 | 19 OCT 2015 | 7 | 001 | 08 AUG 2018 | 08 AUG 2018 | 4 | 001 |
| 28 AUG 2013 | 30 AUG 2013 | 2 | 003 | 20 OCT 2015 | 20 OCT 2015 | 6 | 001 | 13 AUG 2018 | 13 AUG 2018 | 7 | 002 |

Highly Confidential

| From Date | Thru Date | TD | Pts | From Date | Thru Date | TD | Pts | From Date | Thru Date | TD | Pts |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 SEP 2013 | 01 SEP 2013 | 4 | 001 | 20 OCT 2015 | 20 OCT 2015 | 7 | 001 | 14 AUG 2018 | 14 AUG 2018 | 7 | 002 |
| 02 SEP 2013 | 06 SEP 2013 | 2 | 005 | 23 OCT 2015 | 23 OCT 2015 | 7 | 001 | 06 SEP 2018 | 06 SEP 2018 | 6 | 001 |
| 09 SEP 2013 | 11 SEP 2013 | 2 | 003 | 26 OCT 2015 | 27 OCT 2015 | 2 | 002 | 07 SEP 2018 | 07 SEP 2018 | 6 | 001 |
| 12 SEP 2013 | 12 SEP 2013 | 7 | 001 | 28 OCT 2015 | 28 OCT 2015 | 4 | 001 | 08 SEP 2018 | 08 SEP 2018 | 7 | 002 |
| 16 SEP 2013 | 16 SEP 2013 | 7 | 001 | 29 OCT 2015 | 29 OCT 2015 | 6 | 002 | 09 SEP 2018 | 09 SEP 2018 | 7 | 002 |
| 17 SEP 2013 | 19 SEP 2013 | 4 | 003 | 30 OCT 2015 | 30 OCT 2015 | 6 | 002 | 28 SEP 2018 | 28 SEP 2018 | 7 | 001 |
| 24 OCT 2013 | 24 OCT 2013 | 7 | 001 | 01 NOV 2015 | 01 NOV 2015 | 6 | 001 | 01 OCT 2018 | 01 OCT 2018 | 6 | 001 |
| 25 OCT 2013 | 25 OCT 2013 | 6 | 002 | 02 NOV 2015 | 04 NOV 2015 | 4 | 003 | 01 OCT 2018 | 01 OCT 2018 | 7 | 001 |
| 29 OCT 2013 | 29 OCT 2013 | 6 | 001 | 05 NOV 2015 | 05 NOV 2015 | 6 | 001 | 02 OCT 2018 | 02 OCT 2018 | 6 | 001 |
| 30 OCT 2013 | 30 OCT 2013 | 6 | 001 | 06 NOV 2015 | 06 NOV 2015 | 4 | 001 | 02 OCT 2018 | 02 OCT 2018 | 7 | 001 |
| 05 NOV 2013 | 05 NOV 2013 | 6 | 001 | 21 NOV 2015 | 21 NOV 2015 | 7 | 002 | 03 OCT 2018 | 03 OCT 2018 | 6 | 001 |
| 05 NOV 2013 | 05 NOV 2013 | 7 | 001 | 22 NOV 2015 | 22 NOV 2015 | 7 | 002 | 03 OCT 2018 | 03 OCT 2018 | 7 | 001 |
| 06 NOV 2013 | 06 NOV 2013 | 6 | 001 | 02 DEC 2015 | 02 DEC 2015 | 6 | 001 | 04 OCT 2018 | 04 OCT 2018 | 6 | 001 |
| 06 NOV 2013 | 06 NOV 2013 | 7 | 001 | 04 DEC 2015 | 04 DEC 2015 | 7 | 001 | 04 OCT 2018 | 04 OCT 2018 | 7 | 001 |
| 07 NOV 2013 | 07 NOV 2013 | 6 | 001 | 12 JAN 2016 | 12 JAN 2016 | 7 | 002 | 05 OCT 2018 | 05 OCT 2018 | 7 | 001 |
| 07 NOV 2013 | 07 NOV 2013 | 7 | 001 | 13 JAN 2016 | 15 JAN 2016 | 4 | 003 | 05 OCT 2018 | 05 OCT 2018 | 6 | 001 |
| 08 NOV 2013 | 08 NOV 2013 | 6 | 001 | 19 JAN 2016 | 19 JAN 2016 | 7 | 001 | 17 OCT 2018 | 17 OCT 2018 | 7 | 001 |
