UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAYSON HUNTSMAN,<br><br>Plaintiff,<br><br>v.<br><br>SOUTHWEST AIRLINES CO.,<br><br>Defendant. | Case No. 3:19-cv-00083-JSC<br><br>**ORDER RE: MOTION FOR FINAL APPROVAL AND MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS**<br><br>Re: Dkt. Nos. 236, 242 |

Plaintiff Jayson Huntsman filed this action on behalf of himself and similarly situated Southwest employees alleging Southwest Airlines' policy of refusing to provide paid leave for periods of short-term military leave violates the Uniformed Services Employment and Reemployment Rights Act (USERRA). After five years of litigation, the parties reached a class action settlement, which the Court preliminarily approved. (Dkt. No. 230.[1]) Plaintiff now seeks final approval of the settlement and moves for attorneys' fees, costs, and service awards for the class representatives. (Dkt. Nos. 236, 242.) Having reviewed the briefing and having had the benefit of oral argument on May 12, 2026, the Court GRANTS final approval of the settlement, and GRANTS IN PART the motion for attorneys' fees, costs, and service awards.

## BACKGROUND

The Court assumes familiarity with the lengthy procedural history of this action and incorporates Plaintiff's discussion of it by reference. (Dkt. No. 242 at 9-10.)

//

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

**SETTLEMENT AGREEMENT**

### A.   The Settlement Class

The Agreement defines the Settlement Class as

> all current or former employees of Southwest who, during their employment with Southwest at any time from October 10, 2004 through January 1, 2026, have taken short-term military leave from their employment with Southwest (i.e., military leave that lasted 14 days or fewer) and were subject to a CBA, except for employees subject to the agreement between Southwest and Transport Workers Union Local 550 covering meteorologists.

(Dkt. No. 220-1, Settlement Agreement at § I(F).) This settlement class definition modifies the certified class definition by adding the end date of January 1, 2026.

### B.   Payment Terms

Under the Settlement Agreement, Defendant will pay $18,500,000 ("Cash Settlement Amount"). (*Id*. at § V(1).) From this amount, Plaintiff seeks the following distributions:

1.   Attorneys' fees of 30 percent of the Cash Settlement Amount or $5,550,000 (Dkt. No. 236 at 13);

2.   Litigation Expenses of $714,379.60 (Dkt. No. 236-1, Scimone Decl. at ¶ 24);

3.   Service awards for Plaintiff Huntsman and Class Representative David Cash of $25,000 and $10,000, respectively (Dkt. No. 236 at 13); and

4.   Settlement Administration costs of $17,500 (Dkt. No. 236 at 32; Dkt. No. 242-3 at ¶ 20).

The remaining Net Settlement Amount will be divided between Class Members according to the Plan of Allocation set forth in the Settlement Agreement. (Dkt. No. 220-1 at §§ VI(1)-(2); VII.) The Plan of Allocation contemplates the settlement proceeds will be divided between Class Members pro rata based on the amount of their claim, which is based on their rate of pay and dates of short-term military leave. (*Id*. at § VII.)

### C.   Injunctive Relief

In addition to the monetary settlement, as of January 2026 Defendant has begun providing service member employees with up to ten days of paid short-term military leave per calendar year. (*Id*. at ¶ IV(1)(a).) The daily pay will be an approximation of the difference between the employee's Southwest pay and their military pay with a minimum payment of $30/day. (*Id*. at §

2

IV(1)(b).)

**D.      Scope of release**

Class members who do not opt-out of the settlement will release Defendant:

> from all claims or causes of action, whether in law or equity, whether known or unknown, that were or could have been pled based on the identical factual predicate in the Complaint, including any claim under USERRA Section 4316(b) for damages, prospective relief, or any other form of relief arising from or based on short-term military leaves taken from October 10, 2004 through January 1, 2026.

(Dkt. No. 220-1 at § XIV(1).)