| 08 NOV 2013 | 08 NOV 2013 | 7 | 001 | 19 JAN 2016 | 19 JAN 2016 | 6 | 001 | 17 OCT 2018 | 17 OCT 2018 | 6 | 001 |
| 12 NOV 2013 | 12 NOV 2013 | 6 | 001 | 01 FEB 2016 | 01 FEB 2016 | 7 | 001 | 18 OCT 2018 | 18 OCT 2018 | 6 | 001 |
| 13 NOV 2013 | 13 NOV 2013 | 7 | 001 | 01 FEB 2016 | 01 FEB 2016 | 6 | 001 | 18 OCT 2018 | 18 OCT 2018 | 7 | 001 |
| 18 NOV 2013 | 18 NOV 2013 | 6 | 002 | 02 FEB 2016 | 03 FEB 2016 | 4 | 002 | 23 OCT 2018 | 23 OCT 2018 | 6 | 001 |
| 19 NOV 2013 | 19 NOV 2013 | 6 | 002 | 11 FEB 2016 | 11 FEB 2016 | 7 | 001 | 24 OCT 2018 | 25 OCT 2018 | 4 | 002 |
| 20 NOV 2013 | 20 NOV 2013 | 7 | 001 | 11 FEB 2016 | 11 FEB 2016 | 6 | 001 | 31 OCT 2018 | 31 OCT 2018 | 4 | 001 |
| 22 NOV 2013 | 22 NOV 2013 | 6 | 001 | 12 FEB 2016 | 12 FEB 2016 | 7 | 001 | 07 NOV 2018 | 07 NOV 2018 | 7 | 001 |
| 23 NOV 2013 | 23 NOV 2013 | 7 | 002 | 12 FEB 2016 | 12 FEB 2016 | 6 | 001 | 20 DEC 2018 | 20 DEC 2018 | 7 | 002 |
| 24 NOV 2013 | 24 NOV 2013 | 7 | 002 | 22 FEB 2016 | 22 FEB 2016 | 7 | 001 | 21 DEC 2018 | 21 DEC 2018 | 4 | 001 |
| 05 DEC 2013 | 05 DEC 2013 | 7 | 001 | 25 FEB 2016 | 25 FEB 2016 | 7 | 001 | 28 DEC 2018 | 28 DEC 2018 | 4 | 001 |
| 12 DEC 2013 | 12 DEC 2013 | 2 | 001 | 25 FEB 2016 | 25 FEB 2016 | 6 | 001 | 02 JAN 2019 | 02 JAN 2019 | 4 | 001 |
| 18 DEC 2013 | 18 DEC 2013 | 4 | 001 | 26 FEB 2016 | 02 MAR 2016 | 1 | 006 | 03 JAN 2019 | 03 JAN 2019 | 4 | 001 |
| 20 DEC 2013 | 20 DEC 2013 | 4 | 001 | 08 MAR 2016 | 15 MAR 2016 | 1 | 008 | 04 JAN 2019 | 04 JAN 2019 | 4 | 001 |
| 08 FEB 2014 | 08 FEB 2014 | 7 | 002 | 16 MAR 2016 | 16 MAR 2016 | 7 | 002 | 11 JAN 2019 | 11 JAN 2019 | 7 | 001 |
| 09 FEB 2014 | 09 FEB 2014 | 7 | 002 | 17 MAR 2016 | 18 MAR 2016 | 4 | 002 | 14 JAN 2019 | 14 JAN 2019 | 7 | 001 |
| 10 FEB 2014 | 10 FEB 2014 | 6 | 001 | 21 MAR 2016 | 24 MAR 2016 | 2 | 004 | 16 JAN 2019 | 16 JAN 2019 | 7 | 001 |
| 11 FEB 2014 | 11 FEB 2014 | 7 | 001 | 28 MAR 2016 | 29 MAR 2016 | 2 | 002 | 17 JAN 2019 | 17 JAN 2019 | 7 | 001 |
| 11 FEB 2014 | 11 FEB 2014 | 6 | 001 | 30 MAR 2016 | 30 MAR 2016 | 7 | 001 | 21 JAN 2019 | 21 JAN 2019 | 4 | 001 |
| 12 FEB 2014 | 12 FEB 2014 | 7 | 001 | 31 MAR 2016 | 01 APR 2016 | 4 | 002 | 25 JAN 2019 | 25 JAN 2019 | 4 | 001 |
| 12 FEB 2014 | 12 FEB 2014 | 6 | 001 | 02 APR 2016 | 02 APR 2016 | 7 | 001 | 29 JAN 2019 | 29 JAN 2019 | 4 | 001 |
| 15 FEB 2014 | 18 FEB 2014 | 2 | 004 | 03 APR 2016 | 03 APR 2016 | 7 | 002 | 05 FEB 2019 | 05 FEB 2019 | 6 | 001 |