Upon the effective date of the settlement (31 days after final approval), the Class Representatives will also release Defendant:

> from all claims, obligations, demands, actions, rights, charges, suits, debts, causes of action, and liabilities against the Releasees, of whatever kind and nature, character, and description, whether in law or equity, whether sounding in tort, contract, federal, state and/or local law, statute, ordinance, regulation, common law, or other source of law or contract, whether known or unknown, and whether anticipated or unanticipated, from the beginning of time through the Effective Date, including, but not limited to, all claims arising from or related to their employment with Southwest under any federal, local or state statute or regulation, provided, however, that notwithstanding the foregoing, nothing contained in this release shall in any way diminish or impair (i) any claims they may have that cannot be waived under applicable law, (ii) their rights under this Agreement, or (iii) their rights to vested benefits under employee benefit plans. This general release includes, but is not limited to, a release of all claims under USERRA; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) et seq.; the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq., as amended by the Older Workers Benefit Protection Act of 1990; Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981; the Equal Pay Act of 1963, 29 U.S.C. § 206 and the Lilly Ledbetter Fair Pay Act; the Sarbanes-Oxley Act of 2002; the Dodd-Frank Wall Street Reform and Consumer Protection Act; the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq.; the Consolidated Omnibus Budget Reconciliation Act of 1985, 42 U.S.C. § 1395(c); Executive Order 11141; Section 503 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, et seq.; the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq.; the Americans with Disabilities Act; the Worker Adjustment and Retraining Notification Act; the Family and Medical Leave Act; the National Labor Relations Act; the Immigration Reform and Control Act; the Occupational Safety and Health Act; the Fair Credit Reporting Act; the California Fair Employment and Housing Act, Cal. Govt. Code § 12940 et seq.; the California Family Rights Act, Cal. Govt. Code§ 12945.2; the California Labor Code, including but not limited to Section 132a, Sections 200 et seq. and Sections 1025 et seq., as well as the Private Attorneys General Act; the California Government Code; the

California Constitution; California Unfair Competition Law, Cal. Bus. & Prof. Code§ 17200 et seq.; any amendments to the foregoing statutes; and any other laws and/or regulations relating to employment, compensation or employment discrimination in any state where they have performed work or would have standing to assert a claim.

(*Id*. at § XIV(2)(a).) The Class Representatives also expressly waive all claims under California Civil Code § 1542. (*Id*. at § XIV(2)(b).) However, the Class Representative's release does not prevent them from filing a charge or complaint with the Equal Employment Opportunity Commission or similar state or federal agency. (*Id*. at § XIV(2)(c).)

### E.    Notice

The Court appointed ILYM as the Settlement Administrator. (Dkt. No. 230.)  On February 20, 2026, ILYM received the class data file for the 3,260 Class Members.  (Dkt. No. 242-3, Snow Decl. at ¶ 6.)  ILYM updated and confirmed the mailing addresses by comparing them to the National Change of Address database maintained by the United States Post Office.  (*Id*. at ¶ 7.) On February 27, 2026, the notice packet was emailed and mailed to Class Members.  (*Id*. at ¶ 9.) Of the notice packets mailed, 167 were returned and through further skip-tracing, the packets were remailed to all but 20 individuals.  (*Id*. at ¶¶ 11-13.)

Of the 3,260 Class Members, 197 are individuals who may have taken military leave between 2004 and 2014, but Defendant has no record of their leave.  (Dkt. No. 242-1, Scimone Decl. at ¶ 18.)  These Class Members were sent a claim form along with their notice packets. (Dkt. No. 242-3, Snow Decl. at ¶ 10.)   ILYM received three claim forms from Class Members in this category.  (*Id*. at ¶ 17.)

### F.    Opt-Outs and Objections

The deadline for class members to request exclusion (opt-out) or object to the settlement was April 28, 2026.  (Dkt. No. 232.)  To date, the Settlement Administrator has received six requests to opt-out.  (Dkt. No. 242-1, Scimone Decl. at ¶ 19.)  The settlement administrator received one objection.  (Dkt. No. 243-1.)

## DISCUSSION

The approval of a settlement is a multi-step process. At the preliminary approval stage, the court should grant such approval only if it is justified by the parties' showing that the court will

4

likely be able to (1) "certify the class for purposes of judgment on the proposal" and (2) "approve the proposal under Rule 23(e)(2)." Fed. R. Civ P. 23(e)(B). If the court preliminarily certifies the class and finds the settlement appropriate after "a preliminary fairness evaluation," then the class will be notified, and a final fairness hearing scheduled to determine if the settlement is fair, adequate, and reasonable pursuant to Rule 23. *Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012).