| From Date | Thru Date | TD | Pts | From Date | Thru Date | TD | Pts | From Date | Thru Date | TD | Pts |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 19 FEB 2014 | 19 FEB 2014 | 6 | 001 | 06 APR 2016 | 07 APR 2016 | 2 | 002 | 05 FEB 2019 | 05 FEB 2019 | 7 | 001 |
| 19 FEB 2014 | 19 FEB 2014 | 7 | 001 | 14 APR 2016 | 14 APR 2016 | 6 | 001 | 06 FEB 2019 | 06 FEB 2019 | 6 | 001 |
| 21 FEB 2014 | 21 FEB 2014 | 6 | 001 | 20 APR 2016 | 21 APR 2016 | 2 | 002 | 06 FEB 2019 | 06 FEB 2019 | 7 | 001 |
| 25 FEB 2014 | 25 FEB 2014 | 6 | 001 | 27 APR 2016 | 27 APR 2016 | 6 | 002 | 07 FEB 2019 | 07 FEB 2019 | 6 | 001 |
| 25 FEB 2014 | 25 FEB 2014 | 7 | 001 | 08 MAY 2016 | 08 MAY 2016 | 6 | 002 | 07 FEB 2019 | 07 FEB 2019 | 7 | 001 |
| 26 FEB 2014 | 26 FEB 2014 | 7 | 001 | 09 MAY 2016 | 09 MAY 2016 | 6 | 002 | 08 FEB 2019 | 08 FEB 2019 | 7 | 001 |
| 26 FEB 2014 | 26 FEB 2014 | 6 | 001 | 10 MAY 2016 | 10 MAY 2016 | 6 | 001 | 08 FEB 2019 | 08 FEB 2019 | 6 | 001 |
| 27 FEB 2014 | 27 FEB 2014 | 7 | 001 | 11 MAY 2016 | 11 MAY 2016 | 2 | 001 | 20 FEB 2019 | 20 FEB 2019 | 6 | 001 |
| 27 FEB 2014 | 27 FEB 2014 | 6 | 001 | 12 MAY 2016 | 12 MAY 2016 | 2 | 001 | 09 MAR 2019 | 09 MAR 2019 | 7 | 002 |
| 28 FEB 2014 | 28 FEB 2014 | 6 | 001 | 14 MAY 2016 | 14 MAY 2016 | 7 | 002 | 10 MAR 2019 | 10 MAR 2019 | 7 | 002 |
| 28 FEB 2014 | 28 FEB 2014 | 7 | 001 | 24 MAY 2016 | 25 MAY 2016 | 2 | 002 | 11 MAR 2019 | 11 MAR 2019 | 6 | 002 |
| 01 MAR 2014 | 01 MAR 2014 | 6 | 002 | 09 JUN 2016 | 10 JUN 2016 | 2 | 002 | 12 MAR 2019 | 12 MAR 2019 | 6 | 002 |
| 02 MAR 2014 | 02 MAR 2014 | 6 | 002 | 23 JUN 2016 | 24 JUN 2016 | 2 | 002 | 18 MAR 2019 | 18 MAR 2019 | 6 | 001 |
| 06 MAR 2014 | 06 MAR 2014 | 7 | 001 | 07 JUL 2016 | 08 JUL 2016 | 2 | 002 | 04 MAY 2019 | 04 MAY 2019 | 7 | 002 |
| 07 MAR 2014 | 10 MAR 2014 | 2 | 004 | 21 JUL 2016 | 22 JUL 2016 | 2 | 002 | 05 MAY 2019 | 05 MAY 2019 | 7 | 002 |
| 11 MAR 2014 | 11 MAR 2014 | 6 | 001 | 11 AUG 2016 | 12 AUG 2016 | 2 | 002 | 24 MAY 2019 | 24 MAY 2019 | 7 | 002 |
| 13 MAR 2014 | 15 MAR 2014 | 2 | 003 | 15 AUG 2016 | 15 AUG 2016 | 6 | 001 | 25 MAY 2019 | 25 MAY 2019 | 7 | 002 |
| 23 MAR 2014 | 08 APR 2014 | 1 | 017 | 15 AUG 2016 | 15 AUG 2016 | 7 | 001 | 31 MAY 2019 | 31 MAY 2019 | 7 | 002 |
| 10 APR 2014 | 10 APR 2014 | 7 | 001 | 16 AUG 2016 | 16 AUG 2016 | 7 | 001 | 04 JUN 2019 | 04 JUN 2019 | 7 | 002 |
| 10 APR 2014 | 10 APR 2014 | 6 | 001 | 16 AUG 2016 | 16 AUG 2016 | 6 | 001 | 05 JUN 2019 | 05 JUN 2019 | 4 | 001 |
| 15 APR 2014 | 15 APR 2014 | 2 | 001 | 17 AUG 2016 | 17 AUG 2016 | 6 | 001 | 06 JUN 2019 | 06 JUN 2019 | 4 | 001 |
| 16 APR 2014 | 16 APR 2014 | 6 | 001 | 17 AUG 2016 | 17 AUG 2016 | 7 | 001 | 07 JUN 2019 | 07 JUN 2019 | 4 | 001 |
| 16 APR 2014 | 16 APR 2014 | 7 | 001 | 18 AUG 2016 | 18 AUG 2016 | 7 | 001 | 08 JUN 2019 | 08 JUN 2019 | 4 | 001 |
| 17 APR 2014 | 17 APR 2014 | 6 | 001 | 18 AUG 2016 | 18 AUG 2016 | 6 | 001 | 11 JUN 2019 | 11 JUN 2019 | 7 | 001 |
| 17 APR 2014 | 17 APR 2014 | 7 | 001 | 19 AUG 2016 | 19 AUG 2016 | 7 | 002 | 11 JUN 2019 | 11 JUN 2019 | 6 | 001 |
| 18 APR 2014 | 18 APR 2014 | 7 | 001 | 24 AUG 2016 | 25 AUG 2016 | 2 | 002 | 12 JUN 2019 | 12 JUN 2019 | 6 | 001 |
| 24 APR 2014 | 24 APR 2014 | 7 | 001 | 26 AUG 2016 | 26 AUG 2016 | 7 | 002 | 12 JUN 2019 | 12 JUN 2019 | 7 | 001 |
| 25 APR 2014 | 08 MAY 2014 | 1 | 014 | 01 SEP 2016 | 01 SEP 2016 | 6 | 002 | 15 JUL 2019 | 15 JUL 2019 | 7 | 002 |
| 09 MAY 2014 | 09 MAY 2014 | 7 | 001 | 02 SEP 2016 | 02 SEP 2016 | 6 | 002 | 16 JUL 2019 | 16 JUL 2019 | 7 | 002 |
| 12 MAY 2014 | 12 MAY 2014 | 7 | 001 | 05 SEP 2016 | 05 SEP 2016 | 7 | 001 | 20 AUG 2019 | 20 AUG 2019 | 7 | 002 |
| 15 MAY 2014 | 15 MAY 2014 | 7 | 001 | 05 SEP 2016 | 05 SEP 2016 | 6 | 001 | 21 AUG 2019 | 21 AUG 2019 | 7 | 002 |
| 19 MAY 2014 | 19 MAY 2014 | 6 | 001 | 06 SEP 2016 | 06 SEP 2016 | 7 | 001 | 07 SEP 2019 | 07 SEP 2019 | 7 | 002 |
| 29 MAY 2014 | 29 MAY 2014 | 6 | 002 | 06 SEP 2016 | 06 SEP 2016 | 6 | 001 | 08 SEP 2019 | 08 SEP 2019 | 7 | 002 |
| 30 MAY 2014 | 30 MAY 2014 | 6 | 002 | 07 SEP 2016 | 07 SEP 2016 | 7 | 001 | 21 OCT 2019 | 21 OCT 2019 | 7 | 002 |
| 02 JUN 2014 | 02 JUN 2014 | 6 | 001 | 07 SEP 2016 | 07 SEP 2016 | 6 | 001 | 22 OCT 2019 | 22 OCT 2019 | 7 | 002 |
| 02 JUN 2014 | 02 JUN 2014 | 7 | 001 | 08 SEP 2016 | 09 SEP 2016 | 2 | 002 | 01 NOV 2019 | 01 NOV 2019 | 7 | 002 |
| 06 JUN 2014 | 06 JUN 2014 | 7 | 001 | 22 SEP 2016 | 23 SEP 2016 | 2 | 002 | 02 NOV 2019 | 02 NOV 2019 | 7 | 002 |
| 06 JUN 2014 | 06 JUN 2014 | 6 | 001 | 27 SEP 2016 | 27 SEP 2016 | 6 | 002 | | | | |