At the second stage, "after notice is given to putative class members, the Court entertains any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. Oct. 8, 2014) (citing *Diaz v. Tr. Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). Following the final fairness hearing, the Court must finally determine whether the parties should be allowed to settle the class action pursuant to their agreed upon terms. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

## I.      CLASS CERTIFICATION

Final approval of a class action settlement requires, as a threshold matter, an assessment of whether the class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and (b). *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019–1022 (9th Cir. 1998). Here, the Court certified a class under Rule 23(b)(3) prior to settlement, and on preliminary approval modified the class definition to clarify the end date is January 1, 2026 and appointed David Cash as a substitute class representative. (Dkt. No. 95; Dkt. No. 230 at 5.) Nothing in the current submission gives the Court reason to reconsider its prior orders.

## II.     ADEQUACY OF NOTICE

Under Federal Rule of Civil Procedure 23(e), the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Notice includes "[n]otice of the motion [for attorneys' fees which] must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner." Fed. R. Civ. P. 23(h)(1).

Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances,

*United States District Court*
*Northern District of California*

including individual notice to all members who can be identified through reasonable effort." The notice must "clearly and concisely state in plain, easily understood language" the nature of the action, the class definition, and the class members' right to exclude themselves from the class. Fed. R. Civ. P. 23(c)(2)(B); *see also Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.") (cleaned up). Although Rule 23 requires reasonable efforts be made to reach all class members, it does not require that each class member actually receive notice. *See Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (noting the standard for class notice is "best practicable" notice, not "actually received" notice).

The Court finds the notice plan previously approved by the Court, as implemented by the Settlement Administrator, complied with Rule 23(c)(2)(B). First, the Settlement Administrator provided mail and email notice. (Dkt. No. 242-3, Snow Decl. at ¶¶ 6-9.) Second, the notice clearly and concisely provided an overview of the lawsuit, Class Member options under the settlement, the process for requesting exclusion or objecting to all or part of the settlement, provided contact information for Class Counsel and the Settlement Administrator, and directed class members to a website, email, and toll-free number for additional information. (Dkt. No. 242-3.) The settlement website provided the notice and claim form (for those individuals who needed to verify their dates of military leave to recover under the settlement). *See* www.SWAuserrasettlement.com (last visited May 5, 2026). Finally, the Settlement Administrator has received only six requests for exclusion and one objection. (Dkt. No. 242-3 at ¶¶ 15, 17.)

Given the above, the Court concludes the parties have sufficiently provided the best practicable notice to class members.

## III.    FINAL APPROVAL

To grant final approval, the Court must find the terms of the parties' settlement are fair, adequate, and reasonable under Rule 23(e). *In re California Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 674 (9th Cir. 2025). In making this determination, courts generally must consider the following factors:

6

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill*, 361 F.3d at 575. "This list is not exclusive and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).

Under the revised Rule 23(e), the Court must also consider whether the settlement resulted from collusion among the parties. *See Briseno v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (holding that courts must apply the collusion factors set forth in *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 941 (9th Cir. 2011), to post-class action settlements as well as those settled before certification.)

### A.    The Fairness Factors

#### 1.    The Strength of Plaintiffs' Case and Risk, Expense, Complexity, and Likely Duration of Further Litigation

The Court first considers "the strength of [Plaintiffs'] case on the merits balanced against the amount offered in the settlement." *See Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (internal quotation marks and citation omitted). The Court need not reach an ultimate conclusion about the merits of the dispute to resolve this factor "for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). To that end, there is no "particular formula by which th[e] outcome must be tested." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). Rather, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Id*. (internal quotation marks and citation omitted). "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to a present value." *Id*.

Over the nearly seven years this case has been pending, there has been extensive discovery

United States District Court
Northern District of California

7

and motion practice, and Defendant's motion to decertify the class was pending when settlement was reached.  Though Plaintiff maintains the class was properly certified, a court recently decertified a similar USERRA paid-leave class based on arguments similar to those Defendant was raising.  (Dkt. No. 242 at 14.) Given the risks posed by continuing to litigate Plaintiff's claims, the certainty of class member recovery under the settlement weighs in favor of granting final approval.

### 2.     Settlement Amount

When considering the fairness and adequacy of the amount offered in settlement, "it is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *DIRECTV, Inc.*, 221 F.R.D. at 527. "[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Id*. (collecting cases).