Highly Confidential

| From Date | Thru Date | TD | Pts | From Date | Thru Date | TD | Pts |
|-----------|-----------|----|----|-----------|-----------|----|----|

THIS DOCUMENT CONTAINS INFORMATION WHICH MUST BE PROTECTED IAW AFI 33-332 AND
DOD REGULATION 5400.11. PRIVACY ACT OF 1974, AS AMENDED, APPLIES.

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS AIR RESERVE PERSONNEL CENTER
BUCKLEY AFB, COLORADO 80011-9502

RESERVE ORDER
EK-4516                                                           23 JUL 2020

MAJ HUNTSMAN JAYSON


IS RELIEVED FROM CURRENT ASSIGNMENT, ASSIGNED TO THE RETIRED RESERVE SECTION
AND PLACED ON THE USAF RESERVE RETIRED LIST EFFECTIVE AS INDICATED BELOW
ENTITLED TO ARMED FORCES IDENTIFICATION CARD, DD FORM 2 AF(RESERVE) (RED).

CURRENT ASSIGNMENT FROM WHICH RELIEVED.
312 ALF SQ TRAVIS AFB CA 94535 (PAS: T80MFLPG)

DATE ASSIGNED TO                            RETIRED RESERVE SECTION: ZA
RETIRED RESERVE
7 AUG 2020

DATE OF BIRTH                               RETIREMENT IDENTIFICATION CODE: X6

AUTHORITY: 10 USC 12731

REASON
ELIG FOR RETIRED PAY EXCEPT FOR
ATTAINMENT OF ELIGIBILITY AGE

REMARKS
TRANSFER TO RETIRED RESERVE PRECLUDES PROMOTION/ PROMOTION CONSIDERATION.

RETIRED PAY GRADE =

BY ORDER OF THE SECRETARY OF THE AIR FORCE

OFFICIAL

ASHLEY L. HEYEN, COLONEL, USAF                    DISTRIBUTION
DIRECTOR, PERSONNEL & TOTAL FORCE SERVICES        EK
                                                  RO EK-4516

PERSONAL DATA - PRIVACY ACT OF 1974 (USC 552a)

Effective Date---------

**SERVICE HISTORY**

| | | | AD | IDT | IDS | ECI | MBR | TOTAL | RETIRE | SATSVC | HIST | QUAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PTS ACRD TO 11 MAY 2019 | | | 4694 | 0569 | 0000 | 0000 | 194 | 05457 | 05383 | 181119 | STAT | CNTL |
| 27 SEP 1996 | 12 MAY 2000 | | 0000 | 0000 | 0000 | 0000 | 000 | 00000 | 00000 | 000000 | XT | 1 |
| 13 MAY 2000 | 12 MAY 2001 | | 0306 | 0000 | 0000 | 0000 | 015 | 00321 | 00321 | 010000 | ZS | 1 |
| 13 MAY 2000 | 10 JUL 2000 | | 0000 | 0000 | 0000 | 0000 | 002 | 00002 | 00002 | 000000 | FV | 1 |
| 11 JUL 2000 | 12 MAY 2001 | | 0306 | 0000 | 0000 | 0000 | 013 | 00319 | 00319 | 001002 | FS | 1 |
| 13 MAY 2001 | 12 MAY 2002 | | 0365 | 0000 | 0000 | 0000 | 015 | 00380 | 00365 | 010000 | FS | 1 |
| 13 MAY 2002 | 12 MAY 2003 | | 0365 | 0000 | 0000 | 0000 | 015 | 00380 | 00365 | 010000 | FS | 1 |
| 13 MAY 2003 | 12 MAY 2004 | | 0366 | 0000 | 0000 | 0000 | 015 | 00381 | 00366 | 010000 | FS | 1 |
| 13 MAY 2004 | 12 MAY 2005 | | 0365 | 0000 | 0000 | 0000 | 015 | 00380 | 00365 | 010000 | FS | 1 |
| 13 MAY 2005 | 12 MAY 2006 | | 0365 | 0000 | 0000 | 0000 | 014 | 00379 | 00365 | 010000 | ZR | 1 |
| 13 MAY 2005 | 25 APR 2006 | | 0348 | 0000 | 0000 | 0000 | 014 | 00362 | 00362 | 001113 | FS | 1 |
| 26 APR 2006 | 12 MAY 2006 | | 0017 | 0000 | 0000 | 0000 | 000 | 00017 | 00017 | 000017 | FR | 1 |
| 13 MAY 2006 | 12 MAY 2007 | | 0365 | 0000 | 0000 | 0000 | 000 | 00365 | 00365 | 010000 | FR | 1 |
| 13 MAY 2007 | 12 MAY 2008 | | 0366 | 0000 | 0000 | 0000 | 000 | 00366 | 00366 | 010000 | FR | 1 |
| 13 MAY 2008 | 12 MAY 2009 | | 0365 | 0000 | 0000 | 0000 | 000 | 00365 | 00365 | 010000 | FR | 1 |
| 13 MAY 2009 | 12 MAY 2010 | | 0365 | 0000 | 0000 | 0000 | 000 | 00365 | 00365 | 010000 | FR | 1 |
| 13 MAY 2010 | 12 MAY 2011 | | 0365 | 0000 | 0000 | 0000 | 000 | 00365 | 00365 | 010000 | FR | 1 |
| 13 MAY 2011 | 01 MAY 2012 | | 0355 | 0000 | 0000 | 0000 | 000 | 00355 | 00355 | 001119 | FR | 1 |
| 02 MAY 2012 | 11 MAY 2012 | | 0000 | 0000 | 0000 | 0000 | 000 | 00000 | 00000 | 000000 | XC | 1 |
| 12 MAY 2012 | 11 MAY 2013 | | 0051 | 0104 | 0000 | 0000 | 015 | 00170 | 00170 | 010000 | FV | 1 |
| 12 MAY 2013 | 11 MAY 2014 | | 0088 | 0089 | 0000 | 0000 | 015 | 00192 | 00192 | 010000 | FV | 4 |
| 12 MAY 2014 | 11 MAY 2015 | | 0072 | 0088 | 0000 | 0000 | 015 | 00175 | 00175 | 010000 | FV | 4 |
| 12 MAY 2015 | 11 MAY 2016 | | 0074 | 0086 | 0000 | 0000 | 015 | 00175 | 00175 | 010000 | FV | 4 |
| 12 MAY 2016 | 11 MAY 2017 | | 0019 | 0065 | 0000 | 0000 | 015 | 00099 | 00099 | 010000 | FV | 4 |
| 12 MAY 2017 | 11 MAY 2018 | | 0052 | 0075 | 0000 | 0000 | 015 | 00142 | 00142 | 010000 | FV | 4 |

RSGRBTH   - PAGE:  2 OF  3 -
Fri Jan 03 12:25:00PM 2020

Highly Confidential

(A)

Below references March and April statuses not on PCARS.  Our Squadron was out of money and pay statuses were not available and/or were filed later.  This is referenced in my notification and was part of the Continuing Resolution that year.

**Military Duty Details (2)**
**Request Type (2):** New
**Depart Domicile (2):** 04/13/2013 at 0700
**Start Military Duty (2):** 04/13/2013 at 0930
**End Military Duty (2):** 04/13/2013 at 1530
**Return to Domicile (2):** 04/13/2013 at 1800
**Trip Pull Requested (2):**  Assigned pairings currently conflict with this MILOA. Pull conflicting parings AS SOON AS THIS NOTIFICATION IS RECEIVED in Crew Scheduling/Planning.
**Comments/Description of MILOA (2):**  Air Force medical requirment that is due. This request, along with my next request were not placed earlier because the defense bill was not signed. Thank you!