The Court previously concluded the amount of the settlement, $18.5 million, was within the range of approval.  (Dkt. No. 230 at 8.)  This amount will be divided among class members based on wage rates and leave taken with an average net class member recovery of $3,384.20.  (Dkt. No. 242-1 at ¶ 10.)  The highest net payment is $52,243 with the lowest $30.  (*Id*.)  Class counsel represents this amount is 26 to 74.2 percent of the class's estimated damages.  (Dkt. No. 242 at 15.)  This estimate is based on Plaintiff's expert's calculation of a maximum class recovery of $70,909,611 through 2021, using jury leave as a comparator (before prejudgment interest).  (Dkt. No. 220, Scimone Decl. ¶ 28.) When bereavement leave was used as a comparator the recovery diminished to $64,549,612 in damages, and to $24,931,560 when sick leave was used as a comparator. (*Id*.)  The $18.5 million recovery therefore represents 74.2% of the lowest damages scenario and 26% of the highest. (*Id*.)

The settlement's injunctive relief also has substantial monetary value.  Class Counsel estimates the ten days per year of paid military leave, over the five-year period that Southwest has agreed to, has a total value of $37,291,388.72, based on historical patterns of military leave compiled by the experts in this case. (Dkt. No. 242-1 at ¶ 11 (citing Dkt. No. 201-9, Lee Report at 34).)  "On an annual basis, Class Counsel estimate that the average value of this benefit to Class

United States District Court
Northern District of California

United States District Court
Northern District of California

Members is $3,259.16 – over $16,000 per person if used over the entirety of the five-year period. (Dkt. No. 242-1 at ¶ 11.)

In sum, the settlement relief—damages and injunctive relief—weighs strongly in favor of final approval.

### 3.   Extent of Discovery Completed and Stage of Proceedings

In the context of class action settlements, as long as the parties have sufficient information to make an informed decision about settlement, "formal discovery is not a necessary ticket to the bargaining table." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). Rather, a court's focus is on whether "the parties carefully investigated the claims before reaching a resolution." *Ontiveros v. Zamora*, 303 F.R.D. 356, 371 (E.D. Cal. 2014). This case has a lengthy litigation history and several years of discovery culminating in 22 depositions, voluminous written discovery, and multiple expert reports.  (Dkt. No. 242-1 at ¶¶ 14-15.)  The parties reached the settlement with the assistance of a professional mediator with extensive experience with class actions and the airline industry.  (*Id.* at ¶ 16.)

The Court thus concludes this factor likewise weighs in favor of final approval.

### 4.   Experience and Views of Counsel

The experience and views of counsel also weigh in favor of settlement approval. Class Counsel has extensive USERRA litigation experience and strongly support settlement approval given the risks and challenges involved. (Dkt. No. 242-1 at ¶¶ 6-7.)

### 5.   Presence of a Government Participant

No government entity is a party to this action. However, the Settlement Administrator provided notice of the settlement to the relevant state and federal officials pursuant to the Class Action Fairness Act (CAFA), 28 U.S.C. § 1715(b) as required by the Settlement Agreement. (Dkt. No. 242-2, Settlement Agreement at ¶ XIII.1.) The Settlement Administrator provided this notice on December 22, 2025. (Dkt. No. 242-3 at 4.)

### 6.   Reaction of Class Members

As previously discussed, the notice is estimated to have reached the vast majority of class members and the reaction has been overwhelmingly positive. Only one objection was received and

only six class members have opted out. "[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *In re Omnivision Techs., Inc*., 559 F.Supp.2d 1036, 1043 (N.D. Cal. 2008) (citation omitted); *see also Churchill Vill*., 361 F.3d at 577 (holding approval of a settlement that received 45 objections (0.05%) and 500 opt-outs (0.56%) out of 90,000 class members was proper).

**7.      Objection**

Only one objection was received and it was from class member Seargent Joe Kyrouz. (Dkt. No. 243-1.)  The objection is not to the request for fees, expenses, or service awards; rather, Seargent Kyrouz objects to the way drill pay is calculated for his National Guard service as part of the prospective programmatic relief under the settlement.  Plaintiff concedes "on drill days, [Seargent Kyrouz] earns $147.39 more from the military than he does on annual training days, but (if he uses the paid military leave benefit) he gets the same pay from Southwest." (Dkt, No. 243 at 4.)  But, as Plaintiff points out, without the settlement he would not be entitled to any military leave pay at all.  Likewise, to the extent Seargent Kyrouz accurately objects his backpay award is less than he might have received had Plaintiff prevailed on all his claims at trial, as discussed above, there were significant risks to proceeding to trial, including decertification in which case Seargent Kyrouz would not have received anything.  A settlement is a compromise; that it does not provide full recovery on all claims does not make it unfair. *See In re Google Plus Profile Litig*., No. 18-CV-06164 EJD (VKD), 2021 WL 242887, at *5 (N.D. Cal. Jan. 25, 2021) ("That a settlement does not provide full compensation is not a basis for rejecting a settlement, considering the risks of proceeding to trial, recovering nothing, 'must be weighed against the uncertainty of recovering something.'").