(B)

Below shows the leave request beginning on the 9th at 1400 Central.  Sorties cancel a large percentage of the time because of maintenance and/or the tanker breaks for air refueling.  My PCARS shows 10-12 and annotates the probable days and times that the sorties launched.

**Military Duty Details**
**Request Type:** New
**Depart Domicile:** 07/09/2013 at 1400
**Start Military Duty:** 07/09/2013 at 1800
**End Military Duty:** 07/11/2013 at 2350
**Return to Domicile:** 07/12/2013 at 0201
**Trip Pull Requested:**  Assigned pairings currently conflict with this MILOA. Pull conflicting parings AS SOON AS THIS NOTIFICATION IS RECEIVED in Crew Scheduling/Planning.
**Comments/Description of MILOA:** 2nd attempt to complete annual checkrides for qualification

Highly Confidential

(C)

Below shows I was on leave for flying.  There is a one-day break on the 10th on PCARS.  As I was on Flying status the day before, my assumption is we did not fly on the 10th and I did not receive pay as you can only get AFTP pay if you are flying that day.  It is obvious I was on a large chunk before and after that day and this is an example why pay statuses are not always reflective of duty performed.

**Military Duty Details**
Request Type:  New
Depart Domicile: 04/01/2015 at 0300
Start Military Duty: 04/01/2015 at 0500
End Military Duty: 04/19/2015 at 2100
Return to Domicile: 04/19/2015 at 2300
Trip Pull Requested:  Assigned pairings currently conflict with this MILOA. Pull conflicting parings AS SOON AS THIS NOTIFICATION IS RECEIVED in Crew Scheduling/Planning.

(D)

Below shows the 12th was a travel/prep day before leaving the country as an Evaluator for the Western African States in the Netherlands.

**Military Duty Details**
Request Type:  New
Depart Domicile: 06/12/2015 at 0300
Start Military Duty: 06/12/2015 at 0500
End Military Duty: 06/21/2015 at 1700
Return to Domicile: 06/21/2015 at 1900
Trip Pull Requested:  Assigned pairings currently conflict with this MILOA. Pull conflicting parings AS SOON AS THIS NOTIFICATION IS RECEIVED in Crew Scheduling/Planning.
Comments/Description of MILOA:  Air Ops planner for Operation Western Accord in the Netherlands.

(E)

Below shows the comm requirement which is a multi-hour brief on classified materials handling and communication.  The class is normally not held in the Squadron.  Either the status was not processed correctly, was not filed because the class was in another location on base, or the class was canceled upon arrival which would prevent a status from being filed.

**Military Duty Details (2)**
Request Type (2):  New
Depart Domicile (2): 08/25/2015 at 0400
Start Military Duty (2): 08/25/2015 at 0600
End Military Duty (2): 08/25/2015 at 1800
Return to Domicile (2): 08/25/2015 at 2000
Trip Pull Requested (2):  Assigned pairings currently conflict with this MILOA. Pull conflicting parings AS SOON AS THIS NOTIFICATION IS RECEIVED in Crew Scheduling/Planning.
Comments/Description of MILOA (2):  Yearly comm requirement

(F)

Below shows a simulator group was scheduled on 29-30 Oct 2015 and the return to domicile time for travel was Oct 31st at 0700 Central.  No status would be on PCARS for the 31st.

**Military Duty Details**
**Request Type:** New
**Depart Domicile:** 10/29/2015 at 0400
**Start Military Duty:** 10/29/2015 at 1200
**End Military Duty:** 10/30/2015 at 1900
**Return to Domicile:** 10/31/2015 at 0700
**Trip Pull Requested:** Assigned pairings currently conflict with this MILOA. Pull conflicting pairings AS SOON AS THIS NOTIFICATION IS RECEIVED in Crew Scheduling/Planning.
**Comments/Description of MILOA:** Quarterly Sim Group

(G)

Below shows the request was for a mission in the Pacific.  The day before was for travel/prep/appointments prior to departing.

**Military Duty Details**
**Request Type:** New
**Depart Domicile:** 03/07/2016 at 0600
**Start Military Duty:** 03/07/2016 at 0800
**End Military Duty:** 03/14/2016 at 1500
**Return to Domicile:** 03/14/2016 at 1700
**Trip Pull Requested:** Ass gned pa r ngs current y conf ct w th th s MILOA. Pu  conf ct ng pa r ngs AS SOON AS THIS NOTIFICATION IS RECEIVED  n Crew Schedu ng/P ann ng.
**Comments/Description of MILOA:** Short not ce due to requ red appo ntment on Monday fo owed by Pac f c m ss on though the 14th for month y currency and  nstruct on for jun or crew member.

Highly Confidential

(H)

Below shows I was at Travis AFB, in my Squadron on August 6, 2016.





(I)

Below shows I was on base on Nov 22, 2016. It is a picture of the UTA schedule on the Squadron wall in the pilot lounge. I use that for planning. It shows the next fiscal year with dates confirming the time frame.

349TH AIR MOBILITY WING

MISSION: PROVIDE MISSION-READY, FULLY INTEGRATED, CITIZEN AIRMEN FOR OPERATIONAL CAPABILITY AND SURGE CAPACITY IN RAPID GLOBAL MOBILITY.

VISION: THE AIR FORCE RESERVE'S PREMIER AIR MOBILITY WING: AGILE, INNOVATIVE, RESILIENT AND ALWAYS MISSION READY!