Seargent Kyrouz's objection is overruled.

*** 

In sum, the fairness factors weigh in favor of granting Plaintiff's motion for class action settlement final approval.

United States District Court
Northern District of California

**B.     The *Bluetooth* Factors**

Finally, the Court must determine whether the settlement was the result of good faith, arms-length negotiations or fraud and collusion. *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). In determining whether the settlement is the result of collusion, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations." *Id*. The Ninth Circuit has identified three such signs:

1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;

2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and

3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id*. at 947 (internal quotation marks and citations omitted).

For the first *Bluetooth* factor, the Court compares the class payout to class counsel's fees claim. *See In re California Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 675 (9th Cir. 2025) ("class counsel receiving a disproportionately large fee award compared to what the class members received signals potential collusion.")  Counsel seeks 30 percent of the settlement value as attorneys' fees.  This percentage alone may be a sign of collusion. *See Bluetooth*, 654 F.3d at 947.  Plaintiff contends the amount is reasonable as it represents only a 1.15 multiplier over their lodestar.  The Court addresses this red flag as discussed below.

The second warning sign—a "clear sailing" provision—is not present here. *See Bluetooth*, 654 F.3d at 940, n.6 ("a 'clear sailing agreement,' wherein the defendant agrees not to oppose a petition for a fee award up to a specified maximum value."). While Defendant does not oppose the fees request (Dkt. No. 238), it did not agree not to oppose as part of the Settlement Agreement (Dkt. No. 242-2, Settlement Agreement at § IX).

The third warning sign—whether the parties have arranged for fees not awarded to the class to revert to the defendant rather than be added to the settlement fund, *see Bluetooth*, 654 F.3d

11

at 948—is also not present here. The Settlement Agreement is non-reversionary—all of the funds will be distributed to the class members or the cy pres. (Dkt. No. 242-2, Settlement Agreement at § VII.3.)

Despite the presence of one warning sign, the Court concludes the Settlement Agreement did not result from, nor was it influenced by, collusion.

* * *

In sum, the *Churchill* fairness factors support approval, and the *Bluetooth* factors do not indicate collusion. The Court is therefore satisfied the Settlement Agreement was not the result of collusion between the parties and instead is the product of arms-length negotiations between experienced and professional counsel. For each of these reasons, the Settlement Agreement passes muster under Rule 23(e) and final approval is appropriate.

## IV.   MOTION FOR ATTORNEYS' FEES, COSTS, AND CLASS REPRESENTATIVE SERVICE AWARD

### A.   Attorneys' Fees

Rule 23 permits a court to award "reasonable attorneys' fees ... that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "Attorneys' fees provisions included in proposed class action settlement agreements are, like every other aspect of such agreements, subject to the determination of whether the settlement is 'fundamentally fair, adequate, and reasonable.'" *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003) (quoting Fed. R. Civ. P. 23(e)). The Ninth Circuit has approved two methods of determining attorney's fees in cases where the amount of the attorney's fee award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The district court retains discretion in common fund cases to choose either method. *Id*. Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

### 1. Percentage-of-Recovery Method

"Under the percentage-of-recovery method, the attorney's fees equal some percentage of the common settlement fund." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015). In the Ninth Circuit, "courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure." *In re Bluetooth*, 654 F.3d at 942. "The benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors." *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

Plaintiff's request for 30 percent of the Settlement Fund is higher than the benchmark. But Plaintiff argues "in most common fund cases, the award exceeds that benchmark" citing two district court decisions decided before *Bluetooth*. (Dkt. No. 236 at 18 (citing *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008); *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1377-78 (N.D. Cal. 1989).) The Court disagrees. The Ninth Circuit recently emphasized "the typical" benchmark in common fund cases is 25 percent and reversed a district court's order awarding fees in excess of that amount. *In re California Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 679 (9th Cir. 2025). Although the overall result and benefit to the class here is notable given the novel legal issues involved and the decertification risks, Plaintiff has not shown it warrants an upward departure from the 25 percent benchmark. This is especially true when, as here, the amount is not supported by the lodestar cross-check as discussed below.