UTA Schedule for Fiscal Year 2017

| FLIGHT | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 1-2 | 5-6 | 3-4 | 7-8 | 11-12 | 4-5 | 1-2 | 13-14 | 3-4 | 22-23 | 12-13 | 9-10 |
| B | 15-16 | 19-20 | 10-11 | | | | | | | | | |
| Alternate | | | | Note 1 | No Alternate | Note 1 | Note 1 | Note 1 | Note 1 | Note 1 | No Alternate | Note 1 |

Note 1: Personnel assigned to squadrons in 349 MXG and 349 MSG will contact their chain of command. Selected elements of selected units may have alternate training dates scheduled.

| Federal Holidays | |
|---|---|
| Columbus Day | Oct 10, 2016 |
| Veterans Day | Nov 11, 2016 |
| Thanksgiving Day | Nov 24, 2016 |
| Christmas Day (Observed) | Dec 26, 2016 |
| New Year's Day (Observed) | Jan 2, 2017 |
| Birthday of Martin Luther King, Jr. | Jan 16, 2017 |
| President's Day | Feb 20, 2017 |
| Memorial Day | May 29, 2017 |
| Independence Day | Jul 4, 2017 |
| Labor Day | Sep 4, 2017 |

| Other Significant Events | |
|---|---|
| Annual Awards Banquet | Feb 11, 2017 |
| Wing Commander's Call | Jan & Aug UTAs |
| Patriot Wyvern Exercise | Feb & Jul UTAs |
| Travis AFB Airshow | May 6-7, 2017 |
| AFRC UEI | July 20-25, 2017 |
| Wingman Day | Aug UTA |

KOZAK.RAYMON D.A.1174191553

RAYMOND A. KOZAK, Colonel, USAF
Commander

Updated: 23 Aug 2016
All previous versions are obsolete





(J)

Below shows I was on base on January 7th, 2017. It is a signed urinalysis form proving my location and duty.

DEPARTMENT OF THE AIR FORCE
AIR FORCE RESERVE COMMAND

1/7/2017

MEMORANDUM FOR **MAJ HUNTSMAN, JAYSON K,** [redacted]

FROM: 312 AS/CC

SUBJECT: Notification of Selection to Provide a Urine Specimen – Inspection Testing

1. You have been selected to provide a urine specimen for drug testing purposes. Compliance with AFI 90-507 requires that you:

a. Report to 60 MDOS, Building 381, 2nd floor, Wing F (on the hill; 424-5266) with this notification letter and Military ID card.

b. Surrender your military identification (ID) card upon arrival at the testing location and remain at the testing location until you have provided a urine specimen. When your ID card has been returned, you have been given permission to leave.

c. Remove bulky outer garments (e.g., ABU blouse) to prevent direct observation by the observer from being impeded.

d. Remove all genital body piercing jewelry.

e. Wash your hands (with water only) after removal of any genital body piercing jewelry.

f. No hats, purses, bags, briefcases, or other baggage may be brought into the collection room.

g. Be observed urinating directly into the bottle, or other receptacle, provided to you for collecting the urine specimen.

h. Avoid contaminating the specimen. Fill the bottle, or other receptacle provided to you, with a minimum of 30 milliliters of your urine.

2. Failure to comply with these instructions in any way may result in disciplinary action against you under the Uniform Code of Military Justice (UCMJ). You will acknowledge that you have read this notification and understand by signing it below.

TRAVIS ROWLEY, Lt Col, USAF
Commander

1st Ind, MAJ HUNTSMAN, JAYSON K

MEMORANDUM FOR 312 AS/CC

I have read and understand this notification. I further understand that failure to comply with this notification in an may result in disciplinary action under the UCMJ.

Date / Time Notified: 7/7/17 / 0515

MAJ HUNTSMAN, JAYSON K

Member reported to the drug testing site at ______ hrs, 1/7/2017 and released at ______ hrs.



(K)

Below shows the request for a flight physical.  This has an early report at the hospital and the sign-in sheets are at the Squadron.   A probably explanation is the sheets were not filled out, not processed, or the physical was re-scheduled due to paper-work or other issues.  These are held during hard UTAs and each type of pay is processed differently.

## Military Duty Details
**Request Type:**  New
**Depart Domicile:**  06/02/2017 at 2200
**Start Military Duty:**  06/03/2017 at 0930
**End Military Duty:**  06/03/2017 at 1830
**Return to Domicile:**  06/03/2017 at 2030
**Trip Pull Requested:**  No pa r ng(s) current y conf  ct w th the MILOA. If conf  ct ng pa r ngs are posted, post MILOA
 mmed ate y
**Comments/Description of MILOA:**  Annua  M  tary F  ght Phys ca

(L)

Below shows communication with the Technical Sergeant in charge of security.  I worked on my security clearance that day from my personal computer.  This was a months' long process due to my prior clearance being a high-level and technological issues including the next level above the Squadron resetting my complete form twice.



(M)

Below shows the leave submitted was for a 3-day UTA.  The dates are off on PCARS by 1 day.
There are a variety of reasons this can happen.


**Military Duty Details**
**Request Type:**  New
**Depart Domicile:**  02/09/2018 at 0730
**Start Military Duty:**  02/09/2018 at 0930
**End Military Duty:**  02/11/2018 at 1830
**Return to Domicile:**  02/11/2018 at 2030
**Trip Pull Requested:**  Ass gned pa r ngs current y conf ct w th th s MILOA. Pu   conf ct ng pa r ngs AS SOON AS
THIS NOTIFICATION IS RECEIVED  n Crew Schedu  ng/P ann ng.
**Comments/Description of MILOA:**  Mandatory 3-day UTA

Highly Confidential

(N)

Below shows photos of me working remotely on reports on May 4th (a coding issue with new OPR formats) in preparation for the UTA on May 5th which is also shown. The picture was taken to show the communication squadron what my error was to produce correct coding.

[redacted]



(O)

Below shows I was at Travis AFB, in the SARM office, on May 23, 2018 performing duty.





P000027

(P)

Below shows I was working on my security clearance.  The picture was taken while communicating with security officials to work through technical issues.





(Q)

Below shows continued remote work on my security clearance after another reset outside of my control.



# Provide date of last contact ❓



# Provide your relationship to this person (check all that apply)



(R)
Below shows a signed doctor's note providing documentation for Air Force Reserve medical officials on the 31st of August due to an injury. I was capable of flying, but not completing the Physical Fitness Test.

STUART ARNOLD BUSSEY, M.D.
31 PANORAMIC WAY, SUITE 201
WALNUT CREEK, CA 94595-1627
(925) 934-7691
DEA # FB 4213930

NAME Jayson Huntsman DOB
ADDRESS DATE 8/27/18

TAMPER-RESISTANT SECURITY FEATURES LISTED ON BACK OF SCRIPT

℞ Please excuse Jayson from all running & walking tests until Nov 1, 2018 on account of Achilles strain

☐ 1-24
☐ 25-49
☐ 50-74
☐ 75-100
☐ 101-150
☐ 151 and over
____ Units

Refill NR 1 2 3 4 5

DO NOT SUBSTITUTE

To ensure brand name dispensing, check and initial box.