### 2. Lodestar Method

The lodestar method "requires multiplying a reasonable hourly rate by the number of hours reasonably expended on the case." *Shirrod v. Dir., Office of Workers' Comp. Programs*, 809 F.3d 1082, 1086 (9th Cir. 2015). "In determining reasonable hours, counsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended." *Chalmers City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986), amended on denial of reh'g, 808 F.2d 1373 (9th Cir. 1987). For the reasonable hourly rate, "the district court should be guided by the

rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Id*. at 1210-11 (citation omitted).

Class Counsel calculates their lodestar as $4,814,946.00 based on 5,255 hours of work. (Dkt. No. 236 at 15, 29.)  This amount is insufficiently substantiated for several reasons.

First, the lodestar amount is referenced once in the motion and once in Mr. Scimone's Declaration.  (Dkt. No. 236 at 15; Dkt. No. 236-1 at ¶ 32.)  But there is no chart reflecting this amount or the total hours sought for the six different firms seeking fees.  Nor is there a chart included with or attached to each of the seven attorney declarations submitted with the attorneys' fees motion.  And, only the Barton firm attaches contemporaneous billing records. (Dkt. No. 236-3 at 23-47.)  While the Court does not require contemporaneous billing records, the Court's preliminary approval order required counsel to provide "declarations and detailed billing summaries, so the Court may determine an appropriate lodestar figure, and to allow Settlement Class Members the opportunity to object to the requested fees."  (Dkt. No. 230 at 11.)  Class Counsel's submission does not comply with the Court's Order.  Instead, the seven attorney declarations (beyond those of appointed Settlement Class Counsel Scimone and Barton) provide brief narrative descriptions listing the hours, rate, and lodestar they are seeking.

Second, the calculations the Court made from these declarations does not match the total lodestar Plaintiff identified ($4,814,946.00 based on 5,255 hours of work) as reflected in the chart below:

| Firm | Hours | Lodestar | Source |
|---|---|---|---|
| Outten & Golden | 3,634.5 | $3,778,582.50 | (Dkt. No. 236-1 at ¶ 26) |
| The Barton Law Firm | 173.4 | $146,394 | (Dkt. No. 236-3 at ¶ ¶ 22-23) |
| Riverside Law Group | 175.5 | $111,835 | (Dkt. No. 236-4 at ¶ 10; Dkt. No. 236-5 at ¶ 8) |
| Law Offices of Thomas Jarrard | 1,024 | $657,650 | (Dkt. No. 236-6 at ¶ 39) |
| Peter Romer-Friedman Law | 27.7 | $31,855 | (Dkt. No. 236-8 at ¶ ¶ 24-25) |
| Gupta Wessler | 51.95 | $60,680 | (Dkt. No. 236-8 at ¶ 7) |
| **Total** | **5,087.05** | **$4,786,996.50** | |

While the difference is not significant given the totals at issue, it is concerning given the lack of transparency regarding how the lodestar was calculated. Class Counsel's current lodestar also represents a significant departure from the estimated lodestar at preliminary approval. At preliminary approval, Class Counsel stated their estimated lodestar was $3,577,431.00 from 3,903.27 billed hours. (Dkt. No. 220, Scimone Decl. at ¶ 37.) The current claimed lodestar represents **an increase of 1,351.73 hours and $1.2 million**.

Third, given the number of hours claimed here—5,255 by six different firms—billing summaries are particularly important to ensure the hours are not "excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983). While this case settled before trial and summary judgment, counsel contend they effectively spent 656 eight-hour days working on this case. That six different firms worked on this case and the lack of explanation in the attorneys' fees motion or supporting declarations as to how the case was staffed between them, raises overstaffing concerns. Equally confusing, three different firms have submitted time for Peter Romer-Friedman. (Dkt. No. 236-1 at ¶ 26 (Outten & Golden seeks $263,175); Dkt. No. 236-9 at ¶ 7 (Gupta Wessler seeks $55,430); Dkt. No. 236-8 at ¶¶ 24-25 (Peter Romer-Friedman Law seeks $31,855).) Presumably, they are seeking to recover based on work Mr. Romer-Friedman did at different times, but that is not explained in the motion or supporting declarations which just list the total number of hours, rate, and lodestar amount. The party seeking fees "bear[s] the burden of showing the time spent and that it was reasonably necessary to the successful prosecution of [the] claims." *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1557 (9th Cir. 1989) ("hours should be credited only if reasonable under the circumstances and supported by other evidence such as testimony or secondary documentation."). Counsel has not provided adequate support for the hours requested.