001382 7B17FP4041099





EXHIBIT 4

EXHIBIT 1

**From:** Swift, Renee J Maj USAF 459 ARW (USA) <renee.j.swift2.mil@mail.mil>
**Sent:** Thursday, July 30, 2020 9:28 AM
**To:** John Freed <John.Freed@wnco.com>
**Subject:** EXTERNAL - FW: FOUO\\\\FW: [Non-DoD Source] Fwd: Jayson Huntsman

**Caution:** *Sender is from outside SWA. Take caution before opening links/attachments or replying with sensitive data. If suspicious, forward to 'suspicious@wnco.com'.*

Mr. Freed, I pulled the orders for Jayson Huntsman, please see attached listing. Given the discrepancies between the calendar of mil duty dates you provided and the orders listed, I want to contact the unit and get a list of inactive duty statuses performed.

Thank you!

v/r

Maj Swift

**From:** Ching, Colette A Lt Col USAF DODHRA ESGR (USA) <colette.a.ching.mil@mail.mil>
**Sent:** Friday, July 24, 2020 9:32 AM
**To:** Swift, Renee J Maj USAF 459 ARW (USA) <renee.j.swift2.mil@mail.mil>
**Cc:** John Freed <John.Freed@wnco.com>; Ching, Colette A Lt Col USAF DODHRA ESGR (USA) <colette.a.ching.mil@mail.mil>
**Subject:** FW: [Non-DoD Source] Fwd: Jayson Huntsman

Hello Major Swift,

Mr. John Freed of Southwest Airlines is requesting verification of service for Reserve member Jayson Huntsman.  He is a member of the 312th Airlift Squadron assigned to the 349 Operations Group at Travis.

I know you said the POC for these requests would be transitioning to a full-time person soon, but can you assist or put Mr. Freed in touch with the new POC?

The dates in question are listed in a graphic in the email thread below.  Please let me know if it did not come through.

V/R,

COLETTE "Cha" CHING, Lt Col, USAF
USERRA Plans and Policy
Employer Support of the Guard and Reserve (ESGR)
Defense Personnel and Family Support Center (DPFSC)
4800 Mark Center Drive, Ste. 05E22
Alexandria, VA 22350-1200
Cell:  (703) 509-4797
Colette.a.ching.mil@mail.mil
ESGR Website:  www.esgr.mil

Customer Service Center:  1-800-336-4590 option 1

**From:** John Freed <John.Freed@wnco.com>
**Sent:** Thursday, July 23, 2020 11:10 AM
**To:** Ching, Colette A Lt Col USAF DODHRA ESGR (USA) <colette.a.ching.mil@mail.mil>
**Subject:** [Non-DoD Source] Fwd: Jayson Huntsman

SWA-HuntsII 009248

All active links contained in this email were disabled. Please verify the identity of the sender, and confirm the authenticity of all links contained within the message prior to copying and pasting the address to a Web browser.

Lt. Col. Ching

He's in the 312th Airlift Squadron assigned to 349th Operations Group at Travis Air Force base.

It's an associate unit of the active duty 22d airlift Squadron 60th Air Mobility Wing.

Thanks,

John

Please use the dates below for verification.

Sent from my iPad

Begin forwarded message:

> **From:** John Freed <John.Freed@wnco.com>
> **Date:** July 22, 2020 at 12:55:00 PM CDT
> **To:** "colette.a.ching.mil@mail.mil" <colette.a.ching.mil@mail.mil>
> **Subject: Jayson Huntsman**
>
> \u-257 ?
> Lt Col Ching
>
> I hope you're doing well. We are requesting verification of absence due to uniformed service. His name is Jayson Huntsman, He drill's at Travis Air force base. Please see the attached.
>
> Thanks,
>
> John
>
>
> **Captain John Freed**
> **Manager Flight Operations**
> **Military Affairs and Support**
> **Southwest Airlines**
> John.Freed@wnco.com < Caution-mailto:John.Freed@wnco.com >
> 469-603-4339 Phone



SWA-HuntsII 009249

| Military Days | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-17 | | | | | | | X | X | | | | | | | | | | | | | | | | | | | | | | | |
| Feb-17 | | | | | | | | | | | X | X | | | | | | | | | | | | | | | | | | | |
| Mar-17 | | | X | X | | | | | | | | | | | | X | | | | | | | | | | | | | | | |
| Apr-17 | | X | | | | | | | | | | | | | | | | X | | | | | | X | | | | | | | |
| May-17 | | | | | | | | | | | | X | X | X | | | | | | | | X | X | | | | | | | | |
| Jun-17 | | | X | | | | | | | | | X | X | | | | | | | | | | | | | | | | | | |
| Jul-17 | | | | | X | | | | | | | X | X | X | | | | | | | | | | | X | X | X | X | X | X | X |
| Aug-17 | | | | | | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | | | | | |
| Sep-17 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Oct-17 | | | | | | | | | | | | | | | | | | X | X | | | | | | | | | | | | |
| Nov-17 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dec-17 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Jan-18 | | | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Feb-18 | | | | | | | | | X | X | X | | | | | | | | | | | | | | | | | | | | |
| Mar-18 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | X | |
| Apr-18 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| May-18 | | | | | | | | | | | | | | | | | | X | | | | X | | | | | | | | | |
| Jun-18 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Jul-18 | | | | | | | | | | | X | X | | | | | | | | | | | | | | | | | | | |
| Aug-18 | | | | | | | | | | | | | | | | | | | | | | | | X | | | | | X | X | |
| Sep-18 | | | | | | | X | | | | | | | | | | | | | | | | | | | | | | | | |
| Oct-18 | | X | | | | | | | | | | | | | | | | | | | | | | X | X | | | | | | X |

******* CONFIDENTIALITY NOTICE *******

This e-mail message and all attachments transmitted with it may contain legally privileged and confidential information intended solely for the use of the addressee. If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately and delete this message from your system. Thank you.