Finally, the hourly rates are insufficiently substantiated. *See Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) (holding the party seeking an award of attorneys' fees bears the burden of establishing the reasonableness of the hourly rates requested.) Mr. Romer-Friedman and Mr. Taylor, both of whom graduated in 2006, seek hourly rates of $1,500 and $1,400/hour respectively, relying on the *Laffey* Matrix. The *Laffey* Matrix is "an inflation-

United States District Court
Northern District of California

adjusted grid of hourly rates for lawyers of varying levels of experience in Washington, D.C." and does not provide "a sound basis for determining rates elsewhere, let alone in a legal market 3,000 miles away." *See Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 454 (9th Cir. 2010) (discussing *Laffey v. Northwest Airlines*, Inc., 572 F. Supp. 354, 371-75 (D. D.C. 1983)).  Further, Mr. Romer-Friedman's hourly rate represents a 50 percent markup to the rate sought by Mr. Barton who graduated six years earlier—in 2000. (*Compare* Dkt. No. 236-8, Romer-Friedman Decl. at ¶ 26 (seeking hourly rate of $1500) *with* Dkt. No. 236-3, Barton Decl. at ¶ 22 (seeking hourly rate of $995/hour); *see also* Dkt. No. 236-9, Taylor Decl. at ¶ 8 (seeking an hourly rate of $1400/hour for a 2006 graduate based on the *Laffey* Matrix.)

Accordingly, the lodestar cross-check does not support an award of 30 percent of the fund.

\*\*\*

In sum, the Court finds it would be inappropriate to deviate from the Ninth Circuit's 25 percent-of-the-fund benchmark here and awards attorneys' fees of $4,625,000.

### B.    Litigation Expenses

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros v. Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (internal quotation marks and citation omitted). Generally, reimbursement of taxable costs is governed by 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54. Attorneys may recover reasonable expenses that would typically be billed to paying clients in non-contingency matters. *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).

Plaintiff seeks $714,379.60 in litigation costs.  The bulk of the expenses ($603,034.87) are expert-related costs.  (Dkt. No. 236-1, Scimone Decl. at ¶¶ 22-24; Dkt. No. 236-7, Walker Decl. at ¶ 2.)  Plaintiff emphasizes this was an expert intensive case.  Plaintiff's experts David Breshears and Daniel Akins reviewed Department of Defense, Department of Homeland Security, and Southwest records to prepare data and damages analyses which were "essential to valuing and settling this case."  (Dkt. No. 236-1 at ¶ 22.)   Under these circumstances, counsel's expenses are reasonable and grants the request for $714,379.60 in litigation costs.

## C.      Settlement Administration Costs

ILYM, the Settlement Administrator, agreed their costs would not exceed $17,500. (Dkt. No. 230 at ¶ 35.)  ILYM's declaration in support of final approval states:

> ILYM Group's total fees and costs for services in connection with the administration of this Settlement, which includes fees and costs incurred to-date, as well as anticipated fees and costs for completion of the settlement administration, are $17,500.00.

(Dkt. No. 242-3, Snow Decl. at ¶ 20.)

## D.      Class Representative Service Awards

"Incentive awards are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) (distinguishing incentive awards from incentive agreements, the latter of which are "entered into as part of the initial retention of counsel" and "put class counsel and the contracting class representatives into a conflict position from day one"). However, the decision to approve such an award is a matter within the Court's discretion. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000). Incentive awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputation risk undertaken in bringing the action, and, sometimes to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59. Although incentive awards are viewed more favorably than incentive agreements, excessive awards "may put the class representative in a conflict with the class and present a considerable danger of individuals bringing cases as class actions principally to increase their own leverage to attain a remunerative settlement for themselves and then trading on that leverage in the course of negotiations." *Id.* at 960 (internal quotation marks and citation omitted). Thus, "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013).