SWA-HuntsII 009250

Huntsman, Jayson K – Active Duty Statues

| Name | Start Date | End Date | Total Days | Order Type |
|---|---|---|---|---|
| HUNTSMAN, JAYSON K | 2017/08/08 | 2017/08/08 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/08/07 | 2017/08/07 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/07/26 | 2017/07/31 | 6 | MPA |
| HUNTSMAN, JAYSON K | 2017/07/25 | 2017/07/25 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/07/24 | 2017/07/24 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/07/21 | 2017/07/21 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/07/20 | 2017/07/20 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/07/14 | 2017/07/14 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/07/13 | 2017/07/13 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/07/12 | 2017/07/12 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/07/11 | 2017/07/11 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/07/10 | 2017/07/10 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/06/12 | 2017/06/12 | 1 | AT |

| Name | Start Date | End Date | Total Days | Order Type |
|---|---|---|---|---|
| HUNTSMAN, JAYSON K | 2018/12/28 | 2018/12/28 | 1 | AT |
| HUNTSMAN, JAYSON K | 2018/12/21 | 2018/12/21 | 1 | AT |
| HUNTSMAN, JAYSON K | 2018/10/31 | 2018/10/31 | 1 | AT |
| HUNTSMAN, JAYSON K | 2018/10/24 | 2018/10/25 | 2 | AT |
| HUNTSMAN, JAYSON K | 2018/08/08 | 2018/08/08 | 1 | AT |
| HUNTSMAN, JAYSON K | 2018/08/07 | 2018/08/07 | 1 | AT |
| HUNTSMAN, JAYSON K | 2018/08/06 | 2018/08/06 | 1 | AT |
| HUNTSMAN, JAYSON K | 2018/08/03 | 2018/08/03 | 1 | AT |
| HUNTSMAN, JAYSON K | 2018/08/02 | 2018/08/02 | 1 | AT |
| HUNTSMAN, JAYSON K | 2018/07/06 | 2018/07/06 | 1 | AT |
| HUNTSMAN, JAYSON K | 2018/07/05 | 2018/07/05 | 1 | AT |
| HUNTSMAN, JAYSON K | 2018/07/03 | 2018/07/03 | 1 | AT |
| HUNTSMAN, JAYSON K | 2018/07/02 | 2018/07/02 | 1 | AT |
| HUNTSMAN, JAYSON K | 2018/06/08 | 2018/06/08 | 1 | AT |
| HUNTSMAN, JAYSON K | 2018/06/07 | 2018/06/07 | 1 | AT |
| HUNTSMAN, JAYSON K | 2018/06/06 | 2018/06/06 | 1 | AT |
| HUNTSMAN, JAYSON K | 2018/06/05 | 2018/06/05 | 1 | AT |
| HUNTSMAN, JAYSON K | 2018/06/04 | 2018/06/04 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/11/20 | 2017/11/20 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/11/17 | 2017/11/17 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/11/10 | 2017/11/10 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/08/18 | 2017/09/16 | 30 | MPA |
| HUNTSMAN, JAYSON K | 2017/08/11 | 2017/08/11 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/08/10 | 2017/08/10 | 1 | AT |
| HUNTSMAN, JAYSON K | 2017/08/09 | 2017/08/09 | 1 | AT |

SWA-HuntsII 009251

EXHIBIT 5

# EXHIBIT 2



**From:** Swift, Renee J Maj USAF 459 ARW (USA) <renee.j.swift2.mil@mail.mil>
**Sent:** Friday, August 7, 2020 12:32 PM
**To:** John Freed <John.Freed@wnco.com>
**Subject:** EXTERNAL - FW: IDT Mil Duty Verification USERRA

**Caution:** Sender is from outside SWA. Take caution before opening links/attachments or replying with sensitive data. If suspicious, forward to 'suspicious@wnco.com'.

Mr. Freed, Here is a another view of the inactive duty statuses. It is a little easier to read.
Maj Swift

**From:** GALBRAITH, STACEY J GS-09 USAF AFRC 349 OG/CSS <stacey.galbraith.1@us.af.mil>
**Sent:** Friday, August 7, 2020 11:18 AM
**To:** Swift, Renee J Maj USAF 459 ARW (USA) <renee.j.swift2.mil@mail.mil>
**Subject:** RE: IDT Mil Duty Verification USERRA

Maj Swift,

Attached is a screenshot of both FY17 and FY18 for Maj Jayson Huntsman.  Please let me know if you need anything else.

//SIGNED//
STACEY J. GALBRAITH, GS-09, DAF
Management Support Specialist
349 OG/CSS
511 Waldron St, Bay B
Travis AFB CA 94535
Comm: 707-424-8816 / DSN: 837-8816
stacey.galbraith.1@us.af.mil
349OG.CSS.CommandSection@us.af.mil

**From:** Swift, Renee J Maj USAF 459 ARW (USA) <renee.j.swift2.mil@mail.mil>
**Sent:** Monday, August 3, 2020 5:56 AM
**To:** GALBRAITH, STACEY J GS-09 USAF AFRC 349 OG/CSS <stacey.galbraith.1@us.af.mil>
**Subject:** FW: IDT Mil Duty Verification USERRA

Hi Ms. Galbraith,
Can you help me pull the following information out of UTAPS? A screenshot of the calendar year would work or a report for FY17 and FY18.
Southwest Airlines contacted AF/REP for a military duty verification. I need the IDT information  (UTA, RMP, AFTP, AGTP, points only) from  January 1,  2017 – October 31, 2018 for Jayson Huntsman in the 312 Airlift Squadron.
Thank you!
v/r
Maj Swift

SWA-HuntsII 009252

**From:** BJERK, BENJAMIN J Lt Col USAF AFRC 349 OG/CCE <benjamin.bjerk.2@us.af.mil>
**Sent:** Friday, July 31, 2020 6:27 PM
**To:** Swift, Renee J Maj USAF 459 ARW (USA) <renee.j.swift2.mil@mail.mil>; Galbraith, Stacey J CIV USAF 349 OG (USA) <stacey.galbraith.1@us.af.mil>
**Cc:** Drew, Michael L Lt Col USAF 349 OG (USA) <michael.drew@us.af.mil>
**Subject:** RE: IDT Mil Duty Verification USERRA

Maj Swift, I believe our UPC, Ms. Stacey Galbraith, can help you with this.  She is in the To: block and will reply soon.


Thanks,
Lt Col Bjerk

BENJAMIN J BJERK, Lt Col, USAF
349 OG Executive Officer
Travis AFB, California
DSN 837-1636

SWA-HuntsII 009253

SWA-Huntsil 009254

**Monitor Calendar**

JAYSON K HUNTSMAN

SWA-HuntsII 009255