In determining whether an incentive award is reasonable, courts generally consider:

> (1) the risk to the class representative in commencing a suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.

17

*Covillo v. Specialtys Café*, No. C–11–00594-DMR, 2014 WL 954516, at \*8 (N.D. Cal. Mar. 6, 2014) (quoting *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995)). A class representative must justify an incentive award through "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008). Further, district courts must evaluate each incentive award individually. *See Staton*, 327 F.3d at 977.

Plaintiff seeks $25,000 for Plaintiff Huntsman and $10,000 for Class Representative Cash. (Dkt. No. 236 at 32-37.) Plaintiff Huntsman submitted a declaration attesting he has spent approximately 397 hours fulfilling his role as Class Representative which has included

> participating in interviews with Class Counsel, identifying potential witnesses, explaining complex SWA policies and procedures to Class Counsel to help them ensure their damages calculations were as accurate as possible, reviewing court filings, providing feedback and insight on case timing and strategy via phone and in person, attending mediation sessions, along with a day-long pre-mediation strategy session, helping think through the changes to SWA's policies, reviewing the settlement agreement, speaking to my lawyers about the settlement, and answering questions about the settlement from other SWA pilots.

(Dkt. No. 236-10 at ¶ 10.) Plaintiff Huntsman's declaration estimates how much time he spent on each of these tasks. (*Id.*) He also estimates he lost wages because he was unable to pick up trips on multiple occasions as a result of his participation in this case resulting in $48,090.12 in lost wages. (*Id.* at ¶ 14.) He also attests to the negative effect his participation has had on his ability to obtain a management level position and the difficulty he would have securing employment with another airline. (*Id.* at ¶¶ 16-18.)

Class Representative Cash estimates he has spent 125 hours on this case performing similar tasks as Plaintiff Huntsman. (Dkt. No. 236-11 at ¶ 8.) He has likewise lost out on pick up trips for an estimated lost income of $14,400. (*Id.* at ¶¶ 9-10.) Finally, he shares Plaintiff Huntsman's concern that he will not be considered for management level positions as a result of his participation in this case. (*Id.* at ¶ 12.)

Given the substantial work they have invested in this case and their personal financial

United States District Court
Northern District of California

losses, the Court concludes a service award of $25,000 for Plaintiff Huntsman and $10,000 for Class Representative Cash is reasonable and does not "undermine the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013).

**CONCLUSION**

For the reasons stated above, the Court GRANTS Plaintiff's motion for final approval of the parties' class action settlement. In addition, the Court GRANTS IN PART Plaintiff's motion for attorney's fees and costs; specifically, the Court awards the following: $4,625,000 in attorneys' fees; $714,379.60 in litigation costs, $17,500 in settlement administration costs, and $25,000 as a service award for Plaintiff Huntsman and $10,000 for Class Representative Cash.

In accordance with the Northern District's Procedural Guidance for Class Action Settlements, "[w]ithin 21 days after the distribution of the settlement funds and payment of attorneys' fees," Class Counsel shall file "a Post-Distribution Accounting" that provides the following, to the extent applicable:

> The total settlement fund, the total number of class members, the total number of class members to whom notice was sent and not returned as undeliverable, the number and percentage of claim forms submitted, the number and percentage of opt-outs, the number and percentage of objections, the average and median recovery per claimant, the largest and smallest amounts paid to class members, the method(s) of notice and the method(s) of payment to class members, the number and value of checks not cashed, the amounts distributed to each cy pres recipient, the administrative costs, the attorneys' fees and costs, the attorneys' fees in terms of percentage of the settlement fund, and the multiplier, if any.

https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/. Class Counsel shall "summarize this information in an easy-to-read chart that allows for quick comparisons with other cases," and "post the Post-Distribution Accounting, including the easy-to-read chart, on the settlement website." *See id.*

As discussed at the hearing, should it become necessary to distribute any funds remaining after distribution to the class to a *cy pres*, the parties must seek Court approval of the *cy pres*.

The parties shall file a proposed judgment.

//

//

19

This Order disposes of Docket Nos. 236, 242.

**IT IS SO ORDERED.**

Dated: May 12, 2026

_Jacqueline Scott Corley_

JACQUELINE SCOTT CORLEY
United States District Judge